## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MINNESOTA

|  |  |
|---|---|
| JAMES CARSON & ERIC LUCERO,<br><br>     Plaintiffs,<br><br>          v.<br><br>STEVE SIMON, Secretary of State of the State of Minnesota, in his official capacity,<br><br>     Defendant. | Case No. 0:20-cv-02030-NEB-TNL |

## MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

This case challenges a patently unlawful consent decree that the Minnesota Secretary of State entered with private litigants that bound the Secretary to violate Minnesota and federal law. Pursuant to its constitutionally delegated authority, the Minnesota Legislature established a bright-line deadline of 8:00 p.m. on November 3, 2020, for mail-in ballots to *arrive* at polling places. It chose November 3 because Congress set the Tuesday after the first Monday in November as a uniform Election Day—the day the voting process must be *consummated*—over 150 years ago. By law, ballots that fail to meet these deadlines are not to be counted. But the Secretary has unilaterally moved that deadline *eight days*, with no colorable basis in legislative authority and in direct conflict with crystal-clear statutory mandates.

This is an *ultra vires* exercise of power that conflicts with the United States Constitution in two independent respects. First, Article II mandates that the rules governing presidential elections be set by Congress or the "Legislature" of each state, and the Secretary is neither. He therefore has no independent power to set any regulations governing presidential elections, let alone regulations that directly conflict with acts of

Congress and the State Legislature. Second, Congress established by statute November 3 as Election Day, and the Secretary has agreed to count ballots received and even potentially *mailed* after Election Day. By refusing to treat November 3 as the consummation of the voting—but merely its *beginning*—the Secretary has violated federal law, and his agreement must yield.

The Secretary's decision to count unlawfully cast ballots promises to inflict severe vote dilution on Plaintiffs and all other Minnesota voters and to injure Plaintiffs directly, as Presidential Elector candidates. Worse, the choice to depart from the laws of the Minnesota Legislature threatens to cast the legitimacy of the entire statewide vote in doubt and creates a significant risk that Congress will not recognize the certified election results. These are irreparable harms, and the public interest plainly favors an injunction that would prevent them. The Court should act promptly to do just that.

## Background

## I.   Congress and the Minnesota Legislature Exercise Their Constitutional Authority To Establish a Single Election Day, Which Is November 3 This Year

Article II of the Constitution establishes state and federal roles in enacting the laws governing presidential elections. Article II, § 1, cl. 2 identifies states' role as: "appoint[ing] in such Manner as the *Legislature* thereof may direct, a Number of Electors, equal to the whole Number of Senators and Representatives to which the State may be entitled in the Congress." U.S. Const. Art. II, § 1, cl. 2 (emphasis added). The term "Legislature" in this provision means what it says. The legislature of each state, not its executive actors or courts, has authority to define the "Manner" of choosing electors. *See, e.g.*, *McPherson v. Blacker*, 146 U.S. 1, 25 (1892). In Minnesota, the "Legislature" within the meaning of Article II is the Minnesota Legislature.

The role of Congress is governed by Article II, § 1, cl. 4, which provides that "Congress may determine the Time of chusing the Electors, and the Day on which they shall give their Votes; which Day shall be the same throughout the United States." Congress has acted under this authority to set the time of choosing electors, and various statutes, taken together, "mandate[] holding all congressional and Presidential elections on a single November day." *Foster v. Love*, 522 U.S. 67, 67 (1997). This "immediate act of the people of America" protects the selection of the President from "cabal, intrigue, and corruption." The Federalist No. 68 at 459 (Hamilton) (Cooke ed., 1961).

Both Congress and the Minnesota Legislature have exercised their respective authorities to regulate presidential elections.

**A.     Congress Exercised Its Power**

Congress has exercised its authority by setting a single Election Day. Congress provided that "[t]he electors of President and Vice President shall be appointed, in each State, on the Tuesday next after the first Monday in November, in every fourth year succeeding every election of a President and Vice President." 3 U.S.C. § 1. This year, that date is Tuesday, November 3, 2020.

