## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MINNESOTA

JAMES CARSON & ERIC LUCERO,

     Plaintiffs,

             v.

STEVE SIMON, Secretary of State of
the State of Minnesota, in his official
capacity,

     Defendant.

Case No. 0:20-cv-02030-NEB-TNL

## DECLARATION OF DANYLL W. FOIX IN SUPPORT OF PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

DANYLL W. FOIX, under penalty of perjury, declares:

1.     I am a partner at Baker & Hostetler LLP, counsel to James Carson and Eric Lucero in this case.

2.     I submit this Declaration in support of Plaintiffs' Motion for a Preliminary Injunction.

3.     Attached hereto as **EXHIBIT A** is a true and correct copy of a complaint in *LaRose v. Simon*, No. 62-CV-20-3149, Minnesota Second Judicial Circuit, County of Ramsey, dated May 13, 2020, which I obtained from the Court House News.

4.     Attached hereto as **EXHIBIT B** is a true and correct copy of the Consent Decree in *LaRose v. Simon*, No. 62-CV-20-3149, Minnesota Second Judicial Circuit, County of Ramsey, dated July 17, 2020, which I obtained from the Supreme Court of Minnesota website.

5.     Attached hereto as **<u>EXHIBIT C</u>** is a true and correct copy of the court's order in *LaRose v. Simon*, No. 62-CV-20-3149, Minnesota Second Judicial Circuit, County of Ramsey, dated August 3, 2020, which I obtained from the Supreme Court of Minnesota website.

Date: September 24, 2020                    BAKER & HOSTETLER LLP

<div style="margin-left:40%">

By: <u>/s/ Danyll W. Foix</u>
DANYLL W. FOIX
(MN Bar 0285390)
*Attorney for Plaintiffs*

</div>

# Exhibit A

STATE OF MINNESOTA

COUNTY OF RAMSEY

DISTRICT COURT

SECOND JUDICIAL DISTRICT
Case Type: Civil Other/Misc.

|  |  |
|---|---|
| Robert LaRose, Teresa Maples, Mary Samson, Gary Severson, and Minnesota Alliance for Retired Americans Educational Fund, | Case No. |
| Plaintiffs, | |
| v. | **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |
| Steve Simon, in his official capacity as Minnesota Secretary of State, | |
| Defendant. | |

## INTRODUCTION

Plaintiffs Robert LaRose, Teresa Maples, Mary Samson, Gary Severson, and Minnesota Alliance for Retired Americans Educational Fund file this Complaint for Declaratory and Injunctive Relief against Defendant Steve Simon, in his official capacity as the Minnesota Secretary of State, and hereby state and allege as follows:

1.      A novel coronavirus is sweeping through the country, with known infections well over one million and fatalities already exceeding the number of Americans killed in the Vietnam War. No states are being spared. In Minnesota as of the date of this filing, there are at least 12,917 confirmed cases and 638 people have died—numbers which surely represent an undercount given the limited testing that has taken place (approximately 122,035 tests performed to date for a population of approximately 5.6 million). There is no clear end in sight. Projections by the federal government indicate the virus will persist at

least into the fall, if not longer. And while the country still has not reached its "peak" of infections, public health officials are already warning about a likely "second wave" of the virus in the fall, which because of its interaction with flu season, could be even worse than the first.

2.      The pandemic's impact is not limited to Minnesotans' health; it also endangers their right to vote as guaranteed by the Minnesota and U.S. Constitutions. Defendant Minnesota Secretary of State Steve Simon (the "Secretary") recognizes the serious threat that this unprecedented public health crisis poses to the State's coming elections. He has described the April 7th spring election in Wisconsin—which saw an historic increase in mail voting alongside a substantial decrease in the availability of in-person voting that nearly crippled the local election apparatus—as "an urgent warning for Minnesota." As a result, the Secretary backed a bill that would permit a shift to all vote-by-mail elections during public health crises like the current pandemic, explaining that without such changes Minnesota is "in for a real disaster of an election season."

3.      The Secretary is right to be concerned. The chair of the Minnesota Association of County Officers recently reported to the Legislature that, as it was in Wisconsin, in-person voting in Minnesota will be severely compromised in the coming August 11th primary ("August Primary") and the November 3rd general election ("November Election") (collectively, the "upcoming elections") due to limited availability of statewide polling places, concerns about COVID-19 exposure expressed by "a significant number of election judges"—many of whom fall into high-risk categories—and challenges with maintaining social distancing at available polling locations.

4.      Although many states have long had a substantial number of their voters cast their ballots by mail, Minnesota is traditionally an in-person voting state, with over 2.3 million of the 2.6 million voters who participated in the 2018 general election voting in person either early or on Election Day, and 2.6 million out of the 2.9 million voters who voted in the 2016 general election doing the same. Thus, as voters transition to absentee voting by mail to protect their safety and the health and safety of their community, the majority will be navigating a system of voting that is new to them. As a result, they are at significantly higher risk of being disenfranchised by unduly burdensome laws regulating the absentee voting process.

5.      The anticipated influx of absentee by-mail voters in Minnesota in the upcoming elections is certain to exacerbate the disenfranchising effects of two Minnesota laws in particular: (1) Minnesota's requirement that each absentee ballot be witnessed by a registered Minnesota voter, a notary, or person otherwise authorized to administer oaths ("Witness Requirement"), Minn. Stat. § 203B.07, and (2) its requirement that absentee ballots be received by either 3:00 p.m. (if hand-delivered) or 8:00 p.m. (if delivered by mail) on Election Day (the "Election Day Receipt Deadline"), *id.* § 203B.08 subd. 3; Minn. R. 8210.2200 subp. 1 (collectively, the "Challenged Provisions").

6.      The Challenged Provisions cannot survive judicial scrutiny under any circumstances. Even under normal circumstances, the Witness Requirement substantially burdens Minnesotans seeking to vote by mail, some severely so, by increasing both the transaction and monetary costs associated with voting. Not only must voters find a witness to sign and certify their absentee ballot before they can send it, they must specifically find

3

a witness who is registered to vote in Minnesota or who is specially authorized to administer oaths. Those unable to find a registered Minnesota voter willing to witness their ballot are forced to seek out a notary and, in many instances, pay a fee to exercise their right to vote. This challenge may very well prove insurmountable for certain types of voters, including those temporarily living out of state or with disabilities, as well as those who live alone, a significant portion of whom are senior citizens at high risk of contracting COVID-19. In the context of a pandemic these burdens become entirely unjustifiable, requiring these voters to risk their health to obtain another registered voter's or notary's signature, or forfeit their right to vote.

7.     Minnesota's Election Day Receipt Deadline disenfranchises thousands of voters who complete and mail their ballot prior to Election Day but whose ballots—in many cases through no fault of their own—are not received by elections officials through the mail by 8:00 p.m. on Election Day. *See* Minn. Stat. § 203B.08 subd. 3; Minn. R. 8210.2200 subp. 1. In 2018 alone, Minnesota discarded over 7,519 absentee ballots, nearly half for no other reason than they arrived after the Election Day Receipt Deadline. While this is unconstitutional under any circumstances, in the current context—where the pandemic will lead to a significant increase in mail voting while at the same time severely burdening an already compromised U.S. Postal Service ("USPS" or the "postal service")—it is all the more unjustifiable. If left in place, the Election Day Receipt Deadline is certain to disenfranchise tens of thousands more voters this year than in years past. As a result, the Court should order the Secretary to adopt the same remedy that the U.S. Supreme Court accepted in Wisconsin for its recent spring election—a postmark deadline. *See Republican*

*Nat'l Comm. v. Democratic Nat'l Comm.*, 140 S. Ct. 1205, 1207 (2020). Due to that change, in the Wisconsin election alone, over 140,000 ballots that would have been rejected under that state's Election Day receipt deadline were counted.

8.      Plaintiffs bring this case to ensure that all eligible Minnesota voters have a fair and safe opportunity to exercise their right to vote. This Court should strike down the Challenged Provisions to ensure that Minnesota's absentee by-mail regime fully complies with the Minnesota and U.S. Constitutions.

## <u>PARTIES</u>

9.      Plaintiff Robert LaRose is a U.S. citizen and registered Minnesota voter who temporarily resides in New Haven, Connecticut while he attends Yale University. He is 24 years old. In 2016, Mr. LaRose voted absentee by-mail while at school. Mr. LaRose received his absentee ballot a week prior to Election Day and promptly mailed it back to the election office in Waconia, Minnesota, where he is registered to vote. Weeks later, he received a notice from the county informing him that his vote was not counted because it arrived after the Election Day Receipt Deadline. Based on this experience, Mr. LaRose is concerned that he will similarly be disenfranchised in the upcoming elections. In particular, Mr. LaRose is concerned that, like in 2016, he will receive his ballot with insufficient time before the election to ensure that it is returned in time to meet the Election Day Receipt Deadline, through no fault of his own. Given the anticipated problems with USPS, Mr. LaRose believes that this is even more likely this year than in years prior. Mr. LaRose is also concerned that he will not be able to comply with the Witness Requirement. He does not know any registered Minnesota voters in Connecticut who could witness his ballot and,

even if he were to pay for a notary, due to COVID-19 and the stay-at-home order in Connecticut, many notaries' offices are currently closed. As a result, Mr. LaRose fears that he will be unable to vote in the upcoming elections.

10.     Plaintiff Teresa Maples is a U.S. citizen and registered Minnesota voter in Red Wing, Minnesota. Ms. Maples is a retired secretary and a member of the Minnesota Alliance for Retired Americans Educational Fund. She is a lifetime voter who has not missed voting in a midterm or general election since first becoming eligible to vote in 1972. Ms. Maples is in her late 60s, lives alone, and suffers from several health conditions—lupus, rheumatoid arthritis, osteoarthritis, osteoporosis, Sjogren's syndrome, dystonia, fibromyalgia, pernicious anemia, and Hashimoto's disease—that contribute to difficulty walking, standing, and completing daily tasks. To address her conditions Ms. Maples takes medications which suppress her immune system. As a result, Ms. Maples has been strictly observing social distancing and has been isolated in her home, alone, for weeks. She does not know when it will be safe to end her isolation. Although Ms. Maples typically votes early in person, due to her mobility issues and increased risk of exposure to and complications from COVID-19, she intends to vote by mail in the upcoming elections. Because Ms. Maples lives alone and must strictly observe social distancing, however, she will be unable to safely meet the Witness Requirement. She is also concerned that even if she meets the Witness Requirement, she may still be disenfranchised by the Election Day Receipt Deadline. She has had problems with mail service in the past and fears that such problems could keep her ballot from arriving in time to be counted.

11.      Plaintiff Mary Sansom is a U.S. citizen and registered Minnesota voter in Newport, Minnesota. Ms. Sansom is a retired employee of Northwest Airlines, a former recording secretary of the International Association of Machinists and Aerospace Workers, and a current member of the Minnesota Alliance for Retired Americans Educational Fund. Ms. Sansom first became eligible to vote in 1973 and has consistently voted in both primary and general elections since. Due to health conditions she has a strong preference for voting by mail. Ms. Sansom has had two knee replacements and open-heart surgery, all of which make walking and standing in line for extended periods of time difficult. Due to both her age and her heart conditions, Ms. Sansom is also at high risk for contracting and experiencing complications from COVID-19. Despite her preference for voting by mail, Ms. Sansom, who lives alone, has previously struggled to find a witness for her absentee ballot and, as a result, has been forced to vote in-person. She is concerned that she will encounter the same difficulties in the upcoming elections and, given the risks to her health from COVID-19, may not be able to vote in-person at all and may not be able to safely obtain a witness for her absentee ballot.

12.      Plaintiff Gary Severson is a U.S. citizen and registered Minnesota voter in Chaska, Minnesota. Mr. Severson is a 72-year-old board member of the Minnesota Alliance for Retired Americans Educational Fund. He is a retired teacher and former member of the Minneapolis Federation of Teachers. Mr. Severson taught high school social studies and civics for 37 years until his retirement in 2012. As a retired civics teacher, Mr. Severson is passionate about the right to vote and has always made every effort to exercise that right, voting in-person in almost every election he has been eligible to vote in since he first

registered. For the upcoming elections, however, Mr. Severson will have to vote absentee due to health issues as well as related concerns about contracting COVID-19. In particular, Mr. Severson has difficulty standing due to arthritis in his knee and an infection that has left his foot numb. This makes standing in line difficult. He also has diabetes, placing him at a heightened risk for complications if exposed to COVID-19. Mr. Severson does not want to put his health and life at risk by exercising his right to vote; nonetheless, he is concerned that the increased volume of absentee ballots as well as potentially decreased capacity of the postal service will put his own ballot at an increased risk of being rejected for arriving after the Election Day Receipt Deadline.

13.      Plaintiff Minnesota Alliance for Retired Americans Educational Fund (the "Alliance") is incorporated in Minnesota as a domestic nonprofit corporation under chapter 317A of the Minnesota Statutes and is a 501(c)(4) nonprofit, social welfare organization under the Internal Revenue Code. The Alliance has 84,282 members in Minnesota, including over 9,000 members in Ramsey County, comprising of retirees from public and private sector unions, community organizations, and individual activists. It is a chartered state affiliate of the Alliance for Retired Americans. The Alliance's mission is to ensure social and economic justice and full civil rights that retirees have earned after a lifetime of work. The Alliance achieves its mission by grassroots advocacy, contributions to state and federal labor and electoral campaigns, and participation in "get out the vote" campaigns, including retiree phone banks and door-to-door campaigning, the creation of educational material, presentations, letter writing campaigns, and email and internet outreach activities.

14. The Challenged Provisions frustrate the Alliance's mission because they deprive individual members of the right to vote and to have their votes counted and threaten the electoral prospects of Alliance-endorsed candidates whose supporters will face greater obstacles casting a vote and having their votes counted. Because of the burdens on mail-in voting created by the Challenged Provisions, the Alliance must devote time and resources to educating its members about these requirements and assisting them in complying with the Challenged Provisions so that their mailed absentee ballots are counted. These efforts reduce the time and resources the Alliance has to educate its members and legislators on public policy issues critical to the Alliance's members, including the pricing of prescription drugs and the expansion of Medicare and Medicaid benefits. The Alliance brings this action on its own behalf as well as on behalf of its members who face burdens on their right to vote because of the Challenged Provisions. Because all of the Alliance's members are of an age that place them at a heightened risk of coronavirus complications, its members are overwhelmingly likely to vote by mail this year and consequently to face the burdens that the Challenged Provisions place on mail voters. The Alliance's members, for example, are voters who are likely to face difficulty in finding someone to safely witness their absentee ballots or in delivering the mail ballot themselves should they be unable to return it through the mail in sufficient time for their ballot to be counted. Additionally, many of the Alliance's members are likely to be voting by mail for the first time, and thus will be more susceptible to confusion and errors in attempting to comply with the Challenged Provisions, thereby increasing their risk of disenfranchisement.

15.     Defendant Steve Simon is the Secretary of State of Minnesota and is named as a Defendant in his official capacity. The Secretary is the State's chief elections administrator and is responsible for the administration and implementation of election laws in Minnesota. Among other duties, he is granted broad powers to "adopt rules establishing the form, content, and type size and style for the printing of blank applications for absentee ballots . . . certificates of eligibility to vote by absentee ballot . . . and directions for casting an absentee ballot." Minn. Stat. § 203B.09. The Secretary is also responsible for "adopt[ing] rules establishing procedures to be followed by county auditors and municipal clerks to assure accurate and timely return of absentee ballots." *Id.* § 203B.08 subd. 4. He is empowered to "authorize procedures and methods of [ballot] return in addition to those specified in [Minn. Stat. § 203B.08]," which includes the Election Day Receipt Deadline. *Id.* He also has a duty to furnish instructional materials to each county containing the options available to voters who need assistance in voting and to develop general materials to train local election officials and election judges on the state's election administration procedures. *See id.* § 204B.27 subd. 1, 4, 11. Finally, the Secretary has the power to develop a state elections emergency plan. *Id.* § 204B.181. The Secretary has acted under color of state law at all times relevant to this action.

