# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

James Carson & Eric Lucero,

                Plaintiffs,

    v.

Steve Simon, in his official capacity as
Secretary of State of Minnesota,

                Defendant.

Civil No. 0:20-cv-02030-NEB-TNL

**DEFENDANT'S MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**

## INTRODUCTION

This case involves a dilatory challenge to a consent decree, entered in Minnesota state court, that modifies an election rule to ensure that voters are not disenfranchised by pandemic conditions this November. The consent decree was executed by the Secretary of the State and the plaintiffs in *LaRose v. Simon*, No. 62-CV-20-3149, Minn. 2d Judicial Cir., County of Ramsey. It changes the rule that absentee ballots must be received by election day (the election day receipt rule). For 2020 only, it establishes a postmark rule, under which ballots are timely if they are postmarked by election day and received within seven days of the election. On August 3, 2020, the state district court judge, the Honorable Sara Grewing, approved and entered judgment on the consent decree and issued an accompanying order explaining why it is fair, reasonable, and in the public interest.

The Republican Party of Minnesota and the Republican National Committee appealed the entry of the consent decree directly to the Minnesota Supreme Court. But,

after the U.S. Supreme Court rejected a challenge to a similar consent decree in Rhode Island, they dropped their appeal and waived their right to challenge the consent decree in any other judicial forum.

Now, seven weeks after the consent decree was entered and nearly two weeks after voting began in Minnesota, Plaintiffs seek to enjoin the consent decree in this forum. They claim that it violates the Electors Clause of Article II and federal elections statutes for a state court judge to order a change to a state election rule, under the state constitution, by entering judgment on a consent decree. Their motion and complaint peddle a bogus scare tactic with no legal support: that Minnesota risks losing its electoral college votes if the consent decree remains in force.

This Court should deny their motion and dismiss this case for at least five reasons. First, Plaintiffs lack standing. Second, this Court should abstain from hearing this case under the *Pennzoil* doctrine. Third, the Court should refrain from issuing an injunction under the Supreme Court's *Purcell* principle. Fourth, Plaintiffs' claims are severely flawed and based on gross misinterpretations of the consent decree. They clearly fail on the merits. Fifth, undoing the consent decree would cause substantial harms and is against the public interest, as it would create confusion and likely disenfranchise voters relying on the ballot instructions they have already received about the postmark rule.

## BACKGROUND

### I.   MINNESOTA'S RESPONSE TO THE COVID-19 PANDEMIC

Covid-19 is an infectious disease caused by a newly discovered coronavirus that spreads rapidly through respiratory transmission. Asymptomatic individuals may carry

and spread the virus, and there is currently no known vaccine or effective treatment, making response efforts complex and daunting.[1]  To date, Covid-19 has killed over 200,000 people in the United States.[2]  It has killed over 2,000 in Minnesota.[3]

In response to the Covid-19 pandemic, Minnesota Governor Tim Walz declared a state of peacetime emergency on March 13.  (Emergency Exec. Order 20-01.)  Since that time, Minnesota has engaged in a comprehensive plan to combat Covid-19 that has included a series of emergency executive orders intended to slow the spread of the disease, ramp up the capacity of the health care system, and provide an increased economic safety net.  On March 25, 2020, Governor Walz directed Minnesotans to stay home, except as necessary for certain exempted activities.  (Emergency Exec. Order 20-20.)  On April 8 and April 30, the Governor extended the stay-at-home order, with gradually lessening restrictions.  (Emergency Exec. Orders 20-33, 20-48.)  On May 13, Governor Walz issued Emergency Executive Order 20-56, which ended the "Stay-at-Home" regime and began the "Stay Safe" orders, which continued reopening Minnesota's public life.  (Emergency Exec. Order 20-56.)  The order prohibited gatherings of more than ten people, required public accommodations, including restaurants and bars, to stay

---

[1]  *See* CDC, *Coronavirus (Covid-19)*, https://www.cdc.gov/coronavirus/2019-ncov/index.html.

[2]  *See* CDC, *Covid Data Tracker*, https://covid.cdc.gov/covid-data-tracker/#cases_totalcases.

[3]  *See* Minnesota Department of Health, *Situation Update for Covid-19*, https://www.health.state.mn.us/diseases/coronavirus/situation.html.

3

closed, required workers to work from home if possible, and mandated social distancing protocols in workplaces that do open.  (*Id.*)

On June 5, Governor Walz signed executive order 20-74, which remains in effect. (Emergency Exec. Order 20-74.)  It continues to encourage Minnesotans to stay home when possible and limit social gatherings.  (*Id.*)  It also allows businesses and other organizations to operate under certain occupancy restrictions and requires them to comply with guidance regarding face coverings, sanitation, and social distancing measures.  (*Id.*)  On July 13, the Governor extended the peacetime emergency through August 12.  (Emergency Exec. Order 20-78.)  On July 22, the Governor issued an order requiring Minnesotans to wear a face covering in certain indoor settings to prevent the spread of Covid-19.  (Emergency Exec. Order 20-81.)  Most recently, on September 11, the Governor extended the peacetime emergency for another 30 days.  (Emergency Exec. Order 20-89.)

## II.   MINNESOTA'S ABSENTEE VOTING SYSTEM

### A.   No-Excuse Absentee Voting and Early Voting

Early and absentee voting begins 46 days before the date of the election, which was September 18, 2020, for the November 3 general election.  Minn. Stat. § 203B.081, subd. 1.  Minnesota is among the states that provide "no-excuse absentee voting," meaning that any eligible voter may vote by absentee ballot.  Minn. Stat. § 203B.02, subd. 1.  A voter may apply for an absentee ballot at any time at least one day before the election.  Minn. Stat. § 203B.04.  Local election officials—county auditors and municipal clerks—are responsible for making absentee ballot application forms available to voters,

4

Minn. Stat. §§ 203B.04-.06, and are required to "furnish them to any person on request," Minn. Stat. § 203B.04, subd. 1(a); *see* Minn. Stat. § 203B.06, subd. 1.   Local election officials are also responsible for transmitting absentee ballots to those who request them. Minn. Stat. § 203B.06, subd. 3(b); Minn. Stat. § 203B.07, subd. 1.

### B.    Minnesota's Election Day Receipt Rule

Minnesota law requires that absentee ballots must be received by the proper local election officials either by 3:00 p.m. (if hand-delivered) or 8:00 p.m. (if delivered by mail) on election day.   Minn. Stat. § 203B.08 subd. 3; Minn. R. 8210.2200 subp. 1. Ballots received after these times are marked late and not sent to the ballot board for counting.   While many states have a similar election day receipt rule, nineteen states have laws that accept postmarked ballots as timely when they are arrive after election day.[4]

## III.   PROCEDURAL HISTORY

### A.    *LaRose v. Simon*

On May 13, 2020, a group of plaintiffs, including Minnesota Alliance for Retired Americans Educational Fund, a nonprofit with over 80,000 members in Minnesota, filed suit against Secretary Simon in Ramsey County.   They sought to enjoin the enforcement of two Minnesota election laws: Minnesota's election day receipt rule and Minnesota's requirement that a witness certify an absentee voter's ballot.   *LaRose v. Simon*, No. 62-

---

[4] For a complete list of these states and statutory cites, see National Conference of State Legislatures,    Receipt    and    Postmark    Deadlines    for    Absentee    Ballots, https://www.ncsl.org/research/elections-and-campaigns/vopp-table-11-receipt-and-postmark-deadlines-for-absentee-ballots.aspx.

