# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

JAMES CARSON & ERIC LUCERO,

      Plaintiffs,

             v.

STEVE SIMON, Secretary of State of the State of Minnesota, in his official capacity,

      Defendant,

and

ROBERT LAROSE, TERESA MAPLES, MARY SANSOM, GARY SEVERSON, & MINNESOTA ALLIANCE FOR RETIRED AMERICANS EDUCATIONAL FUND,

      Intervenor-Defendants.

Civil Action No. 0:20-cv-02030 (NEB/TNL)

**INTERVENOR-DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**

"There is more to the right to vote than the right to mark a piece of paper and drop it in a box or the right to pull a lever in a voting booth. The right to vote includes the right to have the ballot counted." *Reynolds v. Sims*, 377 U.S. 533, 555 n.29 (1964) (quoting *South v. Peters*, 339 U.S. 276, 279 (1950) (Douglas, J., dissenting)).

Recognizing this constitutional imperative, and seeking to ensure that all eligible Minnesotans have safe and meaningful opportunities to cast ballots during an unprecedented public health crisis, Intervenor-Defendants Robert LaRose, Teresa Maples, Mary Sansom, Gary Severson, and Minnesota Alliance for Retired Americans (the "Alliance," and collectively, "Intervenors") filed suit in Minnesota state court, challenging two provisions of the State's election laws that impose particular hardships on voters relying on mail ballots. Defendant Steve Simon, the Minnesota Secretary of State (the "Secretary"), entered a consent decree with Intervenors (the "Consent Decree"), agreeing to forgo enforcement of the challenged laws during the November 2020 general election (the "November Election"). Following extensive briefing, a hearing, and a determination that Intervenors were likely to succeed on the merits of their constitutional challenges to Minnesota's election laws, Ramsey County District Court Judge Sara Grewing issued an order entering the Consent Decree on August 3, 2020.

That should have been the end of this story. Instead, nearly *two months* after Judge Grewing entered the Consent Decree, Plaintiffs James Carson and Eric Lucero challenge the reasonable and constitutionally required resolution of the state court litigation. Relying on misreadings of the law and rank speculation, they seek to upend the plans already in place to ensure that every vote is counted in November and, in so doing, threaten to disenfranchise countless vulnerable Minnesotans.

Plaintiffs' lawsuit—a collateral attack on a state court judgment and the resulting consent decree—raises basic questions of propriety; as the U.S. Supreme Court recently noted, a party "lack[s] a cognizable interest in the State's ability to 'enforce its duly enacted' laws" where "state election officials support [a] challenged decree, and no state official has expressed opposition." *Republican Nat'l Comm. v. Common Cause R.I.*, No. 20A28, 2020 WL 4680151, at *1 (U.S. Aug. 13, 2020) (quoting *Abbott v. Perez*, 138 S.Ct. 2305, 2324 n.17 (2018)). But even if Plaintiffs' suit were not fundamentally inappropriate, they have failed to meet the high burden required for the extraordinary remedy of preliminary injunctive relief.

Plaintiffs cannot succeed on the merits of their claims, which are not only wrong as a matter of law, but also precluded by several jurisdictional and procedural bars. And the purportedly irreparable injuries they claim will be suffered absent an injunction are ultimately fictions, supported by nothing more than supposition and conjecture. By striking contrast, their requested relief *will* result in widescale

disruption ahead of the November Election, and *will* cause voters to suffer disenfranchisement.

"[A]n injunction is an equitable remedy," and, as such, must be deployed to achieve equitable ends. *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 311 (1982). Plaintiffs should not be permitted to launch a procedurally, legally, and factually improper attack on the Consent Decree—one that risks confusion and disenfranchisement for Minnesota voters—when they have fallen far short of the considerable showing required for the extraordinary relief they seek. For these reasons and those that follow, Intervenors respectfully request that Plaintiffs' motion be denied.

## BACKGROUND

### I.      The State Court Action

Each year, Minnesota disenfranchises thousands of voters whose completed mail ballots are postmarked on or before Election Day but arrive after 8 p.m. (the "Election Day Receipt Deadline"). *See* Minn. Stat. §§ 203B.08 subd. 3, 204B.45, 204B.46; Minn. R. 8210.2220 subp. 1; Minn. R. 8210.3000. Recognizing that the ongoing coronavirus pandemic would increase Minnesotans' reliance on absentee voting during both the August primary election (the "August Primary") and the November Election, Intervenors filed suit against the Secretary in state court on May 13, 2020. *See* Declaration of Danyll W. Foix ("Foix Decl."), ECF No. 14, Ex. A.

Intervenors include the Alliance, a nonprofit that seeks to ensure social and economic justice and full civil rights for its more than 84,000 members; individual voters who are at an increased risk of severe illness or death if exposed to COVID-19; and voters whose ballots have been—or are likely to be—rejected as a result of the Election Day Receipt Deadline. *See id.*, Ex. A ¶¶ 9–14. Their complaint sought to enjoin both the Election Day Receipt Deadline and the witness-signature requirement for mail ballots. *See id.*, Ex. A ¶¶ 98–142.

On June 16, Intervenors and the Secretary entered a consent decree in which the Secretary agreed not to enforce these provisions during the August Primary. Two days later, the Republican Party of Minnesota, Republican National Committee, and National Republican Congressional Committee (the "State Court Intervenors") filed a notice of intervention. On July 2, Intervenors filed a motion for temporary injunction, demonstrating that the Election Day Receipt Deadline violates both the fundamental right to vote and the due process clauses of the U.S. and Minnesota Constitutions. *See* Ex. 1 at 21–28; *see also* Ex. 14.[1] On July 17, the State Court Intervenors filed an opposition to Intervenors' motion for temporary injunction, arguing that Intervenors failed to establish the unconstitutionality of the challenged laws. *See generally* Ex. 11.

---

[1] Exhibit cites refer to the exhibits attached to the Declaration of Abha Khanna, filed concurrently with this brief.

That same day, Intervenors and the Secretary filed the Consent Decree, in which the Secretary agreed not to enforce either of the challenged provisions during the November Election. *See* Foix Decl., Ex. B ("Consent Decree"). The State Court Intervenors filed various objections to the Consent Decree—claiming, among other things, that "the Secretary propose[s] to overrule Minnesota's election laws . . . duly enacted by the people of Minnesota through the Legislature," that the Consent Decree permits the "count[ing of] votes that are ***invalid under Minnesota state law***," and that "the Secretary ha[s] no authority to order invalid votes to be counted." Ex. 12 at 2. On July 31, the state court held a hearing on all pending motions and objections, and on August 3, Judge Grewing issued an order entering the Consent Decree (the "State Court Order"). *See* Foix Decl., Ex. C ("State Court Order").

The court first considered which legal standard should be applied to a review of the Consent Decree. *See* State Court Order at 17. While Intervenors advocated a basic fairness inquiry, the State Court Intervenors argued "that the judicial review of a consent decree requires a far more thorough inquiry and fairness finding as articulated by the federal court, namely whether the plaintiff has made an adequate showing of a likelihood of success on the merits of the claim." *Id.* (citing *Flinn v. FMC Corp.*, 528 F.2d 1169, 1172 (4th Cir. 1975)). Under the latter standard, Judge Grewing explained, "[c]ourts can gauge 'the fairness of a proposed compromise' only by 'weighing the plaintiff's likelihood of success on the merits against the amount

and form of the relief offered.'" *Id.* (quoting *Carson v. Am. Brands, Inc.*, 450 U.S. 79, 88 n.14 (1981)). "Because the Court would reach the same result under the federal standards," it ultimately "analyze[d] the proposed entry of the consent decree under both Minnesota and federal law." *Id.* at 18.

The state court's analysis under Minnesota law was straightforward. "It is undisputed," the court explained,

> that the proposed consent decree is non-partisan and waives the Witness Requirement and Election Day receipt deadline only with regard to the November 2020 election. [Intervenors and the Secretary] came to this agreement due to the fact that COVID-19 related illnesses and deaths in Minnesota continue to rise and have no real possibility of abatement by November.

*Id*. The court also observed that "[t]he Consent Decree [] affords [the Secretary] sufficient time to provide instruction and certainty to voters and local election officials before absentee voting begins on September 18." *Id*.

In applying the more probing federal standard, the state court concluded that Intervenors were likely to succeed on the merits of their constitutional challenges to the Election Day Receipt Deadline. After observing that courts have recently approved similar agreements extending the receipt deadline for mail ballots and determining that "safety concerns for the ballot box are not so speculative as to render the Secretary's decision to resolve the Plaintiff's complaints unreasonable," the state court concluded that Intervenors

> are likely to succeed on their Election Day receipt deadline motion. In
> this unusual global crisis, it is more than reasonable to conclude that a
> ballot placed with the United States Postal Service quite possibly might
> not be delivered until on Election Day. It is reasonable for the Secretary
> to conclude that a ballot posted on or before Election Day should be
> counted.

