# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MINNESOTA

| | |
|---|---|
| JAMES CARSON & ERIC LUCERO,<br><br>     Plaintiffs,<br><br>          v.<br><br>STEVE SIMON, Secretary of State of the State of Minnesota, in his official capacity,<br><br>     Defendant,<br><br>and<br><br>ROBERT LAROSE, TERESA MAPLES, MARY SANSOM, GARY SEVERSON, & MINNESOTA ALLIANCE FOR RETIRED AMERICANS EDUCATIONAL FUND,<br><br>        Intervenor-Defendants. | Case No. 0:20-cv-02030-NEB-TNL |

## REPLY IN SUPPORT OF PLAINTIFFS'
## MOTION FOR A PRELIMINARY INJUNCTION

# Table of Contents

I.  Plaintiffs Are Likely to Prevail on the Merits.................................................. 1

    A.      Plaintiffs Are Likely To Prevail On Count I ......................................... 1

          1.     Article II Prohibits the Secretary from Rewriting State Law on the Manner of Appointing Electors ...................................... 2

          2.     The Secretary Lacks the Authority Under Minnesota Law to Alter State Law Establishing the Manner of Appointing Electors ............................................................................................ 5

    B.      Plaintiffs Are Likely To Prevail On Count II ...................................... 7

    C.      The *Purcell* Principle Is Inapplicable .................................................11

II.  Plaintiffs Have Standing Because the Secretary's Actions Threaten Their Concrete Interests as Candidates and Voters ...................................................13

    A.      Article III Standing..........................................................................13

    B.      Prudential Standing .........................................................................17

III.  *Younger* Abstention Does Not Apply ....................................................18

IV.  Plaintiffs Are Not Bound by the Consent Decree ...........................................19

V.  The Equities Weigh in Favor of an Injunction.................................................20

## INTRODUCTION

This case presents vital federal-law questions that will have to be answered either now or after Election Day. Both the Secretary and Intervenors say their aim is to avoid disenfranchisement of Minnesota voters, but disenfranchisement is precisely what the policies they defend will do. When voters rely on those policies to cast ballots that arrive after Election Day, those ballots will be subject to challenge. And, because the Secretary's decision to permit the counting of such ballots blatantly violates the prescriptions of the United States Constitution, those ballots will be disqualified and those voters irreversibly disenfranchised. The lawfulness of the Secretary's policies must be resolved now to prevent that result by making clear what deadline applies for votes to be lawfully counted, to avoid the chaos that will inevitably result when large numbers of untimely ballots are challenged in the short period between Election Day and the federal law "safe harbor" for appointing electors, and to avoid the irreparable harm that Plaintiffs face as candidates and voters.

## I.    PLAINTIFFS ARE LIKELY TO PREVAIL ON THE MERITS

### A.    Plaintiffs Are Likely To Prevail On Count I

The Secretary and Intervenors cannot get past the fact that neither the Secretary nor a Minnesota court is "the Legislature" of Minnesota. Because Article II "leaves it to the legislature exclusively to define the method" of appointing electors, *McPherson v. Blacker*, 146 U.S. 1, 27 (1892), the Secretary may not alter bright-line statutory deadlines.

As an initial matter, the Secretary is incorrect (at 25-26) that the Supreme Court concluded otherwise in *Republican National Committee v. Democratic National Committee*, 140 S. Ct. 1205 (2020) (per curiam). The decision made clear that the lower court's extension of the ballot-receipt deadline—the election-law alteration the Secretary cites

as relevant here—"is not challenged in this Court." *Id.* at 1206. Further, no Article II argument was presented to the Supreme Court as to *any* election-law alteration,[1] the case did not involve the manner or timing of elector appointments. "[C]ases cannot be read as foreclosing an argument that they never dealt with." *Waters v. Churchill*, 511 U.S. 661, 678 (1994).

### 1. Article II Prohibits the Secretary from Rewriting State Law on the Manner of Appointing Electors

a.       The Secretary is mistaken to claim (at 27-31) the right to abandon statutes he believes "would violate Minnesota's Constitution," and a state court's blessing cannot cure his lack of authority. The Electors Clause authorizes *neither* an executive actor nor a state court applying state constitutional law to abandon the "Manner…the Legislature" has "direct[ed]" for appointing electors. "This power is conferred upon the legislatures of the states by the constitution of the United States, and cannot be taken from them or modified *by their state constitutions*." *McPherson v. Blacker*, 146 U.S. 1, 35 (1892) (quotation marks omitted) (emphasis added).