This statute necessarily forbids states from holding votes for the presidency *after* November 3. Another statute provides: "Whenever any State has held an election for the purpose of choosing electors, and has failed to make a choice on the day prescribed by law, the electors may be appointed on a subsequent day in such a manner as the legislature of such State may direct." 3 U.S.C. § 2. This statute only applies if a state has held an election and failed "to make a choice on the day prescribed by law…." It

does not authorize states to allow voting in that election on days after the Tuesday after the first Monday in November.

Congress also set the time for electors appointed in each state to meet and vote: "The electors of President and Vice President of each State shall meet and give their votes on the first Monday after the second Wednesday in December next following their appointment at such place in each State as the legislature of such State shall direct." 3 U.S.C. § 7. This year, that date is December 14, 2020. A state that fails to comply with these acts of Congress forfeits its votes in the Electoral College.

In addition, Congress provided a statutory safe harbor to allow states to provide a binding determination of its electors' vote. 3 U.S.C. § 5. To qualify for the safe harbor, a state must have "provided, by laws enacted prior to the day fixed for the appointment of electors," a means of determining "any controversy or contest concerning the appointment of" electors, and must have completed the process "at least six days before the time fixed for the meeting of the electors." 3 U.S.C. § 5. This year, the safe-harbor deadline is December 8, 2020.

## B.     The Minnesota Legislature Exercised Its Power

The Minnesota Legislature has exercised its constitutional duty to establish rules governing the manner of presidential elections. Minnesota assigns all of its electors to the presidential candidate who receives the "highest number of votes" in the statewide vote. Minn. Stat. § 208.05. Minnesota statutes follow federal law and set the state general election as the first Tuesday after the first Monday of November. Minn. Stat. § 204D.03 Subd. 2. Voters may vote in person, *id.* § 204B.16, and if they do so, they must be in line at the polling place before 8:00 p.m. on voting day, when the polls close. *Id.* § 204C.05. In-person voting is not permitted after Election Day.

Minnesota law also authorizes in-person absentee voting "during the 46 days before the election," *id.* § 203B.081, and absentee voting by mail, *id.* §§ 203B.04, 203B.08. No different from voters who elect to vote in person, those who elect to vote by mail must vote on or before Election Day, not after Election Day. The law requires any ballot received on Election Day "either (1) after 3:00 p.m., if delivered in person; or (2) after 8:00 p.m., if delivered by mail or package delivery service, [to]be marked as received late by the county auditor or municipal clerk" and requires that any such late ballot "must not be delivered to the ballot board." *Id.* § 203B.08 subd. 3, *see also* §§ 204B.45–46. Ballots that are not delivered to the ballot board are not counted. In this way, the law enacted by the Minnesota Legislature does not permit the counting of votes contained in absentee ballots received after the 8:00 p.m. deadline.

Minnesota law provides that the Secretary is the State's chief elections administrator and administers Minnesota's election laws.[1] Reinforcing the Election Day receipt deadline, the Secretary has promulgated rules establishing election procedures consistent with Minnesota and federal statutes. These regulations direct municipal clerks to "communicate with the United States postal service facility serving the municipality with regard to the handling of absentee ballot return envelopes" and to "take all reasonable steps to ensure that all return envelopes received by the post office before 4 p.m. on election day are delivered before the closing of the polls to the ballot board." Minn. R. 8210.2500. The regulations are clear: ballots "received after election day shall be marked as received late…and must not be delivered to the ballot board." *Id.*

---

[1] Among other duties, he "adopt[s] rules establishing the form, content, and type size and style for the printing of blank applications for absentee ballots . . . certificates of eligibility to vote by absentee ballot . . . and directions for casting an absentee ballot." Minn. Stat. § 203B.09. The Secretary is also responsible for "adopt[ing] rules establishing procedures to be followed by county auditors and municipal clerks to assure accurate and timely return of absentee ballots." *Id.* § 203B.08 subd. 4.