## JURISDICTION AND VENUE

16.     Plaintiffs bring this action under the Minnesota Constitution, the United States Constitution, and the laws of Minnesota and the United States. As a court of general jurisdiction, this Court has authority to hear these claims. *See* Minn. Const. art. VI, § 3; Minn. Stat. § 484.01.

17.     This Court is authorized to grant declaratory relief pursuant to the Declaratory Judgments Act. *See* Minn. Stat. § 555.01; Minn. R. Civ. P. 57. This Court also has the authority to grant injunctive relief under the Minnesota Rules of Civil Procedure. *See* Minn. R. Civ. P. 65.

18.     Venue in Ramsey County is proper because the cause of action arose in part in Ramsey County, and Defendant's official residence is in Ramsey County. *See* Minn. Stat. §§ 542.03, 542.09. The Alliance also has a substantial membership in Ramsey County, including members who are, will be, or are likely to be impacted by the Challenged Provisions, and performs a significant amount of its work in Ramsey County.

## FACTUAL ALLEGATIONS

### A.     Absentee By-Mail Voting in Minnesota

19.     Minnesota has conferred the right for any voter to vote absentee by mail without an excuse since 2014. *Id.* § 203B.02 subd. 1. Voters may request an absentee ballot for any particular election and also may request "permanent absentee voter status" to receive an absentee ballot application in each election without specifically requesting one. *Id.* § 203B.04 subd. 5. In addition, outside of metropolitan counties, Minnesota authorizes towns of any size and cities having fewer than 400 registered voters to elect to vote entirely by mail, providing voters in those towns a designated mail ballot. *Id.* § 204B.45.

20.     Nevertheless, most Minnesotans vote in-person. In 2018, only 221,000 Minnesotans voted absentee by mail, while over 2.3 million voted in person either before or on Election Day. Only 77,000 voters voted by mail via a designated mail ballot from their city or town under § 204B.45.

21.     In 2016, nearly 214,000 Minnesotans voted absentee by mail, while over 2.6 million voted in person either before or on Election Day. Only 59,000 voted by a designated mail ballot. Thus, the vast majority of Minnesotans have never voted by mail.

22.     And there is good reason for that. Minnesota provides a robust in-person voting regime that includes over a month of in-person early voting, *id.* § 204B.081 subd. 1, same day registration while early voting, *id.* § 201.054 subd. 1-3, and election day registration, *id.*

23.     As compared to in-person voting, absentee voting requires additional steps that must be taken deliberately and well in advance of Election Day to ensure that a voter's ballot is counted.

24.     To vote absentee, a voter must correctly complete the absentee ballot application and request an absentee ballot by the statutory deadline.

25.     Next, the voter must receive the absentee ballot in the mail, complete the required information, and obtain a witness signature from another registered Minnesota voter, a notary, or person otherwise authorized to administer oaths.

26.     Finally, a voter must mail the absentee ballot with sufficient time for it to arrive at the local election office by the Election Day Receipt Deadline.

27.     The steps described above, which are required to successfully vote absentee, are not insubstantial, often requiring voters to expend significant time, effort, and sometimes money to complete. A misstep at any point—including by elections officials or the USPS, not just the voter—can result in complete disenfranchisement.

Filed in District Court
State of Minnesota
5/13/2020 4:49 PM

### (i)     Witness Requirement

28.     Unless a voter receives a designated mail ballot, a voter must submit an application for an absentee ballot in writing or electronically up to one day before Election Day to vote absentee by mail. *Id.* § 203B.04.

29.     Once the application is received, the county auditor or clerk transmits a ballot to the voter which includes, among other things, a return envelope with an eligibility certificate. *Id.* § 203B.07 subd. 3.

30.     The eligibility certificate requires the voter to provide identifying information and to provide a signed and sworn statement that the voter meets the requirements established by law for voting by absentee ballot. *Id.*

31.     The certificate also requires that a (1) registered Minnesota voter, (2) notary public, or (3) other person otherwise authorized to administer oaths witness the completion of the ballot and provide a signed statement. *Id.*

32.     The witness must specifically attest that: (1) the absentee ballot was displayed to the witness unmarked, (2) the voter marked the ballot in the witness's presence, and (3) if the voter was not previously registered, the voter provided the witness with proof of residence. *Id.*

33.     An absentee ballot submitted under these rules is rejected if the witness has not signed the certificate.[1] *Id.* § 203B.121 subd. 2 (b)(5), (c)(1); § 203B.07 subd. 3.

---

[1] The process outlined above reflects Minnesota's laws governing General Absentee Voting, which apply to all voters requesting an absentee ballot. *See id.* §§ 203B.07-203B.121 subd. 2(b)(5). It also applies to individuals voting by a designated mail ballot. *See* Minn. R.

34.    Minnesota's Witness Requirement imposes a substantial burden on all Minnesota voters by increasing the transaction and monetary costs of voting absentee by mail.

35.    By restricting voters to only three limited categories of acceptable witnesses, all would-be absentee voters face substantial transaction costs, as they must seek out one of these qualified individuals to vote. If a voter is unable to find a registered Minnesota voter willing to witness their ballot, they are limited only to notaries and other persons authorized to provide an oath, some of whom will only do so for a fee.

36.    For Minnesota voters who are temporarily living out of state, many of whom are college students, this burden is severe, as it is far less likely that another registered Minnesota voter will be available to witness their ballots. As a result, they are more likely to have to obtain a signature from a notary and be forced to pay a fee to vote.

37.    Similarly, voters with disabilities are severely burdened by the Witness Requirement. At least 13% of the voting age population in Minnesota are disabled. While absentee voting is often recognized as a mechanism to ensure that more individuals with disabilities are able to vote, one study found that in 2018, only 45.7 percent of Minnesotans with disabilities voted, while 65.2 percent of non-disabled Minnesotans cast ballots—the

---

8210.3000. This process does not, however, apply to voters voting under the Uniformed and Overseas Citizens Absentee Voting Act ("UOCAVA"), 52 U.S.C. §§ 20301–20310. In general, UOCAVA voters are members of the military or Minnesota residents temporarily living overseas. *See* Minn. Stat. § 203B.16-27 (implementing UOCAVA). It also does not apply to "presidential-only voters," i.e., voters who have moved from Minnesota within thirty days of a presidential election but are not eligible to vote where they currently reside who may vote absentee on a federal presidential-only ballot. *See* Minn. R. 8210.0100.

largest gap between disabled and non-disabled voters in the country. This is unsurprising, as the Witness Requirement necessitates that disabled individuals find, communicate with, and meet with a person eligible to serve as their witness. *Id.* § 203B.121 subd. 2 (b)(5), (c)(1); 203B.07 subd. 3. For those who live alone, this is particularly challenging as persons with disabilities may have a more difficult time traveling to have their ballot witnessed or notarized.

38.     These burdens only grow more severe in the current public health crisis. Disabled voters, elderly voters, voters who are immunocompromised or have other high-risk factors for COVID-19, and/or voters who live alone or with others who are ineligible or unregistered to vote must now risk their health and, in some instances, their life to venture out to find a witness. As such, the Witness Requirement is highly likely to prevent an ever-increasing number of eligible Minnesota voters from voting altogether in the upcoming elections.

39.     Even where a voter can overcome the burdens imposed by the Witness Requirement, their risk of disenfranchisement remains high, as voters who fail to complete all of the steps outlined above in time to have their ballot delivered by Election Day will not have their votes counted.

### (ii) Election Day Receipt Deadline

40.     Minnesota law requires that, for a mail-in absentee ballot or designated mail ballot to be counted, it must be received by either 3:00 p.m. (if hand-delivered) or 8:00 p.m. (if delivered by mail) on Election Day. Minn. Stat. §§ 203B.08 subd. 3, 204B.25 subd. 2; Minn. R. 8210.2200 subp. 1, 8210.3000 subp. 8.

41.     Ballots that arrive after the Election Day Receipt Deadline—regardless of whether they were completed and mailed by the voter prior to or on Election Day—are not counted.

42.     In 2018 alone, Minnesota discarded over 3,500 absentee ballots, 47% of all rejected ballots, simply because they arrived after the Election Day Receipt Deadline.

43.     Many voters are unaware of the Election Day Receipt Deadline or how to ensure their ballots arrive by the Deadline. Many local election authorities also fail to accurately direct voters as to how many days before Election Day voters should mail in their ballots. For example, some suggest allowing seven days between *requesting* an absentee ballot and completing the voting process. Others direct voters to submit an *application* by mail "at least four days before the election."

44.     But according to the USPS, completed ballots must be mailed at least one week before Election Day to ensure timely arrival. *See, e.g.*, USPS, *State and Local Election Mail: User's Guide* at 19 (Jan. 2020), https://about.usps.com/publications/pub632.pdf ("[T]he Postal Service recommends that voters mail their marked return ballots at least 1 week before the due date.").

45.     Cost cutting measures, weather, and a shrinking USPS workforce have led to delivery delays in Minnesota in the past, especially in November, when package and mail volumes are already increased in anticipation of the holidays.

46.     Duluth, for example, has reported delays in times of bad weather and during instances when it has had to move large volumes of mail.

Filed in District Court
State of Minnesota
5/13/2020 4:49 PM

47.     A consistent labor shortage has left residents of the Twin Cities to go days, weeks, and up to a month without receiving their mail, a problem that some say stretches back five to six years.

48.     Some populations in Minnesota, including, in particular, Minnesota's Native American population, have limited access to mail. Many residents living on native lands do not have home mail delivery and instead rely on P.O. boxes at post offices many miles from their homes for mail service. As a result, it often takes far longer to send mail, particularly given that transportation is needed (and often hard to come by), and the hours for post offices are limited. As a result, the overall process of sending and receiving mail is slowed, which translates directly into challenges meeting the Election Day Receipt Deadline.

49.     Accordingly, a voter who receives their absentee ballot less than a week before Election Day faces a substantial risk of missing the Election Day Receipt Deadline.

50.     These types of mailing delays are likely to become more common, as the public health crisis exacerbates both the pressures on the postal service as well as election officials' abilities to keep up with mailing absentee ballots at the volume and clip requested, and as thousands more voters—many of whom will be unaware of the Witness Requirement, the Election Day Receipt Deadline, or the steps or time required to comply with both—attempt to navigate the absentee by-mail voting process for the first time.

51.     The Election Day Receipt Deadline is certain to disenfranchise thousands more voters during the upcoming elections as absentee voting by-mail skyrockets.

**B.      The COVID-19 pandemic exacerbates the burdens that the Witness Requirement and Election Day Receipt Deadline place on voters.**

52.      COVID-19, the severe and sometimes deadly disease caused by the novel coronavirus, has been spreading through Minnesota for several months.

53.      To date, there are 12,917 confirmed cases of the novel coronavirus in the state, and 638 Minnesotans' deaths have been officially attributed to COVID-19. The state remains under a stay-at-home order, and Minnesotans across the state are engaging in social distancing to protect their health and slow the spread of the virus, although infections remain on the rise.

54.      The federal government is preparing for the COVID-19 crisis to last 18 months and has warned that the pandemic could come in "multiple waves."

55.      The White House's coronavirus advisor and the Director of the National Institute of Allergy and Infectious Diseases, Dr. Anthony Fauci, was asked at a White House press conference whether the United States was "prepared for [coronavirus] to strike again, say, in the fall." Dr. Fauci responded, "In fact I would anticipate that that would actually happen because of the degree of transmissibility."

56.      The Director of the Centers for Disease Control and Prevention ("CDC") recently warned that the country may encounter a second, more deadly wave of COVID-19 in the fall, which will "be even more difficult than the one we just went through."

57.      Similarly, the Director of the National Center for Immunization and Respiratory Diseases at the CDC, Dr. Nancy Messionnier, said on March 10, 2020 that she expected the virus to continue spreading in the United States through next year.

58.     These sentiments are also shared by scientists outside the United States government. The COVID-19 Response Team at the Imperial College of London has estimated that social distancing and other preventative measures will be required until a vaccine is developed and distributed widely, which they predict could take "18 months or more."

59.     Minnesota Governor Tim Walz has said Minnesota may be one of the last states in the country to even reach a peak and, in fact, Minnesota's peak could come at the same time other states begin to see a second wave of illnesses this fall.

60.     There is thus little question that the spread of COVID-19 in Minnesota will continue this fall and, in particular, during Minnesota's upcoming elections.

61.     Even if Minnesota has already passed its peak when the elections are held, CDC guidelines recommend that individuals still take meaningful social distancing measures even if the threat of community transmission of COVID-19 in the area is only "minimal."

62.     This guidance is necessitated by the reality that asymptomatic carriers appear to be contributing significantly to community spread, and until there is a vaccine or "herd immunity" (i.e., at least 60% of the population has been infected and recovered), Americans will remain at serious risk of contracting the virus.

Filed in District Court
State of Minnesota
5/13/2020 4:49 PM

63.     The Secretary has recognized as much, explaining to the Legislature that without action Minnesota's election system is "in for a real disaster of an election season," while backing a bill supporting all mail voting during a pandemic.[2]

64.     The Secretary is right to forecast these problems. The CDC, anticipating difficulties in conducting elections during the COVID-19 crisis, has now recommended that jurisdictions encourage voting by mail and reduce methods of voting that lead to direct contact with other voters or poll workers.

65.     Other federal, state, and local officials have increasingly come to the same realization. Congress, for example, recently authorized $400 million to help states transition to voting-by-mail.

66.     The chair of the Minnesota Association of County Officers recently reported to the Legislature that in-person voting will be severely compromised in August and November due to limited availability of statewide polling places, concerns about COVID-19 exposure expressed by "a significant number of election judges"—many of whom fall into high-risk categories—and challenges with maintaining social distancing at available polling locations.

---

[2] Relevant to this litigation, a new bill, House File 3429 ("HF 3429"), has passed the Minnesota Senate and is expected to pass in the House of Representatives. HF 3429, which applies only to elections in 2020, appropriates money for election-related purposes that include administration, security, accessibility, training, public health and safety, and public outreach. In relevant part, the bill allows for late-designation of polling places; generally disallows the use of schools as polling places; extends the period during which absentee ballots are processed (but not the Election Day Receipt Deadline); and requires absentee ballots to be processed 14 days prior to the day of the election. None of these provisions alleviates the burdens imposed by the Challenged Provisions.

67.     The April 7, 2020 Wisconsin primary demonstrates that these concerns are warranted. Milwaukee was forced to reduce its polling locations from 180 to just *five* locations because of a severe shortage of poll workers.

68.     Despite the fact that Wisconsin has no-excuse absentee voting, a substantial number of voters had no choice but to vote in person, including those who did not receive absentee ballots in time to cast and return them by Wisconsin's Election Day receipt deadline. Those voters were forced to decide whether to risk their health to cast their ballots.

69.     Ultimately, thousands of Wisconsin citizens stood in long lines for hours to cast their ballots, many wearing masks, gloves, and other protective gear as they congregated together to vote in person.

70.     On April 28, three weeks after the election, the Wisconsin Department of Health Services reported that 52 people who voted in person or worked the polls on April 7 have tested positive for COVID-19 thus far. These numbers may grow.

71.     The inherent challenges to voting in-person during this pandemic led voters in Wisconsin to request absentee ballots at unprecedented rates, with more than one million voters requesting absentee ballots for the recent primary, four times the number who did so in the 2016 general election.

72.     This increased interest in voting by mail, combined with social distancing efforts and decreases in available elections staff, placed a significant strain on local election boards, several of which were not able to send voters a ballot in time for it to be returned—or even delivered to them—by Wisconsin's normal Election Day deadline.