CV-20-3149, Minn. 2d Judicial Cir., County of Ramsey.  The plaintiffs challenged these laws generally and as they are applied for elections held during the Covid-19 pandemic.

After arms-length negotiations, on June 16, the plaintiffs and the Secretary entered into a consent decree for the August 11 primary.  *See* Marisam Decl., Ex. A.  This consent decree provided that the witness requirement would not be enforceable for the primary election.   Most relevantly, it modified the election day receipt rule by establishing a postmark rule, under which ballots postmarked by the day of the primary would be timely.  *Id.*  Judge Grewing signed the consent decree on June 17.  *Id.*

Local election officials implemented the changes required by the consent decree, and the primary election was held with no significant problems, despite record-level turnout.  *See* Tim Harlow, *More than 100,000 voters cast ballots in primary in Minneapolis*, Star Trib. (Aug. 12, 2020).

After plaintiffs filed a motion for a temporary injunction as to the November 3 general election, the parties again negotiated a consent decree.  On July 17, the plaintiffs and the Secretary filed a stipulation and partial consent decree and asked the court to enter the decree for the November 3, 2020 general election.  Marisam Decl., Ex. B. Similar to the consent decree in effect for the primary election, this consent decree provides that the witness requirement is suspended for the November election and that ballots postmarked by election day, and received within seven days, are timely.

Specifically, as to the election day receipt rule, the consent decree establishes:

For the November General Election Defendant shall not enforce the Election Day Receipt Deadline for mail-in ballots, as set out in Minn. Stat. §§ 203B.08 subd. 3, 204B.45, and 204B.46 and Minn. R. 8210.2200 subp. 1, and 8210.3000, that

6

ballots be received by 8:00 p.m. on Election Day if delivered by mail.  Instead, the deadline set forth in paragraph VI.D below shall govern.

. . .

Defendant shall issue guidance instructing all relevant local election officials to count all mail-in ballots in the November General Election that are otherwise validly cast and postmarked on or before Election Day but received by 8 p.m. within 5 business days of Election Day (i.e., seven calendar days, or one week). For the purposes of this Stipulation and Partial Consent Decree, postmark shall refer to any type of imprint applied by the United States Postal Service to indicate the location and date the Postal Service accepts custody of a piece of mail, including bar codes, circular stamps, or other tracking marks.  Where a ballot does not bear a postmark date, the election official reviewing the ballot should presume that it was mailed on or before Election Day unless the preponderance of the evidence demonstrates it was mailed after Election Day.

*Id.* at 9-10.

The consent decree contained undisputed stipulated facts justifying these changes. It was stipulated that, due to the pandemic, "increases in absentee balloting are already being observed for the August 11, 2020 Primary Election and will continue in the November General Election, and coupled with corresponding shortages of elections personnel and mail delays, appear likely to impact the November General Election and threaten to slow down the process of mailing and returning absentee ballots."  *Id.* at 3.  It was also stipulated that: "Mail deliveries could be delayed by a day or more under cost-cutting efforts being imposed by the new postmaster general," due to Covid-19.  *Id.* at 4.

Under Minnesota law, a consent decree is the product of a negotiated agreement between the parties that acquires the status of a judgment through approval of the court. *Hentschel v. Smith*, 153 N.W.2d 199, 206 (Minn. 1967) (quoting *Hafner v. Hafner*, 54 N.W.2d 854, 858 (Minn. 1952)).  While a judge does not ascertain the full rights of the parties in deciding whether to approve a consent decree, the judge assesses the decree's

fairness.  *Id.*; *see also Mr. Steak, Inc. v. Sandquist Steaks, Inc.*, 245 N.W.2d 837, 838 (1976) (noting that courts determine whether a consent decree is "fair and in the public interest").

In *LaRose*, the district court heard argument on the consent decree on July 31.  By that time, the Republican Party of Minnesota, the Republican National Committee, and the National Republican Congressional Committee had moved to intervene to oppose entry of the consent decree and were allowed to participate in the arguments.  On August 3, the court signed the consent decree and entered an accompanying order.  Marisam Decl, Ex. C.  The order laid out the court's reasons for why the consent decree was fair, reasonable, and in the public interest, and why the Secretary was reasonable to conclude that the plaintiffs were likely to succeed on the merits of their motion.  *Id.*  The court specifically found that the requirements of the Minnesota Constitution will be carried out by the implementation of the decree.  Marisam Decl., Ex. B at 6.

On August 10, the Republican Party of Minnesota, the Republican National Committee, and the National Republican Congressional Committee appealed the decision and sought accelerated review directly at the Minnesota Supreme Court.  On August 12, the Minnesota Supreme granted the petition for accelerated review and set a briefing schedule.  *See LaRose v. Simon*, A20-1040, Minn. Sup. Ct. (Aug. 12, 2020 PFR Grant).

The next day, on August 13, the U.S. Supreme Court issued an order rejecting a challenge to a similar consent decree in Rhode Island, as discussed further below.  *See Republican National Committee v. Common Cause of Rhode Island*, Sup. Ct. Docket 20A28, 591 U.S. (Aug. 13, 2020 order in pending case); Marisam Decl., Ex. E.  Perhaps

sensing that their challenge to the *LaRose* consent decree was futile, the Republican Party of Minnesota, the Republican National Committee, and the National Republican Congressional Committee voluntarily dismissed their challenge to the consent decree and waived their right to challenge it in any other forum.   Marisam Decl., Ex. D.   The Minnesota Supreme Court dismissed the appeal on August 18.   *Id.*

On August 28, the Secretary of State's Office, pursuant to the consent decree, sent absentee ballot instructions to local election officials.   In large letters, these instructions inform voters:   "Your returned ballot must be <u>postmarked **on or before**</u> Election day (November 3, 2020) & received by your Absentee Voting Office within 7 days of the election . . . to be counted."   Maeda Decl., Ex. A.   Voters began receiving ballots with these instructions on September 18, when absentee and early voting began in Minnesota. Maeda Decl., ¶ 3.   The Secretary's Office also posted information about the postmark rule on its website.[5]   To date, more than 1 million Minnesota voters have requested absentee ballots.   Maeda Decl., ¶ 4.

## B.   *Carson v. Simon*

More than a month after the Republican Party waived its rights to challenge the consent decree, two members of the Republican Party brought this challenge to the consent decree.   Plaintiffs bring two claims.   First, they claim that, under the Electors Clause in Article II of the U.S. Constitution, a state court judge cannot order changes to a state election law, pursuant to the state constitution, when those changes are submitted to

---

[5]   *See* Office of the Minnesota Secretary of State, Vote Early by Mail, https://www.sos.state.mn.us/elections-voting/other-ways-to-vote/vote-early-by-mail/.

the court through a consent decree.  They ask this Court to be the first ever to adopt such a strained reading of the clause.  Second, they claim that the consent decree should be construed as setting a different date for the November 3 general election, in violation of federal statutory law.

On September 24, they moved for a preliminary injunction seeking to undo the consent decree approved in state court.