*Id.* at 21–23, 25.[2] Upon further concluding that "waiver of the . . . Election Day deadline is in the best interests of the health, safety, and constitutional rights of Minnesota's voters, and, therefore, in the public interest," the state court entered the Consent Decree. *Id.*

The State Court Intervenors appealed. On August 18, the parties signed a stipulation to dismiss the appeal (the "Stipulation"), with the State Court Intervenors "waiv[ing] the right to challenge in any other judicial forum the [State Court Order] and the [Consent Decree]." Ex. 15 at 2. The Minnesota Supreme Court dismissed the appeal pursuant to the Stipulation. *See* Ex. 16 at 2.

## II.   The Consent Decree

Under the Consent Decree, the Secretary agreed to "issue guidance instructing all relevant local election officials to count all mail-in ballots in the November General Election that are otherwise validly cast and postmarked on or

---

[2] There appears to be a typographical error in the State Court Order. Given that the underlying action *challenged* the Election Day Receipt Deadline—and that the court agreed with Intervenors' factual and legal conclusions—the order is more reasonably read as concluding that "a ballot placed with the United States Postal Service quite possibly might not be delivered until *after* Election Day."

before Election Day but received by 8 p.m. within 5 business days of Election Day."
Consent Decree at 10. He further agreed to "issue instructions to include with all
absentee and designated mail ballots" to inform voters that mail ballots "postmarked
on or before Election Day and received by 8 p.m. within 5 business days of Election
Day . . . will be counted." *Id.* at 11. "Where a ballot does not bear a postmark date,
the election official reviewing the ballot should presume that it was mailed on or
before Election Day unless the preponderance of the evidence demonstrates it was
mailed after Election Day." *Id.* at 10. As defined in the Consent Decree, "postmark []
refer[s] to any type of imprint applied by the United States Postal Service to indicate
the location and date the Postal Service accepts custody of a piece of mail, including
bar codes, circular stamps, or other tracking marks." *Id*.

On August 28, the Secretary issued the prescribed guidance to local election
officials and provided them with materials that could be distributed to educate
voters about the new deadline. *See* Ex. 21. The Secretary also updated his website to
directly inform voters about the change, *see, e.g.*, Ex. 22, and numerous news outlets
made similar announcements. *See, e.g.*, Exs. 23–24. Likewise, groups dedicated to
voter education and engagement, including the Alliance, began informing voters of
the deadline in reliance on the Consent Decree. *See* Ex. 17 ¶¶ 9–11; Ex. 18 ¶¶ 6–8.
Local election officials began printing absentee ballots—including instructions
about the postmark deadline—after certification of candidate names on August 28.

8

*See* Minn. R. 8210.0500; Ex. 25. Officials began sending these ballots to voters on September 18. *See* Minn. Stat. § 204B.35. As of that date, over 1 million voters had requested absentee ballots, a number that the Secretary described as "off the charts." Ex. 26 at 1.

## III.    Plaintiffs' Suit

Nearly two months after the Consent Decree was entered, on September 22, 2020, Plaintiffs filed their complaint, alleging that the Consent Decree violates the U.S. Constitution and federal law. *See* Complaint ("Compl."), ECF No. 1. Count I claims that the Consent Decree is an impermissible exercise of the Secretary's authority and thus violates Article II of the U.S. Constitution. *See id.* ¶¶ 75–83. Count II alleges that the Consent Decree "permits Minnesota voters to vote for president *after* Election Day," in violation of federal statutes setting the dates of elections. *Id.* ¶¶ 84–90. Plaintiffs subsequently moved for a preliminary injunction, asking this Court to "enjoin the Secretary's unlawful agreement to count ballots received after 8:00 p.m. on Election Day." *See* Memorandum in Support of Plaintiffs' Motion for a Preliminary Injunction ("Mot."), ECF No. 13, at 18.

The Court granted Intervenors' unopposed motion to intervene as defendants on September 28, 2020. *See* ECF No. 33.

## STANDARD OF LAW

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008); *accord Brand Advantage Grp., Inc. v. Henshaw*, Civil No. 20-225 (JRT/HB), 2020 WL 1891772, at *7 (D. Minn. Apr. 16, 2020) ("Because 'a preliminary injunction is an extraordinary and drastic remedy, one [] should not be granted unless the movant, by a clear showing, carries the burden of persuasion.'" (alteration in original) (quoting *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997))).

"'A plaintiff seeking a preliminary injunction must establish' four factors showing such relief is warranted":

> (1) "he is likely to succeed on the merits"; (2) "he is likely to suffer irreparable harm in the absence of preliminary relief"; (3) "the balance of equities tips in his favor"; and (4) "an injunction is in the public interest."

*MPAY Inc. v. Erie Custom Comput. Applications, Inc.*, 970 F.3d 1010, 1015 (8th Cir. 2020) (quoting *Wise v. Dep't of Transp.*, 943 F.3d 1161, 1165 (8th Cir. 2019)). "[T]he 'party seeking injunctive relief bears the burden of proving' that the relevant factors 'weigh in its favor.'" *Id.* (quoting *Mgmt. Registry, Inc. v. A.W. Cos.*, 920 F.3d 1181, 1183 (8th Cir. 2019)). A party seeking a preliminary injunction must have Article III standing, *see Rodgers v. Bryant*, 942 F.3d 451, 454–55 (8th Cir. 2019), and the action must be justiciable. *See First Lutheran Church v. City of St. Paul*, 326 F.Supp.3d 745, 757 (D. Minn. 2018).

## ARGUMENT

### I.   Plaintiffs cannot succeed on the merits.

Plaintiffs' suit is an improper collateral attack on a state court judgment, one premised on the fundamentally illogical premise that Plaintiffs and other Minnesota voters are injured by a law that *makes it easier for their ballots to be counted*. Given these basic facts, it is unsurprising that Plaintiffs cannot succeed on the merits.

#### A.   Plaintiffs' suit is an improper collateral attack.

The Consent Decree represents an agreement between Intervenors and the Secretary, and the State Court Order entering it is entitled to full faith and credit. *See* art. IV, § 1; 28 U.S.C. § 1738 ("[J]udicial proceedings of any court of any such State . . . . shall have the same full faith and credit in every court within the United States."). Similarly, the Stipulation agreed to by the parties and relied upon by the Minnesota Supreme Court—in which the State Court Intervenors agreed to "waive the right to challenge in any other judicial forum" both the State Court Order and the Consent Decree, Ex. 15 at 2—remains in effect. Both agreements bind Plaintiffs, and both preclude this suit.

Under governing Minnesota law, absent fraud, a valid judgment entered by agreement or consent has the same preclusive effect "as if it had been rendered after contest and full hearing and is binding and conclusive upon the parties *and those in privity with them*." *Hentschel v. Smith*, 153 N.W.2d 199, 203 (Minn. 1967) (emphasis

added) (quoting *Pangalos v. Halpern*, 76 N.W.2d 702, 706 (Minn. 1956)). Both individually and combined, the Consent Decree and the Stipulation constitute a complete and permanent resolution of the state court dispute for the November Election: the Consent Decree agreed that the November Election would operate under an alternative receipt deadline, and the Stipulation precluded further challenge to the Consent Decree in *any* forum. These agreements, entered into absent fraud and effectuated by both Judge Grewing and the Minnesota Supreme Court, therefore bind Plaintiffs and prohibit this action *if* Plaintiffs are in privity with any of the parties to the state court action.

They are. "In determining privity, the Minnesota Supreme Court has directed that 'privity must be determined by the facts of each case.'" *Benson v. Hackbarth*, 481 N.W.2d 375, 377 (Minn. Ct. App. 1992) (quoting *Johnson v. Hunter*, 447 N.W.2d 871, 874 (1989)); *see also Reil v. Benjamin*, 584 N.W.2d 442, 445 (Minn. Ct. App. 1998) ("Privity does not follow one specific definition, but rather expresses the idea that a judgment should also determine the interests of certain non-parties closely connected with the litigation."). Here, the facts indicate Plaintiffs are in privity with both the Secretary and the State Court Intervenors.

As to the former, "when a state government litigates a matter of public concern, that state's citizens will be deemed to be in privity with the government for preclusion purposes." *Mo's Express, LLC v. Sopkin*, 441 F.3d 1229, 1235 (10th Cir.

2006) (quoting *Lance v. Davidson*, 379 F. Supp. 2d 1117, 1125 (D. Colo. 2005)); *accord*

*Washington v. Wash. State Com. Passenger Fishing Vessel Ass'n*, 443 U.S. 658, 692

n.32 (1979) ("[T]hese individuals and groups are citizens of the State of Washington,

which was a party to the relevant proceedings, and 'they, in their common public

rights as citizens of the State, were represented by the State in those proceedings,

and, like it, were bound by the judgment.'" (quoting *City of Tacoma v. Taxpayers of

Tacoma*, 357 U.S. 320, 340–41 (1958))). There is no reasonable dispute that the

Secretary, in litigating the state court action and entering the Consent Decree,

represented all Minnesotans—including Plaintiffs. *See* Compl. ¶¶ 7–8 (describing

Plaintiffs as Minnesota residents and "registered Minnesota voter[s]").