The Electors Clause therefore establishes "a limitation upon the State in respect of any attempt to circumscribe the legislative power." *Id.* at 25; *see also Bush v. Palm Beach Cty. Canvassing Bd.*, 531 U.S. 70, 76 (2000) (same). This limitation operates on the Secretary and forecloses his argument (at 29) that "state constitutional officers and judges" may, constituent with Article II, rewrite the law. *See Bush v. Gore*, 531 U.S. 98, 111-12 (2000) (Rehnquist, J., concurring)).

b.       State constitutions do not supersede Article II of the *federal* Constitution. Following *McPherson*, state courts have repeatedly held that state constitutional provisions "may not operate to 'circumscribe legislative power' granted by the Constitution

---

[1] *See* Emergency Application for Stay, available at https://bit.ly/2Scl9Zm.

of the United States." *State ex rel. Beeson v. Marsh*, 34 N.W.2d 279, 286-87 (Neb. 1948); *see also Commonwealth ex rel. Dummit v. O'Connell*, 181 S.W.2d 691, 694 (Ky. 1944); *Parsons v. Ryan*, 60 P.2d 910, 912 (Kan. 1936); *In re Plurality Elections*, 8 A. 881, 882 (R.I. 1887); *In re Opinions of Justices*, 45 N.H. 595, 601-07 (1864); *Chase v. Miller*, 41 Pa. 403, 409 (1862); *PG Pub. Co. v. Aichele*, 902 F. Supp. 2d 724, 748 (W.D. Pa. 2012).

The Secretary has no authority for his contrary view. The two decisions he cites (at 29-30), *Arizona State Legislature v. Arizona Independent Redistricting Comm'n*, 576 U.S. 787 (2015), and *Smiley v. Holm*, 285 U.S. 355 (1932), both undermine his position. Their holding that the Elections Clause of Article I does not permit a state legislature to "prescribe regulations on the time, place, and manner of holding federal elections in defiance of provisions of the State's constitution," *Arizona*, 576 U.S. at 817-18, refers to the "lawmaking *process*" established by a state constitution. *Id.* at 804 (emphasis added); *see also id.* at 808-13. *Smiley* held that a congressional redistricting plan was not valid under the Elections Clause where the state's governor vetoed the law, consistent with the "*manner*…in which the Constitution of the state has provided that laws shall be enacted." 285 U.S. at 368 (emphasis added). Likewise, *Arizona* held that a redistricting commission, and the ballot initiative that created it, belonged to "the State's prescriptions for lawmaking," 576 U.S. at 808, and therefore fit within the term "Legislature" of the Elections Clause, "which encompasses all legislative authority conferred by the State Constitution, including initiatives adopted by the people themselves." *Id.* at 793.

Minnesota's ballot-receipt deadline was enacted through Minnesota's lawmaking process: the Legislature passed the law, the Governor signed it. And the Secretary's rewriting it obviously does *not* conform to Minnesota's lawmaking prescriptions: he

simply "present[ed] a judge with a consent decree implementing such relief" and obtained an order approving it. Secretary Br. 27.

c.     Even if *Smiley* and *Arizona* somehow prescribed a limited role for "the Legislature" in setting the "Times, Places, and Manner" of congressional elections under Article I's Elections Clause that could be circumscribed by executive officials and courts, that would not reach Article II's Electors Clause. *Arizona* distinguished various functions the Constitution assigns state legislatures, holding that, when the Constitution assigns the legislature an "electoral" function rather than a "lawmaking" function, the legislature must "perform that function to the exclusion of other participants." 576 U.S. at 2667-68.

Unlike the Elections Clause, the Electors Clause concerns the power to "appoint." *See McPherson*, 146 U.S. at 28. It is more akin to the "'ratifying' function for 'proposed amendments to the Constitution under Article V,'" *Arizona*, 576 U.S. at 806-07 (citations omitted), than to the lawmaking function assigned by the Elections Clause of Article I.

d.     Even if the Minnesota Constitution could "circumscrib[e] the legislature's authority under Art. II, § 1, cl. 2," *Palm Beach*, 531 U.S. at 475, the Secretary's position still fails because he lacks the authority to declare Minnesota law unconstitutional. It is the Minnesota judiciary's duty, not the Secretary's, to determine "whether the Legislature has violated its constitutional duty," *Cruz-Guzman v. State*, 916 N.W.2d 1, 9 (Minn. 2018), and that never happened here. The Minnesota judiciary *has not determined that the ballot-receipt deadline violates the State Constitution*. The court order approving the Secretary's agreement states: "While this Court may assess the fairness of such an agreement before approving it, the court does not, in a consent decree,

judicially determine the rights of the parties." State Court Order 17 (quotation marks omitted). There is no judicial determination that the State Constitution supersedes the "Manner" adopted by the "Legislature."

> **2.    The Secretary Lacks the Authority Under Minnesota Law To Alter State Law Establishing the Manner of Appointing Electors**

The Secretary(at 30) and the Secretary (at 31) claim that Minnesota Statutes § 204B.47 delegates authority to the Secretary to alter the law. Not so.

a.    Because the Minnesota Legislature was "not acting solely under the authority given it by the people of the State, but by virtue of a direct grant of authority made under Art. II, § 1, cl. 2, of the United States Constitution," *Palm Beach*, 531 U.S. at 76, this Court "necessarily must examine the law of the State" for itself. *Bush*, 531 U.S. at 114 (Rehnquist, J., concurring). Section 204B.47 does not "delegate [legislative] authority" to the Secretary, Int's Br. 29, but authorizes the Secretary to comply with court orders on the merits in arms-length litigation. The statute does not engraft the Secretary into Minnesota's "lawmaking functions" in "accordance with the method with the State has prescribed for legislative enactments." *Id.* at (29) (quoting *Arizona*, 576 U.S. at 807).