Additionally, any absentee ballot return envelopes "delivered in person by an absent voter or an agent must be received by the county auditor or municipal clerk by 3:00 p.m. on election day," *id.* at 8210.2200. These regulations demonstrate that the Secretary understands Minnesota statutes to establish a non-negotiable deadline of receipt of ballots by 8:00 p.m. on Election Day.

## II.     The Secretary Agrees With Private Litigants To Change the Election Day

In May 2020, a group of registered Minnesota voters and the Minnesota Alliance for Retired Americans Educational Fund ("the State Plaintiffs") filed a complaint against the Secretary in Minnesota state court, challenging *inter alia* the Election Day receipt requirements applicable to mail-in absentee votes.[2] Foix Decl. Ex. A.

Rather than contest the complaint and defend the Legislature's enactments, the Secretary struck a deal with the State Plaintiffs to give them what they were seeking. Their consent decree provides that, "[f]or the November General Election [Secretary Simon] shall not enforce the Election Day Receipt Deadline for mail-in ballots, as set out in Minn. Stat. §§ 203B.08 subd. 3, 204B.45, and 204B.46 and Minn. R. 8210.2220 subp. 1, and 8210.3000, that ballots shall be received by 8:00 p.m. on Election Day..." Foix Decl. Ex. B.[3] The Secretary agreed to "issue guidance instructing all relevant local election officials to count all mail-in ballots in the November General Election that are otherwise validly cast and postmarked on or before Election Day but received by 8 p.m. within 5 business days of Election Day (i.e., seven calendar days, or one week." *Id.* at VI.D. Additionally, the agreement provides that, when "a ballot does not bear a postmark date, the election official reviewing the ballot should presume that it

---

[2] The Secretary is the State's chief elections administrator and administers Minnesota's election laws.
[3] The Consent Decree was affirmed by the Court's August 3, 2020 order. Foix Decl. Ex. C.

was mailed on or before Election Day unless the preponderance of the evidence demonstrates it was mailed after Election Day." *Id.* By entering into agreement, the Secretary has chosen to abandon the enforcement of statutes enacted by the Minnesota Legislature.

### III.   The Secretary's Agreement Threatens the Integrity of Minnesota's Presidential Election and the Disenfranchisement of the Entire State's Electorate and Imposes Irreparable Harm on Plaintiffs

Plaintiff James Carson is a registered Minnesota voter and a nominee of the Republican Party to participate in the Electoral College as a presidential elector. Declaration ¶¶ 1, 9; *see also* Minn. Stat. § 208.03. Plaintiff Eric Lucero is a registered Minnesota voter, serves in the Minnesota House of Representatives as the representative of District 30B and has also been certified as a nominee of the Republican Party to participate in the Electoral College as a presidential election. Declaration ¶¶ 3, 10.

The Secretary's agreement to alter acts of the Minnesota Legislature and Congress work a direct and substantial harm on various interests of both Plaintiffs. First, the Secretary's agreement will necessarily result in the counting of many ballots—perhaps hundreds of thousands—that by law may not be counted in the presidential election. The result of this change in law is dilute the value of Plaintiffs' votes and permit the counting of ballots for Plaintiffs' opponents for the elector offices they seek. Carson Declaration ¶¶ 7, 10–15, Lucero Declaration ¶¶ 7, 10–11, 13.

Second, the Secretary's agreement to violate federal and state law creates substantial uncertainty where those laws create clarity. Statutory law, which is superior to the Secretary's executive authority, establishes a deadline, but Plaintiffs are unable to discern whether that law governs or the Secretary's alterations govern. This uncertainty frustrates Plaintiffs' ability to determine whether to vote in person (and thereby

risk exposure to the Coronavirus) or cast absentee ballots (and thereby risk that their votes will not be counted) and how to advise those who intend to vote for them.