73.     This crisis ultimately necessitated federal litigation that reached the U.S. Supreme Court and resulted in the implementation of a postmark rule, whereby ballots postmarked by Election Day could be counted as long as they are received within six days of Election Day. *See Republican Nat'l Comm.*, 140 S. Ct. at 1207.

74.     Over 140,000 ballots in Wisconsin were postmarked by, but arrived after, Election Day.

75.     Florida similarly experienced significant shortages in poll workers and polling locations, with 800 poll workers withdrawing from Palm Beach County alone in its primary election held on March 17, 2020.

76.     Likewise, Arizona's most populous county, Maricopa, was forced to close over 80 polling locations at the last minute in its March 17, 2020 primary, as poll workers in locations serving high-risk communities backed out.

77.     Arizona also experienced an uptick in absentee voting by mail in its March primary as well as a higher rate of mail-in ballots arriving after Arizona's Election Day receipt deadline.

78.     It is all but certain that Minnesota, like states across the nation, will experience a substantial increase in absentee by-mail voting in the August Primary and November Election as well as substantial challenges administering the system.

79.     An increase in absentee voting in the upcoming elections also means that a significant number of voters who typically vote in person will be voting by mail, and many of those will be voting by mail for the first time. These voters differ from current absentee

voters in important respects that make them even more likely to be burdened by the Witness Requirement and Election Day Receipt Deadline.

80.     Many voters who switch to absentee voting by mail will be doing so precisely because they are immunocompromised, have conditions placing them at high risk for COVID-19, or are generally concerned about their health or the health of their family and friends. As such, they will be far less likely and less able to venture out to find a witness to sign their ballot if they do not already have a ready witness in their home.

81.     Over 630,779 persons in Minnesota live alone—244,096 of whom are 65 years-old and over, the age group that is most at risk from COVID-19.

82.     Moreover, at least 169,548 Minnesotans have no spouse present, living solely with children under the age of 18. These voters are among the countless Minnesota voters who, as a direct result of the Witness Requirement, will face the "excruciating dilemma" between whether to "either venture into public spaces, contrary to public directives and health guidelines or stay at home and lose the opportunity to vote." *Democratic Natl. Comm. v. Bostelmann*, 20-CV-249-WMC, 2020 WL 1320819, at *5 (W.D. Wis. Mar. 20, 2020).

83.     Even if these voters do take the risk to venture out and are able to find a witness, it is unlikely that the certification can be signed safely while maintaining social distancing standards as it requires at least two exchanges of the ballot.

84.     A witness must attest first that they have reviewed the voter's blank ballot, necessarily requiring them to review (and likely touch) the ballot before the voter

completes it. *See* Minn. Stat. § 203B.07 subd. 3. The witness must then sign the ballot after the voter has completed it, requiring an additional exchange of the ballot. *Id.*

85.     Studies have found that COVID-19 can remain on surfaces for several hours to days. Thus, merely exchanging a ballot even where voters are able to maintain a six-foot distance is extremely risky.

86.     Those voters transitioning to absentee voting from Election Day voting also tend to be "late deciders"; that is, they decide who they will vote for later in the election cycle. Because of that, they are more likely to cast an absentee ballot at the end of the voting process with only a few days to go until Election Day.

87.     It is unremarkable that these voters would be more likely to cast their absentee ballots later given that they are also likely to be less familiar with the absentee voting process, including the Witness Requirement and the Election Day Receipt Deadline. Nor would it be unreasonable for them to think their ballots can be mailed later in the election cycle as long as they are postmarked by Election Day, as many other deadlines in Minnesota voters' lives are postmark deadlines. *See, e.g.,* Minn. Stat. § 270C.395 (applying a postmark deadline to tax filings); *id.* § 276.017 (applying a postmark deadline as proof of timely mailing for property taxes).

88.     Finally, as mail balloting increases, USPS is facing a $13 billion budget shortfall and could see a 50 percent reduction in total mail volume by the end of June, compared with the same period last year. This raises particular concerns for Minnesota, which has experienced slow and unreliable mail service in the past. When the postal

service has faced budget crises, it has responded by closing hundreds of processing centers.

89. The postal service has already asked voters to mail their ballots up to a week before Election Day even before COVID-19. Yet even when that advice is followed, there is simply no guarantee that ballots will arrive on time. Together, these circumstances guarantee that as the COVID-19 crisis continues, Minnesota voters will find it increasingly difficult to ensure that their ballots arrive before the Election Day Receipt Deadline.

**C.    The State Has No Legitimate Interest in the Challenged Provisions Under Any Circumstances, and Even Less So During the Pandemic**

90. The State has no legitimate interest in the Witness Requirement. Voter fraud is virtually nonexistent in Minnesota. And adequate protections are already in place to protect against even the perception of it. For example, the ballot board is already required to determine whether another ballot has been previously accepted for a voter and to confirm their identity, address, name, and registration. Minn. R. 8210.2450. And the voter themselves must sign a sworn statement to complete the ballot, subject to Minnesota's perjury statute. Minn. Stat. §§ 203B.07, 609.48 subd. 2.

91. Moreover, Minnesota is one of only twelve states that have a witness or notarization requirement. There is no indication that the absentee voting systems of the 38 other states without a witness or notarization requirement are plagued with more voter fraud than the twelve that do. In fact, Minnesota does not even employ a Witness Requirement for UOCAVA or presidential-only voters, and it has not had any fraud reported for either set of voters. For both sets of voters Minnesota law requires only self-certification.

92.     The justifications for the Election Day Receipt Deadline also cannot hold water. While Minnesota may set a reasonable deadline for receiving ballots to ensure the finality of election results, the Election Day Receipt Deadline is not reasonable. Voters do not reasonably expect that they must submit their ballots a week or more in advance of Election Day.

93.     And the Election Day Receipt Deadline is also unnecessary to ensure that all ballots are received and counted within a reasonable time as Minnesota law permits ballots to be counted and canvassed well after Election Day.

94.     History proves that the Election Day Receipt Deadline disenfranchises voters for reasons entirely outside their control, even when the country is *not* in the grip of an unprecedented public health crisis.

95.     During the current pandemic, with its consequent increase in the number of mail voters and the increased pressures it imposes on elections officials and the post office, the numbers of voters disenfranchised by the Election Day Receipt Deadline is certain to grow exponentially.

96.     Absent relief from this Court, the individual and cumulative impacts of the Witness Requirement and Election Day Receipt Deadline will impose a severe burden on Minnesota voters, deterring them from participating in the franchise and in some cases disenfranchising them entirely.

97.     If these laws stand, particularly during the upcoming elections, many Minnesota voters will find themselves faced with the same unconscionable choice that Wisconsin voters faced on April 7—their health and safety versus their right to vote. The

Filed in District Court
State of Minnesota
5/13/2020 4:49 PM

state and federal constitutions not only empower the Court to ensure that both are protected, they require it.

## CLAIMS FOR RELIEF

## COUNT I

### Violation of the Minnesota Constitution, Art. I, § 2, and Art. VII, § 1
### Unconstitutional Burden on the Right to Vote
### (Witness Requirement & Election Day Receipt Deadline)

98.     Plaintiffs reallege and incorporate by reference all prior paragraphs of this Complaint and the paragraphs in the counts below as though fully set forth herein.

99.     Article I, Section 2 of the Minnesota Constitution provides in relevant part: "No member of this state shall be disfranchised or deprived of any of the rights or privileges secured to any citizen thereof, unless by the law of the land or the judgment of his peers."

100.     Article VII, Section 1 of the Minnesota Constitution provides in relevant part: "Every person 18 years of age or more who has been a citizen of the United States for three months and who has resided in the precinct for 30 days next preceding an election shall be entitled to vote in that precinct."

101.     Together, these provisions guarantee the right to vote to eligible Minnesota residents. Minnesota courts have long held that the right to vote and the right to participate in the political franchise is a fundamental right. *See, e.g.*, *Kahn v. Griffin*, 701 N.W.2d 815, 831 (Minn. 2005).

102.     Minnesota courts have historically applied the *Anderson-Burdick* test in evaluating whether state election laws unconstitutionally infringe on the right to vote. *See id.* at 832-33. Under that standard, which was developed by the U.S. Supreme Court for

challenges to facially neutral, generally applicable voting laws under the federal constitution, courts must carefully balance the character and magnitude of injury to the rights that the plaintiff seeks to vindicate against the precise justifications put forward by the state for the burdens imposed by the rule. *See Burdick v. Takushi*, 504 U.S. 428, 434 (1992); *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983); *see also Kahn*, 701 N.W.2d at 833 (evaluating whether a state election law violates the right to vote under the Minnesota Constitution by "weigh[ing] the character and magnitude of the burden imposed on voters' rights against the interests the state contends justify that burden," "consider[ing] the extent to which the state's concerns make the burden necessary").

103.     The Minnesota Supreme Court has recognized that absentee voting is crucial to participation in the franchise: "The purpose of the absentee ballot is to enfranchise those voters who cannot vote in person." *Erlandson v. Kiffmeyer*, 659 N.W.2d 724, 734 (Minn. 2003). Minnesota's Witness Requirement and Election Day Receipt Deadline, by imposing severe burdens on Minnesota voters who vote by mail, fail to effectuate this purpose.

104.     The Witness Requirement imposes substantial burdens on all Minnesota voters by requiring them to incur additional transaction costs and, in some cases, monetary costs to exercise their right to vote. For voters who temporarily live out of state, are disabled, are seniors, or live alone, these burdens are severe even in more ordinary times. In the context of the current public health crisis, where obtaining a suitable witness requires these voters to risk their health and safety to exercise their right to vote, the severity of that burden will only intensify. The Witness Requirement will thus not only

serve as a strong deterrent to voting, but in many cases will prevent voters from voting altogether.

105.     The Election Day Receipt Deadline also poses a severe burden on voters' right to vote. Voters must first learn about the Election Day Receipt Deadline and accurately guess when their ballot must be mailed for it to be counted, assuming they even receive their ballot in time to mail it. For those voters who, through no fault of their own, misjudge how long it will take for their ballot to be returned to elections officials through the mail, or for those whose ballots do not even reach them until close to Election Day, the consequences of the Election Day Receipt Deadline are absolute and severe: total disenfranchisement.

106.     Minnesota's Election Day Receipt Deadline severely burdens all voters who vote by mail, even if those voters' ballots are successfully counted. The Election Day Receipt Deadline forces Minnesota voters to cast their ballots without the benefit of accounting for, or opportunity to consider, information about the election or the candidates that arise in the final week leading up to Election Day. It thus deprives voters of the ability to engage in this robust period of civic engagement, because it effectively requires them to have already cast their vote for it to be counted.

107.     The number of individuals burdened by the Election Day Receipt Deadline is certain to rise in the upcoming elections in light of the current public-health emergency, due to increased numbers of absentee by-mail voters, increased mail delays, and increased processing times needed for supervisors to send ballots out to absentee voters.

Filed in District Court
State of Minnesota
5/13/2020 4:49 PM

108.     There is no justification for the Witness Requirement or Election Day Receipt Deadline that can fairly outweigh the burdens that the Challenged Provisions impose in voters.  This is particularly so given the unprecedented strains on voters and election officials that have resulted during the COVID-19 pandemic. Thus, even if the Court were to find that the burdens were not severe and were subject to a less searching level of scrutiny than that applied when a law imposes a severe burden on voters, the Challenged Provisions would still violate the Minnesota Constitution.

## COUNT II

**Violation of the Minnesota Constitution, Art. I, § 7,
Deprivation of Liberty Interest; Due Process
(Election Day Receipt Deadline)**

109.     Plaintiffs reallege and incorporate by reference all prior paragraphs of this Complaint and the paragraphs in the counts below as though fully set forth herein.

110.     Minnesota law provides that "[n]o person shall be . . . deprived of life, liberty or property without due process of law." Minn. Const. art. 1, § 7.

111.     Minnesota's "due process protection . . . is identical to the due proces [*sic*] guaranteed under the Constitution of the United States." *Sartori v. Harnischfeger Corp.*, 432 N.W.2d 448, 453 (Minn. 1988); *see McDonald v. City of St. Paul*, 679 F.3d 698, 704 n. 3 (8th Cir. 2012).

112.     Minnesota courts have looked to federal law, including the application of the test laid out in *Mathews v. Eldridge*, 424 U.S. 319 (1976), when evaluating whether the state constitution's due process clause has been violated. *See, e.g.*, *Bendorf v. Comm'r of Pub. Safety*, 727 N.W.2d 410, 415–16 (Minn. 2007) (applying *Mathews* in evaluation of

procedural due process under Minnesota and U.S. Constitutions); *Sartori*, 432 N.W.2d at

453 (discussing federal cases interpreting the U.S. Constitution's due process clause).

113.    The Minnesota Supreme Court has explained that "due process is flexible and

calls for such procedural protections as the particular situation demands." *Bendorf*, 727

N.W.2d at 415–16 (quoting *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972)). In evaluating due

process, it considers: (1) "the private interest that will be affected by the official action," (2)

"the risk of an erroneous deprivation of such interest through the procedures used, and the

probable value, if any, of additional or substitute procedural safeguards," and (3) "the

Government's interest, including the function involved and the fiscal and administrative

burdens that the additional or substitute procedural requirement would entail." *Id.*

(quoting *Mathews*, 424 U.S. at 335).

114.    "When an election process reache[s] the point of patent and fundamental

unfairness,' there is a due process violation." *Fla. State Conference of N.A.A.C.P. v.

Browning*, 522 F.3d 1153, 1183 (11th Cir. 2008) (quoting *Roe v. Alabama*, 43 F.3d 574, 580

(11th Cir. 1995)). Minnesota's Election Day Receipt Deadline, which deprives voters of their

most precious liberty interest—their fundamental right to vote—does just that.

115.    Indeed, many voters are disenfranchised by the Election Day Receipt

Deadline through no fault of their own because (1) they do not learn of the Deadline before

Election Day, (2) they do not receive their ballot from election officials in time for it to be

returned by 8:00 p.m. on Election Day, or (3) mail delays cause their ballot to arrive late,

even if mailed by the voter well in advance of the Deadline.

Filed in District Court
State of Minnesota
5/13/2020 4:49 PM

116.    The Election Day Receipt Deadline further deprives all Minnesota voters who vote by mail of the opportunity to consider information from the final days and week leading up to Election Day by requiring voters to cast their ballots well before Election Day if they wish to ensure that their ballots will actually be counted.

117.    The burdens imposed on voters by the Election Day Receipt Deadline will only grow more severe in light of COVID-19 and the resultant pressures that it will place on Minnesota's vote-by-mail system as well as the postal service.

118.    Minnesota's Election Day Receipt Deadline is neither a reliable nor fair way to administer voting by mail. It causes countless voters to cast their ballots before candidates have delivered their final pitches to the voters. And it disenfranchises voters who have no other way to vote except by mail who, through no fault of their own, do not receive their ballot from election officials in time to return it by the Deadline.

119.    The value of additional or substitute procedural safeguards to ensure that the votes of Minnesota's mail voters are both meaningfully cast and actually counted is readily apparent. A substitute procedure—requiring vote-by-mail ballots to be postmarked on or before Election Day and received by the county within a reasonable period of time after Election Day to be counted—solves the inequities inherent in Minnesota's Election Day Receipt Deadline.[3]

---

[3] The term "postmark" refers to any type of imprint applied by USPS to indicate the location and date USPS accepts custody of a piece of mail, including bar codes, circular stamps, or other tracking marks. Where a ballot does not bear a postmark date, the election official reviewing the ballot should presume that it was mailed on or before Election Day unless the preponderance of the evidence demonstrates it was mailed later.

120.    A postmark date offers a clear, unequivocal, and reliable date to Minnesota voters by which they must cast their ballots, and also ensures that voters who receive their ballots late through no fault of their own are still able to participate in the franchise. A postmark date additionally ensures that all of Minnesota's voters can consider information that may arise and influence voters' choices in the last week of the election cycle in casting their ballots.