## LEGAL STANDARD

Plaintiffs must clear multiple hurdles in this case before the Court addresses the standard of review for their preliminary injunction.  Notably, plaintiffs must demonstrate standing at all stages of litigation, and a plaintiff without standing cannot seek injunctive relief.  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 559–60 (1992).  Plaintiffs must also show that an injunction would not violate abstention doctrine designed to ensure that federal courts do not interfere with a state court's judgment.  *Pennzoil Co. v. Texaco, Inc.*, 481 U.S. 1 (1987).  In addition, in a lawsuit seeking changes to election rules, courts may decline to issue an injunction if it is close to the election and the injunction will interfere with the orderly administration of the election.  *See Purcell v. Gonzalez*, 549 U.S. 1 (2006).

Even if these plaintiffs clear those hurdles, injunctive relief is an extraordinary remedy, and the burden rests with the movant to establish its propriety.  *See Watkins, Inc. v. Lewis*, 346 F.3d 841, 844 (8th Cir.2003).  A district court considers four factors when evaluating whether an injunction is warranted: (1) the threat of irreparable harm to the movant, (2) the balance between this harm and the injury that the injunction will inflict

on other parties, (3) the probability that the movant will succeed on the merits and (4) the public interest.  *See Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 114 (8th Cir. 1981).  The probability of success on the merits is the predominant factor, but the failure to demonstrate irreparable harm is also an independently sufficient ground to deny injunctive relief.  *Watkins, Inc*., 346 F.3d at 844.

## ARGUMENT

This Court should deny the injunction and dismiss this case for five reasons.  First, Plaintiffs lack prudential and Article III standing.  Second, this Court should abstain from hearing this case under the *Pennzoil* doctrine, which precludes federal courts from interfering with state court judgments.

Third, under the *Purcell* principle, Plaintiffs waited too long to challenge the consent decree.  The consent decree has been in force since August 3.  Voting began on September 18, and voters have relied on the changes in the consent decree.  To enjoin the consent decree now and alter the election rule would interfere with the orderly administration of this election, which the Supreme Court has counseled against.  *Purcell*, 549 U.S. at 8.

Fourth, Plaintiffs' claims are not likely to succeed.  Their position that a state court judge cannot order changes to a state election law, pursuant to the state constitution, when those changes are submitted to the court through a consent decree, is ludicrous.  Their claim that the consent decree changes the election day is based on a gross misconstruction of the decree's terms.

Finally, *Dataphase*'s balance of harms weighs heavily against Plaintiffs, given the strong interests in settling election rules well before election day, and ensuring that Minnesotans do not have to risk their health to exercise their right to vote. Plaintiffs' sensationalistic claim that Minnesota will lose its electoral college votes has no basis in law or fact.

## I.   PLAINTIFFS LACK STANDING.

Article III of the U.S. Constitution limits the jurisdiction of federal courts to "Cases" and "Controversies." U.S. Const. art. III, § 2, cl. 1. A "genuine case or controversy" exists only where a plaintiff has "standing" to sue. *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2565 (2019). Standing is a jurisdictional requirement that "cannot be waived or forfeited," *Va. House of Delegates v. Bethune-Hill*, 139 S. Ct. 1945, 1951 (2019), and must be demonstrated by plaintiffs seeking a preliminary injunction, *see, e.g.*, *Jones v. Jegley*, 947 F.3d 1100, 1103-05 (8th Cir. 2020). To establish Article III standing, a plaintiff must present an injury that is "concrete and particularized" and "actual" or "imminent," that is "fairly traceable to the challenged action of the defendant," and that can be prevented or redressed by "a favorable decision." *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009).

In addition to the jurisdictional limitations, the doctrine of standing also imposes prudential limitations that require a plaintiff to "assert his own legal rights and interests," rather than resting "his claim to relief on the legal rights or interests of third parties." *Kowalski v. Tesmer*, 543 U.S. 125, 128 (2004) ("The doctrine of standing . . . involves both constitutional limitations on federal-court jurisdiction and prudential limitations on

its exercise."). Here, Plaintiffs' motion must be denied because they cannot establish either prudential or Article III standing.

### A.      Plaintiffs Lack Prudential Standing.

"Prudential standing is ascertained according to the zone-of-interests tests, that is 'whether the zone of interest sought to be protected by the complainant is arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question.'" *Cent. S. D. Coop. Grazing Dist. v. Sec'y of U.S. Dept. of Agric.*, 266 F.3d 889, 895 (8th Cir. 2001) (quoting *Bennett v. Spear*, 520 U.S. 154, 165 (1997)). "By imposing prudential limitations on standing, the judiciary seeks to avoid deciding questions of broad social import where no individual rights would be vindicated and to limit access to the federal courts to litigants best suited to assert a particular claim." *Oti Kaga, Inc. v. S.D. Hous. Dev. Auth.*, 342 F.3d 871, 880 (8th Cir. 2003). A claimed injury may run afoul of prudential standing "because its effects are indistinct from those felt by persons generally, thus depriving the plaintiff of a unique stake in the controversy." *Id.* A plaintiff may also run afoul of prudential standing limits "because the claim rests on the legal rights of third-parties." *Id.*; *see also Virginia v. Am. Booksellers Ass'n, Inc.*, 484 U.S. 383, 392 (1988) ("Even if an injury in fact is demonstrated, the usual rule is that a party may assert only a violation of its own rights.").

Plaintiffs lack prudential standing because their claims assert injuries to third parties, rather than injuries to themselves. Plaintiffs are two individuals. Both have been nominated by the Republican Party to be electors for Minnesota, and one is a member of the Minnesota House of Representatives. Compl. ¶¶ 7-8. But Plaintiffs' claims assert

13

injuries that are not personal to them. Instead, they are alleged injuries to the Minnesota State Legislature and Congress.

In Count I, for example, Plaintiffs allege that the Secretary violated Article II of the Constitution by extending the receipt deadline because Article II "vests authority *solely in the state legislature* to modify the manner and time of elections." *Id.* ¶ 79 (emphasis added). Similarly, in Count II, Plaintiffs allege that the Secretary violated Article II because "Article II authorizes *only Congress* to set the date for presidential elections." *Id.* ¶ 85 (emphasis added). Plaintiffs argue that the consent decree "usurps the power of Congress" and "also usurps the power of the Minnesota Legislature to set the manner of conducting elections." *Id.* ¶¶ 61-62.

Because usurpation of congressional or legislative power is an injury to those legislative bodies, not to Plaintiffs themselves, Plaintiffs cannot demonstrate that they are within the zone of interest intended to be protected by Article II. *See Ben Oehrleins & Sons & Daughter, Inc. v. Hennepin Cnty.*, 115 F.3d 1372, 1381-82 (8th Cir. 1997) (plaintiffs lacked prudential standing where plaintiffs were seeking to assert the constitutional rights of third parties and were not within the zone of interests intended to be protected by the Commerce Clause).