Plaintiffs are also in privity with the State Court Intervenors. The State Court

Intervenors intervened "[o]n behalf of their supported candidates[ and] voters,"

citing their interest in "helping Republican candidates and voters" by "support[ing]

Republican candidates for office" and "educat[ing], mobiliz[ing], assist[ing], and

turn[ing] out voters," as well as their interests in "defending the[] commonsense and

constitutional state laws" that Intervenors challenged and "ensuring that Minnesota

runs free and fair elections." Ex 13 at 1, 5, 8, 12. As Republican voters and candidates,

*see* Compl. ¶¶ 7–8, 67–69, 72–73; Mot. at 7–9, 14–16, Plaintiffs are not only aligned

with the State Court Intervenors—they are expressly represented by them.

Accordingly, although Plaintiffs are "not parties to" the state court action, they are

nonetheless "connected with it in their interests . . . as if they were parties" because their "interests are represented" by the State Court Intervenors. *Rucker v. Schmidt*, 768 N.W.2d 408, 413 (Minn. Ct. App. 2009) (quoting *Margo-Kraft Distribs., Inc. v. Minneapolis Gas Co.*, 200 N.W.2d 45, 47–48 (Minn. 1972)). To put it differently, Plaintiffs—who are members *and seek to be electors* of the very political party that intervened in the state court action—"are so connected with the" state court litigation that both the Consent Decree *and* the Stipulation "should determine their interests as well as those of the actual parties." *Balasuriya v. Bemel*, 617 N.W.2d 596, 600 (Minn. Ct. App. 2000). Therefore, Plaintiffs are bound by the Stipulation, and cannot challenge either the State Court Order or the Consent Decree in any forum—including this one.

These doctrines ultimately express in legalese what is plainly obvious from the facts of this case. The Secretary entered the Consent Decree to expand the franchise for all Minnesotans, Plaintiffs included. The State Court Intervenors—with whom Plaintiffs as Republican electors have an indisputable connection—signed the Stipulation and agreed to forgo *precisely* this sort of collateral attack. The purpose of both agreements was to promote stability and the franchise in the November Election and its leadup. It would therefore be inequitable and unjust—and unlawful—for Plaintiffs to circumvent the Stipulation and launch this meritless attack on the Consent Decree.

**B.     This Court should abstain under *Pennzoil*.**

Plaintiffs' claims are further precluded under *Pennzoil Co. v. Texaco, Inc.*, 481 U.S. 1 (1987). There, the losing party in a state court proceeding filed suit in federal court, "alleg[ing] that the Texas proceedings violated rights secured to [it] by the Constitution and various federal statutes." *Id.* at 6. The U.S. Supreme Court, noting "the importance to the States of enforcing the orders and judgments of their courts," concluded it must abstain:

> [T]his case involve[s] challenges to the processes by which the State compels compliance with the judgments of its courts. Not only would federal injunctions in such cases interfere with the execution of state judgments, but they would do so on grounds that challenge the very process by which those judgments were obtained. So long as those challenges relate to pending state proceedings, proper respect for the ability of state courts to resolve federal questions presented in state-court litigation mandates that the federal court stay its hand.

*Id.* at 13–14 (footnote omitted); *accord Sprint Commc'ns, Inc. v. Jacobs*, 571 U.S. 69, 73–73 (2013) (under *Pennzoil*, federal courts must abstain where "state civil proceedings . . . implicate a State's interest in enforcing the orders and judgments of its courts"); *Schall v. Joyce*, 885 F.2d 101, 110 (3d Cir. 1989) ("[A]pplication of *Pennzoil* leads to the conclusion that it would be inappropriate for the federal court to proceed on an injunctive claim to render the state judgment nugatory."). The *Pennzoil* Court further noted that abstention was appropriate because the constitutional claims could have been raised in state court. *See* 481 U.S. at 14–16; *see also Aaron v. Target Corp.*, 357 F.3d 768, 774 (8th Cir. 2004) ("Permitting issues

15

before a state court to be litigated in a federal forum instead could be 'quite costly' to the comity and federalism interests which [the abstention doctrine] seeks to protect." (quoting *Huffman v. Pursue, Ltd.*, 420 U.S. 592, 606 (1975)).

Such is the case here. Plaintiffs ultimately seek to render the state court's adjudication nugatory—to enjoin enforcement of the Consent Decree that the state court entered. But that underlying state court action is ongoing, and *that* forum, not this one, is the proper venue for Plaintiffs' challenge to the Consent Decree. Plaintiffs identify no reason why they cannot argue their constitutional claims in state court. This Court should therefore "defer[] on principles of comity to the pending state proceedings." *Pennzoil*, 481 U.S. at 17.

Notably, *Pennzoil* applies even though Plaintiffs are not formally parties in the state court action. Under the abstention doctrine from which *Pennzoil* is derived, *see generally Younger v. Harris*, 401 U.S. 37 (1971), "[i]t is not a prerequisite . . . that the federal plaintiffs also be defendants in the action pending in state court" where, as here, "the interests of the parties seeking relief in federal court are closely related to those of parties in pending state proceedings and where the federal action seeks to interfere with pending state proceedings." *Cedar Rapids Cellular Tel., L.P. v. Miller*, 280 F.3d 874, 881–82 (8th Cir. 2002) (quoting *Womens Servs., P.C. v. Douglas*, 653 F.2d 355, 358 (8th Cir. 1981)). Here, Plaintiffs' action certainly seeks to interfere with the pending state court action, since Plaintiffs move to invalidate the

Consent Decree that was properly entered by the state court. Moreover, Plaintiffs' interests are closely related to the State Court Intervenors'—indeed, as discussed in Part I.A *supra*, they are in privity with them.

### C.   Plaintiffs lack standing.

"The doctrine of standing asks whether a litigant is entitled to have a federal court resolve his grievance. This inquiry involves 'both constitutional limitations on federal-court jurisdiction and prudential limitations on its exercise.'" *Kowalski v. Tesmer*, 543 U.S. 125, 128 (2004) (quoting *Warth v. Seldin*, 422 U.S. 490, 498 (1975)).

"The 'irreducible constitutional minimum of standing' is that a plaintiff show (1) an 'injury-in-fact' that (2) is 'fairly . . . trace[able] to the challenged action of the defendant' and (3) is 'likely . . . [to] be redressed by a favorable decision' in court." *ABF Freight Sys., Inc. v. Int'l Brotherhood of Teamsters*, 645 F.3d 954, 958 (8th Cir. 2011) (alterations in original) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)). "To establish injury in fact, a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *First Lutheran Church*, 326 F.Supp.3d at 758 (quoting *Spokeo, Inc. v. Robins*, 136 S.Ct. 1540, 1548 (2016)).

Moreover, prudential considerations require "that a party 'generally must assert his own legal rights and interests, and cannot rest his claim to relief on the

legal rights or interests of third parties.'" *Kowalski*, 543 U.S. at 129 (quoting *Warth*, 422 U.S. at 499).

### 1.    Article III Standing

Plaintiffs lack Article III standing to bring their claims. They identify four purported injuries that they will suffer as a result of the Consent Decree: (1) it "will necessarily result in the counting of many ballots—perhaps hundreds of thousands—that by law may not be counted in the presidential election," which will "dilute the value of Plaintiffs' votes and permit the counting of ballots for Plaintiffs' opponents for the elector offices they seek"; (2) it "violate[s] federal and state law [and] creates substantial uncertainty," which "frustrates Plaintiffs' ability to determine whether to vote in person (and thereby risk exposure to the Coronavirus) or cast absentee ballots (and thereby risk that their votes will not be counted) and how to advise those who intend to vote for them"; (3) it "creates a clear and present danger that Minnesota's election results will not be accepted under the safe harbor law and therefore will not be accepted by the United States Congress in determining the winner of the presidential election" because it "is not an enacted law but an executive policy in flat contradiction to State law"; and (4) its "election deadlines risk placing the resolution of the contest past dates Congress has set for both the safe harbor and the actual vote of the Electoral College," leading to "a substantial risk that Plaintiffs' votes will be completely meaningless, if either Minnesota loses

its representation in the Electoral College or its asserted results do not qualify for the safe harbor." Mot. at 7–9; *see also id.* at 14–16; Compl. ¶¶ 66–74. Ultimately, none of these alleged harms withstands even the slightest scrutiny, and certainly none satisfies Article III.