Section 204B.47 cannot carry the weight Intervenors would give it. It authorizes the Secretary "adopt alternative election procedures" only "[w]hen a provision of the Minnesota Election Law cannot be implemented as a result of an order of a state or federal court…." Here, it is not the case that the receipt deadline "*cannot* be implemented as a *result*" of a state-court order. Instead, the *Secretary* decided that the deadline should not be implemented and asked a state court to rubberstamp that determination. Had the Secretary not requested this, there would be no impediment to

implementing the Election Day deadline—and, importantly, the Secretary and Intervenors do not ask this Court to hold otherwise.

Plaintiffs insist that the state court "undertook a rigorous analysis" in approving the Secretary's request, but that is incorrect. "A consent judgment is based wholly on the consent of the parties," *Hentschel v. Smith*, 153 N.W.2d 199, 206 (Minn. 1967); *City of Barnum v. Sabri*, 657 N.W.2d 201, 205 (Minn. Ct. App. 2003), so the Secretary's *consent* is the cause in fact from which the supposed inability to enforce the ballot-receipt deadline "result[ed]." Moreover, "there is no judicial inquiry into the facts or the law applicable to the controversy" before a Minnesota court approves a consent decree, and "the court's authority is limited by the consent or stipulation," *Hentschel*, 153 N.W.2d at 206 (quotation marks omitted), a point the state court acknowledged, Foix Decl. Ex. C, at 17. The court did not analyze the ballot-receipt deadline, stating only that "the Secretary's decision to enter the consent decree [is] reasonable," *id.* at 21.

No Minnesota court has determined that the ballot-receipt deadline "cannot be enforced."

b.     The position of the Secretary and Intervenors undoes the statutory scheme. It fares no better than the position rejected in *Bush* under a Florida statute broadly authorizing state courts to "provide any relief appropriate under the circumstances" during an election recount. 531 U.S. at 102 (quoting Fla. Stat. § 102.168(8)). The Supreme Court determined that the Florida Supreme Court's order requiring "a recount to proceed" was not authorized under this provision because that course of action conflicted with the election code. *Id.* at 110-11. Because the Florida Supreme

Court's order "contemplates action in violation of the Florida Election Code, [it] could not be part of an 'appropriate' order authorized by" Florida statute. *Id.* at 111.

So too here. Minnesota law gives the Secretary executive power to enforce the law, not legislative power to alter it. To read Section 204B.47 as empowering the Secretary to rewrite state election law through an agreement would distort the statutory scheme beyond recognition.

### B.    Plaintiffs Are Likely To Prevail On Count II

Intervenors and the Secretary concede that "the state system cannot directly conflict with federal election laws" governing presidential elections. Int's Br. 33 (quotation marks omitted). But they inexplicably contend that their agreement to count votes received *seven days* after November 3 "does not change the date of the election." Secretary Br. 32. They cannot square that circle.

1.    There is no "presumption against preemption" in cases under the Electors Clause or its cousin the Elections Clause. *See Arizona v. Inter Tribal Council of Arizona, Inc.*, 570 U.S. 1, 13 (2013). When Congress exercises this authority "it *necessarily* displaces some element of a pre-existing legal regime erected by the States," *id.* at 14, not to mention non-pre-existing regimes as here. "[T]here is no compelling reason not to read Elections Clause [or Electors Clause] legislation simply to mean what it says." *Id.* at 15.

Federal law provides that electors "shall be appointed…on the Tuesday next after the first Monday in November." 3. U.S.C. § 1. Election Day is November 3. "When the federal statutes speak of 'the election'…, they plainly refer to the combined actions of voters and officials meant to make a final selection of an officeholder." *Foster*

*v. Love*, 522 U.S. 67, 71 (1997). Thus, "voting must end[] on federal election day." *Lamone v. Capozzi*, 912 A.2d 674, 692 (Md. 2006).

The Secretary tries (at 32) to square his policy with federal law by contending that under his policy "a ballot must be mailed by election day" to be counted. *See also* Int's Br. 33. But even if that were true (it is not), it is the arrival of the ballot, not its mailing, that marks the "'consummation' of the process of selecting an official." *Voting Integrity Project, Inc. v. Keisling*, 259 F.3d 1169, 1175 (9th Cir. 2001). Voters do not "appoint[]" electors by handing paper to a postal worker, but by casting a ballot at a polling place. 3 U.S.C. § 1; *Foster*, 522 U.S. at 71 (holding that "Election Day" requires the combination of actions by voters *and election officials*). The Minnesota Legislature and the Secretary understand this: the State's law and regulations are unequivocal that it is the arrival that counts, not the mailing. Minn. Stat. § 204D.03 Subd. 2; Minn. R. 8210.2500, 8210.2200.