Third, the Secretary's agreement to violate federal and state law threatens to disenfranchise all Minnesota voters. A procedure for resolving election contests (which the vote-counting process qualifies as) will not satisfy Congress's safe harbor of 3 U.S.C. § 5 unless it is resolved "by laws enacted prior to the day fixed for the appointment of electors." The consent decree is not an enacted law but an executive policy in flat contradiction to State law. Adherence to this policy over and against Minnesota's "enacted" laws creates a clear and present danger that Minnesota's election results will not be accepted under the safe harbor law and therefore will not be accepted by the United States Congress in determining the winner of the presidential election. As the Secretary intends to conduct the election, Congress will have no obligation to respect the popular vote of Minnesota's electorate. This threatens Plaintiffs' opportunity to cast meaningful votes and to take office as Electors and participate in the Electoral College.

Fourth, the Secretary's election deadlines risk placing the resolution of the contest past dates Congress has set for both the safe harbor and the actual vote of the Electoral College. Under those deadlines, it will remain unknown who wins the state's vote for at least eight days after Election Day, and any contest about the ultimate result is unlikely to reach a conclusion before the safe-harbor deadline or even before the vote of the Electoral College. There is a substantial risk that Plaintiffs' votes will be completely meaningless, if either Minnesota loses its representation in the Electoral College or its asserted results do not qualify for the safe harbor. This is yet another way in

which the Secretary's actions threaten Plaintiffs' right to cast meaningful votes and opportunity to participate in the Electoral College.

<b>Legal Standard</b>

"When deciding whether to grant" a preliminary injunction, district courts must consider whether (1) the plaintiffs are "likely to succeed on the merits," (2) they are "likely to suffer irreparable harm in the absence of preliminary relief," (3) "the balance of equities tip[ped] in [their] favor," and (4) "an injunction [is] in the public interest." *See Jones v. Jegley*, 947 F.3d 1100, 1104–05 (8th Cir. 2020) (quoting *Winter v. Nat'l Res. Def. Council, Inc.*, 555 U.S. 7, 32 (2008)).

<b>Argument</b>

## I. Plaintiffs Are Likely To Succeed on the Merits of Their Claim that the Consent Decree Violates Federal Law and the Constitution

The Secretary's agreement to violate state and federal law by counting ballots received and even mailed after Election Day is plainly unlawful and is virtually certain to be held as much after final judgment. First, the Secretary lacks the constitutional authority to depart from the laws established by Congress and the Minnesota Legislature and to set a completely new set of time-and-manner election regulations that flatly *contradict* those laws. Second, the Secretary's choice to count ballots cast after election day plainly contradicts federal law and is preempted. Each of these violations of the Constitution is itself a sufficient basis for an injunction and establishes that the first element is met.

### A. The Secretary's Agreement Is *Ultra Vires* in Violation of Article II of the Constitution

The Secretary's agreement violates Article II of the Constitution by arrogating to himself, an executive actor, the authority to regulate presidential elections, which Article II vests solely with legislative actors: Congress and the "Legislature" of each

9

state. The Secretary has no authority to set time or manner regulations governing presidential elections by overriding the law enacted by the Minnesota Legislature and yet has purported to do so by an agreement with private parties. That is unconstitutional.

The Article II delegation of authority over presidential elections confers on Congress and state legislatures a share of *federal constitutional* lawmaking authority. As the Supreme Court unanimously held in *Bush v. Palm Beach County Canvassing Bd.*, 531 U.S. 70 (2000), "in the case of a law enacted by a state legislature applicable not only to elections to state offices, but also to the selection of Presidential electors, the legislature is not acting solely under the authority given it by the people of the State, but by virtue of a direct grant of authority made under Art. II, § 1, cl. 2, of the United States Constitution." *Id.* at 473–74. This provision "convey[s] the broadest power of determination" and "leaves it to the legislature *exclusively* to define the method" of appointment of electors. *McPherson v. Blacker*, 146 U.S. 1, 27 (1892) (emphasis added). Indeed, because "[t]his power is conferred upon the legislatures of the States by the Constitution of the United States," it "cannot be taken from them or modified" even by "their State constitutions." *Id.* at 35; *see also Bush v. Gore*, 531 U.S. 98, 112–13 (2000) (Rehnquist, J., concurring).