121.    Requiring Minnesota to accept ballots that are postmarked on or before Election Day and which arrive within a reasonable time period after Election Day imposes minimal, if any, administrative burden on the State; any such burden is outweighed by the severe burden placed on Minnesota voters. As the United States Supreme Court has explained, "administrative convenience" cannot justify the deprivation of a constitutional right. *See Taylor v. Louisiana*, 419 U.S. 522, 535 (1975).

122.    Having allowed its voters to vote by mail, Minnesota must establish adequate procedures to ensure that voters have a reliable, fair, and effective method to cast their ballots. Because Minnesota's Election Day Receipt Deadline is markedly inadequate in all of those respects, and Minnesota is readily capable of instituting a substitute procedure which would protect those voters' rights with minimal burden to the state, the Election Day Receipt Deadline violates Minnesota voters' procedural due process rights.

## COUNT III

**U.S. Const. Amend. I and XIV, 42 U.S.C. § 1983, 28 U.S.C. §§ 2201, 2202**
**Undue Burden on the Right to Vote**
**(Witness Requirement & Election Day Receipt Deadline)**

123.    Plaintiffs reallege and incorporate by reference all prior paragraphs of this Complaint and the paragraphs in the counts below as though fully set forth herein.

124.    Under the *Anderson-Burdick* balancing test, a court considering a challenge to a state election law must carefully balance the character and magnitude of injury to the First and Fourteenth Amendment rights that the plaintiff seeks to vindicate against "'the precise interests put forward by the State as justifications for the burden imposed by its rule,' taking into consideration 'the extent to which those interests make it necessary to burden the plaintiff's rights.'" *Burdick*, 504 U.S. at 434 (quoting *Anderson*, 460 U.S. at 789). This balancing test utilizes a flexible sliding scale, where the rigorousness of scrutiny depends upon the extent to which the challenged law burdens voting rights.

125.    Minnesota's Witness Requirement and Election Day Receipt Deadline impose a severe burden on Minnesota voters who vote by mail.

126.    The Witness Requirement imposes substantial burdens on all Minnesota voters by requiring them to incur additional transaction costs and, in some cases, monetary costs to exercise their right to vote. For voters who temporarily live out of state, are disabled, are seniors, or live alone, these burdens are severe and grow even more severe in the current public health crisis where obtaining a suitable witness requires them to risk their health and safety to exercise their right to vote. The Witness Requirement will thus

not only serve as a strong deterrent to voting, but in many cases will prevent voters from voting altogether.

127.     The Election Day Receipt Deadline also poses a severe burden on voters' right to vote. Voters must first learn about the Election Day Receipt Deadline and accurately guess when their ballot must be mailed for it to be counted, if they even receive their ballot in time to mail it. For those voters who, through no fault of their own, misjudge how long it will take for their ballot to arrive back to county election officials, or for those whose ballots reach the voter a day or two before Election Day, the consequences are absolute and severe: total disenfranchisement.

128.     The Election Day Receipt Deadline also severely burdens all voters who vote by mail, even if those voters' ballots are successfully counted. The Deadline forces Minnesota voters to cast their mail ballots without the benefit of accounting for, or opportunity to consider, information about the election or the candidates that arise in the final week leading up to Election Day. Minnesota's Election Day Receipt Deadline thus deprives voters of the ability to engage in this robust period of civic engagement, because it effectively requires them to have already cast their vote for it to be counted.

129.     The number of individuals burdened by the Election Day Receipt Deadline is certain to rise in the upcoming elections in light of the current public-health emergency, due to what is likely to be a dramatic increase in numbers of voters participating in the elections by casting an absentee by-mail ballot, increased mail delays, and increased processing times needed for supervisors to send ballots out to absentee voters.

130.    There is no justification for the Witness Requirement or Election Day Receipt Deadline that can fairly outweigh the burdens that the Challenged Provisions impose in voters. This is particularly so given the unprecedented strains on voters and election officials that have resulted during the COVID-19 pandemic. Thus, even if the Court were to find that the burdens were not severe and were subject to a less searching level of scrutiny than that applied when a law imposes a severe burden on voters, the Challenged Provisions would still violate the First and Fourteenth Amendments.

**COUNT IV**

**Due Process**
**U.S. Const. Amend. XIV, 42 U.S.C. § 1983**
**Denial of Procedural Due Process**
**(Election Day Receipt Deadline)**

131.    Plaintiffs reallege and reincorporate by reference all prior paragraphs of this Complaint and the paragraphs in the counts below as though fully set forth herein.

132.    The Due Process Clause of the United States Constitution prohibits the states from depriving "any person of . . . liberty . . . without due process of law." U.S. Const. amend. XIV, § 1. Which protections are due in a given case requires a careful analysis of the importance of the rights and the other interests at stake. *See Mathews*, 424 U.S. at 334–35; *Nozzi v. Hous. Auth. of City of L.A.*, 806 F.3d 1178, 1192 (9th Cir. 2015).

133.    Courts must first consider "the nature of the interest that will be affected" by the government's action as well as the "degree of potential deprivation that may be created" by existing procedures. *Nozzi*, 806 F.3d at 1192–93. Second, "courts must consider the 'fairness and reliability' of the existing procedures and the 'probable value, if any, of

Filed in District Court
State of Minnesota
5/13/2020 4:49 PM

additional procedural safeguards.'" *Id.* at 1193 (quoting *Mathews*, 424 U.S. at 343). Finally, courts must consider "the public interest, which 'includes the administrative burden and other societal costs that would be associated with' additional or substitute procedures." *Id.* (quoting *Mathews*, 424 U.S. at 347). Overall, "due process is flexible and calls for such procedural protections as the particular situation demands." *Mathews*, 424 U.S. at 334 (quotation and citation omitted).

134.    Minnesota's vote-by-mail procedures must comport with due process. *See Raetzel v. Parks/Bellemont Absentee Election Bd.*, 762 F. Supp. 1354, 1358 (D. Ariz. 1990). "Such due process is not provided when the election procedures [for voting by mail]" do not adequately protect the right to vote or ensure that an "individual is not continually and repeatedly denied so fundamental a right." *Id.*; *see also Saucedo v. Gardner*, 335 F. Supp. 3d 202, 217 (D.N.H. 2018) ("Having induced voters to vote by absentee ballot, the State must provide adequate process to ensure that voters' ballots are fairly considered and, if eligible, counted.").

135.    "When an election process 'reache[s] the point of patent and fundamental unfairness,' there is a due process violation." *Browning*, 522 F.3d at 1183-84 (quoting *Roe*, 43 F.3d at 580). A state's elections system, "the specifics of which are not explicitly made known to potential voters, that leaves potential voters in the dark as to its effect on a voter's [ability to vote] and that fails to give voters a fair opportunity to [participate], is fundamentally unfair and violative of the Due Process Clause of the Fourteenth Amendment." *Id.* at 1185.

Filed in District Court
State of Minnesota
5/13/2020 4:49 PM

136.    The nature of the interest at stake in this case—the right to vote and to have that vote count—is the most precious liberty interest of all because it is preservative of all other basic civil and political rights.

137.    The Election Day Receipt Deadline is neither a reliable nor fair way to administer voting by mail. Many voters are disenfranchised by the Election Day Receipt Deadline through no fault of their own because (1) they do not learn of the Election Day Receipt Deadline before Election Day, (2) they do not receive their ballot from the election official in time for it to be returned by 8:00 p.m. on Election Day, or (3) despite mailing their ballot with ample time, mail delays out of their control cause their ballot to arrive late.

138.    The Election Day Receipt Deadline further deprives all Minnesota voters who vote by mail of the opportunity to consider information from the final days and week leading up to Election Day by requiring voters to cast their ballots well before Election Day if they wish to ensure that their ballots will actually be counted. This will only get worse in light of COVID-19 and the resultant pressures that it will place on Minnesota's vote-by-mail system as well as the postal service.

139.    The value of additional or substitute procedural safeguards to ensure that the votes of Minnesota's mail voters are both meaningfully cast and actually counted is readily apparent. A substitute procedure—requiring vote-by-mail ballots to be postmarked on or before Election Day and received by the county within a reasonable time period after Election Day to be counted—solves the inequities inherent in Minnesota's Election Day Receipt Deadline.

140.    A postmark date not only offers a clear, unequivocal, and reliable date to Minnesota voters by which they must cast their ballots, but it also ensures that voters who receive their ballots late through no fault of their own are still able to participate in the franchise. A postmark date additionally ensures that all of Minnesota's voters can consider any information that may arise and influence voters' choices in the last week of the election.

141.    Requiring Minnesota to accept ballots that are postmarked on or before Election Day and which arrive within a reasonable time period after Election Day imposes minimal, if any, administrative burden on the State; any such burden is outweighed by the severe burden placed on Minnesota voters. As the United States Supreme Court has explained, "administrative convenience" cannot justify the deprivation of a constitutional right. *See Taylor*, 419 U.S. at 535.

142.    Having allowed its voters to vote by mail, Minnesota must establish adequate procedures to ensure that voters have a reliable, fair, and effective method to cast their ballots. Because Minnesota's Election Day Receipt Deadline is markedly inadequate in all of those respects, and Minnesota is readily capable of instituting a substitute procedure which would protect those voters' rights with minimal burden to the state, the Election Day Receipt Deadline violates Minnesota voters' procedural due process rights.

## **PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiffs respectfully request that this Court enter judgment in their favor and against Defendant, and:

a.      Enter a declaratory judgment pursuant to Minn. Stat. § 555.01 and Minn. R. Civ. P. 57 that the Witness Requirement and Election Day Receipt Deadline

Filed in District Court
State of Minnesota
5/13/2020 4:49 PM

are unconstitutional and invalid because they violate the rights of Plaintiffs under the Minnesota Constitution, Art. I, §§ 2, 7, Art. VII, § 1, and the First and Fourteenth Amendments of the United States Constitution;

b.   Enjoin Defendant and his respective agents, officers, employees, and successors, and all persons acting in concert with each or any of them, from rejecting ballots that are postmarked on or before Election Day and arrive at the municipal clerk's office within a reasonable period of time after Election Day, subject to the definition of "postmarked" noted herein;

c.   Enjoin Defendant and his respective agents, officers, employees, and successors, and all persons acting in concert with each or any of them, from enforcing the Witness Requirement, and from rejecting any ballots for failure to comply with the Witness Requirement, pursuant to Minn. R. Civ. P. 65;

d.   Award to Plaintiffs their costs and disbursements, pursuant to applicable statutory and common law; and

e.   Grant Plaintiffs such other and further relief as the Court deems necessary, just, and proper.

Filed in District Court
State of Minnesota
5/13/2020 4:49 PM

Dated:  May 13, 2020                    **GREENE ESPEL PLLP**


  /s/ Sybil L. Dunlop
Sybil L. Dunlop, Reg. No. 0390186
Samuel J. Clark, Reg. No. 0388955
222 S. Ninth Street, Suite 2200
Minneapolis, MN  55402
sdunlop@greeneespel.com
sclark@greeneespel.com
(612) 373-0830

**PERKINS COIE LLP**

Marc E. Elias, DC Reg. No. 442007
*(pro hac vice pending)*
Amanda R. Callais, DC Reg. No. 1021944
*(pro hac vice pending)*
700 13th St. N.W., Suite 600
Washington, D.C. 20005-3960
MElias@perkinscoie.com
ACallais@perkinscoie.com
(202) 654-6396

Abha Khanna, WA Reg. No. 426126
*(pro hac vice pending)*
700 13th St. N.W., Suite
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
AKhanna@perkinscoie.com
(206) 359-8312

Charles G. Curtis, Jr., WI Reg. No. 1013075
*(pro hac vice pending)*
33 East Main Street, Suite 201
Madison, WI 53703-3095
CCurtis@perkinscoie.com
(608) 663-5411

Attorneys for Plaintiffs

Filed in District Court
State of Minnesota
5/13/2020 4:49 PM

## ACKNOWLEDGMENT

The undersigned hereby acknowledges that pursuant to Minn. Stat. § 549.211, Subd. 3, sanctions may be imposed if, after notice and a reasonable opportunity to respond, the Court determines that the undersigned has violated the provisions of Minn. Stat. § 549.211, Subd. 2.

/s/ Sybil L. Dunlop
Sybil L. Dunlop

Filed in District Court
State of Minnesota
5/13/2020 4:49 PM

## ACKNOWLEDGEMENT

The undersigned hereby acknowledges that costs, disbursements and reasonable attorney and witness fees may be awarded pursuant to Minn. Stat. § 549.2ll, subdivision 2, to the party against whom the allegations in this pleading are asserted.

 /s/ *Sybil L. Dunlop*
Sybil L. Dunlop

# Exhibit B

STATE OF MINNESOTA                                    DISTRICT COURT

COUNTY OF RAMSEY                            SECOND JUDICIAL DISTRICT
                                                      Case Type: Civil

-------------------------------------------------------------------------------------------------------

| | |
|---|---|
| Robert LaRose, Teresa Maples, Mary Sansom, Gary Severson, and Minnesota Alliance for Retired Americans, <br><br> Plaintiffs, <br><br> v. <br><br> Steve Simon, in his official capacity as Minnesota Secretary of State, <br><br> Defendant. | **STIPULATION AND PARTIAL CONSENT DECREE** <br><br> Court File No: 62-CV-20-3149 |

Plaintiffs Robert LaRose, Teresa Maples, Mary Sansom, Gary Severson, and Minnesota Alliance for Retired Americans, and Defendant Steve Simon (collectively, "the Parties") stipulate to the following and request that this Court approve this Partial Consent Decree. This Stipulation and Partial Consent Decree is limited only to Plaintiffs' claims as they pertain to the November 3, 2020 general election ("November General Election") and is premised upon the current public health crisis facing Minnesota caused by the ongoing spread of the novel coronavirus.

## I.
## RECITALS

**WHEREAS** on May 13, 2020, Plaintiffs filed a complaint against Defendant challenging the constitutionality and enforcement of Minnesota's requirement that each mail-in ballot be witnessed by a registered Minnesota voter, a notary, or person otherwise authorized to administer oaths ("Witness Requirement"), Minn. Stat. §§ 203B.07, 204B.45, and 204B.46, and its requirement that ballots be received by 8:00 p.m. on Election Day if delivered by mail (the

"Election Day Receipt Deadline"), *id.* §§ 203B.08 subd. 3; 204B.45, and 204B.46, Minn. R

.8210.2200 subp. 1 and 8210.3000 (collectively, "Challenged Provisions"), in general and

specifically during the ongoing public health crisis caused by the spread of the novel coronavirus;

> **WHEREAS** among other relief requested, the Complaint seeks to enjoin enforcement of

the Challenged Provisions during the November General Election due, in part, to the public health

crisis caused by the spread of the novel coronavirus;

> **WHEREAS** the coronavirus public health crisis is ongoing and Minnesota remains under

"Stay Safe" Emergency Executive Order 20-74, which contemplates a phased reopening of

Minnesota that continues to require social distancing and mandates that "[i]ndividuals engaging in

activities outside of the home follow the requirements of [the Stay Safe Order and Minnesota

Department of Health and Centers for Disease Control and Prevention ("CDC")] Guidelines,"

Exec. Order 20-74 ¶ 6(a), and states that individuals "at risk of severe illness from COVID-19 . .