A federal district court found a lack of prudential standing based on nearly identical facts to those alleged by Plaintiffs here. In *Corman v. Torres*, 287 F. Supp. 3d 558 (M.D. Pa. 2018), plaintiffs were several Pennsylvania state senators and legislators who sought to enjoin an election from being conducted using the Pennsylvania Supreme Court's redistricting map, which it had issued after finding a prior version of the map

unconstitutional.  *Id.* at 561-62.  Plaintiffs brought suit under the Elections Clause in Article I, which "vests authority to prescribe '[t]he Times, Places and Manner of holding Elections for Senators and Representatives . . . in each State by the Legislature thereof[.]'"  *Id.* at 573 (quoting U.S. Const. art. I, § 4, cl. 1).  Plaintiffs argued that, by issuing a redistricting map, the Pennsylvania Supreme Court had violated the Elections Clause and usurped the authority of the state legislature to dictate the times, places, and manner of elections for senators and representatives.  *Id.*  But the Court found that Plaintiffs lacked prudential standing to bring this claim because plaintiffs "are neither the Pennsylvania General Assembly nor a group to which Pennsylvania has delegated the Commonwealth's lawmaking power."  *Id.*

As in *Corman*, Plaintiffs' grievance is based on the Secretary allegedly usurping the power of Congress and the Legislature to make certain rules regarding elections.  But Plaintiffs represent neither entity and cannot rely on alleged injuries to those entities to establish standing.  *Compare Va. House of Delegates v. Bethune-Hill*, 139 S. Ct. 1945, 1953 (2019) (finding Virginia House of delegates lacked standing to challenge usurpation of authority over redistricting maps because "the Virginia constitutional provision the House cites allocates redistricting authority to the 'General Assembly,' of which the House constitutes only a part" and "a single House of a bicameral legislature lacks capacity to assert interests belonging to the legislature as a whole"), *with Ariz. State Legislature v. Ariz. Independent Redistrict Comm'n*, 576 U.S. 787, 799-802 (recognizing that the Arizona house and senate acting together had standing to challenge a referendum that gave redistricting authority exclusively to an independent commission, thereby

allegedly usurping the legislature's authority under the U.S. Constitution over congressional redistricting).

**B.      Plaintiffs Cannot Demonstrate Article III Standing Because They Have No Cognizable Interest.**

Plaintiffs also lack Article III standing because they have no legally cognizable interest.    To demonstrate standing, Plaintiffs must show "an invasion of a legally protected interest which is [both] concrete and particularized [] and [] actual or imminent, not conjectural or hypothetical." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 573–74 (1992).  Plaintiffs' asserted bases for standing all fail.  First, standing cannot be based on Plaintiffs' generalized interest in the enforcement of Minnesota's election laws.  Second, Plaintiffs' status as voters is insufficient to identify a particularized and concrete injury. Third, Plaintiffs cannot sue based on their status as electors nominated by the Republican Party.

First, Plaintiffs' asserted interest in the enforcement of Minnesota's election laws is not a basis for standing.  The United States Supreme Court has repeatedly held that "a 'generalized grievance,' no matter how sincere, is insufficient to confer standing." *Hollingsworth v. Perry*, 570 U.S. 693, 705 (2013).  "A litigant raising only a generally available grievance about government—claiming only harm to his and every citizen's interest in proper application of the Constitution and laws, and seeking relief that no more directly and tangible benefits him than it does the public at large—does not state an Article III case or controversy." *Id.*

The United States Supreme Court recently rejected an almost identical challenge to a consent decree on the basis that the challengers' general interest in enforcement of duly enacted election laws was not a cognizable interest for standing. *Republican National Committee v. Common Cause of Rhode Island*, Sup. Ct. Docket 20A28, 591 U.S. (Aug. 13, 2020 order in pending case) (Marisam Decl., Ex. E).

In July 2020, a federal district court in Rhode Island approved a consent decree between the Rhode Island Secretary of State and a group of plaintiffs that enjoined enforcement of Rhode Island's requirement that a witness certify an absentee voter's ballot. *See Common Cause of Rhode Island v. Gorbea*, 20-cv-318, 2020 WL 4365608 (D.R.I.) (July 30, 2020). The Rhode Island Republican Party and the Republican National Committee ("Republicans") moved to stay enforcement of the consent decree at the First Circuit Court of Appeals. The appellate court denied the stay, holding that the Republicans were not likely to succeed on the merits and had not shown an irreparable injury. *Common Cause Rhode Island v. Gorbea*, -- F.3d --, No. 20-1753, 2020 WL 4579367 (1st Cir. Aug. 7, 2020). The Republicans then applied to the United States Supreme Court for an emergency stay. *Republican National Committee v. Common Cause Rhode Island*, Sup. Ct. Docket 20A28, Aug. 10, 2020 Application.

The Supreme Court denied the emergency stay request, finding that the Republicans lacked a cognizable interest, as necessary to support standing. The Court explained:

> [H]ere the state election officials support the challenged decree, and no state official has expressed opposition. Under these circumstances, the applicants lack a cognizable interest in the State's ability to enforce its duly

enacted laws.  The status quo is one in which the challenged requirement has not been in effect, given the rules used in Rhode Island's last election, and many Rhode Island voters may well hold that belief.

*Id.* Aug. 13, 2020 Slip Order (citation and quotation omitted).

The exact same reasoning applies to this case.  Here, just like the Rhode Island state election officials, the Secretary supports the challenged consent decree, and no state official has expressed opposition.  Additionally, the status quo for the last election in Minnesota—the August 11 primary—is one in which the election day receipt rule from Minn. Stat. § 203B.08, subd. 3, was not enforced.  Instead, the August 11 primary used a postmark rule pursuant to the June 17 consent decree governing relief for the primary election in *LaRose*, just like the one in the consent decree Plaintiffs seek to challenge here.  *See* Marisam Decl., Ex. B.  Furthermore, like Rhode Island voters, many Minnesota voters "may well hold th[e] belief" that an election day receipt deadline will not apply to the November 3 general election, particularly because they have received ballots with instructions about the postmark rule.  *See* Maeda Decl.  There is no way to distinguish the Supreme Court's holding in a way that would allow Plaintiffs to establish standing in this case.

Second, to the extent Plaintiffs are suing in their capacity as voters, their asserted injuries are too generalized to support standing.  *See Lujan*, 504 U.S. at 573-74.  Plaintiffs vaguely suggest that they, as Minnesota voters, are injured by "vote dilution."  (Dkt. 13 at 14-15.)  Plaintiffs essentially argue that their votes will have less impact because more Minnesotans will be able to cast valid ballots in the November 3 election with the extension of the deadline for receiving and counting ballots.  This exact same generalized

theory of standing was recently rejected by a district court in Nevada.  There, plaintiffs also challenged changes to voting rules, due to the COVID-19 pandemic.  However, the court held that claims by voters of a substantial risk of vote dilution "amount to general grievances that cannot support a finding of particularized injury as to [p]laintiffs."  *Paher v. Cegavske*, No. 3:20-cv-00243-MMD-WGC, 2020 WL 2748301, at *4 (D. Nev. May 27, 2020).

The fundamental problem with this type of injury is that it does not differentiate Plaintiffs from anyone else in the public at large.  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 573–74 (1992); *see also Valley Forge Christian College v. Americans United for Separation of Church and State*, 454 U.S. 464, 485, (1982) ("The proposition that all constitutional provisions are enforceable by any citizen simply because citizens are the ultimate beneficiaries of those provisions has no boundaries.").  This theory is "precisely the kind of undifferentiated, generalized grievance about the conduct of government" that fails to confer Article III standing.  *Lance v. Coffman*, 549 U.S. 437, 442 (2007); *see also Allen v. Wright*, 468 U.S. 737, 754 (1984) ("[A]n asserted right to have the Government act in accordance with the law is not sufficient, standing alone, to confer jurisdiction on a federal court.").  Plaintiffs have nowhere indicated how their interests in the integrity of elections and their interest in voting differs from the general interests of Minnesota voters.  Without any sort of particularized injury on their voting rights by the consent decree, Plaintiffs cannot establish standing.