### a.   Vote Dilution

Plaintiffs point to the alleged "[c]ounting [of] votes invalidly cast," which will "substantially increase[] the pool of total votes cast and dilute[] the weight of Plaintiffs' votes." Compl. ¶ 68; *see also* Mot. at 14–15. But courts have repeatedly held that the purported injury of vote dilution as a result of unlawful voting does not confer standing, as it is both unduly speculative and impermissibly generalized. *See, e.g., Donald J. Trump for President, Inc. v. Cegavske*, No. 2:20-CV-1445 JCM (VCF), 2020 WL 5626974, at *4 (D. Nev. Sept. 18, 2020) ("Plaintiffs never describe how their member voters will be harmed by vote dilution where other voters will not. As with other '[g]enerally available grievance[s] about the government,' plaintiffs seek relief on behalf of their member voters that 'no more directly and tangibly benefits [them] than it does the public at large.'" (alterations in original) (quoting *Lujan*, 504 U.S. at 573–74)); *Martel v. Condos*, No. 5:20-cv-131, 2020 WL 5755289, at *4 (D. Vt. Sept. 16, 2020) ("If every voter suffers the same incremental dilution of the franchise caused by some third-party's fraudulent vote, then these voters have experienced a generalized injury."); *Am. Civil Rights Union v. Martinez-Rivera*, 166 F.Supp.3d 779,

789 (W.D. Tex. 2015) ("[T]he risk of vote dilution[ is] speculative and, as such, [is] more akin to a generalized grievance about the government than an injury in fact.").

As another court recently explained when confronted with a similar claim,

> Plaintiffs' purported injury of having their votes diluted due to ostensible election fraud may be conceivably raised by any Nevada voter. Such claimed injury therefore does not satisfy the requirement that Plaintiffs must state a concrete and particularized injury. This is not a pioneering finding. Other courts have similarly found the absence of an injury-in-fact based on claimed vote dilution.

*Paher v. Cegavske* ("*Paher I*"), No. 3:20-cv-00243-MMD-WGC, 2020 WL 2089813, at *5 (D. Nev. Apr. 30, 2020) (citations omitted); *accord Paher v. Cegavske* ("*Paher II*"), No. 3:20-cv-00243-MMD-WGC, 2020 WL 2748301, at *4 (D. Nev. May 27, 2020) (no standing where Plaintiffs "fail to more than speculatively connect the specific conduct they challenge . . . and the claimed injury [of] vote dilution").

Such is the case here. Any purported dilution somehow caused by the Consent Decree and postmark presumption would affect *all* Minnesota voters, not merely Plaintiffs. *Cf. Citizens for Fair Representation v. Padilla*, 815 F.App'x 120, 123 (9th Cir. 2020) (no standing where "the growing size of California's electoral districts values—or in Plaintiffs' view, devalues—every vote equally"). Accordingly, Plaintiffs' purported vote-dilution injury is an impermissibly generalized grievance and cannot support standing. *See Lujan*, 504 U.S. at 573–74 (holding that plaintiff "claiming only harm to his and every citizen's interest in proper application of the Constitution and laws . . . does not state an Article III case or controversy").

Moreover, any vote-dilution injury Plaintiffs claim on the basis that they "are not only voters, but also candidates for office," Mot. at 15, cannot establish standing. As an initial matter, it is wholly speculative. Plaintiffs cannot and do not offer any logical theory as to why unlawful voting would exclusively benefit their opponents and only cause harm to them. Indeed, it is just as likely under Plaintiffs' scant reasoning that their electoral positions would be *improved*, not undermined, by illegal voting. *See Trump for President*, 2020 WL 5626974, at *7 (finding that "alleged harm is too speculative" where plaintiffs failed to show that enjoining challenged law would "improve the odds for plaintiffs' candidates"). The injury also relies on the actions of independent third parties—either fraudsters who knowingly cast ballots after November 3 or lawful citizens who accidentally cast late ballots— the existence of whom is never explained by Plaintiffs. These tardy votes would then need to pass through the postal system *without* receiving a postmark or some other indicia of when they were mailed—a wholly unlikely scenario, as discussed in Part II *infra*. This daisy-chain of hypothetical occurrences, unsupported by even a shred of persuasive explanation, is simply too speculative to constitute a concrete injury-in-fact. *See id*. at *5 (concluding that "injuries are too speculative to establish standing" where plaintiffs "offer a patchwork theory of harm that does not rely on" challenged law but instead on entities "out of defendant's control").

There is also an "unbridgeable gap in the causal chain" between the claimed injury of vote dilution and the alleged constitutional violations. *Corman v. Torres*, 287 F.Supp.3d 558, 571 (M.D. Pa. 2018) (per curiam). To satisfy Article III, "there must be a causal connection between the injury and the conduct complained of— the injury has to be 'fairly . . . trace[able] to the challenged action of the defendant, and not . . . th[e] result [of] the independent action of some third party not before the court.'" *Lujan*, 504 U.S. at 560 (alterations in original) (quoting *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 41–42 (1976)). Plaintiffs' vote-dilution injury is traceable to non-party actors who might, for various reasons, cast ballots after Election Day. It is *not* traceable to the Secretary or the Consent Decree. *See Lujan*, 504 U.S. at 562 (where "the existence of one or more of the essential elements of standing 'depends on the unfettered choices made by independent actors not before the courts' . . . it becomes the burden of the plaintiff to adduce facts showing that those choices have been or will be made in such manner as to produce causation and permit redressability of injury" (citations omitted) (quoting *ASARCO Inc. v. Kadish*, 490 U.S. 605, 615 (1989))).

### b. Uncertainty

Plaintiffs' claims of widespread uncertainty fare no better. The only basis they identify for this uncertainty is the alleged unlawfulness of the Consent Decree. *See* Mot. at 7 ("Statutory law, which is superior to the Secretary's executive authority,

establishes a deadline, but Plaintiffs are unable to discern whether that law governs or the Secretary's alterations govern."). Any purported confusion is a generalized grievance, akin to claims that the alleged constitutional violation itself creates a viable injury. The U.S. Supreme Court has repeatedly described such harms as "precisely the kind of undifferentiated, generalized grievance about the conduct of government that" is insufficient for standing. *Lance v. Coffman*, 549 U.S. 437, 442 (2007); *see also Lujan*, 504 U.S. at 573–74.

Moreover, Plaintiffs do not identify any actual basis for this purported confusion. *See Trump for President*, 2020 WL 5626974, at *5 ("Outside of stating 'confus[ion]' and 'discourage[ment]' in a conclusory manner, plaintiffs make no indication of how [challenged law] will discourage their member voters from voting." (first and second alterations in original)). The Secretary's conduct is wholly consistent with Minnesota law, *see infra* Part I.D, and under the terms of the Consent Decree, both the Secretary and local officials have informed the public that a postmark deadline will be in place for the November Election—just as it was for the August Primary. The *only* source muddying these untroubled waters and introducing confusion and uncertainty *is this litigation itself*, and courts have routinely held that such self-inflicted wounds are insufficient for standing. *See, e.g.*, *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 418 (2013) (concluding that "self-inflicted injuries [] not fairly traceable to the Government's purported activities . . .

do[] not give rise to standing"). Plaintiffs cannot cast doubt on the propriety of the Secretary's lawful actions and then claim that the resulting confusion causes them injury. In fact, the relief Plaintiffs seek would *create*, not *redress*, any uncertainty, since Minnesota voters have been informed of the postmark presumption and are expecting an election consistent with the August Primary. *See infra* Parts II–III; *see also Common Cause R.I.*, 2020 WL 4680151, at *1 ("The status quo is one in which the challenged requirement has not been in effect, given the rules used in Rhode Island's last election, and many Rhode Island voters may well hold that belief."); *Townley v. Miller*, 722 F.3d 1128, 1133–35 (9th Cir. 2013) (no standing where relief plaintiffs sought would increase rather than decrease their asserted harm).

### c.   Safe Harbor and Congressional Deadlines

The third and fourth harms identified by Plaintiffs boil down to the same grievance: the Consent Decree runs afoul of Congress's mechanisms for determining the winners of presidential contests, both because it is inherently unlawful and because it will not comply with necessary deadlines. But both harms are ultimately "conjectural" and "hypothetical," and neither "actual" nor "imminent" as required by Article III. *First Lutheran Church*, 326 F.Supp.3d at 758 (quoting *Spokeo*, 136 S.Ct. at 1548).

First, the Consent Decree and the Secretary's actions pursuant to it are wholly consistent with Minnesota law. *See infra* Part I.D. There is thus no doubt that the

State's vote-counting process for the November Election will be conducted pursuant to "laws enacted prior to the day fixed for the appointment of electors," 3 U.S.C. § 5, and no imminent or likely risk that Congress will reject Minnesota's returns under the safe-harbor provision. Any injury based on this impossible scenario is therefore completely hypothetical and patently insufficient for purposes of standing.