2.      Even if the congressional deadline was to mail a ballot by November 3, the Secretary's policy is to count ballots mailed after that date. It is not true that, as the Secretary insists, "a ballot must be mailed by election day" under his policy. Secretary Br. 32. Instead, the Secretary has agreed to count ballots "if they are received within seven days and there is no evidence…showing they were mailed after election day." *Id.* at 32-33. Ballots mailed after November 3 will be counted under this policy. This "fundamentally alters the nature of the election." *Republican Nat'l Comm.*, 140 S. Ct. at 1207.

It does not help the Secretary or Intervenors to call this policy a "presumption." Secretary Br. 32; Int's Br. 33-34. They identify no circumstance under which any poll worker could ever have a basis to suspect that a ballot received on (say) November 8

was mailed after Election Day. That being so, the policy treats late-mailed ballots as mailed on November 3 by operation of law, so long as they are received by 8:00 p.m. on the 10th. Importantly, the U.S. Postal Service's policy is that it does not postmark mail bearing prepaid postage,[2] which includes all Minnesota absentee ballots, and so most or all ballots will bear no postmark and no evidence one way or the other of the true mailing date.

Intervenors therefore miss the mark (at 34) in claiming no conflict because "Congress has *not* codified a postmark presumption." Congress *has* codified an Election Day, and altering Election Day under the label "presumption" is no less a conflict than doing so by any other label. By Intervenors' logic, the Secretary could keep ballot drop boxes open a week (or a month) after Election Day and "presume" that every ballot envelope deposited that week (or month) was actually cast (e.g., filled out and sealed) November 3. For the same reason, it is entirely illogical for Intervenors to claim (at 35) that the "postmark presumption effectuates [a] requirement" that "ballots be postmarked on Election Day." It is the opposite: to presume that a ballot bearing *no postmark* is in fact "postmarked on Election Day" is to suspend reality. This is not a "standard for election officials to determination whether ballots were cast on Election Day," Int's Br. 37, but the abdication of any enforceable standard. The way to "effectuate" a postmarked-by-Election-Day requirement is to require a postmark showing that the ballot was cast on or before Election Day.

Equally unpersuasive is the Secretary's contention (at 33) that the "presumption is based on the Postal Service's own guidance" that it may take "one week" for ballots

---

[2] United States Postal Service, Handbook PO-408 - Area Mail Processing Guidelines, 1-1.3 "Postmarks," available at  https://about.usps.com/hand-books/po408/ch1_003.htm (Last accessed Oct. 1, 2020).

to be delivered. That is not a basis to *presume* that a ballot received by November 10 was cast on or before November 3. The Postal Service guidance tells voters when to cast a ballot to avoid a risk that it may arrive after a certain date, but does not reveal when a given ballot was mailed. Simply because *some* ballots may take a week to arrive does not mean one can presume that a ballot arriving at a polling place must have been sent at least seven days earlier. Indeed, Minnesota court rules presume that postal mail is generally received in three days, not a week. Minn. R. Civ. P. 6.01(e).

3.     It is indeed "not surprising" that "Plaintiffs cite no cases where postmark presumptions…were found to conflict with federal law." Int's Br. 36. Until the year 2020, no one seems to have thought of this workaround of Election Day. "[T]he law responds to proper evidence and valid inferences in ever-changing circumstances, as it learns more about ways in which its commands are circumvented." *Bethune-Hill v. Virginia State Bd. of Elections*, 137 S. Ct. 788, 799 (2017). Similarly, until 2020, no one seems to have thought that Election Day "ha[s] the effect of impeding citizens in exercising their right to vote." Int's Br. 35 (quotation marks omitted). The law of the Minnesota Legislature and Congress is the same law that has governed presidential elections for generations, through all sorts of calamities and difficulties.

The franchise is easier than ever to exercise. Mail-in voting itself is relatively new, and Intervenors and the Secretary have no response to the Montana Supreme Court's determination in 1944 that Congress intended servicemembers risking their lives in World War II to have their ballots in by Election Day to be counted. *Maddox v. Bd. of State Canvassers*, 116 Mont. 217, 149 P.2d 112, 113 (1944). There is no reason to believe that Congress intended a different result here.

### C.   The *Purcell* Principle Is Inapplicable

The Secretary's reliance (at 32-34) on *Purcell v. Gonzalez*, 549 U.S. 1 (2006) (per curiam), (which Intervenors do not join) is misplaced. "[I]t is important to remember that the Supreme Court in *Purcell* did not set forth a per se prohibition against enjoining voting laws on the eve of an election." *Feldman v. Arizona Sec'y of State's Office*, 843 F.3d 366, 368 (9th Cir. 2016).

First, the question here, relating to which ballots are validly cast, can be, and often is, litigated *after* the election. *See Bush v. Gore*, 531 U.S. at 106-11; *Bush v. Hillsborough Cty. Canvassing Bd.*, 123 F. Supp. 2d 1305 (N.D. Fla. 2000) (addressing ballot validity under federal law). It cannot be too *late* to raise these issues, when they will otherwise be raised weeks from now. Nor does the Secretary explain why it is better to obtain federal-court resolution of these issues later rather than sooner. Concerns related to "voter confusion," *Purcell*, 549 U.S. at 4-5, weigh in favor of an injunction rather than against it.