It necessarily follows that only the Minnesota Legislature, not the Secretary, may establish regulations governing the upcoming presidential election. The word "legislature" was "not one 'of uncertain meaning when incorporated into the Constitution.'" *Smiley v. Holm*, 285 U.S. 355, 365 (1932) (quoting *Hawke v. Smith*, 253 U.S. 221, 227 (1920)). The term "legislature" necessarily differentiates between that body and the "State" of which it is only a subpart. By empowering one body of the state to

10

prescribe election rules, the Constitution impliedly denies it to other state bodies and officials, including the Secretary.

Further, the Article II delegation of authority is the states' sole basis for regulating presidential elections. This power is neither inherent no persevered under the Tenth Amendment. *Cook v. Gralike*, 531 U.S. 510, 522 (2001); *U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779, 805 (1995). Because there is no basis for Minnesota to regulate elections to the presidency outside of the delegation of Article II, any regulation not promulgated by the Minnesota Legislature is beyond the very authority of Minnesota, as a sovereign, to regulate in this arena.

There is then no authority for the Secretary to establish *any* rules governing the time of presidential elections, let alone rules that *directly contradict* statutes enacted by "the Legislature" of Minnesota. U.S. Const. Art. II, § 1, cl. 1. Neither the Minnesota Legislature nor Congress passed laws providing that voters may vote up to *eight days* after Election Day, and the bright-line deadline of 8:00 p.m. on that date for ballots to *arrive* reflects a clear and unmistakable legislative *rejection* of the Secretary's position. The Secretary has agreed to a panoply of new election rules with no basis whatsoever in the Constitution or Minnesota statutory law, and the agreement unlawfully promulgates rules in direct contravention of Minnesota statutory law. In short, the Constitution delegates no authority to the Secretary, and the Secretary's act violates the law established by the body that *does* received delegated authority.

Article II affords this violation of *Minnesota* law a *federal* constitutional significance. It is Article II itself that delegates the power to regulate elections, so "the text of the election law itself…takes on independent significance." *Bush*, 531 U.S. at 112–13 (Rehnquist, J., concurring). "A significant departure from the legislative scheme for

appointing Presidential electors presents a federal constitutional question." *Id.* at 113. The question whether rules promulgated by the Secretary constitute as manner restrictions "direct[ed]" by the Minnesota "Legislature," U.S. Const. Art. II, § 1, cl. 2, is a federal constitutional question for this Court to resolve. And the plain answer is no.

### B.    The Secretary's Agreement Contravenes Acts of Congress

The Secretary's agreement violates federal law yet again insofar as it directly conflicts with Acts of Congress setting the Election Day. The new deadlines and ballot-counting procedures the Secretary has set would therefore be unlawful even if the Minnesota Legislature had adopted them.

Courts have uniformly interpreted Article II to confer on Congress a unique authority over presidential elections, which supersedes state authority in the event of a conflict. *See Oregon v. Mitchell*, 400 U.S. 112, 124, (1970) ("It is the prerogative of Congress to oversee the conduct of presidential and vice-presidential elections and to set the qualifications for voters for electors for those offices."); *cf. Anderson v. Celebrezze*, 460 U.S. 780, 784–85 (1983). Here, Congress has acted definitively by statute to establish the Tuesday after the first Monday in November as the *sole* day for choosing electors for the presidency. 3 U.S.C. § 1. This choice of the Tuesday after the first Monday in November goes back at least to January 1845, which Congress passed the "Presidential Election Day Act." 28 Cong. Ch. 1, 5 Stat. 721.