. [are] strongly urged to stay at home or in their place of residence," *id.* ¶4;

> **WHEREAS** Minnesota remains under a peacetime emergency, declared by the governor,

because the "COVID-19 pandemic continues to present an unprecedented and rapidly evolving

challenge to our State," Emergency Executive Order 20-78;

> **WHEREAS** Minnesota is currently witnessing an increase in positive COVID-19 cases,

Minnesota has had over 42,000 confirmed COVID-19 cases, with over 4,300 hospitalizations and

over 1,500 fatalities, and current projections indicate that the coronavirus crisis will continue into

the fall and well into the November General Election cycle;

> **WHEREAS** cases continue to spread and climb across the country, and the director of the

National Institute of Allergy and Infectious Diseases recently warned that the country is still "knee-

deep" in the first wave of the pandemic;

**WHEREAS** federal guidelines state "[e]veryone should avoid close contact" by "keeping distance from others," CDC, Coronavirus Disease 2019: How to Protect Yourself & Others, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/prevention.html (last visited July 13, 2020), and advise that jurisdictions "offer alternative voting methods that minimize direct contact," including "alternatives to in-person voting" such as absentee voting, CDC, Recommendations for Election Polling Locations: Interim guidance to prevent spread of coronavirus disease 2019 (COVID-19), https://www.cdc.gov/coronavirus/2019-ncov/community/election-polling-locations.html (last visited July 13, 2020);

**WHEREAS** Minnesota is anticipated to be required to maintain social distancing and abide by CDC Guidelines until the crisis subsides;

**WHEREAS** the absentee voting period for the November General Election begins on September 18, 2020, 46 days prior to the date of the election, Minn. Stat. § 203B.081 subd.1; *id.* § 204B.35, and absentee instructions, ballots, and envelopes, including the certificate of eligibility, must be prepared in time to have a supply for every precinct available to cover absentee voting prior to that date;

**WHEREAS** available public data regarding transmission of COVID-19 supports Plaintiffs' concerns for their safety if they are required to interact with others to cast their ballot in the November General Election;

**WHEREAS** anticipated increases in absentee balloting are already being observed for the August 11, 2020 Primary Election and will continue in the November General Election, and coupled with corresponding shortages of elections personnel and mail delays, appear likely to impact the November General Election and threaten to slow down the process of mailing and returning absentee ballots;

**WHEREAS** the delivery standards for the Postal Service, even in ordinary times contemplate, at a minimum, at least a week for ballots to be processed through the postal system and delivered to election officials, "State And Local Election Mail—User's Guide," United States Postal Service, January 2020, available at https://about.usps.com/publications/pub632.pdf (last visited, July 13, 2020);

**WHEREAS** the Office of Inspector General for the United States Postal Service has reported that states with absentee ballot request deadlines less than seven days before Election Day, including Minnesota, are at "high risk" of ballots "not being delivered, completed by voters, and returned to the election offices in time . . . due to the time required for election commissions to produce ballots and Postal Service delivery standards." Office of Inspector General, U.S.P.S., Rpt. No. 20-235-R20, Timeliness of Ballot Mail in the Milwaukee Processing & Distribution Center Service Area 6-7 (2020), available at https://www.uspsoig.gov/sites/default/files/document-library-files/2020/20-235-R20.pdf (last visited, July 13, 2020);

**WHEREAS** it was recently reported: "Mail deliveries could be delayed by a day or more under cost-cutting efforts being imposed by the new postmaster general. The plan eliminates overtime for hundreds of thousands of postal workers and says employees must adopt a 'different mindset' to ensure the Postal Service's survival during the coronavirus pandemic." Matthew Daly, *Mail delays likely as new postal boss pushes cost-cutting*, Mpls. Star Tribune (July 15, 2020);

**WHEREAS** on April 28, 2020, the Wisconsin Department of Health Services reported that 52 people who voted in person or worked the polls for Wisconsin's April 7, 2020 primary election have tested positive for COVID-19 thus far;

**WHEREAS** courts in other states have enjoined those states from enforcing witness requirements, similar to Minnesota's witness requirement, for primary elections this spring. *See Thomas v. Andino*, -- F. Supp. 3d. --, 2020 WL 2617329 (D.S.C. May 25, 2020); *League of Women Voters of Va. v. Va. State Bd. of Elections*, -- F. Supp. 3d --, 2020 WL 2158249, at *8 (W.D. Va. May 5, 2020) ("In our current era of social distancing-where not just Virginians, but all Americans, have been instructed to maintain a minimum of six feet from those outside their household–the burden [of the witness requirement] is substantial for a substantial and discrete class of Virginia's electorate. During this pandemic, the witness requirement has become both too restrictive and not restrictive enough to effectively prevent voter fraud.").

**WHEREAS** for the April 7, 2020 primary election in Wisconsin, the U.S. Supreme Court affirmed the implementation of a postmark rule, whereby ballots postmarked by Election Day could be counted as long as they were received within six days of Election Day, *Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 140 S. Ct. 1205, 1207 (2020), and other courts have also enjoined Election Day Receipt Deadlines during the current public health crisis, *see Driscoll v. Stapleton*, No. DV 20-408, slip op. at 11 (Mont. Dist. Ct. May 22, 2020); *see also Republican Nat'l Comm.*, 140 S.Ct. at 1210 (Ginsburg, J., dissenting) (noting that, in Wisconsin, the "surge in absentee-ballot requests has overwhelmed election officials, who face a huge backlog in sending ballots");

**WHEREAS** multiple courts have found that the pandemic requires or justifies changes to other aspects of states' election laws, *see, e.g., People Not Politicians Oregon v. Clarno*, 20-cv-1053, 2020 WL 3960440 (D. Or. July 13, 2020); *Cooper v. Raffensperger*, -- F. Supp. 3d --, 20-cv-1312, 2020 WL 3892454 (N.D. Ga. July 9, 2020); *Reclaim Idaho v. Little*, 20-cv-268, 2020 WL 3892454 (D. Idaho June 26, 2020); *Libertarian Party of Ill. v. Pritzker*, 20-cv-2112, 2020 WL

62-CV-20-3149

Filed in District Court
State of Minnesota
7/3/2020 3:25 PM

1951687 (N.D. Ill. Apr. 23, 2020); *Paher v. Cegavske*, -- F. Supp. 3d --, 20-cv-243, 2020 WL 2089813 (D. Nev. Apr. 30, 2020);

WHEREAS the Parties agree that an expeditious resolution of this matter for the November General Election, in the manner contemplated by the terms of this Stipulation and Partial Consent Decree, will limit confusion and increase certainty surrounding the November General Election, including in the days remaining before the September 18, 2020 deadline for absentee ballot preparation, and is in the best interests of the health, safety, and constitutional rights of the citizens of Minnesota, and, therefore, in the public interest;

WHEREAS the Parties wish to avoid the burden and expense of litigation over an expedited preliminary injunction for the November General Election;

WHEREAS the Parties, in agreeing to these terms, acting by and through their counsel, have engaged in arms' length negotiations, and both Parties are represented by counsel knowledgeable in this area of the law;

WHEREAS, on June 17, 2020, this Court signed and approved a stipulation and partial consent decree implementing substantially similar relief for the August 11, 2020 primary election;

WHEREAS voters have been informed about the rule changes for the primary election, voting has begun with those rules in place, and it would minimize confusion to have consistent rules regarding how elections are conducted during this pandemic;

WHEREAS it is the finding of this Court, made on the pleadings and upon agreement of the Parties, that: (i) the requirements of the Minnesota Constitution, Art. I, §§ 2, 7, and Art. VII, § 1, and U.S. Constitution, Amend. I and XIV, will be carried out by the implementation of this Partial Consent Decree, (ii) the terms of this Partial Consent Decree constitute a fair and equitable settlement of the issues raised with respect to the November General Election, (iii) this Partial

Consent Decree is intended to and does resolve Plaintiffs' claims with respect to the November

General Election; and (iv) this Partial Consent Decree is not intended to and does resolve Plaintiffs'

claims generally or with respect to any election held after the November General Election;

**NOW, THEREFORE**, upon consent of the Parties, in consideration of the mutual

promises and recitals contained in this Stipulation and Partial Consent Decree, including

relinquishment of certain legal rights, the Parties agree as follows:

## II.
## JURISDICTION

This Court has jurisdiction over the subject matter of this action pursuant to Minn. Const.

Art. VI, § 3 and Minn. Stat. § 484.01 and has jurisdiction over the Parties herein. The Court shall

retain jurisdiction of this Stipulation and Consent Decree for the duration of the term of this Partial

Consent Decree for purposes of entering all orders, judgments, and decrees that may be necessary

to implement and enforce compliance with the terms provided herein.

## III.
## PARTIES

This Stipulation and Partial Consent Decree applies to and is binding upon the following

parties:

A.    The State of Minnesota by Steve Simon, Secretary of State of Minnesota; and

B.    All Plaintiffs.

## IV.
## SCOPE OF CONSENT DECREE

A.    This Stipulation and Partial Consent Decree constitutes a partial settlement and

resolution of Plaintiffs' claims against Defendant pending in this Lawsuit. Plaintiffs recognize that

by signing this Stipulation and Partial Consent Decree, they are releasing any claims under the

Minnesota or U.S. Constitutions that they might have against Defendant with respect to the

Witness Requirement and Election Day Receipt Deadline in the November General Election. Plaintiffs' release of claims will become final upon the effective date of this Stipulation and Partial Consent Decree.

B.    The Parties to this Stipulation and Partial Consent Decree acknowledge that this does not resolve or purport to resolve any claims pertaining to the constitutionality or enforcement of the Witness Requirement and Election Day Receipt Deadline for elections held after the November General Election. Neither Party releases any claims or defenses with respect to the Witness Requirement and Election Day Receipt Deadline related to elections occurring after the November General Election.

C.    The Parties to this Stipulation and Partial Consent Decree further acknowledge that by signing this Stipulation and Partial Consent Decree, the Parties do not release or waive the following: (i) any rights, claims, or defenses that are based on any events that occur after they sign this Stipulation and Partial Consent Decree, (ii) any claims or defenses that are unrelated to the allegations filed by Plaintiffs in this Lawsuit, and (iii) any right to institute legal action for the purpose of enforcing this Stipulation and Partial Consent Decree or defenses thereto.

D.    By entering this Stipulation and Partial Consent Decree, Plaintiffs are partially settling a disputed matter between themselves and Defendant. The Parties are entering this Stipulation and Partial Consent Decree for the purpose of resolving a disputed claim, avoiding the burdens and costs associated with the costs of a preliminary injunction motion and hearing, and ensuring both safety and certainty in advance of the November General Election. Nothing in this Stipulation and Partial Consent Decree constitutes an admission by any party of liability or wrongdoing. The Parties acknowledge that a court may seek to consider this Stipulation and Partial

Consent Decree, including the violations alleged in Plaintiffs' Complaint, in a future proceeding distinct from this Lawsuit.

## V.
## CONSENT DECREE OBJECTIVES

In addition to partially settling the claims of the Parties, the objective of this Stipulation and Partial Consent Decree is to ensure that Minnesota voters can safely and constitutionally exercise the franchise in the November General Election, and to ensure that election officials have sufficient time to implement changes for the November General Election and educate voters about these changes before voting begins.

## VI.
## INJUNCTIVE RELIEF

**IT IS HEREBY ORDERED, ADJUDGED, AND DECREED FOR THE REASONS STATED ABOVE THAT:**

A.      For the November General Election Defendant shall not enforce the Witness Requirement, with respect to voting only, as set out in Minn. Stat.  § 203B.07, subd. 3 (1) and (2), that each absentee ballot and designated mail ballot for voters previously registered in Minnesota be witnessed by a registered Minnesota voter, a notary, or person otherwise authorized to administer oaths, Minn. Stat. § 204B.45 - .46, and Minn. R. 8210.3000.

B.      For the November General Election Defendant shall not enforce the Election Day Receipt Deadline for mail-in ballots, as set out in Minn. Stat. §§ 203B.08 subd. 3, 204B.45, and 204B.46 and Minn. R. 8210.2200 subp. 1, and 8210.3000, that ballots be received by 8:00 p.m. on Election Day if delivered by mail. Instead, the deadline set forth in paragraph VI.D below shall govern.

C.      Defendant shall issue guidance instructing all relevant local election officials to count all absentee and designated mail ballots in the November General Election, as long as they are otherwise validly cast by voters who registered in Minnesota before casting their absentee or designated mail ballot.  No witness signature will be required on those ballots.

D.      Defendant shall issue guidance instructing all relevant local election officials to count all mail-in ballots in the November General Election that are otherwise validly cast and postmarked on or before Election Day but received by 8 p.m. within 5 business days of Election Day (i.e., seven calendar days, or one week). For the purposes of this Stipulation and Partial Consent Decree, postmark shall refer to any type of imprint applied by the United States Postal Service to indicate the location and date the Postal Service accepts custody of a piece of mail, including bar codes, circular stamps, or other tracking marks. Where a ballot does not bear a postmark date, the election official reviewing the ballot should presume that it was mailed on or before Election Day unless the preponderance of the evidence demonstrates it was mailed after Election Day.

E.      Defendant shall issue instructions to include with all absentee ballots and designated mail ballots—or issue guidance instructing all relevant local election officials to modify, amend, or print the instructions accompanying each absentee ballot and designated mail ballot—to inform voters that any absentee ballot or designated mail ballot cast by a previously registered voter in the November General Election without a witness signature will not be rejected on that basis and that the witness signature line and associated language for witnesses to certify a previously registered voter's ballot, Minn. Stat. §§ 203B.07, subd. 3 (1) and (2), 204B.45, 204B.46; Minn. R. 8210.2200, subp.1; Minn. R. 8210.3000, be removed from the certification of

eligibility altogether for absentee ballot and designated mail ballot materials sent to previously registered voters.

F.      Defendant shall issue instructions to include with all absentee and designated mail ballots—or issue guidance instructing all relevant local election officials to modify, amend, or print instructions accompanying each absentee and designated mail ballot—to inform voters that any absentee or designated mail ballot cast in the November General Election and postmarked on or before Election Day and received by 8 p.m. within 5 business days of Election Day (i.e., seven calendar days, or one week) will be counted.

G.      Defendant shall take additional reasonable steps to inform the public that the Witness Requirement for voting will not be enforced for the November General Election and issue guidance instructing all relevant city and county election officials to do the same.

H.      Defendant shall take additional reasonable steps to inform the public that the Election Day Receipt Deadline will not be enforced for the November General Election and that any absentee or designated mail ballot cast in the November General Election and postmarked on or before Election Day and received by 8 p.m. within 5 business days of Election Day (i.e., seven calendar days, or one week) will be counted.

I.      Plaintiffs will withdraw their Motion for Temporary Injunction for the November General Election, filed on July 2, 2020, and will not file any further motions for injunctive relief for the November General Election based on the claims raised in their Complaint of May 13, 2020.

J.      In accordance with the terms of this Stipulation and Partial Consent Decree, the Parties shall each bear their own fees, expenses, and costs incurred as of the date of this Order with respect to Plaintiffs' claims raised as to the November General Election against Defendant.

# VII.
## ENFORCEMENT AND RESERVATION OF REMEDIES

The Parties to this Stipulation and Partial Consent Decree may request relief from this Court if issues arise concerning the interpretation of this Stipulation and Partial Consent Decree that cannot be resolved through the process described below. This Court specifically retains continuing jurisdiction over the subject matter hereof and the Parties hereto for the purposes of interpreting, enforcing, or modifying the terms of this Stipulation and Partial Consent Decree, or for granting any other relief not inconsistent with the terms of this Partial Consent Decree, until this Partial Consent Decree is terminated. The Parties may apply to this Court for any orders or other relief necessary to construe or effectuate this Stipulation and Partial Consent Decree or seek informal conferences for direction as may be appropriate. The Parties shall attempt to meet and confer regarding any dispute prior to seeking relief from the Court.

If either Party believes that the other has not complied with the requirements of this Stipulation and Partial Consent Decree, it shall notify the other Party of its noncompliance by emailing the Party's counsel. Notice shall be given at least one business day prior to initiating any action or filing any motion with the Court.

The Parties specifically reserve their right to seek recovery of their litigation costs and expenses arising from any violation of this Stipulation and Partial Consent Decree that requires either Party to file a motion with this Court for enforcement of this Stipulation and Partial Consent Decree.