Finally, to the extent Plaintiffs are suing in their capacity as members and representatives of the Republican Party of Minnesota, including as electors for the party,

they cannot establish standing.  As an initial matter, the Republican Party of Minnesota has expressly waived its right to challenge the consent decree in any judicial forum.  *See* Marisam Decl., Ex. D.  This waiver was an express condition of the stipulation to dismiss the Republican Party of Minnesota's appeal challenging the consent decree in state court: "Appellants waive the right to challenge in any other judicial forum the August 3, 2020 Orders and the August 3, 2020 Stipulations and Partial Consent Decrees that formed the basis for the above-captioned consolidated appeals."  *Id.*  The Minnesota Supreme Court then entered an order dismissing these appeals pursuant to the joint stipulation.  *Id.* Plaintiffs cannot claim standing as members and representatives of a group that has expressly waived any right to challenge the decree.

Even if Plaintiffs could claim standing on behalf of the Republican Party, this would not allow them to escape the Supreme Court's ruling in *Republican National Committee v. Common Cause Rhode Island*.  Whether viewed as individuals interested in enforcement of Minnesota's election laws, individual voters, or representatives of the Republican Party of Minnesota, Plaintiffs lack a cognizable interest that would provide them with standing to attack the consent decree here.

## II. THIS COURT MUST ABSTAIN UNDER *PENNZOIL*.

This Court must abstain under *Pennzoil Co. v. Texaco, Inc.*, 481 U.S. 1 (1987).  In *Pennzoil*, after Texaco lost in state court, it filed a federal lawsuit seeking to enjoin enforcement of the state court judgment, alleging that the state's process for compelling compliance with the judgment violated the U.S. Constitution.  *Id*. at 13. The U.S. Supreme Court, citing "the importance to the States of enforcing the orders and

20

judgments of their courts," held that the federal district court could not entertain the suit. *Id*. at 13. "[F]ederal injunctions" may not be used to "interfere with the execution of state judgments," particularly where the federal lawsuit "challenge[s] the very process by which [the state court] judgments were obtained" and the federal constitutional claim could have been raised in the state court action. *Id*. at 14-16. The purpose of *Pennzoil* is to preserve the State's interest in protecting "the authority of the judicial system, so that its orders and judgments are not rendered nugatory." *Id.* at 14 n.12; *see also Sprint Commc'ns, Inc. v. Jacobs*, 134 S. Ct. 584, 588 (2013) (Pennzoil applies where a federal challenge "implicate[s] a State's interest in enforcing the orders and judgments of its courts").

*Pennzoil* forbids the relief Plaintiffs seek here. Under Minnesota law, a consent decree is a court judgment. *Hentschel v. Smith*, 153 N.W.2d 199, 206 (Minn. 1967). Plaintiffs ask this Court to render the state court's judgment "nugatory," and they do so by challenging the process by which the judgment was entered. This is precisely the type of claim for the *Pennzoil* doctrine was created to avoid.

*Pennzoil* applies even though Plaintiffs were not formally parties in the state court action. *Pennzoil* is a form of *Younger* abstention, and numerous courts, including the Eighth Circuit Court of Appeals, have held that Younger bars claims of federal plaintiffs whose interests are inextricably intertwined with, or essentially derivative of, parties to a state court action. *Cedar Rapids Cellular Tel., L.P. v. Miller*, 280 F.3d 874, 881 (8th Cir. 2002); *accord Spargo v. N.Y. State Comm'n on Judicial Conduct*, 351 F.3d 65, 82-84 (2d Cir. 2003); *D.L. v. Unified Sch. Dist. No. 497*, 392 F.3d 1223, 1230-31 (10th Cir. 2004).

21

Plaintiffs' interests are clearly intertwined with and essentially derivative of the interests of the Republican Party of Minnesota, which challenged the consent decree in state court. Plaintiffs claim that they are members of the party and that they are two of the party's nominees to serve as electors in this presidential election. Compl. ¶¶ 7-8, 73 (ECF No. 1). Indeed, they are suing based on harms to them as the Republican Party's electors. *Id.* They cannot credibly claim that their interests are distinct from the Republican Party's on these issues.

The proper forum for any federal constitutional challenge to the state court judgment was in the state court itself, or in the U.S. Supreme Court on direct review. The Republican Party had the opportunity to raise these exact issues with the Minnesota Supreme Court and appeal to the U.S. Supreme Court, if they disagreed with their ruling on federal constitutional questions. Instead, it dropped its appeal and waived its right to challenge the consent decree. Marisam Decl., Ex. D. Federal court is closed to the party on these issues, and is closed to Plaintiffs, whose interests are essentially derivative of the Republican Party's interests.

## III.   PLAINTIFFS CANNOT GET THE RELIEF THEY SEEK UNDER THE *PURCELL* PRINCIPLE.

Plaintiffs filed this lawsuit on September 22, four days after voting began for the general election in Minnesota and seven weeks after entry of the consent decree they challenge. Voters have already received ballots with instructions notifying them of the postmark rule. At this late date, Plaintiffs cannot get the injunctive relief they seek under the *Purcell* principle, which counsels courts to abstain from entering injunctions that change election rules at the last minute. *Purcell*, 549 U.S. at 7.

Last-minute changes deprive election officials of the time they need to implement changes and notify voters. Orderly election administration requires knowing the rules for the election well in advance of voting. Ideally, any changes to those rules should come with plenty of lead time, so election officials can implement the changes and notify voters. The Supreme Court highlighted these concerns in *Purcell*, where it announced a presumption against last-minute interventions in the electoral process: "Court orders affecting elections, especially conflicting orders, can themselves result in voter confusion and consequent incentive to remain away from the polls. As an election draws closer, that risk will increase." *Id.* at 7.

The *Purcell* principle is a sufficient basis to deny injunctive relief. *See id.* at 5. In the *Purcell* case itself, the Supreme Court vacated a lower court's injunction because it changed an election rule too close to an election. The Ninth Circuit Court of Appeals had enjoined enforcement of an Arizona voter-identification law shortly before an election. The Supreme Court vacated the injunction because of "the imminence of the election," while "express[ing] no opinion here on the correct disposition" of the case. *Id.* at 8.; *see also Short v. Brown*, 893 F.3d 671, 680 (9th Cir. 2018) ("[E]ven if the merits question were close, the district court did not abuse its discretion [by denying a preliminary injunction on Purcell grounds]").

In this case, Plaintiffs seek an injunction to change an election rule that was in place in Minnesota for this year's primary election and, since the state district court's August 3 order and judgment, has been the announced rule for the November general

election.  Plaintiffs waited until September 22, four days after voting began in Minnesota, to bring this lawsuit.  Their delay is fatal under the *Purcell* principle.

The First Circuit recently made a similar point regarding a consent decree suspending enforcement of the absentee witness requirement in Rhode Island due to Covid-19.  Because the election rule was also not enforced for the primary election due to Covid-19, the First Circuit stated that the status quo in the state was an election without the requirement and *Purcell* concerns cut in favor of denying a stay of the consent decree as to the general election.  *Common Cause Rhode Island*, 2020 WL 4579367, at *4.

The U.S. Supreme Court denied an application for an emergency stay of the consent decree in large part based on this same reason: "The status quo is one in which the challenged requirement has not been in effect, given the rules used in Rhode Island's last election, and many Rhode Island voters may well hold that belief."  *Republican National Committee*, Sup. Ct. Docket 20A28 (Aug. 13, 2020 order in pending case); Marisam Decl., Ex. E.