Second, there is simply no logical basis for Plaintiffs' assertion that "the Secretary's election deadlines risk placing the resolution of the contest past dates Congress has set for both the safe harbor and the actual vote of the Electoral College." Mot. at 8. Their only basis for this alleged harm is that "it will remain unknown who wins the state's vote for at least eight days after Election Day, and any contest about the ultimate result is unlikely to reach a conclusion before the safe-harbor deadline or even before the vote of the Electoral College." *Id*. But even a cursory review of the relevant chronology demonstrates just how farfetched Plaintiffs' claims are. County canvassing boards have until 10 days after an election to publicly canvass votes, Minn. Stat. § 204C.33 subd. 1—*after* the receipt deadline applied by the Consent Decree. The state canvassing board then meets the third Tuesday after election day (this year, November 24) to canvass the county canvassing boards' reports, declaring the results three days later: November 27. *Id.* § 204C.33 subd. 3. There is thus no plausible reason why the Consent Decree will result in uncertainty past December 14. Accordingly, any alleged risk stemming from

the applicable deadlines is wholly conjectural and neither traceable to the Consent Decree nor likely to be redressed by its invalidation, since the Secretary's actions consistent with the agreement will ensure that all necessary deadlines are met.[3]

The reasoning underlying Plaintiffs' purported harms ranges from the nonsensical to the merely unpersuasive. In any event, Plaintiffs have not identified *any* concrete injuries, traceable to the Secretary and redressable by this Court, that they will suffer absent injunctive relief. This is, ultimately, a case where the formalistic Article III requirement perfectly illustrates the practical underpinning of the standing doctrine: Plaintiffs will suffer no actual harm as a result of the Consent Decree, which will *expand* voting opportunities for Minnesotans. Accordingly, they lack Article III standing.

### 2. Prudential Standing

Plaintiffs further lack prudential standing to bring Count I. "Even if an injury in fact is demonstrated, the usual rule is that a party may assert only a violation of its own rights." *Virginia v. Am. Booksellers Ass'n*, 484 U.S. 383, 392 (1988). Plaintiffs'

---

[3] Other states' ballot receipt deadlines match or even *exceed* the provisions of the Consent Decree. *See, e.g.*, 10 Ill. Comp. Stat. 5/19-8, 5/18A-15 (ballot must be received within 14 days of election); Alaska Stat. § 15.20.081 (ballot must be received within 10 days of election); Ohio Rev. Code § 3509.05 (same). There is no indication that these states have difficulty, regularly or even occasionally, meeting applicable deadlines.

claims, by contrast, "rest . . . on the legal rights or interests of third parties.'"
*Kowalski*, 543 U.S. at 129 (quoting *Warth*, 422 U.S. at 499).

Count I is predicated solely on *the Minnesota Legislature's* purported rights
under the Electors Clause—and nothing more. Plaintiffs allege that the Consent
Decree "is contrary to Minnesota State Law setting the receipt deadline as 8:00 p.m.
on November 3, 2020," and therefore violates Article II, "which vests authority *solely
in the state legislature* to modify the manner and time of elections." Compl. ¶¶ 78–
79 (emphasis added). Their motion is replete with references to the Minnesota
Legislature and the alleged usurpation of its authority. *See, e.g.*, Mot. at 2 ("The
legislature of each state, not its executive actors or courts, has authority to define
the 'Manner' of choosing electors." (citation omitted) (quoting U.S. Const. art. II,
§ 1, cl. 2)); *id.* at 10 ("[O]nly the Minnesota Legislature, not the Secretary, may
establish regulations governing the upcoming presidential election."). Plaintiffs,
however, have no authority or standing to assert the rights of the Minnesota
Legislature. *Cf. Corman*, 287 F.Supp.3d at 573 ("[T]he Elections Clause claims
asserted in the verified complaint belong, if they belong to anyone, only to the
Pennsylvania General Assembly.").[4]

---

[4] Although *Corman* specifically concerned the Elections Clause, the Elections and
Electors Clauses play functionally identical roles, with the former setting the terms
for congressional elections and the latter implicating presidential elections. *See Ariz.
State Legislature v. Ariz. Indep. Redistricting Comm'n*, 576 U.S. 787, 839 (2015)
(Roberts, C.J., dissenting) (noting that Electors Clause is "a constitutional provision

Plaintiffs are not the Minnesota Legislature,[5] and they have identified no

"'"hindrance' to the [Legislature's] ability to protect [its] own interests." *Kowalski*,

543 U.S. at 130 (quoting *Powers v. Ohio*, 499 U.S. 400, 411 (1991)); *see also Hughes v.*

*City of Cedar Rapids*, 840 F.3d 987, 992 (8th Cir. 2016) (third-party standing

requires "'a close relationship with the person who possesses the right' *and* 'a

hindrance to the possessor's ability to protect [her] own interests'" (alteration in

original) (emphasis added) (quoting *Kowalski*, 543 U.S. at 130)). "Absent a

'hindrance' to the third-party's ability to defend its own rights, this prudential

limitation on standing cannot be excused." *Corman*, 287 F.Supp.3d at 572 (quoting

*Kowalski*, 543 U.S. at 130).[6] Accordingly, applying the "usual rule" of prudential

standing, *Am. Booksellers*, 484 U.S. at 392, Plaintiffs "do[] not have third-party

---

with considerable similarity to the Elections Clause"). Accordingly, cases
interpreting "the Legislature" in the context of the Elections Clause inform
application of the Electors Clause. *See, e.g., Castaño v. United States*, 444 F.Supp.3d
118, 140–41 (D.D.C. 2020); *De La Fuente v. Simon*, 940 N.W.2d 477, 493 n.15 (Minn.
2020).

[5] Plaintiff Lucero serves as a member of the Minnesota House of Representatives,
Mot. at 7, but does not purport to represent the Minnesota Legislature. Nor could
he; in his individual capacity, he cannot assert that body's institutional injuries, *see,
e.g., Raines v. Byrd*, 521 U.S. 811, 829 (1997); *Kerr v. Hickenlooper*, 824 F.3d 1207,
1214–15 (10th Cir. 2016), and the Secretary's "alleged usurpation of the [Minnesota
Legislature's] power did not deprive [him] of any rights vested personally in" him by
the Electors Clause. *Corman*, 287 F.Supp.3d at 569.

[6] The opinion of the three-judge panel in *Corman* is highly instructive. There, as
here, third parties brought in federal court a collateral attack on a state court
judgment. *See* 287 F.Supp.3d at 561. The panel ultimately concluded that these third
parties lacked both Article III and prudential standing. *See id.* at 573–74.

standing" to assert claims on the Legislature's behalf, which is fully capable of representing its own interests. *Hughes*, 840 F.3d at 992; *see also Corman*, 287 F.Supp.3d at 571–73.[7]

### D.   Count I fails as a matter of law.

Even if this Court could adjudicate Count I, it fails as a matter of law, and therefore cannot serve as the basis for injunctive relief.

The Electors Clause vests authority in "the Legislature" of each state to regulate presidential elections. U.S. Const. art. II, § 1, cl. 2. The U.S. Supreme Court has held, however, that state legislatures can delegate this authority—including to state officials like the Secretary. *See, e.g., Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*, 576 U.S. 787, 807 (2015) (noting that Elections Clause does not preclude "the State's choice to include" state officials in lawmaking functions so long as such involvement is "in accordance with the method which the State has prescribed for legislative enactments" (quoting *Smiley v. Holm*, 285 U.S. 355, 367 (1932))); *Corman*, 287 F.Supp.3d at 573 ("The Supreme Court interprets the words 'the Legislature thereof,' as used in that clause, to mean the lawmaking processes of

---

[7] Indeed, the Minnesota Legislature has seen fit to defend its interests in prior judicial proceedings. *See, e.g., Ninetieth Minn. State Senate v. Dayton*, 903 N.W.2d 609, 612 (Minn. 2017) (adjudicating Legislature's challenge to governor's line-item veto power).

a state." (quoting *Ariz. State Legislature*, 576 U.S. at 816).[8] Indeed, such delegation

*must* be permitted; if Plaintiffs were correct that "any regulation not promulgated

by the Minnesota Legislature is beyond the very authority of Minnesota, as a

sovereign, to regulate in this arena," Mot. at 11, then *any* discretion exercised by *any*

non-legislative entity in *any* state—from a county clerk's decision on polling-place

locations to a secretary of state's guidance on how to word ballot instructions—

would be unconstitutional.[9]

Accordingly, the Consent Decree and the Secretary's actions under it could

only constitute plausible violations of the Electors Clause if he exceeded the

authority granted to him by the Minnesota Legislature. He did not. Minnesota

Statutes section 204B.47, titled "Alternative election procedures; duties of secretary

of state," provides as follows:

> When a provision of the Minnesota Election Law cannot be
> implemented as a result of an order of a state or federal court, the
> secretary of state shall adopt alternative election procedures to permit
> the administration of any election affected by the order. The
> procedures may include the voting and handling of ballots cast after
> 8:00 p.m. as a result of a state or federal court order or any other order
> extending the time established by law for closing the polls. The
> alternative election procedures remain in effect until the first day of
> July following the next succeeding final adjournment of the legislature,
> unless otherwise provided by law or by court order.

---

[8] As discussed in note 4 *supra*, the Electors and Elections Clauses are textually and
legally analogous.

[9] Plaintiffs themselves highlight some of the discretionary responsibilities lawfully
conveyed by the Minnesota Legislature to the Secretary and local officials. *See* Mot.
at 5–6 & n.1.