Second, this is not a case involving something like a redistricting plan, a voter-identification law, or the names printed on the face of a ballot. This challenge concerns what happens *after* it—i.e., which ballots will be deemed late or early. Other than announce that Minnesota law means what it *already says*, the Secretary will not need to change any element of the election process.

Third, the *Purcell* principle limits courts' discretion "to grant an injunction to alter a State's *established* election procedures," *Crookston v. Johnson*, 841 F.3d 396, 398 (6th Cir. 2016) (emphasis added), but there is nothing established about the Secretary's policy of counting ballots received and even mailed after Election Day. *Feldman*, 843 F.3d at 368 ("[T]he concern in *Purcell* and *Southwest Voter* was that a federal court injunction would disrupt long standing state procedures.").

11

Fourth, the Secretary favored a last-minute alteration to election procedure by entering into an agreement with private parties. Having done so, the Secretary cannot credibly contend that review of that alteration is too disruptive. Further, the alteration the Secretary favored was not merely the suspension of a state-law requirement, as in *Common Cause Rhode Island v. Gorbea*, 970 F.3d 11, 13 (1st Cir. 2020) (suspension of required witness signatures for absentee ballots), but a *newly invented* regime, complete with a new "Election Day."

Fifth, "[a] state official unhappy with the lawful decisions of the state legislature should not be able to round up an agreeable plaintiff who then uses collusive litigation to 'force' the state to do what the official wants." *Id.* at 17. Here, the Secretary disagrees with the Minnesota Legislature's judgment, and he leveraged a state-court suit to manufacture a workaround.

Sixth, Plaintiffs did not delay in bringing this action, which was filed less than a month after they were certified as elector candidates. *Feldman*, 843 F.3d at 369 (finding no delay where plaintiffs filed the action "less than six weeks" after their claims became ripe). Further, Plaintiffs "have pursued expedited consideration of their claims at every stage of the litigation," *id.*, and will continue to do so.

As in *Common Cause Rhode Island*, "[b]ecause of the unusual—indeed in several instances unique—characteristics of this case, the *Purcell* concerns that would normally support a stay are largely inapplicable, and arguably militate against it." 970 F.3d at 17.

## II.   Plaintiffs Have Standing Because the Secretary's Actions Threaten Their Concrete Interests as Candidates and Voters

### A.   Article III Standing

Plaintiffs' standing, as both candidates for office and voters, to challenge the validity of the Secretary's actions under federal law is unimpeachable.

1.   Plaintiffs have standing as candidates for the office of Presidential elector. *See* Minn. Stat. § 208.03 (providing for the election of "Presidential electors"). As candidates, Plaintiffs have a direct and personal stake in the conduct of their election consistent with governing federal law and, in particular, Article II's Presidential Electors Clause. Recognizing as much, practically every major case enforcing the Electors Clause has been brought by candidates. That includes *McPherson v. Blacker*, 146 U.S. 1 (1892), a pre-election suit by elector candidates challenging a state's manner of appointing electors as inconsistent with the Electors Clause. More recently, the Supreme Court adjudicated similar claims by candidates in *Bush v. Palm Beach County Canvassing Bd.*, 531 U.S. at 76, and then *Bush v. Gore*, 531 U.S. at 103.[3] As in those latter cases, Plaintiffs will be injured by the tallying of votes for their opponents in violation of federal law.

Additional injuries to Plaintiffs of an election conducted other than in the "manner" authorized by federal law are obvious and acute. The most daunting is the prospect that the Secretary's policies will be held to violate the "safe harbor" provision of 3 U.S.C. § 5—because they were not validly "enacted prior to the day fixed for the appointment of the electors"—thereby jeopardizing Minnesota's participation in the Electoral College, as well as Plaintiffs' ability to serve effectively as electors. *See*

---

[3] In each case, Bush, as the party "seeking to invoke [the Supreme] Court's jurisdiction," was required to have standing. *Virginia House of Delegates v. Bethune-Hill*, 139 S. Ct. 1945, 1951 (2019). Electors' standing is no less than that of the nominees they support. *See Storer v. Brown*, 415 U.S. 724, 738 n.9 (1974).

*generally Bush v. Palm Beach County Canvassing Bd.*, 531 U.S. at 77-78. This injury arises directly by operation of law: if the Secretary's actions are invalid, then Minnesota will be ineligible for the safe harbor. It was to avoid *that precise result* that the Supreme Court terminated Florida's 2000 recount, and Plaintiffs' interest here as candidates is identical. *Bush v. Gore*, 531 U.S. at 110.

Another injury is the inevitable last-minute litigation over ballot eligibility, and chaos, that will inevitably occur in the absence of a clear determination as to what rules govern under federal law in advance of Election Day. *See, e.g.*, *Bush v. Gore*, *supra*. Not only will that force Plaintiffs to incur significant expense, but it will also risk extended litigation that may push resolution of the contest past the safe harbor deadline—after all, if ballots are still coming in (under the Secretary's policies) on November 10, there is every likelihood that controversies and contests over those votes will continue straight through the December 8 deadline and perhaps even through the Electoral College's vote on December 14. 3 U.S.C. § 7. These injuries are more than sufficient to support standing, and they counsel resolution of this dispute now, rather than after Election Day when the likelihood of serious, irremediable injury is even greater. *See* Secretary Br. 32 (acknowledging "problem" of "post-election litigation over whether to count the ballot").