As *Foster v. Love*, 522 U.S. 67 (1997) recognized, this provision and others "mandate[] holding all elections for Congress and the presidency on a single day throughout the Union." *Id.* at 69–70. *Foster* rejected a state's efforts to conduct an election on a day other than election day as preempted by act of Congress. *Id.* at 74. Indeed, a single Election Day was what the framers of the Constitution envisioned. Alexander Hamilton opined that "uniformity in the time of elections…may be found by experience to

be of great importance to the public welfare," The Federalist No. 61 at 413 (Hamilton) (Cooke ed. 1961) and that "the immediate act of the people of America" in selecting electors would frustrate "cabal, intrigue, and corruption." The Federalist No. 68 at 459 (Hamilton) (Cooke ed., 1961). Indeed, during the reconstruction era, "Congress expressly considered [and rejected] an amendment to continue to allow states in which by law polls are held open more than one day to continue the practice." *Voting Integrity Project, Inc. v. Keisling*, 259 F.3d 1169, 1173 (9th Cir. 2001) (internal quotation marks omitted). Congress rejected this proposal for a simple and plain reason: "It gives some statutes undue advantage. It gives some parties undue advantage." Cong. Globe, 42d Cong., 2d Sess. 141 (1871).[4]

For these reasons, the case law is unanimous that Election Day must be the "consummation" of the process of voting. *Voting Integrity Project*, 259 F.3d at 1175 (applying *Foster*, 522 U.S. at 67). There is "no dispute that the combined actions must occur, that voting must end, on federal election day." *Lamone v. Capozzi*, 912 A.2d 674, 692 (Md. 2006). Any "regime of combined action meant to make a final selection on any day other than federal election day" violates federal law. *Millsaps v. Thompson*, 259 F.3d 535, 547 (6th Cir. 2001). Of unique relevance on this point is *Maddox v. Bd. of State Canvassers*, 149 P.2d 112 (Mont. 1944), which rejected a Montana statute, enacted during World War II, that authorized overseas ballots that arrived in December to be counted in the presidential election. *Id.* at 114. Notwithstanding the legislature's good intentions to assist absent servicemembers in voting, the court found the act unconstitutional, holding that "the legislature may not constitutionally extend beyond

---

[4] For all of these reasons, the notion the Election Day is unconstitutional is patently incorrect.

'the Tuesday next after the first Monday in November' the time when the presidential electors shall be appointed or elected by the ballots of the voters." *Id.* at 114.

This case is no different. The Secretary's new state-law regime treats Election Day as the beginning, not the consummation, of voting. Under the Secretary's agreement, votes will be counted if they arrive up to eight days after Election Day. And, so long as they do not bear a postmark, they will be counted even if they are *mailed after Election Day*. This means that voters who decide to vote on November 4, or even later, may still vote in Minnesota, and the Secretary has required that these votes be counted. That contravenes the law of Congress and is preempted.

## II.    Plaintiffs—and the Entire State of Minnesota—Will Suffer Irreparable Harm in the Absence of an Injunction

The Secretary's agreement to violate state and federal law will inflict irreparable harm on Plaintiffs, unless this Court intervenes. The Secretary's newfangled policy of counting invalid votes is certain to dilute the value of Plaintiffs' votes. The "principal issue[]" here is "whether the votes that have been ordered to be counted are, under a reasonable interpretation of [Minnesota] law, legally cast votes," and the "counting of votes that are of questionable legality…threaten[s] irreparable harm." *Bush v. Gore*, 531 U.S. 1046, 1047 (2000) (Scalia, J., concurring in order issuing stay pending appeal).