# VIII.
## GENERAL TERMS

A.    **Voluntary Agreement**. The Parties acknowledge that no person has exerted undue pressure on them to sign this Stipulation and Partial Consent Decree. Each Party is voluntarily

choosing to enter into this Stipulation and Partial Consent Decree because of the benefits that are provided under the agreement. The Parties acknowledge that they have read and understand the terms of this Stipulation and Partial Consent Decree; they have been represented by legal counsel or had the opportunity to obtain legal counsel; and they are voluntarily entering into this Stipulation and Partial Consent Decree to resolve the dispute among them.

     **B.**    **Severability**. The provisions of this Stipulation and Partial Consent Decree shall be severable, and should any provisions be declared by a court of competent jurisdiction to be unenforceable, the remaining provisions of this Stipulation and Partial Consent Decree shall remain in full force and effect.

     **C.**    **Agreement**. This Stipulation and Partial Consent Decree is binding. The Parties acknowledge that they have been advised that (i) the other Party has no duty to protect their interest or provide them with information about their legal rights, (ii) signing this Stipulation and Partial Consent Decree may adversely affect their legal rights, and (iii) they should consult an attorney before signing this Stipulation and Partial Consent Decree if they are uncertain of their rights.

     **D.**    **Entire Agreement**. This Stipulation and Consent Decree constitutes the entire agreement between the Parties relating to the constitutionality and enforcement of the Witness Requirement and Election Day Receipt Deadline as they pertain to the November General Election. No Party has relied upon any statements, promises, or representations that are not stated in this document. No changes to this Stipulation and Partial Consent Decree are valid unless they are in writing, identified as an amendment to this Stipulation and Partial Consent Decree, and signed by all Parties. There are no inducements or representations leading to the execution of this Stipulation and Partial Consent Decree except as herein explicitly contained.

**E.    Warranty**. The persons signing this Stipulation and Partial Consent Decree warrant that they have full authority to enter this Stipulation and Partial Consent Decree on behalf of the Party each represents, and that this Stipulation and Partial Consent Decree is valid and enforceable as to that Party.

**F.    Counterparts**. This Stipulation and Partial Consent Decree may be executed in multiple counterparts, which shall be construed together as if one instrument. Any Party shall be entitled to rely on an electronic or facsimile copy of a signature as if it were an original.

**G.    Effective Date**. This Stipulation and Partial Consent Decree is effective upon the date it is entered by the Court. Defendant agrees to continue to initiate and implement all activities necessary to comply with the provisions of this Stipulation and Partial Consent Decree pending entry by the Court.

## IX.
## TERMINATION

This Stipulation and Partial Consent Decree shall remain in effect through the certification of ballots for the November General Election. The Court shall retain jurisdiction to enforce the terms of the Partial Consent Decree for the duration of this Partial Consent Decree. This Court's jurisdiction over this Stipulation and Partial Consent Decree shall automatically terminate after the certification of all ballots for the November General Election.

**THE PARTIES ENTER INTO AND APPROVE THIS STIPULATION AND PARTIAL CONSENT DECREE AND SUBMIT IT TO THE COURT SO THAT IT MAY BE APPROVED AND ENTERED. THE PARTIES HAVE CAUSED THIS STIPULATION AND CONSENT DECREE TO BE SIGNED ON THE DATES OPPOSITE THEIR SIGNATURES.**

**SECRETARY OF STATE OF MINNESOTA**

Dated: __July 17, 2020_____     By: _____

Steve Simon
Secretary of State


**GREENE ESPEL PLLP**

Dated: ___July 17, 2020 _____     By: /s/ *Sybil L. Dunlop*_____

Sybil L. Dunlop (Reg. No. 390186)
Samuel J. Clark (Reg. No. 388955)
222 South Ninth Street, Suite 2200
Minneapolis, MN 55402
Phone: (612) 373-0830
Fax: (612) 373-0929
Email: SDunlop@GreeneEspel.com
Email: SClark@GreeneEspel.com


**PERKINS COIE LLP**

Marc E. Elias*
Amanda R. Callais*
700 13th St. N.W., Suite 600
Washington, D.C. 20005-3960
Phone: (202) 654-6200
Fax: (202) 654-9106
Email: MElias@perkinscoie.com
Email: ACallais@perkinscoie.com

Abha Khanna*
1201 Third Avenue Suite 4900
Seattle, WA 98101-3099
Phone: (206) 359-8312
Fax: (206) 359-9312
Email: AKhanna@perkinscoie.com

Charles G. Curtis, Jr.*
33 East Main Street, Suite 201
Madison, Wisconsin 53703-3095
Phone: (608) 663-7460
Fax: (608) 663-7499
Email: CCurtis@perkinscoie.com

Filed in District Court
State of Minnesota
7/3/2020 3:25 PM

*Admitted  pro hac vice

*Attorneys for Plaintiffs*

**IT IS SO DECREED AND ORDERED. JUDGMENT SHALL BE ENTERED IN ACCORDANCE WITH THE FOREGOING CONSENT DECREE.**

Dated: _____August 3, 2020_____

Grewing, Sara (Judge)
Aug 3 2020 3:05 PM

The Honorable Judge Sara Grewing
Judge of District Court

# Exhibit C

STATE OF MINNESOTA                                    DISTRICT COURT

COUNTY OF RAMSEY                                SECOND JUDICIAL DISTRICT

---

Robert LaRose, Teresa Maples,                              62-CV-20-3149
Mary Samson, Gary Severson,
Minnesota Alliance for Retired Americans Educational Fund
,

Plaintiffs,                                                  **ORDER**

vs.

Minnesota Secretary of State, Steve Simon, in his official capacity,
Defendant.

---

The above named matter came before this Court on July 31, 2020 on Proposed Intervenors the Republican Party of Minnesota, the Republican National Committee, and the National Republican Congressional Committee's motion to intervene, and Plaintiffs' and Defendant's requests that the Court enter the Proposed General Election Consent Decree.

Based on the pleadings, arguments and submissions of counsel, the Court makes the following:

<u>**Order**</u>

1. The motion of the Republican Party of Minnesota, the Republican National Committee, and the National Republican Congressional Committee's ("the Committees") to intervene as a matter of right is **denied.**

2. The motion of the Committees to intervene on a permissive basis is **granted.**

3. The request by the Committees to vacate the primary election consent decree is **denied.**

4. The request by the Plaintiffs and the Defendant to enter the General Election Consent Decree is **granted.**

5. The attached memorandum is incorporated herein.

Dated: August 3, 2020                        BY THE COURT:

                                             *Sara Grewing*
                                             _____
                                             Grewing, Sara (Judge)
                                             Aug 3 2020 3:05 PM
                                             Sara Grewing
                                             Judge of District Court

Plaintiffs Robert LaRose, Teresa Maples, Mary Samson, Gary Severson, and Minnesota Alliance for Retired Americans Educational Fund, have sued Secretary of State Steve Simon alleging that Minnesota's witness requirement for absentee ballots as well as the postmark rule for receipt of absentee ballots are unconstitutional burdens on the right to vote as applied during the COVID-19 pandemic.

## BACKGROUND

### 1. The COVID-19 pandemic

A novel coronavirus has killed more than 154,471 Americans and continues to spread throughout the country. Centers for Disease Control and Prevention, https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/us-cases-deaths.html. As of this writing, more than 56,560 Minnesotans have been infected with COVID-19 and 1,616 have died. Minnesota Dept. of Health https://www.health.state.mn.us/diseases/coronavirus/situation.html (last visited August 3, 2020).

The virus spreads through interpersonal contact and through respiratory droplets spread by a carrier of the virus. *See* Troisi Expert Decl. ¶¶ 10, 17–19. COVID-19 is highly contagious, and these numbers likely underrepresent the virus's spread. *Id.*

Americans will need to take extensive precautions to protect themselves from COVID-19, including by social distancing, until a vaccine is developed and made available for mass distribution, which will not be until 2021 at the earliest. Troisi Expert Decl. ¶¶ 22–26; Ex. 4, at 4. In the meantime, the CDC estimates 92 to 95 percent of Americans remain susceptible to the virus. Ex. 5; *see also* Troisi Expert Decl. ¶¶ 12–13. The CDC Director predicts that this fall—right when Americans start heading to the polls to vote in the general election—is likely to see another wave of infections "even more difficult than the one we just went through." Ex. 6, at 1; *see also* Troisi

2

Expert Decl. ¶¶ 22, 28.

**2.      Minnesota's response**

Governor Tim Walz anticipates that Minnesota might be one of the last states to reach a peak of infections, and the first peak is expected to come at the same time other states begin to see a second wave of illnesses this fall. Ex. 7, at 3. In the meantime, 34 states—including Minnesota—are currently experiencing an increase in cases as states begin to reopen from shelter-in-place orders. Troisi Expert Decl. ¶¶ 9, 21–22.

On March 13, 2020, Governor Tim Walz declared a peacetime state of emergency in response to the public health threat posed by COVID-19, "to protect all Minnesotans by slowing the spread of COVID-19" in  Executive Order 51 20-01. On March 25, Governor Walz directed all Minnesotans to remain in their homes subject to some limited exceptions, pursuant to Executive Order 20-20.  Governor Walz extended that order's restrictions on April 13 in Executive Order 20-35, on May 13 in Executive Order 20-53, on June 12 in Executive Order 20-75, and again on July 13 in Executive Order 20-78.  The current peacetime state of emergency is set to expire on August 12, 2020.

In addition, the Minnesota Department of Health ("MDH") has issued guidance urging all Minnesotans to "[s]tay home as much as possible, stay at least 6 feet from other people." Moran Decl., Ex. 15.  The MDH further recommends against large public gatherings, especially indoor gatherings, because when groups of people gather in places like churches, schools, or other public buildings, transmission can be "particularly effective." *Id*., Ex. 17.

According to the 2014-2018 American Community Survey, between 26 and 28.4% of households in Minnesota consist of an individual living alone.  Maples Decl. ¶¶ 10–11. Nearly 40% of those living alone are age 65 or older.  *Id.* Another 175,000 households consist of a single

parent with children under the age of 18. *Id.* In total, over 36% of individuals in Minnesota live in a household without another person who may be able to serve as a witness for a mail absentee ballot. *Id*.

Two of the named Plaintiffs here, Teresa Maples and Mary Samson live alone and are immunocompromised with mobility issues. Maples ¶ 10; Samson ¶ 6. Plaintiffs assert that these voters and others like them must not only find someone to witness their ballot, but they must leave their home or invite someone into it to obtain the witness's signature, risking exposure to the virus and diminishing the safety benefits of voting by mail. *See* Troisi Expert Decl. ¶¶ 10, 17–20, 29–31.

**4.      Minnesota's absentee ballot requirements**

Under Minnesota law, any eligible voter may vote by absentee ballot. *See* Minn. Stat. § 203B.02, subd. 1. A voter may apply for an absentee ballot at any time at least one day before the election. Minn. Stat. § 203B.04. When the county auditor or municipal clerk receives an absentee ballot application, the registrar mails the applicant a sealed envelope containing the unmarked ballot, instructions for completing the ballot, and an envelope for resealing the marked ballot. Minn. Stat. § 203B.07, subd. 1–3.

The resealing envelope has "[a] certificate of eligibility to vote by absentee ballot printed on the back" on which the voter must include personal identification information, such as the last four digits of their social security number, or their driver's license number, or state identification number. This certificate "must also contain a statement to be signed and sworn by the voter indicating that the voter meets all the requirements established by law for voting by absentee ballot." *Id*. at subd. 3.

After a voter marks her ballot, she must (1) seal the ballot in its envelope, (2) sign the eligibility certificate on the back, and (3) have a witness sign the eligibility certificate. *Id*. at subd 3. The witness must be "registered to vote in Minnesota [or be] a notary public or other individual authorized to administer oaths." *Id*. By signing the eligibility certificate, the witness attests that the ballot was shown to him "unmarked," that "the voter marked the ballot in [his] presence without showing how they were marked," or if unable to physically mark the ballot, "that the voter directed another individual to mark them." *Id.*

When absentee ballots are counted, two or more election officers form a "ballot board" to examine each absentee ballot envelope. As relevant here, a ballot will be deemed accepted if a majority of the ballot board is satisfied that: (1) the voter's name and address match her application; (2) the signed envelope matches the identification number on the application; (3) the envelope includes a "certificate [that] has been completed," including a witness signature; and (4) the voter has not voted twice in that election. Minn. Stat. § 203B.121, subds. 2(b)(1–6).

A ballot must be rejected if any of these criteria – including lacking a witness signature – are not satisfied. Minn. Stat. § 203B.121, subd. 2(c)(1).  Moreover, a ballot must be received on Election Day by 8:00 pm in order to be counted.  §§ 203B.08 subd. 3; 204B.45; 204B.46, Minn. R .8210.2200, subp. 1 & 8210.3000.

### 5.  Post Office Concerns in Minnesota and Nationwide

Based on data from other states, as well as Minnesota's historically high voter turnout rate, experts anticipate that as many as 1.5 million Minnesotans may cast their ballots via mail in November 2020.  Mayer Aff ¶ 66.  More than 500,000 ballots have been requested so far for Minnesota's August 11 primary, compared with 54,000 requests made by this time in 2018.  *See,* Kim Hyatt, *COVID-19 Sparks 'Tidal Wave' of Mail-In Ballots Across Minnesota,* Minneap. Star-

Trib. (August 2, 2020), https://www.startribune.com/covid-19-sparks-tidal-wave-of-mail-in-ballots-across-minnesota/571982202/.

Other states across the country have seen the increase in absentee balloting due to COVID-19 stretch the capacity of their election officials and the U.S. Postal Service. *See* Michelle Ye Hee Lee and Jacob Bogage, *Postal Service Backlog Sparks Worries that Ballot Delivery Could be Delayed in November*, Wash. Post, (July 30, 2020), https://www.washingtonpost.com/politics/postal-service-backlog-sparks-worries-that-ballot-delivery-could-be-delayed-in-november/2020/07/30/cb19f1f4-d1d0-11ea-8d32-1ebf4e9d8e0d_story.html. In states that held primary elections between April and June, the number and percentage of votes cast by mail increased dramatically. Mayer Aff. at ¶ 25. In Wisconsin's April 7, 2020 primary, over 60% of ballots were cast by mail, compared to 5.5% in 2018 (Wisconsin Elections Commission 2020). In Kentucky's June 24, 2020 presidential primary, 80% of voters cast a mail ballot (Gardner, Lee, and Viebeck 2020), compared to 1.5% in 2018. In Nebraska, 84.2% voted by mail in the May 12, 2020 primary, compared to 24% in 2018 (Nebraska Secretary of State 2020). And in Georgia, 57% voted by mail in the June 9, 2020 primary, compared to 5.6% in 2018. *Id.*

In both Ohio and Wisconsin, the increase in mail volume stretched the capacity of the U.S. Postal Service. Mayer Aff. at ¶ 32. In Ohio, voters expressed frustration with delays in obtaining and submitting their absentee ballots. *Id.* Five days before the April 28 postmark deadline, the Ohio Secretary of State Frank LaRose wrote the Ohio congressional delegation, informing them that problems with mail delivery were affecting absentee voting:

> As Ohioans rush to submit their vote-by-mail requests, and our boards work overtime to fulfill them, we are finding that the delivery of the mail is taking far longer than what is published by the United States Postal Service (USPS) as expected delivery times. Instead of first-class mail taking 1-3 days for delivery, we have heard wide reports of it taking as

Filed in District Court
State of Minnesota
8/3/2020 3:13 PM

long as 7-9 days. As you can imagine, these delays mean it is very possible that many Ohioans who have requested a ballot may not receive it in time.

*Id.*

In addition, the Deputy Assistant Inspector General for the United States Postal Service has noted that Minnesota's voters are at "high risk" of their ballots not being delivered to voters before an election.  Pl Ex. 2.

## Procedural History

On May 13, 2020, Plaintiffs Robert LaRose, Teresa Maples, Mary Samson, Gary Severson, and the Minnesota Alliance for Retired Americans Educational Fund sued Minnesota Secretary of State Steve Simon seeking to enjoin both the enforcement of Minnesota's witness requirement for absentee ballots, as well as the requirement that all absentee ballots be received by 8:00 pm on Election Day.