The same reasoning applies with even greater force here.  The status quo is one in which there was a postmark rule for Minnesota's last election, under the June 17 consent decree.  Many Minnesota voters believe that this is the rule for the general election, because they have received instructions with their ballots telling them this is the rule.

Under *Purcell*, Plaintiffs cannot get the relief they want.  This Court should deny the injunction.

IV.    **PLAINTIFFS ARTICLE II CLAIM FAILS ON THE MERITS.**

The predominant factor for an injunction is the likelihood of success on the merits. *Watkins, Inc.*, 346 F.3d at 844.  Plaintiffs' first claim, under the Electors Clause of Article II of the U.S. Constitution, fails for four reasons.

First, the U.S. Supreme Court has established that courts can order a change from an election day receipt rule to a postmark rule due to Covid-19.  *See Republican Nat'l Comm. v. Dem. Nat'l Comm*, 140 S. Ct. 1205 (2020) (per curiam).  Second, there is no basis to support Plaintiffs' absurd claim that courts cannot order this relief when it is presented to them in the form of a consent decree.  Third, Plaintiffs' Electors Clause claim has no grounding in the clause's text, purpose, or history.  Fourth, the Minnesota Legislature has authorized the Secretary of State to make changes to election laws pursuant to court orders.

### A.    The Supreme Court Has Established that a Court Can Enter an Order Changing a State's Election Day Receipt Rule to a Postmark Rule.

Earlier this year, the U.S. Supreme Court ordered that Wisconsin change its election day receipt rule to a postmark rule for its primary election.  *Republican Nat'l Comm. v. Dem. Nat'l Comm*, 140 S. Ct. 1205 (2020) (per curiam).  The consent decree and judgment issued by the state court judge in *LaRose* implemented virtually the identical relief for the Minnesota general election.

Wisconsin, like Minnesota, has a requirement that absentee ballots must be received by election day.   Wisc. Stat. § 6.87(6).  Before Wisconsin's April 7, 2020, primary, a federal district court in Wisconsin ordered that absentee ballots received six days after the election should be counted, regardless of when they are postmarked, based

on concerns related to the spread of Covid-19.  140 S. Ct. at 1206.  The Seventh Circuit Court of Appeals rejected the Republican National Committee's attempt to stay the district court order.  *Democratic National Committee v. Bostelmann*, No. 20-1538, 2020 WL 3619499 (7th Cir. Apr. 3, 2020).  The Supreme Court stayed the district court's order to the extent it requires the State to count absentee ballots postmarked after election day. *Republican National Committee*, 140 S. Ct. at 1206.  However, the Court ordered that all ballots postmarked by election day and received within six days are timely: "Therefore, subject to any further alterations that the State may make to state law, in order to be counted in this election a voter's absentee ballot must be either (i) postmarked by election day, April 7, 2020, and received by April 13, 2020, at 4:00 p.m., or (ii) hand-delivered as provided under state law by April 7, 2020, at 8:00 p.m."  *Id.* at 1208.  The Supreme Court's holding shows that such a change is a lawful and reasonable response to an election held during this pandemic.

The rationale for the change to the Wisconsin primary was that the pandemic had led to a surge in absentee ballot requests, creating a backlog and delay in how quickly voters would receive their ballots.  *Id.* at 1209-1210 (Ginsburg, J., dissenting).  The *LaRose* consent decree implements the same relief based on similar rationales.  It was an undisputed stipulated finding at the state district court that a backlog of requests for ballots bogs down the process of transmitting ballots to voters.  It was also an undisputed stipulated finding at the state district court that the Postal Service has announced cost-cutting efforts that will delay mail deliveries and the return of absentee ballots during the

pandemic.  Marisam Decl., Ex. B at 3-4.  These findings persuaded the state court judge

that entering the consent decree and entering judgment on it was the appropriate action.

In short, it is clear that courts have the power to order exactly the relief ordered by

the state court in *LaRose*.

**B.      The Secretary Has Authority to Enter into a Consent Decree and to Implement the Relief Ordered by the State Judge.**

Because Plaintiffs cannot credibly argue that a court lacks the authority to order a

change from an election day receipt rule to a postmark rule, they are left to argue that the

Secretary lacks authority to present a judge with a consent decree implementing such

relief.  This position is absurd.  It is contrary to constitutional principles, case law, and

common sense.

The Secretary is a constitutional officer and chief elections officer for Minnesota.

He is bound to support the Constitution and exercise his best judgment when

implementing Minnesota's election laws.  Minn. Const., art. V, sec. 6.  When the *LaRose*

lawsuit was filed challenging the constitutionality of election laws as applied during this

pandemic, he had an obligation to exercise his best judgment to determine whether

application of the laws would violate Minnesota's Constitution.  The Secretary, though,

did not unilaterally sign a settlement agreement to halt enforcement of the laws.  He

presented a consent decree in court that invited judicial review and approval.  The district

court found that the relief in the decrees was fair and equitable, and it was reasonable to

conclude that the plaintiffs were likely to succeed on the merits of their claims.  Marisam

Decl., Ex. C.  The Secretary is bound by the judicial power of the courts to implement the

relief in the consent decree judgment.

In the litigation over the Rhode Island consent decree altering an election rule due to Covid-19, the First Circuit expressly rejected the kind of argument Plaintiffs advance now. The Rhode Island Republican Party and Republican National Committee argued that the Secretary of State lacked the authority to enter into a decree changing a state's election laws. The First Circuit held otherwise: "if state officials fairly conclude, as credibly happened here, that enforcement of a law is unconstitutional in certain circumstances, one can hardly fault them for so acknowledging." *Common Cause Rhode Island*, 2020 WL 4579367, at *4 "And it would be odd indeed to say that a plaintiff cannot get relief from an unconstitutional law merely because the state official charged with enforcing the law agrees that its application is unconstitutional." *Id.*

Here, Plaintiffs are asking this Court to make the same "odd" finding: that a constitutional officer of a state cannot conclude that a law he implements is constitutionally problematic if applied under certain conditions, such as a pandemic, and then ask a judge to approve a change to avoid those constitutional difficulties. This Court should reject that request.

> **C.     Nothing in Article II Prevents a State from Finding that Its Election Laws Violate Its Constitution.**

Plaintiffs wish to stretch Article II far beyond its text, its historical purpose, and existing precedent. Nothing in Article II restricts a state court judge from finding a state election law unconstitutional under the state constitution. And, nothing restricts a state's chief elections officer from submitting, for a state court judge's consideration, a consent decree finding that temporarily changing a state election law would implement the provisions of the state constitution.

The Electors Clause of Article II provides: "Each State shall appoint, in such Manner as the Legislature thereof may direct, a Number of Electors, equal to the whole Number of Senators and Representatives to which the State may be entitled in the Congress." Art. II, § 1, cl. 2.

While the clause grants authority to state legislatures, it does not mean that their state laws are free from scrutiny by state constitutional officers and judges. Nearly 130 years ago, the Supreme Court made this clear when it stated that "[w]hat is forbidden or required to be done by a State" in the Article II context "is forbidden or required of the legislative power under state constitutions as they exist." *McPherson v. Blacker,* 146 U.S. 1, 25 (1892). The State's "legislative power is the supreme authority except as limited by the constitution of the State." *Id.*

A large body of Supreme Court case law makes the same point regarding the conceptually similar Elections Clause of Article I, which grants state legislature's authority to set time, place, and manner rules for U.S. congressional elections: "The Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof." Art. I, § 4, cl. 1. While the Electors Clause of Article II addresses presidential elections, the Elections Clause of Article I addresses congressional elections. Both clauses grant authority to state legislatures to set relevant state election rules.