*See also Clark v. Pawlenty*, 755 N.W.2d 293, 299 (Minn. 2008). In other words, if a court determines that an election law cannot be implemented, then the Minnesota Legislature does not merely *permit* the Secretary to adopt alternative procedures, it *requires* him to do so. Such remedial action explicitly includes extending the Election Day Receipt Deadline.

This is *precisely* what happened here. Intervenors sued the Secretary in state court, challenging, among other things, the Election Day Receipt Deadline. The parties drafted the Consent Decree, which was submitted to Judge Grewing. At the insistence of the State Court Intervenors, the court undertook a rigorous analysis and addressed Intervenors' likelihood of success on the merits. *See* State Court Order at 17–25. Judge Grewing determined that Intervenors were likely to succeed on the merits of their constitutional challenges to the Election Day Receipt Deadline, and having concluded that "this waiver of the . . . Election Day deadline is in the best interests of the health, safety, and constitutional rights of Minnesota's voters, and, therefore, in the public interest," entered the Consent Decree. *Id.* at 25.

In the parlance of section 204B.47, following the State Court Order, the Election Day Receipt Deadline *could not be implemented*. The Secretary therefore *had* to "adopt alternative election procedures to permit the administration" of the November Election. He did so, issuing guidance and instructions consistent with

the Consent Decree. *See* Exs. 21–22 These actions were both contemplated and required by a statute enacted by the Minnesota Legislature.

Accordingly, the Secretary has not "chosen to abandon the enforcement of statutes enacted by the Minnesota Legislature." Mot. at 7. Quite the contrary, he has exercised the authority expressly granted to him by that body—a result required by the state court's finding regarding the unconstitutionality of the Election Day Receipt Deadline during the November Election.[10]

---

[10] *American Broadcasting Cos. v. Ritchie*, Civil No. 08-5285 (MJD/AJB), 2011 WL 665858 (D. Minn. Feb. 14, 2011), is instructive. There, "[t]he Court held that 'Plaintiffs are likely to succeed on the merits of their claim that, as applied to Plaintiffs' exit polling activities, [a Minnesota election statute] violates the First Amendment." *Id.* at *2 (quoting *Am. Broad. Cos. v. Ritchie*, Civil No. 08-5285 (MJD/AJB), 2008 WL 4635377, at *7 (D. Minn. Oct. 15, 2008)). Subsequently, the court explained that

> [u]nder Minnesota law, if a provision of state election law cannot be implemented as a result of a court order, the Secretary of State has the duty to "adopt alternative election procedures to permit the administration of any election affected by the order." This is exactly what the Secretary of State did after this Court issued the Preliminary Injunction in this case.

*Id.* at *4 (citation omitted) (quoting Minn. Stat. § 204B.47). Here, similarly, Judge Grewing concluded that Intervenors were likely to succeed on the merits of their challenge to the Election Day Receipt Deadline and entered the Consent Decree, thus requiring the Secretary to take remedial actions and implement alternative procedures.

### E.     Count II fails as a matter of law.

Count II—which alleges that the Consent Decree "violates federal law yet again insofar as it directly conflicts with Acts of Congress setting the Election Day," Mot. at 12–14—also fails as a matter of law.

"[A] state's discretion and flexibility in establishing the time, place and manner of" federal elections—presidential elections included—has one, and *only* one, "limitation: the state system cannot directly conflict with federal election laws on the subject." *Voting Integrity Project, Inc. v. Bomer*, 199 F.3d 773, 775 (5th Cir. 2000). But while "Congress has the authority to compel states to hold [federal] elections on the dates it specifies," *Voting Integrity Project, Inc. v. Keisling*, 259 F.3d 1169, 1170 (9th Cir. 2001)—specifically, "the Tuesday next after the first Monday in November," 3 U.S.C. § 1—nothing in the Consent Decree alters the timing of Minnesota's election to a date other than that prescribed by Congress. Contrary to Plaintiffs' assertions, the Consent Decree does not "treat November 3 as . . . merely [the] *beginning*" of Election Day or permit "holding votes for the presidency *after* November 3." Mot. at 2–3. Instead, the Consent Decree requires that, to be counted, mail ballots must be "postmarked *on or before Election Day*." Consent Decree at 10 (emphasis added).

This critical fact notwithstanding, Count II focuses on a complementary provision of the Consent Decree, which reads, "Where a ballot does not bear a

postmark date, the election official reviewing the ballot should presume that it was mailed on or before Election Day unless the preponderance of the evidence demonstrates it was mailed after." *Id*. But this provision simply provides a presumption for election officials to use to determine whether a mail ballot was "postmarked on or before Election Day," *id.*—the date mandated by Congress.

The Elections Clause—and, by extension, the Electors Clause, *see supra* note 4—"is a default provision; it invests the States with responsibility for the mechanics of [federal] elections, *but only so far as Congress declines to preempt state legislative choices*." *Foster v. Love*, 522 U.S. 67, 69 (1997) (emphasis added) (citation omitted). Intervenors are not aware of, and Plaintiffs have not pointed to, any law by Congress dictating to states how to determine the postmark date of mail ballots. Because Congress has *not* codified a postmark presumption that competes with the Secretary's, "compliance with both [the postmark presumption] and the federal election day statutes does not present 'a physical impossibility,'" and so no preemption has occurred. *Millsaps v. Thompson*, 259 F.3d 535, 549 (6th Cir. 2001) (citation omitted) (quoting *Fla. Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142–43 (1963)).

This case is therefore readily distinguishable from *Foster*, the leading case on which Plaintiffs rely. There, the U.S. Supreme Court considered "Louisiana's 'open primary' statute," which "provide[d] an opportunity to fill the offices of United

States Senator and Representative during the previous month" before the date mandated by Congress, "without any action to be taken on federal election day." *Foster*, 522 U.S. at 68–69. The Court concluded that this system "runs afoul of the federal statute" because it permitted federal elections to be entirely consummated before the statutorily mandated Election Day. *Id.* at 69, 72. Here, by contrast, the Consent Decree does *not* set a competing date on which "a contested selection of candidates for a [federal] office [] is concluded as a matter of law." *Id.* at 72. Quite the contrary, it mandates that ballots be postmarked by Election Day, and its postmark presumption effectuates this requirement. Courts have consistently held that the procedures and standards established by states to facilitate the federal election date do not alter the date prescribed by Congress. *See, e.g., Millsaps*, 259 F.3d at 549 ("[T]here is no reason to think that simply because Congress established a federal election day it displaced all State regulation of the times for holding federal elections."); *Keisling*, 259 F.3d at 1175 (emphasizing that *Foster* did not "present the question whether a State must always employ the conventional mechanics of an election" (quoting *Foster*, 522 U.S. at 72 n.4)).

As one post-*Foster* appellate court decision concluded, "we cannot conceive that Congress intended the federal election day statutes to have the effect of impeding citizens in exercising their right to vote." *Bomer*, 199 F.3d at 777; *accord Millsaps*, 259 F.3d at 545 ("[A]ll courts that have considered the issue have viewed

statutes that facilitate the exercise of the fundamental right of voting as compatible with the federal statutes."). The Consent Decree facilitates Minnesotans' ability to have their votes counted by creating a presumption that certain ballots were cast on the Election Day prescribed by Congress. It thus "further[s] the important federal objective of reducing the burden on citizens to exercise their right to vote . . . without thwarting other federal concerns," *Bomer*, 199 F.3d at 777, by ensuring that voters who cast ballots on or before Election Day are not arbitrarily disenfranchised simply because the postal system, through no fault of the voter, fails to affix a legible postmark.

Conspicuously, Plaintiffs cite no cases where postmark presumptions or similar regulations were found to conflict with federal law.[11] This is not surprising; the Consent Decree's postmark presumption, like other similar presumptions applied nationwide,[12] is wholly consistent with federal law because it merely sets a

---

[11] Notably, in *Gallagher v. New York State Board of Elections*, a federal court embraced a presumption "that absentee ballots received [within days of primary election] were [] timely cast despite the absence of a postmark." No. 20 Civ. 5504 (AT), 2020 WL 4496849, at *22 & n.5 (S.D.N.Y. Aug. 3, 2020). And the Pennsylvania Supreme Court recently adopted a postmark presumption with similar language to the Consent Decree. *See Pa. Democratic Party v. Boockvar*, No. 133 MM 2020, 2020 WL 5554644, at *31 (Pa. Sept. 17, 2020) ("[B]allots . . . that lack a postmark or other proof of mailing, or for which the postmark or other proof of mailing is illegible, will be presumed to have been mailed by Election Day unless a preponderance of the evidence demonstrates that it was mailed after Election Day.").

[12] *See, e.g.*, Cal. Elec. Code § 4103(b)(2); 10 Ill. Comp. Stat. 5/19-8(c); Md. Code Regs. 33.11.03.08(B)(3)(b)(ii); Wash. Rev. Code § 29A.40.110(4).

standard for election officials to determine whether ballots were cast on Election Day. Therefore, the Consent Decree is not preempted, and Plaintiffs cannot prevail on the merits of Count II.