The Secretary's only response to all this is the claim (at 19) that Plaintiffs as electors are somehow acting in the capacity of "representatives of the Republican Party of Minnesota." But Minnesota law regards Plaintiffs as candidates for elected office, Minn. Stat. § 208.03, not organizational representatives of a political party.

Intervenors, in turn, primarily argue (at 23-24) that Minnesota's safe-harbor compliance is not at risk because (in their view) the Secretary's actions comport were

validly "enacted" and therefore satisfy the safe harbor—essentially the merits presented in this litigation. Crucially, Intervenors do not dispute that, if the Secretary's actions were not validly "enacted" because they violate Article II, serious cognizable injury will follow. Nor does the Secretary dispute as much. And while Intervenors contend that extending the ballot deadline will not itself threaten safe-harbor compliance, their argument (at 25) consists entirely of a recitation of statutory deadlines, unmoored from the well-known realities of drawn-out post-election litigation. *See, e.g.*, *Bush v. Gore*, *supra*. This is not uncharted territory for Minnesota: driven largely by disputes over absentee ballots, the 2008 senatorial election recount was only certified on January 5—62 days after the election—and the contest litigation took another six months.[4] Given the far larger numbers of absentee ballots expected this year, the Secretary's actions will only exacerbate the already serious problem of timely certification of the vote. That is especially so given the lack of any dispute by the Secretary or Intervenors that the issues presented in this case will have to be decided for this election; if not now, it will be after Election Day through numerous challenges to particular late-received ballots, increasing the chaos and likelihood of disaster.

2.    Plaintiffs have standing as voters threatened with the dilution of their votes by ballots cast and counted in violation of federal law. "The right to vote is individual and personal in nature, and voters who allege facts showing disadvantage to themselves as individuals have standing to sue to remedy that disadvantage." *Gill v. Whitford*, 138 S. Ct. 1916, 1920 (2018) (internal quotation marks and citations omitted). Here, the Secretaries' actions authorize counting ballots that federal law holds to

---

[4] *See generally* 2008 United States Senate election in Minnesota, Wikipedia, https://bit.ly/3cS55pi.

be ineligible, and that will necessarily have the effect of diluting Plaintiffs' lawfully cast votes.

The Secretary does not dispute that vote dilution is a cognizable injury in fact or that it can be remedied by injunction. Instead, he contends (at 19) that this injury amounts to a "generalized grievance," citing *Paher v. Cegavske*, No. 3:20-cv-00243-MMD-WGC, 2020 WL 2748301 (D. Nev. May 27, 2020). But the claimed injury in *Pahler* was dilution through the casting of additional fraudulent ballots that the plaintiffs believed would be facilitated by the policies they challenged. *Id*. at *2. That, the court concluded, amounted to a generalized grievance that the state should be enforcing its policies to deter fraudulent voting. *Id*. at *4. Here, by contrast, the entire point of the Secretary's actions is to count votes that, as a matter of federal law, are ineligible. Unlike in *Pahler*, there is nothing "speculative," *id*., about the link between Plaintiffs' dilution injury and the specific actions they challenge: the more ineligible votes that are counted, the less weight Plaintiffs' votes will receive. Intervenors' cited authorities (at 19-20) are identically inapposite, all addressing speculative claims of dilution-through-fraudulent-voting as opposed to, as here, the certainty that ballots will be counted in violation of federal law, which is precisely what the Secretary has agreed to do.[5] While both the Secretaries and Intervenors cite *Lance v. Coffman*, 549 U.S. 437 (2007) in their "generalized grievance" argument, neither notes that it specifically juxtaposed the injury it rejected against vote dilution, which it recognized to be a firm basis for standing, *id*. at 1198 (citing *Baker v. Carr*, 369 U.S. 186 (1962)). In that way, *Lance* supports standing here.

---

[5] Intervenors' assertion (at 22) that there is no causal link between Plaintiffs' dilution injury and the Secretary's challenged actions is wrong for the same reason.

As voters, Plaintiffs also face the prospect of complete disenfranchisement through the State's failure to comply with the safe harbor, as discussed above. While the Secretary and Intervenors dispute the premise, they do not deny that this would be a cognizable injury sufficient to support standing.