By increasing the pool of counted votes to include those illegally cast after Election Day, the Secretary will dilute the votes of all voters who dutifully comply with Minnesota statutory law and submit their ballots by Election Day. This is a paradigmatic irreparable harm supporting provisional injunctive relief. *Montano v. Suffolk Cty. Legislature*, 268 F. Supp. 2d 243, 260 (E.D.N.Y. 2003) ("An abridgement or dilution of the right to vote constitutes irreparable harm."); *Patino v. City of Pasadena*, 229 F. Supp. 3d 582, 590 (S.D. Tex. 2017) ("The irreparable harm to the plaintiffs'

14

fundamental right to vote weighs heavily against a stay."); *Day v. Robinwood W. Cmty. Improvement Dist.*, 2009 WL 1161655, at *3 (E.D. Mo. Apr. 29, 2009) ("These Plaintiffs are threatened with an irreparable harm because, absent a preliminary injunction, their votes will be diluted in the upcoming June 9, 2009 election."); *Democratic Nat'l Comm. v. Republican Nat'l Comm.*, 2016 WL 6584915, at *17 (D.N.J. Nov. 5, 2016) (collecting cases).

And the Secretary's agreement imposes special injury on Plaintiffs, who are not only voters, but also candidates for office. Because "the rights of voters and the rights of candidates do not lend themselves to neat separation," *Burdick v. Takushi*, 504 U.S. 428, 438 (1992) (quotation marks omitted), "laws that affect candidates always have at least some theoretical, correlative effect on voters" and vice versa. *Bullock v. Carter*, 405 U.S. 134, 143 (1972); *cf. Mancuso v. Taft*, 476 F.2d 187, 190 (1st Cir. 1973) (permitting "both candidates and voters" to challenge an election law "because of its impact on voting rights," and because a "candidate for public office…is so closely related to and dependent upon those who wish to vote for him and his litigation will so vitally affect their rights…."). The Secretary's agreement to violate state and federal law will dilute all validly cast votes, including all votes validly cast for Plaintiffs as electors. That irreparable injury runs directly to Plaintiffs in their capacity as candidates to represent Minnesota as electors.

In addition, the legal infirmity of the Secretary's agreement and concomitant set of policies has created a significant uncertainty about the rules governing the November election and whether *any Minnesota citizens* will have their votes counted. A procedure for resolving election contests (which the vote-counting process qualifies as) will not satisfy Congress's safe harbor of 3 U.S.C. § 5 unless it is resolved "by laws enacted

prior to the day fixed for the appointment of electors." *See Bush v. Gore*, 531 U.S. 98, 111 (2000). The consent decree is not an enacted law but an executive policy in flat contradiction to enacted law. As a result, the implementation of these policies over and against Minnesota's "enacted" laws creates a clear and present danger that Minnesota's election results will not be accepted under the safe harbor law and therefore will not be accepted by the United States Congress in determining the winner of the presidential election. As the Secretary intends to conduct the election, Congress will have no obligation to respect the popular vote of Minnesota's electorate, and Minnesota's popular vote may prove completely worthless.

If it is irreparable harm to dilute even one vote (it is), it is clearly irreparable harm to deny any value to any vote cast by anyone in the entire state of Minnesota. That harm would yet again directly impact Plaintiffs in their capacities as candidates to represent Minnesota as electors. The Secretary's unlawful policy will confer on Congress the unfettered right to reject the results of the statewide vote and thereby deny Plaintiffs the opportunity to serve as electors and participate in the Electoral College.

A further harm results from the Secretary's election deadlines risk placing the resolution of the contest past dates Congress has set for both the safe harbor and the actual vote of the Electoral College. It will remain unknown who wins the state's vote for at least eight days after Election Day, and any contest about the ultimate result is unlikely to reach a conclusion before the safe-harbor deadline or even before the vote of the Electoral College. There is a substantial risk that Plaintiffs' votes will be completely meaningless, if either Minnesota loses its representation in the Electoral College or its asserted results do not qualify for the safe harbor.