On June 16, 2020, the Plaintiffs and the Defendant entered into a consent decree in which the Defendant agreed, for the August 11 primary, that he would not enforce the witness requirement for absentee ballots.  Primary Consent Dec. at 7.  The Defendant further agreed to accept any otherwise validly cast ballot so long as it was postmarked and received at least one day prior to the county canvas (*i.e.* within two days of the Election Day for the August Primary.)  *Id.*

On June 18, the Republican Party of Minnesota, the Republican National Committee, and the National Republican Congressional Committee ("the Committees") filed their motion to intervene and request for an expedited hearing to be heard on the merits of their opposition to the primary consent decree.  The Court denied the Committees request for an expedited hearing since they were not parties to the litigation, but allowed the Committees to provisionally participate in briefing and argument on July 31, 2020.

On July 2, Plaintiffs filed their motion for a temporary injunction seeking essentially the same relief in the Primary Consent Decree for the general election. On July 17, Plaintiffs and the Defendant filed a stipulation and partial consent decree and asked the Court to enter the agreement as it pertains to the November 2020 general election. The parties sought immediate entry of their consent decree, which the court denied, given the pending intervention motion. The Court then heard all pending matters for argument on July 31, 2020.

## ANALYSIS

### The Republican Committees' Motions to Intervene

The Proposed Intervenors moved to intervene as a matter of right under Minn. R. Civ. P. 24.01, or in the alternative for permissive intervention under Minn. R. Civ. P. 24.02

### A. The Republican Committees are not entitled to intervene as a matter of right

.
Rule 24.01 provides:

> Upon timely application anyone shall be permitted to intervene in an action when the applicant claims an interest relating to the property or transaction which is the subject of the action and the applicant is so situated that the disposition of the action may as a practical matter impair or impede the applicant's ability to protect that interest, unless the applicant's interest is adequately represented by existing parties.

Specifically, a party seeking intervention of right must demonstrate: (1) the application for intervention was timely; (2) an interest relating to the property or transaction which is the subject of the action; (3) circumstances demonstrating that the disposition of the action may as a practical matter impair or impede the party's ability to protect that interest; and (4) the party is not adequately represented by the existing parties. *Minneapolis Star & Tribune Co. v. Schumacher*, 392 N.W. 2d 197, 207 (Minn. 1986) (citing Minn. R. Civ. P. 24.01). Would-be intervenors must satisfy all of these factors. *Luthen v. Luthen*, 596 N.W.2d 278, 280–81 (Minn. App. 1999).

### 1.  The Republican Committees' attempted intervention was timely

The Republican Committees contend that they acted with diligence in filing their motion.

They contend that they sought intervention less than two days after the Plaintiffs and the Defendant

filed their proposed consent decree eliminating the witness and Election Day receipt requirements

for the Primary Election.  The Committees assert that discovery has not begun, no scheduling order

has been entered by the Court, and "no rights have yet been adjudicated between the original

parties and no new issues have been introduced which will prejudice either of the original parties."

*Engelrup v. Potter*, 224 N.W.2d 484, 489 (Minn. 1974) (allowing intervention 10 months after

action commenced, though not in an elections case); *Lamb-Weston/RDO v. Cnty. of Hubbard*, No.

C5-97-187, C5-98-183, 1998 WL 321023, at *2 (Minn. Tax Ct. June 15, 1998) (motion for

intervention timely where "discovery had just begun").

Plaintiffs strongly urge the Court to find that the Committees were not timely in their motion

to intervene that came five weeks after the filing of the summons and complaint.  Plaintiffs assert

that the need for expediency is obvious, and their month-long delay in attempting to intervene is

untimely.

 Because the notice to intervene was filed at the earliest stage of this litigation, before discovery

began and the Court heard the motions for injunctive relief, the court finds that the Republican

Committees made a timely application.

### 2.  The Republican Committees have not demonstrated a sufficient enough interest in the enforcement of the absentee ballot statute to justify intervention

The second factor directs this Court to evaluate whether the Republican Committees have

an interest relating to the property or transaction which is the subject of this action. *Schumacher*,

392 N.W. 2d at 197. In order to intervene as a matter of right, Proposed Intervenors must claim

"an interest relating to the property or transaction which is the subject of the action." *Miller v.*

*Astleford Equip. Co*., 332 N.W.2d 653, 654 (Minn. 1983). They "must show an interest in the litigation and that [they] will either gain or lose by the judgment between the original parties." *Veranth v. Moravitz*, 284 N.W. 849, 851 (Minn. 1939). Interests that are "speculative" are insufficient; they must be "direct, substantial and legally protectable." *Standard Heating & Air Conditioning Co. v. City of Minneapolis*, 137 F.3d 567, 571 (8th Cir. 1998). Similarly, "[a]n undifferentiated generalized interest in the outcome of an ongoing action is too porous a foundation on which to premise intervention as of right." *Dalton v. Barrett*, No. 2:17-CV-04057, 2019 WL 3069856, at *4 (W.D. Mo. July 12, 2019).

The Republican Committees assert the following factors as the basis for their intervention:

1) The Committees' support of free and fair elections for all Minnesotans;
2) The preservation of existing state laws; and
3) The interest in ensuring that the Committees are not subject to a broader range of competitive tactics than state law would otherwise allow. *See* PO MTI 11, 12

### a. The support of free and fair elections for all Minnesotans and the preservation of existing law are interests too generalized to support intervention

Supporting free and fair elections is a laudable goal, and one that all Minnesotans should share. The Republican Committees' assertion of this goal as a particularized right to support intervention is misplaced. Generalized interests are insufficient to support intervention under Rule 24. *See Chiglo v. City of Preston*, 104 F.3d 185, 187 (8th Cir. 1997) (intervention improper where proposed intervenors asserted "a generalized interest in the public benefits" of enforcing an ordinance).

Similarly, an interest in preserving the statutory status quo is a goal that could be shared by millions of Minnesotans. A general ideological interest in enforcing the current law is insufficient to support intervention, particularly when the statutes at issue do not involve the

regulation of a party's conduct.  *See Coal. to Defend Affirmative Action v. Granholm*, 501 F.3d

775, 782 (6th Cir. 2007).

### b.  The preservation of a competitive environment is not sufficient as a matter of law to support intervention as a matter of right in a case involving the witness and Election Day receipt deadline requirements

The Republican Committees rely primarily on *Shays v. Fed. Election Comm'n*, in support

of their argument that protecting the competitive electoral environment is sufficient to justify

intervention.  414 F.3d 76, 85 (D.C. Cir. 2005).  In *Shays*, the United States Court of Appeals for

the District of Columbia recognized that candidates for public office had standing to challenge

Federal Election Commission's regulations under the Bipartisan Campaign Finance Reform Act

of 2002.  *Id.* at 83.  The court reasoned that, as candidates for office, the proposed plaintiffs were

among those who benefit from BCRA's restrictions on practices Congress believed to be

corrupting.  *Id.*  Moreover, the court surmised that no one would suffer more directly than

candidates if political rivals were to get elected using illegal financing.  *Id.*

The Court finds the Committees' reliance on *Shays* is somewhat misplaced.   This case

involves a determination of who is allowed to vote safely, not the regulation of political parties'

expenditure of resources.  The Committees did not address *how* they would allocate their resources

differently, for example, if Ms. Maples or Ms. Samson voted without the signature of a witness or

had their ballots postmarked on Election Day.  When pressed at the hearing, the Committees did

not claim that a change to the absentee voting requirements would directly harm their electoral

prospects, cause them to spend more money, or burden the campaign activity, as was at issue in

*Shays*.  *Id.*

### c.  The Republican Committees are not the "mirror image" of the Plaintiffs

The Committees also allege that their intervention is justified as a matter of right because they are the "mirror image" of the Plaintiffs. The Committees rely on *Democratic Nat'l Comm. v. Bostelmann*, in which the U.S. District Court for the Western District of Wisconsin granted intervention to the Republican National Committee and Republican Party of Wisconsin in a case brought by the Democratic National Committee and Democratic Party of Wisconsin. No. 20-cv-249, 2020 WL 1505640, at *5 (W.D. Wis. Mar. 28, 2020).

The Plaintiffs in *Democratic National Committee* are different than the parties at issue here. Clearly, if the Plaintiffs in this case were the opposing committees for President or the Democratic National Committee in general, there would be no doubt that the Committees would be entitled to intervention as a matter of right, as "mirror image" parties. That is not the case here – organizational Plaintiffs are a 501(c)(4) nonprofit made up of mostly retirees from public and private sector unions. There is nothing in the record to suggest that the Committees' interest "mirrors" that of the Plaintiffs or their members.

### 3. The Republican Committees have not demonstrated an interest that would be impaired or impeded by the non-enforcement of the witness requirements

The third factor directs this Court to consider the circumstances revealing that the disposition of the action may as a practical matter impair or impede the party's ability to protect that interest. *Schumacher*, 392 N.W.2d 197 at 207. This factor should be viewed from a practical standpoint rather than one based on strict legal criteria. *Id*.

The Committees argue that if the Plaintiffs' action succeeds, then the witness requirements and the Election Day receipt deadline, and their safeguards against voter fraud, ballot tampering, and undue influence in voting will be upended in the run-up to a general election. The Committees argue that Plaintiffs' lawsuit and the parties' proposed consent decree aims to "'short circuit the democratic process'" by enjoining in their entirety two state laws that "'embody[] the will of the

people'" and reflect the Legislature's appropriate effort to uphold the integrity of Minnesota's elections. *See* Committees' Br. (citing *Voting for Am., v. Steen*, 732 F.3d 382 (5th Cir. 2013).

The Court remains concerned that the Committees have not demonstrated *how* the waiver of the witness requirement or the Election Day receipt deadline would undermine electoral integrity. There is nothing of note in the record that suggests that waiving the witness requirement or counting otherwise valid ballots postmarked by Election Day would result in fraud. Certainly, there are safeguards in place to prevent such fraud, which is punishable as a felony in Minnesota.

Moreover, the Committees' interest in Minnesota holding "free and fair elections" is indistinguishable from the interest of any Minnesota voter. The relief sought by the Plaintiffs and contemplated in part by the consent decree are non-partisan: a suspension of the witness requirement and the Election Day receipt deadline during the pendency of the COVID-19 epidemic. The benefits of the relief sought will accrue equivalently to all voters, whether they cast their votes for Democrats, Republicans, Independents, or the Green Party—no voters would be obligated to endanger themselves and their community to exercise their right to vote, and those who cast their ballots on Election Day would be counted. The Committees present no evidence that the outcome of this litigation will specifically disadvantage their candidates or the voters they represent.

### 4. The Secretary of State does not adequately represent the Committees' interest

The final factor for consideration by this Court relates to the adequacy of the representation of the Republican Committees' interest by the Defendant. *Schumacher*, 392 N.W.2d 197 at 207. The inquiry here is whether the Secretary of State and its representation by the Office of the Minnesota Attorney General would sufficiently represent the interests of the Republican Committees.

The Committees argue that they have a minimal burden of showing that the existing parties may not adequately represent their interests. *Faribo Farms v. County of Dodge*, 464 N.W.2d 568, 570 (Minn. App. 1990). The Committees argue that two decisions made recently by the Secretary to abandon any defense of the witness requirements without notice to the public or the Committees are enough to justify a finding that the Secretary's representation is insufficient. Further, the Committees argue that, as discussed below, there are courts across the country that have found the witness requirement constitutional.

As the Committees have plainly stated, they should not be forced to rely on "doubtful friends" to represent their interests. Broadly, the Committees maintain that courts express skepticism over government entities serving as adequate advocates for private parties, "often conclud[ing] that governmental entities do not adequately represent the interests of aspiring intervenors." *Fund for Animals, Inc. v. Norton*, 322 F.3d 728, 736 (D.C. Cir. 2003).

The Defendant contends that courts presume that the defense of a statute from a state official is adequate as a matter of law "because in such cases the government is presumed to represent the interests of all its citizens." *N.D. ex rel. Stenehjem v. United States*, 787 F.3d 918, 921 (8th Cir. 2015). The Secretary maintains that he is providing an adequate defense to the challenged laws and argues that this Court need look no further than his aggressive defense of the ballot request statute in this case and his opposition to Plaintiffs' motion for injunctive relief.

Plaintiffs advance a similar argument, and argue that the Committees bear a heavier burden on this factor because the Secretary has a constitutional and statutory mandate to support the Committees' interests. *Swinton v. SquareTrade, Inc*., 960 F.3d 1001, 1005 (8th Cir. 2020); *see also Oakland Bulk & Oversized Terminal, LLC v. City of Oakland*, 960 F.3d 603, 620 (9th Cir. 2020) ("To establish inadequate representation, Intervenors needed to make a "very compelling

showing" because: (1) a governmental entity (Oakland) was already acting on behalf of their interests in this action: and (2) Intervenors and Oakland share the same ultimate objective of upholding the Ordinance and Resolution.").

This Court is persuaded by the authority advanced by Plaintiffs which raises the bar for demonstrating inadequacy when one of the parties is an arm or agency of the government and the case concerns a matter of sovereign interest. *Stenehjem*, 787 F.3d 918 at 921. The Court is further persuaded, however, that the Committees have sufficiently demonstrated that inadequacy because the Secretary has twice conceded the witness requirement in *LaRose* as well as in United States District Court. *See League of Women Voters v. Simon*, No. 20-1205, Tr.1–13 (D. Minn. Jun. 23, 2020).   For these reasons, the Court finds that the Committees' interests are not sufficiently represented by the Secretary of State.

The Committees' have failed to demonstrate factors two and three under Minn. R. Civ. P. 24.01 and *Schumacher.*   Because the Committee must satisfy all four factors to succeed, their motion to intervene as a matter of right is denied.  *Luthen*, 596 N.W.2d 278, at 281.

### B.  The Republican Committees are entitled to permissive intervention

Under Rule 24.02, a court may grant intervention "upon timely application . . . when an applicant's claim or defense and the main action have a common question of law or fact." Minn. R. Civ. P. 24.02. Moreover, in exercising its discretion under Rule 24.02, "the court shall consider whether the intervention will unduly delay or prejudice the adjudication of the rights of the original parties." *Id.*

As discussed above, the Committees' application to intervene is timely under both 24.01 and 24.02. *See, e.g.*, *State ex rel. Lucero v. CSL Plasma, Inc.*, No. 27-CV-19-3629, 2020 WL 807356, at *10 (Minn. Dist. Ct. Feb. 12, 2020).

Second, it is undisputed that the Committees will raise defenses that share many common questions with the claims and defenses of the parties. Plaintiffs allege that the disputed statutes surrounding absentee balloting are unconstitutional. The Committees contend that these state election laws are valid and enforceable.

Third, the Committees argue that allowing their intervention will not lead to delay or prejudice. This case is in the earliest of stages, and Committees' participation will add no additional delay.

In considering the Committees' motion for permissive intervention, this Court is mindful of the arguments advanced by the Plaintiffs and the Defendant that the Court should evaluate whether granting permissive intervention would prompt other similarly situated non-parties to seek intervention. *Ohio Valley Environmental Coalition v. McCarthy*, 313 F.R.D. 10, 30 (S.D. W. Va. 2015). Certainly the risk of opening the door to a parade of would-be intervenors is significant, particularly when considering the general election is 92 days away.  A strict adherence to the timeliness requirement of 24.02 should address the parties' very valid concerns.

In making its narrow ruling that permissive, though not mandatory, intervention is appropriate, this Court is mindful of the fact that public trust in government remains at an all-time low.  *See* i.e. Matt Stevens, *Falling Trust in Government Makes It Harder to Solve Problems, Americans Say,* N.Y. Times, July 22, 2019 https://www.nytimes.com/2019/07/22/us/politics/pew-trust-distrust-survey.html.  The once-in-a-century global pandemic and the attendant societal unease likely only exacerbates that anxiety and distrust. The Court is concerned that the denial of a seat at the litigation table to the Committees would only erode public confidence in the electoral process in this unique global moment.  The Committees' motion for permissive intervention is granted.