The Supreme Court has repeatedly held that nothing in the Elections Clause alters a state court's authority to review state election laws and provide relief from them. In *Smiley v. Holm*, 285 U.S. 355 (1932), the Court held that the Elections Clause does not

"render[] inapplicable the conditions which attach to the making of state laws."  *Id*. at 365.  It does not "endow the Legislature of the state with power to enact laws in any manner other than that in which the Constitution of the state has provided that laws shall be enacted." *Id*. at 368.

More recently, the Supreme Court has explained: "Nothing in that [Elections] Clause instructs, nor has this Court ever held, that a state legislature may prescribe regulations on the time, place, and manner of holding federal elections in defiance of provisions of the State's constitution."  *Arizona State Legislature v. Arizona Indep. Redistricting Comm'n*, 135 S. Ct. 2652, 2673 (2015).

In short, while the Electors and Elections clauses grant authority to state legislatures regarding federal elections, they do not make state election laws free from review by state courts and do not prevent those courts from ordering relief from those laws.

Historically, Plaintiffs reading of Article II also finds no support.  Alexander Hamilton, writing in the Federalist Papers, emphasized that the primary purpose of the process established by Article II was to minimize the opportunity for "cabal, intrigue, and corruption" in the selection of the President.  THE FEDERALIST NO. 68 (Alexander Hamilton).  The Article II process ensured that electors could not be bribed because their identities would not be known in advance.  Most importantly for Hamilton, separating the meetings of the electors by state made these individuals less susceptible to a mob mentality: "And as the electors, chosen in each state, are to assemble and vote in the state, in which they are chosen, this detached and divided situation will expose them

30

much less to heats and ferments, which might be communicated from them to the people, than if they were all to be convened at one time, in one place." *Id.*

This basic purpose of Article II is not implicated in this case at all. By changing Minnesota's election day receipt rule to a postmark rule for the 2020 election due to Covid-19, the consent decree does not increase the opportunity for corruption that the Electors Clause in Article II was designed to guard against.

Plaintiffs are unlikely to succeed on the merits of the claim because their claim wholly lacks support from the text, purpose, history, or case law regarding the clause.

**D.     Even If Article II Requires a Legislative Enactment, Minnesota Has Such a Statute.**

Even if Article II requires a legislative enactment to authorize the Secretary to implement the relief in the consent decree, Minnesota has such a statute. Section 204B.47 provides: "When a provision of the Minnesota Election Law cannot be implemented as a result of an order of a state or federal court, the secretary of state shall adopt alternative election procedures to permit the administration of any election affected by the order." Minn. Stat. § 204B.47.

The consent decree and accompanying order are a judge and order from a state court establishing that the election day receipt rule cannot be implemented. *See Hentschel v. Smith*, 153 N.W.2d 199, 206 (Minn. 1967) (consent decrees have the force of a court judgment). By implementing the relief in the consent decree, the Secretary is acting pursuant to this express legislative enactment.

## V.  PLAINTIFFS' STATUTORY CLAIM FAILS ON THE MERITS BECAUSE THE CONSENT DECREE DOES NOT CHANGE THE DATE OF THE ELECTION.

Plaintiffs' second claim fails because it is based on a gross misreading of the consent decree.  In fact, the decree does not change the date of the election.

Plaintiffs rely on a single sentence in the decree: "Where a ballot does not bear a postmark date, the election official reviewing the ballot should presume that it was mailed on or before Election Day unless the preponderance of the evidence demonstrates it was mailed after Election Day."  Marisam Decl., Ex. B at 10.

Plaintiffs twist this language to claim that it violates federal statutory law by changing the date of the election.  It does no such thing.  It does not alter the rule that a ballot must be mailed by election day.  It just establishes a presumption to ensure that voters are not disenfranchised when they timely submit their ballots but, for no fault of their own, the Postal Service inadvertently does not postmark their ballots.

When a ballot lacks a postmark, due to inadvertence or negligence by the Postal Service, it can lead to post-election litigation over whether to count the ballot.  *See, e.g., Gallagher v. New York State Bd. of Elections*, No. 20 CIV. 5504, 2020 WL 4496849 (S.D.N.Y. Aug. 3, 2020).  Unfortunately, this kind of post-election litigation about the validity of ballots cast for particular candidates "threatens to undermine voter confidence in the electoral process and potentially to undermine confidence in the judiciary as well." Richard L. Hasen, *The Untimely Death of Bush v. Gore*, 60 Stan. L. Rev. 1, 5 (2007).

To avoid this post-election problem, the consent decree establishes a presumption that ballots without postmarks are timely, if they are received within seven days and there

is no evidence, such as other markings or dates, showing they were mailed after election day.

This presumption is based on the Postal Service's own guidance.  Even in ordinary times, before Covid-19, the Postal Service recommends that voters mail their ballots at least one week before their due date, to allow time for the ballots to be processed through the postal system and delivered to election officials.  *See* State And Local Election Mail—User's Guide, United States Postal Service, January 2020.[6]  In addition, the Office of Inspector General for the United States Postal Service has reported that states with absentee ballot request deadlines less than seven days before election day are at "high risk" of ballots "not being delivered, completed by voters, and returned to the election offices in time . . . due to the time required for election commissions to produce ballots and Postal Service delivery standards." Office of Inspector General, U.S.P.S., Rpt. No. 20-235-R20, Timeliness of Ballot Mail in the Milwaukee Processing & Distribution Center Service Area 6-7 (2020)[7].  These were undisputed stipulated facts that were part of the consent decree and record in *LaRose*.  Marisam Decl, Ex. B at 4.

Recent reports have found that "postal districts across the country are missing by wide margins the agency's own goals for on-time delivery, raising the possibility that scores of mailed ballots could miss deadlines for reaching local election offices if voters wait too long."  Anthony Izaguirre and Pia Deshpande, *Records: Mail delivery lags*

---

[6] This guidance document is available at https://about.usps.com/publications/pub632.pdf .

[7] This report is available at https://www.uspsoig.gov/sites/default/files/document-library-files/2020/20-235-R20.pdf .

*behind targets as election nears*, Star Trib. (Sept. 24, 2020).  In light of these reports, it is even more important that voters have protections to ensure they are not disenfranchised if, through no fault of their own, the Postal Service fails to postmark their ballot.

Most importantly, though, the presumption in the consent decree does not change the date of the election.  It simply establishes an evidentiary presumption for determining whether a ballot was mailed on election day.  Under the consent decree, election day remains November 3.

Because the consent decree has not changed any dates relevant to federal law, Plaintiffs cannot succeed on this claim.

## VI.  THE BALANCE OF HARMS AND THE PUBLIC INTEREST WEIGH HEAVILY AGAINST AN INJUNCTION.

Not only has Plaintiff failed to demonstrate any likelihood of success on the merits, but the remaining injunction factors, balance of harms and the public interest, also weigh heavily against an injunction that would undo the changes ordered by the consent decree for at least three reasons.  First, the state's strong interest in minimizing voter confusion and ensuring orderly elections cuts against an injunction.  Second, Plaintiffs' claimed harms of vote dilution are entirely without merit.  Third, Plaintiffs' claim that Minnesota will lose its electoral college votes is a scare tactic without any legal grounding.