## II.  Plaintiffs will suffer no injury absent an injunction.

Even if Plaintiffs could succeed on the merits of their claims, the equities strongly militate against injunctive relief.

To satisfy *Winter*'s irreparable-harm requirement, "[t]he harm must be '*likely* in the absence of an injunction,' 'great[,] and of such imminence that there is a clear and present need for equitable relief.'" *Minn. RFL Republican Farmer Lab. Caucus v. Freeman*, No. 19-cv-1949 (ECT/DTS), 2020 WL 5512509, at *5 (D. Minn. Sept. 14, 2020) (second alteration in original) (citation omitted) (first quoting *Winter*, 555 U.S. at 22; and then quoting *Iowa Utils. Bd. v. FCC*, 109 F.3d 418, 425 (8th Cir. 1996)). Plaintiffs have fallen far short of this burden; they have failed to demonstrate *any* imminent or even plausible injury, let alone one that is likely.

As discussed at length in Part I.C.1 *supra*, Plaintiffs identify four bases for irreparable harm in their motion: vote dilution, widespread uncertainty, rejection of Minnesota's presidential votes under Congress's safe-harbor provision, and the risk that the State will be unable to meet federal election deadlines. *See* Mot. at 14–16. These harms are not only hopelessly speculative and even illogical, but are also unsupported by any compelling evidence.

First, Plaintiffs have provided no sound reasoning—let alone persuasive evidence—as to how their votes will be diluted due to a sudden influx of late ballots, or why any appreciable number of mail ballots would lack postmarks, bar codes, tracking marks, or any other indicia indicating the dates the U.S. Postal Service ("USPS") took custody of the ballots. Indeed, the likelihood of such an occurrence is infinitesimal. As explained by Richard Haefner, the President of the Minnesota Postal Workers' Union and a USPS employee in Minnesota for nearly three decades, "almost all absentee ballots that are mailed in Minnesota receive a postmark or some other indicia indicating the date that they were sent, and it is highly unlikely that any substantial quantity (and certainly not thousands) of ballots are delivered to election offices without postmarks." Ex. 19 ¶¶ 2, 6; *see also id.* ¶¶ 3–5 (explaining how mail ballots are processed). He further notes that "ballots dropped off after election day . . . . would have gone through [these same] cancellation procedures . . . and would have been clearly dated as mail sent after Election Day." *Id.* ¶ 7. Mr. Haefner is not alone in this assessment. Former Deputy Postmaster General Ronald Stroman confirms that "it is the USPS's standard practice to affix postmarks to *all* single-piece First Class Mail, including all completed absentee ballots mailed by voters," and "[c]onsistent with this requirement, almost all completed ballots mailed by voters that the USPS handles have postmarks affixed to them." Ex. 20 ¶¶ 2, 7. Moreover, "[o]n rare occasions" where, "through inadvertent oversight, a piece of

mail [is not] postmarked . . . . there are readily available means for determining when the USPS received" it, as "USPS sprays barcodes on all pieces of mail that it receives" and "takes a scanned, date-stamped image of every piece of mail that it processes." *Id.* ¶ 9.

Even setting aside Intervenors' evidence regarding standard USPS practice, it is simply not plausible, let alone likely, that such widespread post-Election Day voting would occur. The *only way* Plaintiffs could suffer vote dilution would be if, even before a mail ballot proceeded through the postal system, someone—either a nefarious fraudster or merely a hapless innocent—cast it *after* Election Day. But the existence of such late voters is neither likely nor even plausible. For the hypothetical innocent voter, it beggars belief that someone politically engaged enough to cast a ballot would somehow do so *after* Election Day. And as for the specter of voter fraud, Plaintiffs have not produced a shred of compelling evidence suggesting a likelihood of fraud in Minnesota or anywhere else. Quite the contrary, the literature on voter fraud in the United States has a clear and consistent finding: this form of fraud is rare. *See, e.g.,* Ex. 27 (surveying universal vote-by-mail states and concluding that there is no "evidence that there is widespread fraud in the use of mail-in ballots"); Ex. 28 ("[I]t is [] more likely for an American to be struck by lightning than to commit mail voting fraud."). Even though the August Primary utilized a similar postmark deadline, Plaintiffs do not—and cannot—provide any evidence of fraud

associated with mail balloting during that election. *See* Ex. 19 ¶¶ 7–8 ("I do not remember seeing any absentee ballots dropped off after election day. . . . It is also not the case that absentee ballots or any other type of mail is likely to be given a backdated postmark."). Repeating the fiction of widespread voter fraud, even in a court of law, does not make it true—as evidenced by the repeated rejection of attempts to limit voting opportunities based on similarly speculative and unsubstantiated allegations.[13]

---

[13] *See, e.g., People First of Ala. v. Sec'y of State*, 815 F.App'x 505, 513 (11th Cir. 2020) (concluding that state's "interest for maintaining the photo ID and witness requirements do not outweigh" burdens on voters where evidence "suggests that Alabama has not found itself in recent years to have a significant absentee-ballot fraud problem"); *Democratic Nat'l Comm. v. Hobbs*, 948 F.3d 989, 1036 (9th Cir. 2020) (en banc) (rejecting fraud-based justification for ballot collection ban where "[t]here has never been a case of voter fraud associated with ballot collection charged in Arizona" (quoting *Democratic Nat'l Comm. v. Reagan*, 329 F.Supp.3d 824, 852 (D. Ariz. 2018))); *Middleton v. Andino*, No. 3:20-cv-01730-JMC, 2020 WL 5591590, at *32 (D.S.C. Sept. 18, 2020) ("[T]he fact the Witness Requirement may provide a lead to investigate absentee fraud is undercut by an utter dearth of absentee fraud. Indeed, the recent June 2020 Primaries occurred without the Witness Requirement and resulted in little to 'no evidence of fraud . . . much less material evidence of the type of fraud that could be prevented by the [Witness Requirement] in the first place." (quoting *Common Cause R.I. v. Gorbea*, 970 F.3d 11, 15 (1st Cir. 2020) (per curiam))); *Cook Cnty. Republican Party v. Pritzker*, No. 20-cv-4676, 2020 WL 5573059, at *3 (N.D. Ill. Sept. 17, 2020) (denying preliminary injunction upon finding "[t]he isolated incidents cited lend support to the proposition that over time voter fraud rates have 'remained infinitesimally small'"); *Paher II*, 2020 WL 2748301, at *7 (denying preliminary injunction where "Plaintiffs' claims of voter disenfranchisement are speculative at best"); *Paher I*, 2020 WL 2089813, at *6 & n.10 (finding that plaintiffs' "claim of voter fraud is without any factual basis").

Next, Plaintiffs have not explained how the Consent Decree could result in widespread confusion regarding "the rules governing the November election." Mot. at 15. Guidance and information issued by the Secretary, local election officials, and voter education organizations have been consistent throughout this election season, indicating that the Election Day Receipt Deadline will not be in effect, and that ballots must be postmarked on or before Election Day. *See, e.g.*, Exs. 21–22; Ex. 17 ¶¶ 9–10; Ex. 18 ¶¶ 6–7. Moreover, the Consent Decree replicates the system used during the August Primary—an election that saw record turnout. *See* Ex. 29 ("Six out of every 10 Minnesotans who voted in the August primary election cast their ballot absentee or by mail—a surge that helped voter turnout to triple over the last presidential election year in 2016."); *see also Trump for President*, 2020 WL 5626974, at *5 (finding "no showing of [] voters' confusion" where "voters exercised their ability to vote by mail in Nevada's 2020 primary election"). Nor have Plaintiffs demonstrated why any uncertainty would exist due to the alleged risk of disenfranchisement stemming from Congress's safe-harbor statute. Both the Consent Decree and the Secretary's actions applying it are consistent with enactments of the Minnesota Legislature, and thus do not run afoul of the safe-harbor provision.

Finally, Plaintiffs' concerns about the applicable deadlines are nothing but bunkum. There is simply no indication that the postmark deadline and

accompanying presumption—which *conform* to applicable deadlines, not conflict with them—will result in harm to Plaintiffs or any other voters. *See supra* Part I.C.1.c.

Plaintiffs' delay in filing suit further militates against a finding of irreparable harm. The state court entered the Consent Decree on August 3. Despite the allegedly grievous injuries that Plaintiffs will suffer as a result, they waited *nearly two months* before filing their complaint and seeking injunctive relief, during which time the Secretary and other election officials implemented plans and issued guidance consistent with the Consent Decree. As courts have explained,

> [a] preliminary injunction is sought upon the theory that there is an urgent need for speedy action to protect the plaintiff's rights. By sleeping on its rights a plaintiff demonstrates the lack of need for speedy action and cannot complain of the delay involved pending any final relief to which it may be entitled after a trial of all the issues.