3.　　Finally, the Secretary's reliance on *Republican National Committee v. Common Cause of Rhode Island*, Sup. Ct. No. 20A28 (Aug. 13, 2020 order), is misplaced. The case involved a challenge by political parties as intervenors to a federal consent decree relaxing a state's witness or notary requirement for mailed ballots in light of the COVID-19 pandemic. *Common Cause Rhode Island v. Gorbea*, 970 F.3d 11, 13-14 (1st Cir. 2020). Similar to the other cases cited by the Secretary and Intervenors, the intervenors' sole claimed injury was that "their candidates may be the victims of fraudulent ballots." *Id.* at 15. Thus, it was little surprise that the Supreme Court found the intervenors to "lack a cognizable interest in the State's ability to enforce its duly enacted laws," given that their complaint was that the state should be doing more to deter fraud, *see* 970 F.3d at 15-16. As explained above, that is completely different from Plaintiffs' objection to the Secretary's commitment to count votes that federal law holds to be ineligible, a policy that injures Plaintiffs directly as both candidates and voters.

## B.　　Prudential Standing

The Secretary's prudential standing argument comes *at least* a decade too late. Contrary to the Secretary's claim (at 13-14), Plaintiffs seek to vindicate their own rights, not any third party's like the Minnesota Legislature or Congress. The Electors Clause and Election Day Clause of Article II are among the Constitution's federalism provisions that serve to "protect[] the liberty of all persons within a State by ensuring that laws enacted in excess of delegated governmental power cannot direct or control

their actions." *Bond v. United States*, 564 U.S. 211, 222 (2011). On that basis, *Bond* held that individuals "can assert injury from governmental action taken in excess of the authority that federalism defines." *Id*. at 220. An individual's "rights in that regard do not belong to a State," *id*., a point that carries the day equally under Article III and "prudential standing rules," *id*. at 225. That is so in this context: the aberrant prudential standing limitations invoked by the Secretary would have barred adjudication in each of the Electors Clause cases discussed above, including *McPherson v. Blacker* and *Bush v. Palm Beach County Canvassing Bd. See also Foster*, 522 U.S. at 67 (voter challenge under Elections Clause).[6]

## III.  *Younger* Abstention Does Not Apply

The Court should not, and may not, abstain.

First, the *Younger* abstention doctrine the Secretary and Intervenors rely on reaches only cases between the "same parties and 'substantially identical' claims, raising 'nearly identical allegations and issues.'" *Yang v. Tsui*, 416 F.3d 199, 204 n. 5 (3rd Cir. 2005); *Friends of Lake View Sch. Dist. Incop. No. 25 v. Beebe*, 578 F.3d 753, 757 (8th Cir. 2009) (applying *Younger* when identical parties raised "the same issues as the state-court proceedings"); *Bates v. Van Buren Tp.*, 122 Fed. Appx. 803, 805 (6th Cir. 2004) (*Younger* requires "a parallel case between the same parties"). Plaintiffs were not parties to the state proceeding. *See infra* § IV. Nor are the issues the same.

---

[6] Obsolete decisions like *Ben Oehrleins & Sons & Daughter, Inc. v. Hennepin Cnty*, 115 F.3d 1372, (8th Cir. 1997), which the Secretary cites (at 14), were overruled by *Bond*, as the Eighth Circuit has recognized, *see United States v. Smith*, 655 F.3d 839, 848 (8th Cir.2011), *vacated on other grounds*, 566 U.S. 1032 (2012).

The line on standing to enforce the Elections Clause that Intervenors quote (at 27) from *Corman v. Torres*, 287 F. Supp. 3d 558 (M.D. Pa. 2018), does not mean what Intervenors suggest; in context, the court's point was that *individual state legislators* in their official capacity as such, as opposed to the legislature as a whole, lacked standing.

18

Second, there is *no* "pending case in a state court—or even a pending administrative proceeding or any type of proceeding," so "abstention would be inappropriate." *Fantasysrus 2, L.L.C. v. City of East Grand Forks, Minn.*, 881 F.Supp.2d 1024, 1029 (D. Minn. 2012) (distinguishing *Cedar Rapids Cellular*).

Third, the concluded state-court proceeding did not "involve[] certain orders uniquely in furtherance of the state courts' ability to perform their judicial functions." *Sprint Communications v. Jacobs*, 571 U.S. 69 (2013).

## IV.   Plaintiffs Are Not Bound by the Consent Decree

Intervenors' reliance (at 11-14) on the Full Faith and Credit Clause is erroneous for similar reasons. The Clause requires federal courts to apply "the preclusion rules of the state from which the judgment originated." *Lommen v. City of E. Grand Forks*, 97 F.3d 272, 274 (8th Cir. 1996). Minnesota preclusion doctrine does not reach Plaintiffs because they were not parties to the state-court litigation, nor in privity with any parties.

1.     The Intervenors first advances the baffling argument (at 12-13) that Plaintiffs were in privity *with the Secretary* in the state-court action.

The right to vote is personal to Plaintiffs; it does not exist at the grace of the Secretary. Even for purposes of *intervention*, courts have repeatedly recognized that voter interests are not represented by state officials. *Cleveland Cty. Ass'n for Gov't by People v. Cleveland Cty. Bd. of Comm'rs*, 142 F.3d 468, 474 (D.C. Cir. 1998 (quoting *Meek v. Metro. Dade Cty., Fla.*, 985 F.2d 1471, 1478 (11th Cir. 1993)); *Clark v. Putnam Cty.*, 168 F.3d 458 (11th Cir. 1999). The Secretary's cited authorities have nothing to do with the right to vote. *See Washington v. Washington State Commercial Passenger Fishing Vessel*

19

*Ass'n*, 443 U.S. 658, 661-662, 692 n.32; *City of Tacoma v. Taxpayers of Tacoma*, 357 U.S. 320, 329 (1958).