### III.   The Balance of Equities and the Public Interest Favor an Injunction

There is no contest on the other equitable factors. "[I]t is always in the public interest to protect constitutional rights" and "[t]he balance of equities generally favors…constitutionally-protected freedom[s]." *Rodgers v. Bryant*, 942 F.3d 451, 458 (8th Cir. 2019) (cleaned up). *Cf. Willson v. City of Bel-Nor, Mo.*, 924 F.3d 995, 999 (8th Cir. 2019).

The balance of equities is one-sided. On the one hand, the Secretary's policy is sure to inflict substantial vote dilution of millions of Minnesota voters (including Plaintiffs) and places the entire statewide vote at risk. That is an injury of the highest and most severe constitutional magnitude, for reasons stated above.

On the other hand, the Secretary has no interest at all in setting rules that the Constitution does not allow him to set. And the Secretary's interest in settling a meritless lawsuit—contending nonsensically that Election Day is unconstitutional—carries zero weight. *Cf. Shaw v. Hunt*, 517 U.S. 899, 908 n.4 (1996) (holding that a state has "no…interest in avoiding meritless lawsuits"). Further, even if the Secretary is (somehow) vindicated by the final resolution of this case, the harm of an erroneous ruling at this stage would be non-existent: the Secretary would simply be compelled to conduct this election the way every Minnesota Secretary of State has conducted elections for generations. An order compelling the Secretary to do what Minnesota law tells the Secretary to do does not inflict any meaningful injury on the Secretary *in his official capacity* (i.e., as an officer of the state charged with carrying out the law enacted by the Legislature)—and certainly not one sufficiently severe as to outweigh the voting rights of every last Minnesota citizen. And the State's interest is for the valid laws enacted by its Legislature to be enforced. *See, e.g.*, *Reprod. Health Servs. of Planned Parenthood of St. Louis Region, Inc. v. Nixon*, 428 F.3d 1139, 1144 (8th Cir. 2005) (recognizing a "State's interest in enforcing its laws").

17

The public interest emphatically supports a preliminary injunction. Again, "it is always in the public interest to protect constitutional rights," *Phelps-Roper v. Nixon*, 545 F.3d 685, 690 (8th Cir. 2008),[5] and the right to vote of each Minnesota citizen hangs in the balance and is directly threatened by the Secretary's unlawful agreement. The policies Congress implemented in setting an Election Day well over 100 years ago, and the policies of the Minnesota Legislature in honor that date with a clear received-by deadline, vindicate the public's interest in the integrity of presidential elections and in a clear set of rules—that have proven fair over generations of practice—for voters to follow in casting their votes. Indeed, the Secretary's unlawful agreement is of momentous concern to the entire State and the country, "by casting a cloud upon...the legitimacy of the election." *Bush*, 531 U.S. at 1047 (Scalia, J., concurring in order granting a stay pending appeal). No Minnesota citizen benefits from that cloud, and every Minnesota voter would benefit from an injunction.

## CONCLUSION

The Court should grant the motion and enjoin the Secretary's unlawful agreement to count ballots received after 8:00 p.m. on Election Day.

---

[5] Overruled on other grounds by *Phelps-Roper v. City of Manchester, Mo.*, 697 F.3d 678 (8th Cir. 2012).

Date: September 24, 2020                    Respectfully submitted,


                                           /s/ Danyll W. Foix
NATHAN M. HANSEN                           DANYLL W. FOIX
(MN Bar 0328017)                           (MN Bar 0285390)
2440 Charles Street North                  DAVID B. RIVKIN*
Suite 242                                  ANDREW M. GROSSMAN*
North St. Paul, MN 55109                   RICHARD B. RAILE*
Phone: (651) 704-9600                      BAKER & HOSTETLER LLP
Fax: (651) 704-9604                        1050 Connecticut Ave., N.W.
                                           Suite 1100
                                           Washington, DC 20036
                                           Phone: (202) 861-1596
                                           Fax: (202) 861-1783
                                           dfoix@bakerlaw.com
                                           *Attorneys for Plaintiffs*


* *pro hac vice* motions pending