**The Plaintiffs' and Defendant's Motion to Approve the Consent Decree**

At the outset, the Plaintiffs and Defendants disagree with the Committees on the legal standard under which this Court should review the proposed General Election Consent decree.[1] It is undisputed that a consent decree is the product of a negotiated agreement. *City of Barnum v. Sabri*, 657 N.W.2d 201, 205 (Minn. App. 2003); *see also Elsen v. State Farmers Mut. Ins*., N.W.2d 652, 655 (Minn. 1945) (describing a consent decree as a "mere agreement of the parties under sanction of the court" to be interpreted as an agreement).  While this Court may assess the fairness of such an agreement before approving it, "the court does not, in a consent decree, judicially determine the rights of the parties." *Hentschel v. Smith*, 153 N.W.2d 199, 206 (Minn. 1967) (quoting *Hafner v. Hafner*, 54 N.W.2d 854, 858 (Minn. 1952)). Plaintiffs and Defendant argue that a trial court's power to set aside a consent decree is limited to three instances: fraud, mistake, or the absence of real consent. *Hafner*, 54 N.W.2d at 857.

The Committees argue that the judicial review of a consent decree requires a far more thorough inquiry and fairness finding as articulated by the federal court, namely whether the plaintiff has made an adequate showing of a likelihood of success on the merits of the claim. *See Flinn v. FMC Corp*., 528 F.2d 1169, 1172 (4th Cir. 1975). Courts can gauge "the fairness of a proposed compromise" only by "weighing the plaintiff's likelihood of success on the merits against the amount and form of the relief offered." *Carson v. Am. Brands, Inc*., 450 U.S. 79, 88 n.14 (1981).[2]

---

[1] The Committees did not address the primary election consent decree at argument, nor did they petition any higher court for relief via writ following the Court's entry of the primary election consent decree.  Therefore, it is the Court's position that primary election consent decree remains in place as entered, and that similar analysis regarding fairness applies to both agreements.

[2] As discussed above, this Court allowed the Committees to participate in the argument regarding the entry of the consent decree in the interest of judicial economy, despite not yet having determined at argument that they would be granted leave to intervene under Rule 24.02.

This Court is required and bound to follow Minnesota law interpreting the Minnesota Statutes. Because the Court would reach the same result under the federal standards, this Court will analyze the proposed entry of the consent decree under both Minnesota and federal law.

### 1.  The entry of the proposed consent decree is appropriate under Minnesota law

Plaintiffs and Defendant assert that the Committees are relying on non-controlling federal law, and Plaintiffs assert that the court need look no further than *Hafner*'s permissive language that a court "may look to see that a settlement is fair." 54 N.W.2d at 858.  It follows, Plaintiffs assert, that this Court should have no problem entering the Consent Decree, which is fair, preservative of the rights of the citizens of the State of Minnesota, and the agreement of the parties as the result of arms-length settlement negotiations.

It is undisputed that the proposed consent decree is non-partisan and waives the Witness Requirement and Election Day receipt deadline only with regard to the November 2020 election. The Plaintiffs and Defendant came to this agreement due to the fact that COVID-19 related illnesses and deaths in Minnesota continue to rise and have no real possibility of abatement by November. General Election Consent Decree at 2-3. If entered by this Court, Minnesotans will not have to risk their health and safety to comply with the Witness Requirement in order to vote absentee in the general election. The Consent Decree further affords Defendant sufficient time to provide instruction and certainty to voters and local election officials before absentee voting begins on September 18.

Perhaps most notably, the proposed Consent Decree reflects a limited compromise of Plaintiffs' claims, as it does not provide relief to Plaintiffs regarding their claim pertaining to universal mailing of absentee ballots.

The Committees offer no evidence that the Proposed General Election Consent Decree is the product of fraud, neglect or the absence of consent.  As such, under Minnesota state law, the proposed consent decree should be entered.

**2.   The entry of the proposed consent decree is fair and appropriate under the federal standard because the Plaintiffs are likely to succeed on the merits of their claim**

**a.   The U.S. District Court decision**

Most significant to this Court, the Committees argue that this Court should decline to enter the proposed consent decree because the United States District Court for the District of Minnesota declined to enter a nearly identical consent decree for the August primary. *League of Women Voters v. Simon*, No. 20-1205, Tr. 1–13 (D. Minn. Jun. 23, 2020). As discussed at argument, this Court is deeply concerned about two courts in Minnesota reaching opposite conclusions, especially on something so essential to a functioning government as the right to vote.

Unlike the claims advanced in the U.S. District Court case, this case relies both on claims raised under the Minnesota Constitution and the U.S. Constitution.  Compl. at 16.  It is undisputed that Minnesota courts can find greater protections of individual rights than the U.S. Constitution. *Kahn v. Griffin*, 701 N.W.2d 815, 828 (Minn. 2005) (noting "it is now axiomatic that we can and will interpret our state constitution to afford greater protections of individual civil and political rights than does the federal constitution").  Moreover, this Court, unlike the U.S. District Court, is bound by *Erlandson v. Kiffmeyer*, in which the Minnesota Supreme Court found that election officials were required to mail replacement ballots to all voters who requested them following the death of Senator Paul Wellstone.  659 N.W.2d 724, 726 (Minn. 2003).

In writing for the Court, Chief Justice Blatz found as follows:

The purpose of the absentee ballot is to enfranchise those voters who cannot vote in person. To prohibit mailing of replacement absentee ballots to absentee voters who continue to be unable to vote or pick up a ballot in person disenfranchises the very people the absentee voter

laws are intended to benefit. In the total absence of any rational explanation, allowing some absentee voters to revote with replacement ballots but denying that opportunity to the very group for which absentee voting is designed by prohibiting the mailing of replacement absentee ballots is a denial of equal protection that requires remedial action.

*Erlandson*, 659 N.W.2d at 734.

As such, this Court is not bound by the same overbreadth reasoning that drew the federal court to the opposite conclusion.

### b.  Other federal and state Authority

### i.      The witness requirement

The Committees next assert that the proposed entry of the Consent Decree should be denied based on the authority from courts across the country that have upheld the witness requirements. The Committees cite one U.S. Supreme Court order and three cases from other jurisdictions that do not reflect the unique procedural posture of this case. *See Merrill v. People First of Ala*., No. 19A1063, Order (S. Ct. July 2, 2020) ("Merrill Order") (Justice Thomas granting a stay without analysis of an 11th Circuit ruling allowing curbside voting and exemptions from some absentee requirements in three counties in Alabama); *Democratic Nat'l Comm. v. Bostelmann*, No. 20-1538, 2020 WL 3619499 (7th Cir. Apr. 3, 2020) (finding that a Wisconsin U.S. District Court exceeded the limitations of appropriate injunctive relief); *Miller v. Thurston*, No. 20-2095, 2020 WL 3240600 (8th Cir. June 15, 2020) (addressing the "wet signature" requirement for Alabama witnesses); *Clark v. Edwards*, -- F. Supp. 3d --, 2020 WL 3415376 (M.D. La. June 22, 2020) (dismissed on standing).[3]

---

[3] The Committees also offer *Nielsen v. DeSantis* in support of its argument that other courts have found the witness requirement constitutional, but this case. Dealt primarily with ballot deadline issues and ballot access for blind voters. No. 4:20-cv-236 (N.D. Fla. June 24, 2020)

The Plaintiffs in turn offer three cases from other districts that *do* more closely reflect the unique procedural posture of this case, namely *Thomas v. Andino*, - F. Supp. 3d. -, 2020 WL 2617329 (D.S.C. May 25, 2020) (enjoining the South Carolina State Election Commission from enforcing the witness requirement); *League of Women Voters of Va. v. Va. State Bd. of Elections*, - F. Supp. 3d --, 2020 WL 2158249 (W.D. Va. May 5, 2020) (approving a consent decree between the parties that would enjoin the enforcement of Virginia's witness requirement); *Common Cause Rhode Island et al v. Nellie M. Gorbea et al.* 2020 WL 4365608 (D. R.I. July 30, 2020) (approving a consent decree between the parties that would enjoin the enforcement of Rhode Island's witness requirement).

As such, this Court is not persuaded by the Committees' argument that the vast weight of authority rests in the Committee's favor on the witness requirement question: indeed, the three district court cases that address the very same question in other states are conclusions in favor of the Plaintiffs.  Moreover, it is reasonable for the Secretary to conclude that the Plaintiffs would be likely to prevail in the instant case.

**ii.    The Election Day receipt deadline**

The Committees next point the Court to the Pennsylvania Supreme Court, which has rejected requests to postpone the Election Day receipt deadline for mail-in and absentee ballots submitted in Pennsylvania's June primary. *See, e.g., Dis. Rights Pa. v. Boockvar*, No. 83 MM 2020 (May 15, 2020) (per curiam); *Dis. Rights Pa. v. Boockvar*, No. 83 MM 2020 (May 15, 2020) (Wecht, J., concurring).

Again, given that dozens of courts around the country are wrestling with this issue, there is sufficient enough inapposite authority to render the Secretary's decision to enter the consent decree reasonable.  *See, e.g.  Democratic Nat'l Comm. v. Bostelmann*, No. 20-CV-249-WMC, 2020 WL

1638374, at *18 (W.D. Wis. Apr. 2, 2020) (extending deadline for the receipt of absentee ballots for the primary election in Wisconsin after the Wisconsin Election Commission agreed to the extension).

### c.  The alleged speculation regarding what COVID-19 will be in November

The Committees next argue that the consent decree rests on mere speculation that COVID-19 will render voting unsafe in November.  The Committees argue that the record is devoid of evidence that COVID-19 will be worse in November, or that guidance will develop that will make in-person voting unconstitutionally unsafe.  Further, the Committees argue that following basic social distancing practices will render the witness requirement safe for the Plaintiffs, or alternatively, that the Plaintiffs could secure a Zoom account and somehow have a witness approve their ballot while still complying with social distancing.

This Court is not convinced that the Plaintiffs must demonstrate that in-person voting is unconstitutionally unsafe.  Rather, Plaintiffs need only show that Minnesotans' right to vote absentee is burdened by the challenged laws. *Kahn v. Griffin*, 701 N.W.2d 815, 832-33 (Minn. 2005); *see also Erlandson v. Kiffmeyer*, 659 N.W.2d 724, 734 (Minn. 2003) ("The purpose of the absentee ballot is to enfranchise those voters who cannot vote in person.").

Moreover, as to the question of voter safety, and with deep respect to Committees' counsel, his clients can't have it both ways.  As the Defendant noted at argument, the President's own tweets suggest a recognition that voter safety will be compromised in November.  The day before this hearing, the President of the United States tweeted "Delay the Election until people can properly, securely and safely vote???"  *See* Donald J. Trump (@realDonaldTrump) Twitter (July 30, 2020, 8:46 a.m.).

Counsel said that he had not seen the President's tweets from the previous day but offered, essentially, that if the President had had the opportunity to fully state his point, he would have acknowledged that Minnesota's voter safety standards are so unique as not implicate the President's safety concerns.

The President's own admissions, as well as the prediction of experts that COVID-19 will likely surge in the fall as the election coincides with the return of cold and flu season, lead the Court to conclude that the safety concerns for the ballot box are not so speculative as to render the Secretary's decision to resolve the Plaintiff's complaints unreasonable.  *See* Kristine A. Moore et al., *Part 1: The Future of the COVID-9 Pandemic: Lessons Learned from Pandemic Influenza, in COVID-19*: The Cidrap Viewpoint (Ctr. for Infectious Disease Research and Policy, 2020), https://www.cidrap.umn.edu/sites/default/files/public/downloads/cidrap-covid19-viewpoint-part1_0.pdf.; Glen Howatt, *COVID-19 Cases Could Surge in Fall, Last Two Years, University of Minnesota Report Says* Minneap. Star-Trib. (May 3, 2020), https://www.startribune.com/covid-19-cases-could-surge-in-fall-last-2-years-u-report-predicts/570130602/.   Indeed, many schools throughout Minnesota will begin the school year remotely over COVID concerns.  *See* Erin Adler, *St. Paul Schools Likely to Begin Year With Distance Learning,* Minneap. Star-Trib. (July 30, 2020), https://www.startribune.com/st-paul-schools-likely-to-begin-year-with-distance-learning/571962822/.  The fact that school districts across the state have determined that hundreds of thousands of Minnesota children will not return to the classroom in September makes the impact of COVID in November far from speculative.

### d.  The Plaintiffs' claims that the absentee ballot statutes and the Election Day receipt deadline present an unconstitutional burden

The Committees next argue that the Plaintiffs have failed to demonstrate their likelihood of success on either of their constitutional or Equal Protection claims.  The Committee argues that

enforcement of the witness requirement and Election Day receipt deadlines are not the sort of state election laws that raise constitutional questions. *See Burdick v. Takushi*, 504 U.S. 428, 433 (1992) (recognizing that state election laws "will invariably impose some burden upon individual voters"). "[T]o maintain fair, honest, and orderly elections, states may impose regulations that in some measure burden the right to vote." *Kahn v. Griffin*, 701 N.W.2d 815, 832 (Minn. 2005) (citing *Anderson v. Celebrezze*, 460 U.S. 780, 788 (1983)).

At a minimum, it is reasonable for the Secretary to conclude that the Plaintiffs are likely to succeed on their claim that the witness requirement violates the Equal Protection Clause of the Minnesota and U.S. Constitutions.  By requiring voters who live alone to place their lives and health in danger in order to exercise their fundamental right to vote, it is reasonable to conclude that the Witness Requirement impermissibly and irrationally denies the fundamental right to vote to those individuals while there is still ongoing community transmission of COVID-19.  As in *Erlandson,* this Court need not resolve whether strict scrutiny or rational basis review is the proper standard here, because in the circumstances of this case the witness requirement would likely not survive even the lowest level of scrutiny.  659 N.W.2d at 734.  The Secretary offers no rational basis for the enforcement of the witness requirement, and the Committees' vague references to fraud prevention, without more, are insufficient to suggest a legitimate state interest for enforcing the Witness Requirement during a global pandemic.

Moreover, had the parties not reached a consent decree to suspend the witness requirements for the general election, this Court would have been empowered to grant the preliminary injunction, or *sua sponte*, find that the requirement, as applied in the current pandemic, unconstitutionally limits voting access, and simply order precisely what the consent decree achieves.  *See, e.g.*, *Burdick v. Takushi*, 504 U.S. 428, 434 (1992) (holding that the

24

constitutionality of election laws depends upon a court's balancing of the character and magnitude of any law burdening the right to vote against the relevant government interest served by the law); *Anderson v. Celebrezze*, 460 U.S. 780, 788 (1983).

Similarly, it is reasonable for the Secretary to conclude that the Plaintiffs are likely to succeed on their Election Day receipt deadline motion.  In this unusual global crisis, it is more than reasonable to conclude that a ballot placed with the United States Postal Service quite possibly might not be delivered until on Election Day. It is reasonable for the Secretary to conclude that a ballot posted on or before Election Day should be counted.

### e.  The balancing of the equities

The Committees finally argue that this Court should reject the General Election Consent Decree because waiving the witness requirement is not in the public interest.  Certainly, the Plaintiffs and the Secretary of State have sufficiently demonstrated that the consent decree is in the best interests of the people that they represent.   It is reasonable for the Secretary to conclude that this waiver of the witness requirement and Election Day deadline is in the best interests of the health, safety, and constitutional rights of Minnesota's voters, and, therefore, in the public interest.

Under either Minnesota or federal law, the proposed General Election Consent Decree is fair and appropriate.  The Motion to enter the Consent Decree is granted.