### A.  An Injunction Would Confuse Voters and Disrupt Election Administration.

The State has a strong interest in minimizing voter confusion and ensuring orderly elections.  *See Carlson v. Simon*, 888 N.W.2d 467, 474 (Minn. 2016) (recognizing the

"State's interest in the orderly administration of the election and electoral processes"); *Hippert v. Ritchie*, 813 N.W.2d 374, 381 (Minn. 2012) (recognizing the state interest in minimizing "voter confusion").  When possible, these interests weigh in favor of making changes well before voting begins.  The Secretary acted in accordance with these interests when he submitted the consent decree for judicial approval on July 17, well before voting began for the general election.  The consent decree was approved on August 3 and no stay was issued, meaning that it has been the law in Minnesota since that date.

Most importantly, election officials and voters have been notified about the change ordered under the consent decree.  Ballots have been mailed to voters with instructions notifying them that their ballots will be timely if they are postmarked by election day. *See* Maeda Decl.

It is incredibly important that this presidential election, held during a once-in-a-century pandemic, goes as smoothly as possible.  An order enjoining the postmark rule at this late date would cause confusion and would interfere with orderly election administration.  The worst-case scenario would be that scores of ballots are not counted because voters, relying on their ballot instructions, mail their ballots on or shortly before election day.  This disenfranchisement is a likely outcome if Plaintiffs prevail.

Plaintiffs come nowhere close to identifying an interest sufficient to outweigh the state interest in minimizing voter confusion, ensuring orderly election administration, and ensuring that conditions created by this once-in-a-century pandemic do not cause disenfranchisement.

**B.      Plaintiffs' Vote Dilution Harm Is Not Cognizable.**

Plaintiffs' assertion of harms from "vote dilution" lacks any legal support.  Vote dilution "refers to the idea that each vote must carry equal weight."  *Rucho v. Common Cause*, 139 S. Ct. 2484, 2501 (2019).  It is most often asserted in cases where plaintiffs claim intentional vote dilution by a legislature to pack racial minorities into a single legislative district to invidiously minimize or cancel out their voting power.  *See Abbott v. Perez*, 138 S. Ct. 2305, 2314 (2018).

Plaintiffs claim that the consent decree will lead to an increase in valid ballots counted, which means their votes will have less marginal impact.  In other words, *increased participation in the election harms them*.  Under this theory, any voter is harmed by any law that lets anyone other than themselves cast a ballot.  This theory of vote dilution as a cognizable harm has never been accepted and should not be accepted now.

**C.      Plaintiffs' Assertion that Minnesota Will Lose Its Electoral College Votes Is an Unsupported Scare Tactic.**

Plaintiffs' assertion that Minnesota may lose its electoral college votes because of the consent decree is a bogus scare tactic with no support.

December 8 is known as the "safe harbor" deadline for appointing people who make up the Electoral College. 3 U.S.C. § 5.  If "any controversy or contest" remains after that date, then Congress will decide which electors, if any, may cast the state's ballots for president.  *Id*.  The statute does not impose any affirmative duties on states or their governmental braches.  Rather, it provides a safe harbor for states to select electors, "by judicial or other methods," when the results are contested.  *Id*.  The purpose of the

statute is to encourage a state to settle any contests and have its results for a presidential contest fully determined by a set date. *See Bush v. Palm Beach Cty. Canvassing Bd.*, 531 U.S. 70, 77 (2000).

The Supreme Court discussed this safe harbor statute in *Bush v. Gore*, 531 U.S. 98 (2000) (per curiam). While the justices issued many separate opinions, there were two basic views on the effect of the statute. The consent decree is acceptable under both views.

One view, the controlling view, was that, while a state court could order changes to election laws during a presidential election, it could not order relief that would push the state's selection of electors past the safe harbor date, if the state legislature had intended to take advantage of the safe harbor. *See id.* at 110 ("That statute, in turn, requires that any controversy or contest that is designed to lead to a conclusive selection of electors be completed by December 12. That date is upon us, and there is no recount procedure in place under the State Supreme Court's order that comports with minimal constitutional standards."); *Bush v. Gore*, 531 U.S. 98, 122 (2000) ((Rehnquist, J., concurring) ("Surely when the Florida Legislature empowered the courts of the State to grant 'appropriate' relief, it must have meant relief that would have become final by the cutoff date of 3 U. S. C. § 5.").

A second view, adopted by four justices, was that the "3 U.S.C. § 5 issue is not serious." *Bush v. Gore*, 531 U.S. 98, 130 (2000) (Souter, J., dissenting). The reason is that "no State is required to conform to § 5 if it cannot do that (for whatever reason); the sanction for failing to satisfy the conditions of § 5 is simply loss of what has been called

its 'safe harbor.'  And even that determination is to be made, if made anywhere, in the Congress."  *Id.*  Furthermore, by its very text, "Section 5, like Article II, assumes the involvement of the state judiciary in interpreting state election laws and resolving election disputes under those laws." *Bush v. Gore*, 531 U.S. 98. 125 (2000) (Stevens, J., dissenting).  Nothing in Article II or the statute frees state law from review by state courts. *Id.* at 124.

In short, under one view, state courts can order relief but just not delay the state's official certification of results.  Under the other view, state courts can order relief that delays the official certification beyond the safe harbor date.  The consent decree is acceptable under either view because it does not change any of Minnesota's deadlines for officially certifying the results of the election and will not cause Minnesota to fail to meet the federal statutory deadlines.

In Minnesota, county canvassing boards have ten days from election day to tally the results of a general election and officially certify the results.  Minn. Stat. Ann. § 204C.33, subd. 1.  The county reports are then transmitted to the State.  The State Canvassing Board is responsible for meeting and declaring the official results. *Id.* at subd 3.  The State Canvassing Board meets on the third Tuesday following a state general election. *Id.*  After meeting, it has three days to complete the canvass and declare the results. *Id.*  This state timeline is compliant with federal law, and Plaintiffs do not claim otherwise.

Nothing in the consent decree changes this timeline.  The consent decree provides that ballots postmarked by election day and received within seven days are timely and

should be counted.  County canvassing boards can comply with this decree and still meet their requirement to canvass county results within ten days of the election.  Most importantly, the timing in the consent decree does not come close to affecting the State Canvassing Board's schedule for declaring the final and official results for Minnesota.

There is simply no merit to Plaintiffs' assertion that the consent decree puts Minnesota's electoral votes in jeopardy because it changes the time for the certification of results in Minnesota.

## CONCLUSION

For these reasons, the Court should deny the injunction.


Dated:  September 29, 2020              KEITH ELLISON
                                        Attorney General
                                        State of Minnesota


                                        /s/ Jason Marisam
                                        JASON MARISAM (#0398187)
                                        CICELY MILTICH (#0392902)
                                        Assistant Attorneys General

                                        445 Minnesota Street, Suite 1100
                                        St. Paul, Minnesota 55101-2128
                                        (651) 757-1275 (Voice)
                                        (651) 282-5832 (Fax)
                                        jason.marisam@ag.state.mn.us
                                        cicely.miltich@ag.state.mn.us

                                        ATTORNEYS FOR DEFENDANT