*GTE Corp. v. Williams*, 731 F.2d 676, 679 (10th Cir. 1984) (quoting *Gillette Co. v. Ed Pinaud, Inc.*, 178 F.Supp. 618, 622 (S.D.N.Y. 1959)); *see also Travel Tags, Inc. v. UV Color, Inc.*, 690 F.Supp.2d 785, 801 (D. Minn. 2010) ("The Court may consider unexplained delays when assessing irreparable harm."). Plaintiffs' inexplicable delay would not only result in harm to the Secretary and public if injunctive relief were granted, *see infra* Part III, but also illustrates a fundamental reality—despite their vociferous claims to the contrary, Plaintiffs are not actually at *any risk* of irreparable injury stemming from the Consent Decree.

### III.    The balance of harms weighs strongly against injunctive relief.

While Plaintiffs have not demonstrated *any* likely injury, enjoining the Consent Decree at this late stage would have a devastating impact on the course of the November Election in Minnesota. Plaintiffs suggest that "the harm of an erroneous ruling at this stage would be non-existent: the Secretary would simply be compelled to conduct this election the way every Minnesota Secretary of State has conducted elections for generations." Mot. at 17. This blasé assertion does not reflect the hardships that would be imposed on both election officials and voters— including Intervenors—if the Consent Decree were enjoined.

Restoring the Election Day Receipt Deadline for the November Election would result in disenfranchisement for Minnesota voters. This Court need not take Intervenors' word for it—this is the conclusion reached by the state court when it entered the Consent Decree. Judge Grewing explained that "[b]ased on data from other states, as well as Minnesota's historically high voter turnout rate, experts anticipate that as many as 1.5 million Minnesotans may cast their ballots via mail in November 2020," State Court Order at 5—a prediction later underscored by the record turnout in the August Primary. Judge Grewing further noted the "stretched [] capacity of the U.S. Postal Service" and the negative experiences of mail voters in Ohio and Wisconsin. State Court Order at 6–7. Ultimately, the state court concluded that "waiver of the . . . Election Day deadline is in the best interests of the

health, safety, and constitutional rights of Minnesota's voters, and, therefore, in the public interest." *Id.* at 25. This conclusion was supported by Intervenors' evidence and declarations, which established the difficulties they and other voters would experience under the Election Day Receipt Deadline. *See* Exs. 2–9; Ex. 10 ¶¶ 3, 46, 52–55, 64–66 (noting that 3,517 late ballots were rejected in 2018 and predicting that 16,800 ballots could be rejected in November Election due to Election Day Receipt Deadline); *see also* Ex. 17 ¶¶ 4, 7, 10–11 (describing hardships if Election Day Receipt Deadline were reinstated); Ex. 18 ¶¶ 3, 8–11 (same).

This disenfranchisement would come to pass if the Consent Decree were enjoined. Depriving a voter of the opportunity to cast a ballot is not only a significant harm—"[t]o disenfranchise a single voter is a matter for grave concern," *Serv. Emps. Int'l Union, Local 1 v. Husted*, 906 F.Supp.2d 745, 750 (S.D. Ohio 2012)—but an irreparable harm as well. *See League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 247 (4th Cir. 2014) ("[O]nce the election occurs, there can be no do-over and no redress."); *Fla. Democratic Party v. Scott*, 215 F.Supp.3d 1250, 1258 (N.D. Fla. 2016) ("This isn't golf: there are no mulligans.").

These disenfranchising effects would only be exacerbated if election officials were required to reverse course at this late date. Both officials *and* the voters they serve have already planned for an election similar to the August Primary, which featured a postmark deadline *and* boasted record turnout. *See supra* Part II; *see also*

*Paher I*, 2020 WL 2089813, at *12 ("[E]ven accepting Plaintiffs' purported harm to them of being disenfranchised due to vote dilution, such disenfranchisement could be, even more concretely, claimed in the absence of the Plan (and additionally by confusion that may result by the Court enjoining the Plan . . .)."). Local election officials are proceeding with implementation of the Consent Decree, and requiring corrective efforts at this point—such as changing guidance on websites, updating absentee ballot return envelope instructions, and distributing new guidance and instructions directly to voters—would be administratively infeasible. *See Cook Cnty. Republican Party*, 2020 WL 5573059, at *10 (denying preliminary injunction where plaintiff delayed in bringing suit and concluding that "enjoining the [challenged election law] approximately six weeks before the election would introduce even greater challenges into what already is an exceedingly difficult election to administer").

　　Plaintiffs had every reason to know that absentee voting in Minnesota began on September 18, several days before they even filed their suit—this date was emphasized in both the State Court Order, *see* State Court Order at 18, and the Consent Decree itself, *see* Consent Decree at 3, 6. And yet they allowed this and other critical dates to pass, thus adding considerably to the administrative burdens that must be shouldered in order to undo the Consent Decree and heightening the consequent risk of disenfranchisement. Plaintiffs, in turn, have not demonstrated

*any* likely injury to themselves that would occur absent an injunction. Accordingly, while enjoining the Consent Decree's postmark deadline would not prevent any harms to Plaintiffs—their supposed harms are ultimately imaginary—it would indisputably disenfranchise Minnesota voters whose ballots, *through no fault of their own*, are not delivered by Election Day.

## IV.    The public interest would not be served by an injunction.

An injunction restoring the Election Day Receipt Deadline—resulting in likely disenfranchisement of eligible voters—would not serve the public interest. "By definition, '[t]he public interest . . . favors permitting as many qualified voters to vote as possible.'" *League of Women Voters*, 769 F.3d at 247 (alterations in original) (quoting *Obama for Am. v. Husted*, 697 F.3d 423, 437 (6th Cir. 2012)). This includes not only Intervenors and the Alliance's members, but *all* eligible Minnesotans who would risk disenfranchisement if Plaintiffs receive their requested injunctive relief. *See, e.g.*, Ex. 18 ¶¶ 3, 8–11. By contrast, the public interest would most assuredly be *ill*-served if voters' constitutional rights were violated to safeguard against nonexistent risks of voter fraud and missed deadlines. *See, e.g.*, *Common Cause R.I. v. Gorbea*, 970 F.3d 11, 15 (1st Cir. 2020) (per curiam) (concluding that risk of "fraudulent ballots . . . . is dubious as a matter of fact and reality" where state law provides protections against fraud); *Paher I*, 2020 WL 2089813, at *7 ("Plaintiffs' overarching theory that having widespread mail-in votes makes the Nevada election

more susceptible to voter fraud seems unlikely where the Plan essentially maintains the material safeguards to preserve election integrity.").[14]

## CONCLUSION

Plaintiffs seek the extraordinary remedy of a preliminary injunction to dismantle the Consent Decree and, as a result, inject confusion and disenfranchisement into the November Election. But the Court cannot grant the relief they seek consistent with basic principles of preclusion, abstention, and standing. Plaintiffs ultimately fail to demonstrate a likelihood of success on the merits or any actual injury that they would suffer as a result of the Consent Decree. Because they have not, "by a clear showing, carrie[d] the burden of persuasion," *Brand Advantage Grp.*, 2020 WL 1891772, at *7 (quoting *Mazurek*, 520 U.S. at 972), Intervenors respectfully request that this Court deny Plaintiffs' motion for a preliminary injunction.

---

[14] For example, under Minnesota law, it is a felony to vote more than once in the same election, Minn. Stat. § 204C.14; to "[p]ut a ballot in a ballot box for any illegal purpose," *id.*; to apply for an absentee ballot with the intent to cast it illegally, *id.* § 203B.03; or to bribe or otherwise induce a voter to refrain from voting or vote in a particular way, *id.* § 211B.13.

DATED this 29th day of September, 2020

GREENE ESPEL PLLP

By: _____s/ Sybil L. Dunlop_____
    Sybil L. Dunlop, Reg. No. 390186
    Samuel J. Clark, Reg. No. 0388955
    222 South Ninth Street, Suite 2200
    Minneapolis, Minnesota 55402
    Phone: (612) 373-0830
    Fax: (612) 373-0929
    Email: SDunlop@GreeneEspel.com
           SClark@GreeneEspel.com

    Marc E. Elias, Esq.
    *(admitted pro hac vice)*
    Amanda R. Callais, Esq.*
    PERKINS COIE LLP
    700 Thirteenth Street NW, Suite 800
    Washington, D.C. 20005-3960

    *Pro hac vice application forthcoming

Abha Khanna, Esq.
*(admitted pro hac vice)*
Jonathan P. Hawley, Esq.
*(admitted pro hac vice)*
**PERKINS COIE LLP**
1201 Third Avenue, Suite 4900
Seattle, Washington 98101-3099

Will M. Conley, Esq.
*(admitted pro hac vice)*
**PERKINS COIE LLP**
33 East Main Street, Suite 201
Madison, Wisconsin 53703-3095

*Attorneys for Proposed Intervenor-*
*Defendants Robert LaRose, Teresa Maples,*
*Mary Sansom, Gary Severson, and Minnesota*
*Alliance for Retired Americans*