2.      Plaintiffs are also not in privity with the political party organizations that intervened in the state-court litigation. The mere affiliation with a political party as voters or candidates does not render an individual "so identified in interest with another that he represents the same legal right." *Rucker v. Schmidt*, 794 N.W.2d 114, 118 (Minn. 2011). Those parties did not represent Plaintiffs' interests or even raise the same *arguments* Plaintiffs raise here. "[T]he application of collateral estoppel is…inequitable." *Reil v. Benjamin*, 584 N.W.2d 442, 445 (Minn. Ct. App. 1998).

## V.    The Equities Weigh in Favor of an Injunction

The balance of equities favors an injunction. The Secretary's actions threaten post-election chaos over issues that can and should be put to rest now. Neither response brief addresses the injury Plaintiffs bear as candidates for office when invalid votes for their opponents are counted. That injury will have to be redressed either now or in the future, and every equity favors doing so now, so as to avoid myriad acute harms to Plaintiffs as well as voters who can avoid having their late-cast ballots challenged and rejected only by a decision in advance of the election. In addition, the Secretary's policies will increase the voting pool by counting invalid votes, resulting in vote dilution, a severe, irreparable harm. *See Bush*, 531 U.S. at 1047 (Scalia, J., concurring in order issuing stay pending appeal) (the "counting of votes that are of questionable legality…threaten[s] irreparable harm").

Contrary to Intervenors' contention (at 39), "the existence of such late voters is" both "likely" and "plausible." Under the Secretary's policy, voters have no incentive to mail their ballots early, drop them off, or vote in person, meaning that many

ballots will arrive after Election Day. Worse, persons watching the elongated ballot-counting unfolding under this new "Election Week" will face strong incentives to cast a ballot, and those who already cast their ballot will find new incentive to vote again. This is not a "specter;" it's called "human nature." Nor is the August primary a helpful benchmark for analyzing this dynamic: there was no meaningful presidential contest at issue then.

By contrast, the Secretary has *no* interest in a new statutory scheme not enacted by the Minnesota Legislature. Hence, an injunction would be all benefit and no harm. The Secretary's concern that he would need to re-instruct voters on the deadline is resolved quite simply: an injunction would require a simple communication to Minnesota poll-workers and voters that the long-standing deadline for absentee ballots applies. And that would benefit voters and the public interest by avoiding likely disenfranchisement through post-election challenges.

Meanwhile, the Secretary's "worst case scenario"—"that scores of ballots are not counted," Secretary Br. 35,—is more likely to occur without an injunction than with one. Nothing prevents a candidate from challenging late-received ballots. Without an injunction, an untold number of Minnesota voters will cast their ballots in reliance on the Secretary's unconstitutional and unlawful guidance and risk seeing their votes rejected after a post-election legal challenge. The result: complete disenfranchisement. By contrast, an injunction now makes clear to voters, at a time when they can do something about it, that ballots must be received by Election Day to be counted.

Thus, the public interest therefore plainly favors an injunction. Intervenors are correct that (at 44), "once the election occurs, there can be no do-over and no redress." (quoting *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 247 (4th Cir.

2014)). And neither the Secretary nor Intervenors has any meaningful response to Plaintiffs' contention that the safe harbor cannot be satisfied through this unlawful scheme, except to restate their incorrect view of the merits that the Secretary's novel legal regime is "consistent with enactments of the Minnesota Legislature" and federal law. Int's Br. 41.

And, as discussed above, there is grave doubt the State will be able to count the ballots and appoint electors in the tight timeline prescribed by federal law, given the Secretary's (at 34) and Intervenors' acknowledgements (at 43–44) that more mail-in ballots than ever before will be cast. Adding further pressure, the Secretary's actions leave canvassing boards seven fewer days to complete their results. The die is cast for disaster.

## CONCLUSION

The Court should enter the requested injunction.


Date: October 1, 2020                          Respectfully submitted,


                                               /s/ Danyll W. Foix
NATHAN M. HANSEN                               DANYLL W. FOIX
(MN Bar 0328017)                               (MN Bar 0285390)
2440 Charles Street North                      DAVID B. RIVKIN**
Suite 242                                      ANDREW M. GROSSMAN*
North St. Paul, MN 55109                       RICHARD B. RAILE*
Phone: (651) 704-9600                          BAKER & HOSTETLER LLP
Fax: (651) 704-9604                            1050 Connecticut Ave., N.W.
                                               Suite 1100
                                               Washington, D.C. 20036
                                               Phone: (202) 861-1596
                                               Fax: (202) 861-1783
                                               dfoix@bakerlaw.com
                                               *Attorneys for Plaintiffs*


* admitted *pro hac vice*
***pro hac vice* motion forthcoming