# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

---

JAMES CARSON and ERIC LUCERO,

        Plaintiffs,

v.

STEVE SIMON in his official capacity as
Secretary of State of the State of
Minnesota,

        Defendant,

and

ROBERT LAROSE, TERESA MAPLES,
MARY SANSOM, GARY SEVERSON,
and MINNESOTA ALLIANCE FOR
RETIRED AMERICANS EDUCATION
FUND,

        Intervenor Defendants.

Case No. 20-CV-2030 (NEB/TNL)

ORDER ON MOTION FOR
PRELIMINARY INJUNCTION

---

In connection with a Minnesota state court action challenging the constitutionality of several of Minnesota's election laws, Secretary of State Steve Simon ("Secretary Simon") entered into a consent decree (the "Consent Decree") with the Minnesota Alliance for Retired Americans Education Fund and several of its members (collectively, the "Alliance"). The Republican Party of Minnesota and others intervened and objected. After a hearing, the state court issued an order consistent with the Consent Decree,

ordering Secretary Simon not to enforce Minnesota's statutorily-mandated absentee ballot receipt deadline of 8:00 p.m. on Election Day, November 3, 2020. Instead, the court ordered Secretary Simon to count ballots that are postmarked by November 3, so long as election officials receive them within a week of Election Day.

Plaintiffs James Carson and Eric Lucero are certified nominees of the Republican Party to be presidential electors in the 2020 United States Presidential Election (the "Electors"). The Electors now bring suit in this Court against Secretary Simon, alleging that the Consent Decree and the state court's order confirming it are unconstitutional. The Electors move the Court for a preliminary injunction to enjoin enforcement of the state-court order. For the reasons that follow, the Court determines that the Electors lack standing and denies the motion for preliminary injunction.

## BACKGROUND

### I.    The COVID-19 Pandemic

COVID-19 is a highly infectious respiratory disease that has caused a global pandemic and killed over 210,000 Americans and 2,100 Minnesotans. *See generally* CDC, *Coronavirus (COVID-19)*, https://www.cdc.gov/coronavirus/2019-ncov/index.html (last accessed Oct. 8, 2020); Minn. Dep't of Health, *Situation Update for COVID-19*, https://www.health.state.mn.us/diseases/coronavirus/situation.html (last accessed Oct. 8, 2020); (ECF No. 14, Ex. C at 2–4 ("Consent Decree Order").) In response to COVID-19, Minnesota Governor Tim Walz has issued a series of emergency executive orders in

an attempt to combat the spread of the virus throughout the state. *E.g.*, Emergency Exec. Orders 20-01, 20-20, 20-33, 20-48, 20-56, 20-74, 20-78, 20-81, 20-89, available at https://mn.gov/governor/news/executiveorders.jsp. These orders include directives for Minnesotans to stay home, limit social gatherings, wear masks in public spaces, and reduce capacity for indoor events. Emergency Exec. Orders 20-20, 20-56, 20-81. Both the pandemic and these restrictions necessarily impact Minnesotans' ability to vote at the polls on Election Day.

## II.   Federal Law Governing Elections

The Electors' claims are based in part on Article II of the Constitution, which grants state legislatures the authority to determine how to select presidential electors. The "Electors Clause" provides that "[e]ach State shall appoint, in such Manner as the Legislature thereof may direct, a Number of [Presidential] Electors . . . ." U.S. Const. art. II, § 1, cl. 2. Article I has a corresponding provision for the selection of Senators and Representatives, the "Elections Clause," which provides that the "Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations." U.S. Const. art. I § 4, cl. 1. The Electors Clause and Elections Clause have "considerable similarity," and interpretations of one clause may inform the other. *Ariz. State Leg. v. Ariz. Indep. Redistricting Comm'n*, 576 U.S. 787, 839 (2015) (Roberts, C.J., dissenting); *see Donald J. Trump for President, Inc. v. Bullock*, No. CV 20-66-H-DLC, 2020

WL 5810556, at *11 (D. Mont. Sept. 30, 2020) (finding that the term "Legislature" has the same meaning in both clauses).

The Elections Clause gives a state legislature authority to involve other state actors, including members of the state's executive branch, in setting the times, places, and manner of elections. U.S. Const. art. I § 4, cl. 1; *Ariz. State Leg.*, 576 U.S. at 816–18. The phrase "the Legislature thereof" in this clause does not refer exclusively to the legislature; rather, it refers to the ordinary "lawmaking processes of a state." *Corman v. Torres*, 287 F. Supp. 3d 558, 573 (M.D. Pa. 2018) (three-judge panel) (citing *Ariz. State Leg.*, 576 U.S. at 816–18).

The Electors Clause similarly gives a state legislature discretion in prescribing the process for selecting presidential electors. *McPherson v. Blacker*, 146 U.S. 1, 25–26 (1892). Under this clause, each state must appoint electors "in such Manner as the Legislature thereof may direct." U.S. Const. art. II, § 1, cl. 2. The words "in such Manner as the Legislature thereof may direct" do not mean that the legislature itself must select the electors for a given election; rather, they mean that the legislature has the sole authority to prescribe the process through which the state selects those electors. *Id.*; *McPherson*, 146 U.S. at 25 (citing U.S. Const. art. II, § 1, cl. 2). The legislature may (1) delegate the authority to select electors to the public at large, (2) delegate the authority to the executive, or (3) prescribe a different procedure entirely. *Id.* at 25–26. The Electors Clause operates only to ensure that the legislature determines how the electors are selected. *Id.*

The Electors also raise a claim under federal law governing the date of a presidential election. Under the Constitution, Congress has the power to set the date on which the presidential election occurs; that day must be the same throughout the country. U.S. Const. art. II, § 1, cl. 4. Congress used that power to set "the Tuesday next after the first Monday in November" as the date for selecting presidential electors. 3 U.S.C. § 1. This year, Election Day falls on November 3. Once selected, the presidential electors meet on "the first Monday after the second Wednesday in December." 3 U.S.C. § 7. This year, that date is December 14. Congress has also provided that it must generally accept the votes of electors selected and certified by six days prior to the meeting of the Electoral College—often called the "safe harbor." 3 U.S.C. § 5. Essentially, under the safe harbor, so long as a state certifies its election results by six days before the meeting of the Electoral College—this year, by December 8—Congress must almost always accept those electors' votes.[1]

III.    **Minnesota Election Laws, the Secretary of State's Authority to Issue Rules for Elections, and Minnesota's Counting Procedures**

Minnesota has a no-excuse absentee voting system, which permits any eligible voter to vote absentee for any reason. Minn. Stat. § 203B.02 subd. 1. Absentee voting begins 46 days before Election Day; in 2020, that date was September 18. Minn. Stat. § 203B.081 subd. 1. A voter seeking to vote absentee may request a ballot at any time up

---

[1] Congress may decline to accept votes that are not "regularly given by electors" so long as both Houses agree to do so. 3 U.S.C. § 15.

to the day before Election Day and local election officials are responsible for providing ballots to those voters. Minn. Stat. §§ 203B.04–.07.

By Minnesota statute, to be counted, an absentee ballot must reach election officials by either 3:00 p.m. (for hand-delivered ballots) or 8:00 p.m. (for mail-delivered ballots) on Election Day (the "Receipt Deadline"). Minn. Stat. § 203B.08 subd. 3; Minn. R. 8210.2200 subp. 1. Ballots received after the Receipt Deadline are marked as "late" and cannot be counted. Minn. Stat. § 203B.08 subd. 3. Many other states have similar Receipt Deadlines,[2] which differ from Postmark Deadlines, where ballots are counted if they are postmarked by Election Day but received afterwards.[3] The difference between these two absentee-ballot counting deadlines—and which one Minnesota will follow—is the crux of this case.

What happens when an absentee ballot is received is not the subject of much dispute. Minnesota law sets out a specific procedure for accepting, rejecting, and

---

[2] *See, e.g.*, Ariz. Rev. Stat. § 16-547(C) ("In order to be valid and counted, the ballot . . . must be delivered . . . no later than 7:00 p.m. on election day."); Colo. Rev. Stat. § 1-7.5-107(4)(b)(II) ("All envelopes containing mail ballots must be in the hands of the county clerk . . . no later than 7 p.m. on the day of the election.").

[3] *See, e.g.*, Alaska Stat. § 15.20.081(e) ("[T]he ballot may not be counted unless it is received by the close of business on the 10th day after the election. If the ballot is postmarked, it must be postmarked on or before election day."); D.C. Code § 1-1001.05(a)(10A) (stating that the D.C. Board of Elections must accept "absentee ballots postmarked . . . on or before the day of the election, and received by the Board no later than the 7th day after the election") (also amended to allow for the 10th day after the election in 2020).

counting absentee ballots. Minn. Stat. § 203B.121. Each county has a ballot board that is responsible for either accepting or rejecting each absentee ballot. *Id.* subds. 1, 2. Upon receipt of an absentee ballot, the ballot board decides, based on several criteria, whether to accept or reject the ballot.[4] *Id.* subd. 2. Generally, the ballot board begins to process "accepted" absentee ballots one week before the election (the "Processing Window"). *Id.* subd. 4. 2020 brings a different circumstance, and so Minnesota enacted special legislation extending the Processing Window to two weeks before Election Day. 2020 Minn. Sess. Law Serv. ch. 77 § 1 subd. 3 (altering certain Minnesota election laws for 2020 only). After the close of business two weeks before an election, a voter whose ballot the ballot board has accepted may not cast another ballot. *Id.* On each day during the Processing Window, the ballot board places absentee ballots in the ballot box to be counted separately from ballots cast in person. Minn. Stat. § 203B.121 subds. 4, 5. Once all absentee ballots have been received and counted, the tallies are added to the returns from in-person votes. *Id.* subd. 5(b).

After that process is complete, the final tallies are reported to a canvassing board. Minn. Stat. §§ 204C.19, 204C.31 subd. 3. There is one canvassing board for each county in Minnesota and one statewide canvassing board. Minn. Stat. § 204C.31 subds. 1, 2. The county canvassing boards meet to certify each county's election results between three and

---

[4] Depending on the proximity to Election Day, the ballot board must take certain steps to contact a voter whose absentee ballot it rejects and offer the voter the opportunity to correct any errors. Minn. Stat. § 203B.121 subd. 2(c).

ten days following Election Day. Minn. Stat. § 204C.33 subd. 1. The county boards then transmit those certifications to the secretary of state. *Id.* On the third Tuesday following Election Day, the state canvassing board meets to certify the results from each county board; this year, that day is November 24. *Id.* subd. 3. The state canvassing board then has three days to certify the statewide results of the election. *Id.*

In a presidential election, these results are used to select the state's electors for the Electoral College. Minn. Stat. §§ 208.02, 208.03, 208.05. The electors chosen by the party that receives the most votes must cast their electoral votes for their party's nominee. Minn. Stat. § 208.43. If an elector fails to vote as required, he or she vacates the office of elector, and the secretary of state follows a statutory procedure to choose an alternate to fill the vacant seat. Minn. Stat. §§ 208.45, 208.46.

The processes described above are, for the most part, statutory. These same statutes give the secretary of state, as Minnesota's chief election official, duties and responsibilities. *See, e.g.*, Minn. Stat. § 204B.27 (describing multiple election-related responsibilities of the secretary of state); *see also Clark v. Pawlenty*, 755 N.W.2d 293, 299 (Minn. 2008); Minn. Const. art. VII, § 8. For example, the legislature has delegated to the secretary of state the authority to prescribe rules for the receipt of absentee ballots in addition to those the legislature has specified. Minn. Stat. § 203B.08 subd. 4. And in cases where provisions of Minnesota's election laws cannot be implemented "as a result of an order of a state or federal court," the legislature has directed that the secretary of state

8

"shall adopt alternative election procedures to permit the administration of any election affected by the order. The procedures may include the voting and handling of ballots cast after 8:00 p.m. as a result of a state or federal court order." Minn. Stat. § 204B.47.

## IV. The State Court Proceedings and Resulting Changes to Election Proceedings

On May 13, 2020, the Alliance[5] sued Secretary Simon to enjoin enforcement of the Receipt Deadline.[6] *LaRose v. Simon*, No. 62-CV-20-3149 (Minn. Dist. Ct. 2020) ("*LaRose*"). In *LaRose*, the Alliance alleged that the Receipt Deadline is unconstitutional because it "disenfranchises thousands of voters" who timely mail their ballots, but whose ballots are not received by election officials by the Receipt Deadline.[7] (ECF No. 14, Ex. A ("*LaRose* Compl.") ¶ 7.) The Alliance asserted that the Receipt Deadline is unconstitutional under

---

[5] The Alliance was joined by Robert LaRose, Teresa Maples, Mary Samson, and Gary Severson as individual plaintiffs. (ECF No. 14, Ex. A at 1.) Each of the state-court plaintiffs is a Defendant Intervenor before this Court.

[6] The Alliance also challenged Minnesota's requirement that each absentee ballot be witnessed by a registered Minnesota voter, notary, or person authorized to administer oaths. (ECF No. 14, Ex. A ¶ 5); *See* Minn. Stat. § 203B.07. This witness requirement is not at issue here, but voters have challenged similar requirements in other states. *See, e.g., Common Cause R.I. v. Gorbea*, 970 F.3d 11 (1st Cir. 2020) (challenging Rhode Island's requirement of two witnesses per absentee ballot).

[7] Voters in other states have filed similar challenges to their states' Receipt Deadlines. *See, e.g., Pa. Democratic Party v. Boockvar*, No. 133 MM 2020, __ A.3d __, 2020 WL 5554644 (Pa. Sept. 17, 2020) (challenging various aspects of Pennsylvania's mail-in ballot procedures, including a Receipt Deadline); *Democratic Nat'l Comm. v. Bostelmann*, No. 20-cv-249-wmc, 2020 WL 5627186 (W.D. Wis. Sept. 21, 2020) (challenging various Wisconsin election laws, including the state's Receipt Deadline).

normal circumstances, but that COVID-19 makes it even more unjustifiable due to an increase in absentee ballots overwhelming the United States Postal Service. (*Id.*) Specifically, the Alliance alleged that the Receipt Deadline constitutes an undue burden on the right to vote in violation of the First and Fourteenth Amendments, as well as a deprivation of procedural due process under the Fourteenth Amendment. (*Id.* ¶¶ 123–42.) The Alliance sought an injunction directing Secretary Simon to accept timely postmarked absentee ballots received within a "reasonable" time after Election Day. (*Id.* Prayer for Relief.) The Alliance sought this relief for both the August 11, 2020 primary election (the "Primary") and the November 3, 2020 general election. (*See id.* ¶ 3.)

On June 17, 2020, the Honorable Sara Grewing, Judge of the Second Judicial District, State of Minnesota, entered a court order and partial consent decree resolving the Alliance's claims regarding the Primary (the "Primary Consent Decree Order").[8] (ECF No. 36-1, Ex. A at 1, 14.) Pursuant to the Primary Consent Decree Order, Secretary Simon agreed not to enforce the Receipt Deadline; instead, election officials would accept all absentee ballots received up to two days after the Primary so long as they were postmarked on or before the date of the Primary. (*Id.* at 7–8.) Secretary Simon also agreed to issue instructions to elections officials about the change. These included enclosing information with each absentee ballot telling voters that their ballot could arrive up to

---

[8] No party intervened to challenge the Primary Consent Decree Order.

two days after the date of the election, as well as taking additional steps to tell the public that the Receipt Deadline would not be enforced. (*Id.* at 8–9.)[9] After the state court entered the Primary Consent Decree Order, the parties continued to litigate the Alliance's challenges to the Receipt Deadline for the general election.

In support of its claim that the Receipt Deadline was unconstitutional, the Alliance offered the expert declaration of Kenneth R. Mayer, Ph.D, a political science professor at the University of Wisconsin-Madison. (ECF No. 39-1, Ex. 10 ("Mayer Decl.").) Professor Mayer's research indicated that, absent a change to the Receipt Deadline, "tens of thousands" of Minnesotans could have their absentee ballots rejected. (*Id.* at 1.) Specifically, Professor Mayer determined that if half of Minnesotans voted by mail (approximately 1.5 million ballots or more), enforcement of the Receipt Deadline could result in the rejection of over 12,000 ballots. (*Id.* at 14.) Professor Mayer also analyzed instances of absentee voter fraud in Minnesota, finding only two cases since 1979, both of which involved a single ballot; given that voters had cast over 45 million ballots since

---

[9] Secretary Simon did so in part by stating on his official website that an absentee ballot that was postmarked on or before August 11, 2020 (the date of the Primary), would be accepted and counted so long as election officials received it prior to the county canvass, which would take place on either the second or third day after the Primary. Minn. Sec'y of State, *Vote Early by Mail*, https://web.archive.org/web/20200805091323/ https://www.sos.state.mn.us/elections-voting/other-ways-to-vote/vote-early-by-mail/. These steps are nearly identical to the steps taken thus far for the general election. (*Compare* Primary Consent Decree Order at 7–9, *with* Consent Decree at 9–11 (detailing Secretary Simon's obligations under the Primary Consent Decree Order and Consent Decree).)

1975, the voter fraud rate was 0.000004%. (*Id.* at 15.) Professor Mayer concluded that the Receipt Deadline imposes a burden on eligible Minnesota voters. (*Id.*)

On June 18, 2020, one day after the Primary Consent Decree Order, the Republican Party of Minnesota, the Republican National Committee, and the National Republican Congressional Committee moved to intervene in *LaRose*; President Trump's campaign, Donald J. Trump for President, Inc., later joined as an intervenor (together, the "State Court Intervenors"). (Consent Decree Order at 7; ECF No. 39-1, Ex. 15.) On July 2, 2020, the Alliance asked the state court to issue an injunction for the general election containing essentially the same relief afforded by the Primary Consent Decree Order. (Consent Decree Order at 8.) On July 17, 2020, Secretary Simon and the Alliance filed the Consent Decree and asked the state court to approve it. (*Id.*) The State Court Intervenors opposed. After a hearing on the Consent Decree, the state court entered the Consent Decree Order on August 3, 2020. (*Id.* at 1, 8; ECF No. 14, Ex. B (Consent Decree) at 16.)

In the Consent Decree, Secretary Simon agreed that the Alliance's challenge presented a serious constitutional issue. (Consent Decree at 3–4, 6–7.) Thus, as he had for the Primary, he agreed not to enforce the Receipt Deadline as set out in Minnesota Statutes Section 203B.08, subdivision 3, among others. (*Id.* at 9.) Instead, as he had for the Primary, Secretary Simon agreed that he would "issue guidance" to local election officials to "count all mail-in ballots" with a postmark of Election Day or before, if those election officials received the ballots within five business days (seven calendar days) of Election

Day (the "Postmark Deadline"). (*Id*. at 10.) The Consent Decree also included a provision that if a mail ballot did not have a postmark, the election official "should presume that it was mailed on or before Election Day unless the preponderance of the evidence demonstrates it was mailed after Election Day." (*Id*.)

In the Consent Decree Order, the state court analyzed the Consent Decree under both Minnesota and federal law and determined that, under either standard, the Consent Decree was appropriate given the constitutional concerns over the Receipt Deadline in the midst of the pandemic. The federal standard, which is a more searching review than the Minnesota standard, requires a court to weigh the plaintiff's likelihood of success on the merits against the relief offered. (*Id*. at 17); *see Carson v. Am. Brands, Inc.*, 450 U.S. 79, 88 n.14 (1981) ("Courts judge the fairness of a proposed compromise by weighing the plaintiff's likelihood of success on the merits against the amount and form of the relief offered in the settlement.").

Under the Minnesota standard, the state court determined that the Consent Decree was appropriate because it was nonpartisan, was limited to the November 2020 election, and gave Secretary Simon enough time to instruct election officials and voters on the new procedures before voting started on September 18. (Consent Decree Order at 18.) The court further concluded that the State Court Intervenors were unable to provide evidence that the Consent Decree was a product of fraud, neglect, or absence of consent, and was therefore proper under Minnesota law. (*Id.* at 19.)

13

Under the federal standard, the state court concluded that the Consent Decree was proper because the Alliance was likely to succeed on the merits of its claims. (*Id*.) Drawing on the fact that many courts across the nation were facing the same issues, the state court determined that Secretary Simon's decision to enter into the Consent Decree was "reasonable." (*Id.* at 21–22.) Based on the burdens COVID-19 was likely to impose upon Minnesota voters, and potential postal service delays, the court again noted that it was "reasonable" for Secretary Simon to conclude that the Alliance was likely to succeed on the merits of its claims. (*Id.* at 23–25.) The court also noted that, in the absence of the Consent Decree, it would have had the authority to issue such injunctive relief on the merits. (*Id.* at 24.)

The State Court Intervenors appealed the Consent Decree Order to the Minnesota Supreme Court. They then promptly dropped the appeal. On August 18, 2020, the parties stipulated to the dismissal of all appeals and waived their right to challenge the Consent Decree in any other judicial forum. (ECF No. 39-1, Ex. 15 at 2–3.) The Minnesota Supreme Court dismissed the appeals the same day. (ECF No. 39-1, Ex. 16.)

**V.     Secretary Simon's Instructions to Voters**

After entry of the Consent Decree Order on August 3, Secretary Simon prepared ballots in compliance with the Consent Decree. On August 28, Secretary Simon issued guidance to state election officials as agreed in the Consent Decree. (ECF No. 39-1, Ex. 21 ("Absentee Ballot Guidance"); Consent Decree at 10.) In the Absentee Ballot Guidance,

14

Secretary Simon provided state election officials with documents to be used as instructions for absentee ballots. (Absentee Ballot Guidance at 3–10.) For example, the Absentee Ballot Guidance included instructions for adding the following language to absentee ballot return envelopes:



(*Id.* at 8.) The Absentee Ballot Guidance also directed election officials to include the following language with each ballot, instructing voters that the ballot must be postmarked by November 3 and would be received and counted up to one week after Election Day:

## For the 2020 Minnesota State General Election

## being held November 3, 2020!!

**_Registered_** Minnesota Voters

> Because you are a registered voter in the State of Minnesota when this ballot packet was sent to you, you are <u>NOT</u> required to have a witness for the 2020 Minnesota State General Elections returned ballots.

> Your returned ballot must be <u>postmarked</u>
>
> **_on or before_** Election Day (November 3, 2020)
>
> & received by your Absentee Voting Office within 7 days of the election.... to be counted.

> If you do not want to use the U.S. post office or private delivery service to return your voted ballot, please contact your Absentee Voting Office (listed on return envelope) and inquire as to "drop off" locations.
>
> "Drop Off" locations, dates & hours may vary.

(*Id.* at 12.)[10] Minnesota voters who requested absentee ballots for the general election

began receiving their ballots on September 18, 2020, when early voting began. (ECF

---

[10] This information is substantially the same as that used in the primary election following the Primary Consent Decree Order. Minn. Sec'y of State, *Vote Early by Mail*, https://web.archive.org/web/20200805091323/https://www.sos.state.mn.us/elections-voting/other-ways-to-vote/vote-early-by-mail/.

No. 37 ("Maeda Decl.") ¶ 3.) As of September 29, over 1 million Minnesota voters had requested absentee ballots. (*Id.* ¶ 4.)

## VI.    Procedural History of this Lawsuit

The Electors filed the Complaint on September 22, 2020, seven weeks after entry of the Consent Decree. (ECF No. 1 ("Compl.").) The Electors bring two claims. Count I asserts that Secretary Simon exceeded his authority by entering into the Consent Decree and agreeing to accept absentee ballots after the Receipt Deadline, thereby violating the Electors Clause. (*Id.* ¶¶ 75–83.) Count II asserts that, by agreeing to accept absentee ballots after the Receipt Deadline, Secretary Simon violated the congressional mandate that Election Day be held on November 3. (*Id.* ¶¶ 84–90); 3 U.S.C. § 1.

The Electors are both Minnesota residents and registered voters. (Compl. ¶¶ 7–8.) Carson is a resident of Ramsey County and Lucero resides in Wright County. (*Id.*) Lucero is also a member of the Minnesota House of Representatives, representing District 30B. (*Id.* ¶ 8.) The Electors are certified under Minnesota Statutes Section 203B.08 as nominees of the Republican Party to be presidential electors in 2020. (*Id.* ¶¶ 7–8.) The parties agree that the Electors are properly certified, meaning that they are candidates for the office of presidential elector.

The Electors filed their Motion for Preliminary Injunction on September 24, 2020, requesting expedited handling. (ECF No. 12.) On September 25, the Alliance moved to intervene, a request to which both Secretary Simon and the Electors consented, and which

the Court granted. (ECF Nos. 20, 22, 23, 33.) Following an expedited briefing schedule,

the Court heard oral argument on the Motion on October 2. (ECF No. 45.)

## ANALYSIS

### I.      The Electors Lack Standing

"The doctrine of standing asks whether a litigant is entitled to have a federal court

resolve his grievance. This inquiry involves 'both constitutional limitations on federal-

court jurisdiction and prudential limitations on its exercise.'" *Kowalski v. Tesmer*, 543

U.S. 125, 128 (2004) (quoting *Warth v. Seldin*, 422 U.S. 490, 498 (1975)). Secretary Simon

and the Alliance argue that the Electors lack Article III and prudential standing to bring

their claims, and so the Court considers both theories. At this stage of the litigation, the

Court assumes that the allegations in the Complaint are true and views them in the light

most favorable to the Electors. *Jones v. Jegley*, 947 F.3d 1100, 1103 (8th Cir. 2020). The

Electors bear the burden of establishing standing and must clearly allege facts

demonstrating each element. *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014).

### A.      Article III Standing

The jurisdiction of federal courts is limited to cases and controversies. U.S. Const.

art III, § 2; *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 559 (1992). Standing is a jurisdictional

requirement "rooted in the traditional understanding of a case or controversy." *Spokeo,*

*Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016). Under the familiar three-part standing inquiry,

plaintiffs must show that they have "(1) suffered an injury in fact, (2) that is fairly

traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Id.* (citing *Lujan*, 504 U.S. at 560–61).

To meet the first prong of this inquiry—injury in fact—a plaintiff must show that he or she suffered an "invasion of a legally protected interest" that is concrete and particularized, and "actual or imminent, not conjectural or hypothetical." *Lujan*, 504 U.S. at 560 (quotation marks and citation omitted). Where, as here, a plaintiff alleges future injury, the alleged injury may suffice to confer standing if the threatened injury is "certainly impending," or there is a "substantial risk that the harm will occur." *Susan B. Anthony List*, 573 U.S. at 158 (quotation marks and citation omitted). Although the imminence of future injuries is an "elastic concept," it cannot be too speculative. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (citation omitted). The "threatened injury must be *certainly impending* to constitute injury in fact," and "'allegations of *possible* future injury' are not sufficient." *Id.* (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990) (emphasis original)).

The injury must also "affect the plaintiff in a personal and individual way." *Lujan*, 504 U.S. at 560 n.1. Claims that are "plainly undifferentiated and common to all members of the public" are generalized grievances, not injuries that give rise to standing. *Lance v. Coffman*, 549 U.S. 437, 441–42 (2007) (internal quotation marks and citation omitted). For example, a claim that a state has violated the Elections Clause is "precisely the kind of undifferentiated, generalized grievance" that does not confer standing. *Id.* at 442; *see*

*Lujan*, 504 U.S. at 574 (quoting *Fairchild v. Hughes*, 258 U.S. 126, 129–30 (1922), and

*Massachusetts v. Mellon*, 262 U.S. 447, 488–89 (1923)).

To meet the second prong—causation—the plaintiff must show that there is some

link between the alleged injury and the challenged conduct, which must not be "too

attenuated." *Red River Freethinkers v. City of Fargo*, 679 F.3d 1015, 1023 (8th Cir. 2012)

(quoting *Allen v. Wright*, 468 U.S. 737, 752 (1984)).

With this framework in mind, the Court turns to the Electors' allegations. They

raise four theories of injury to support standing: vote dilution; uncertainty over how to

vote; a risk to safe harbor compliance; and damage to their prospects for election as

candidates for office. The Court considers each; none confers standing.

### 1. Vote Dilution as Injury

The Electors assert that they have standing as voters (as differentiated from their

status as candidates for the office of presidential elector), because the counting of

absentee ballots received after Election Day will injure them by diluting the value of their

votes. (ECF No. 44 ("Reply") at 15–16.) The Electors' theory is that votes received after

Election Day are invalid and unlawful, and thus counting these votes will increase the

total amount of votes cast, which will in turn render their own lawful votes less

influential.[11] (Compl. ¶ 68.)

---

[11] This theory presumes the Electors' votes are either in-person or absentee but received
by election officials on or before Election Day.

There is little dispute that, in certain cases, vote dilution can be a cognizable injury that confers standing. *E.g.*, *United States v. Hays*, 515 U.S. 737, 744–45 (1995) ("Where a plaintiff resides in a racially gerrymandered district [and has therefore had his or her vote diluted], . . . the plaintiff has been denied equal treatment because of the legislature's reliance on racial criteria, and therefore has standing to challenge the legislature's action."). It does not follow that all forms of vote dilution give rise to standing. The Electors have not explained, for instance, why the principles underlying standing in racial gerrymandering cases (where a state legislature or redistricting committee takes affirmative action that dilutes or restricts the votes of a specific minority population) should extend to the present case, where the official action (entry of the Consent Decree Order) expands voting rights for all. In *Gill v. Whitford*, the Supreme Court recognized that plaintiffs in past vote-dilution cases had standing when their claimed injuries were "individual and personal in nature," and the plaintiffs had alleged "facts showing disadvantage to themselves as individuals." 138 S. Ct. 1916, 1929–30 (2018) (quoting *Reynolds v. Sims*, 377 U.S. 533, 561 (1964), and *Baker v. Carr*, 369 U.S. 186, 206 (1962)).

This case presents a different circumstance. The Electors allege that their votes will be diluted, but such dilution affects all Minnesota voters equally, giving no disadvantage to the Electors. Indeed, the Electors' claim of vote dilution is a paradigmatic generalized grievance that cannot support standing. The prospect of hypothetical unlawful votes in the upcoming presidential election is not a harm unique to the Electors.

Illustrating this principle, in the many challenges to state election laws leading to the November election, other courts have rejected similar vote dilution theories. *See, e.g.*, *Donald J. Trump for President, Inc. v. Cegavske*, No. 2:20-cv-1445JCMVCF, 2020 WL 5626974, at *4 (D. Nev. Sept. 18, 2020) (determining that plaintiffs' vote dilution theory was a generalized grievance and too speculative to confer standing); *Martel v. Condos*, No. 5:20-cv-131, 2020 WL 5755289, at *4 (D. Vt. Sept. 16, 2020) (concluding that plaintiffs' vote dilution theory amounted to a generalized grievance); *Paher v. Cegavske*, No. 3:20-cv-00243MMDWGC, 2020 WL 2748301, at *4 (D. Nev. May 27, 2020) (determining that plaintiffs' claim that their votes would be diluted as a result of an election conducted exclusively by vote-by-mail was too generalized); *Am. Civil Rights Union v. Martinez-Rivera*, 166 F. Supp. 3d 779, 789 (W.D. Tex. 2015) (upholding a magistrate judge's conclusion that plaintiff's vote dilution claim was speculative and a generalized grievance as not clearly erroneous).

At oral argument and in their reply brief, the Electors maintain that these recent cases are distinguishable because in these cases, the plaintiffs alleged future vote dilution caused by potential fraud, *i.e.*, "dilution-through-fraudulent-voting," rather than "the certainty that ballots will be counted in violation of federal law."[12] (Reply at 16.) In *Paher*,

---

[12] Notwithstanding counsel's assertions that the Electors are not relying on claims of voter fraud, the Electors' Reply Brief states:

> Under [Secretary Simon's] policy, voters have no incentive to mail their ballots early, drop them off, or vote in person, meaning that many ballots will arrive after Election Day. Worse, persons watching the elongated

for example, Nevada's secretary of state planned to conduct Nevada's presidential primary exclusively by mail. 2020 WL 2748301, at *2. The plaintiffs, Nevada voters, claimed that conducting an election exclusively by mail would "strip[] voter-fraud-prevention safeguards" and cause dilution of their votes due to a hypothesized increase in voter fraud. *Id.* The court found this alleged injury too generalized to confer standing because the claims were "materially grounded on ostensible election fraud that may be conceivably raised *by any Nevada voter*." *Id.* at *4 (emphasis original). The Electors attempt to distinguish their case from *Paher* and assertions of injury through potential voter fraud by arguing that here "the entire point of [Secretary Simon's] actions is to count votes that, as a matter of federal law, are ineligible." (Reply at 16.) This is a distinction without a difference. In both cases, the plaintiffs allege that the votes are unlawful, whether by fraud or by arriving "late" pursuant to the Consent Decree Order. According to the Electors, both types of unlawful ballots would dilute votes. And in both cases, the counting of those ballots is a generalized grievance, affecting all Minnesota voters in the same way. Regardless of how the Electors characterize the challenged ballots, the

---

> ballot-counting unfolding under this new "Election Week" will face strong incentives to cast a ballot, and those who already cast their ballot will find new incentive to vote again. This is not a "specter;" it's called "human nature."

(Reply at 20–21.) The Court is at a loss to understand the Electors' claim as anything other than an argument that it is human nature to commit voter fraud—a felony in the State of Minnesota. Minn. Stat. § 201.014 subd. 3.

outcome is the same: allegations of vote dilution due to the counting of hypothetical, allegedly unlawful ballots is a generalized grievance that does not confer standing.

### 2.  *Uncertainty as Injury*

The Electors also argue that unless there is a "clear determination as to what rules govern under federal law in advance of Election Day," chaos and uncertainty will result. (Reply at 14; ECF No. 13 ("Pl. Br.") at 7–8.) As a result of this uncertainty, the Electors claim that they will not be able to determine whether to vote in person or by mail. (Pl. Br. at 7–8.)

Voter confusion as injury fares no better than the Electors' vote dilution theory. The Electors' alleged confusion and uncertainty is speculative at best; they can do no more than guess what will occur if the Court does not enjoin the Consent Decree Order. The Electors' conclusory assertion that voters will not know whether to vote in person or by mail is unsupported by factual allegations or the record.

In reality, the Electors are in danger of creating confusion rather than avoiding it. After the state court entered the Primary Consent Decree Order on June 17, voters were informed that the Receipt Deadline would not apply to the Primary. (*See* Primary Consent Decree Order at 7–9, 13.) And once the state court entered the Consent Decree Order on August 3, voters were informed that the Receipt Deadline was changed for the general election as well.

24

The record is replete with information provided to Minnesota voters about the Postmark Deadline. Secretary Simon directed state election officials to prepare ballots highlighting that absentee ballots must be postmarked on or before Election Day and received within seven days of the election to be counted. (Absentee Ballot Guidance.) Over one million Minnesotans have requested absentee ballots, and as of September 18, those voters began receiving those ballots with clear instructions stating that the Postmark Deadline applied. (Maeda Decl. ¶¶ 3–4.) Many news sources, including Secretary Simon's official website,[13] have told their readers, listeners, and watchers that the Postmark Deadline applies. (ECF No. 39-1, Exs. 22–26 (news sources, including Secretary Simon's website, KARE 11, CNN, Twin Cities Pioneer Press, and ABC News, reporting on the Postmark Deadline).) And this evidence comports with the experiences of voters in the Primary. (Primary Consent Decree Order at 7–8; Minn. Sec'y of State, *Vote Early by Mail*, https://web.archive.org/web/20200805091323/ https://www.sos.state.mn.us/elections-voting/other-ways-to-vote/vote-early-by-mail/.) This is a difficult genie to put back in the lamp. Giving Minnesota voters conflicting

---

[13] The instructions on Secretary Simon's official page are available in eleven different languages: English, Spanish, Hmong, Somali, Vietnamese, Russian, Chinese, Lao, Oromo, Khmer, and Amharic. Minn. Sec'y of State, *Vote Early by Mail*, https://www.sos.state.mn.us/elections-voting/other-ways-to-vote/vote-early-by-mail/ (last accessed Oct. 8, 2020).

messages after they have received their absentee ballots would certainly cause some of those voters uncertainty and confusion.[14]

Moreover, to the extent the Electors seek certainty, they have it. Secretary Simon, having been sued in state court, considered Minnesota Statute Section 203B.08's Receipt Deadline, and concluded that, as applied in the pandemic, it raised constitutional issues. (Consent Decree at 3–4, 6–7.) Through the Consent Decree, he remedied this issue by implementing a Postmark Deadline. (*Id.* at 9–10.) A state-court judge analyzed the Consent Decree, concluded that Section 203B.08 was likely unconstitutional as applied in this pandemic, and ordered Secretary Simon to implement the Postmark Deadline. (Consent Decree Order at 19–25.) The Secretary did so, sending out ballots and informing voters of the Postmark Deadline. (Absentee Ballot Guidance; Maeda Decl. ¶¶ 3–4.) Minnesota voters have now begun to vote pursuant to the Postmark Deadline rule. The

---

[14] The Court is also cognizant of the equitable principle that district courts should be wary of changing the rules of elections near Election Day, which is in essence what the Electors are asking the Court to do. *Purcell v. Gonzalez*, 549 U.S. 1 (2006) (expressing disfavor of court orders altering election rules in the weeks leading up to an election). The Supreme Court has recently reaffirmed the *Purcell* principle. *See Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 140 S. Ct. 1205, 1207 (2020) ("This Court has repeatedly emphasized that lower federal courts should ordinarily not alter the election rules on the eve of an election."); *cf. Republican Nat'l Comm. v. Common Cause R.I.*, No. 20A28, -- S.Ct. --, 2020 WL 4680151, at *1 (U.S. Aug. 13, 2020) (denying an application for a stay in part to avoid disrupting the status quo voting procedure that voters would expect). Given the timing and procedural posture of this case, an injunction by this Court upsetting the Consent Decree Order may well violate *Purcell.* Due to its jurisdictional determination, the Court need not make this call, but it is well aware of its import in this context.

Court sees no confusion or uncertainty in this chain of events. This theory cannot support standing.

### 3. *Safe Harbor Deadline as Injury*

The Electors next claim they have standing because as Electors and candidates for office, they would be injured by possible "last-minute litigation over ballot eligibility" that would prevent certification of Minnesota's election results before the safe harbor deadline. (Reply at 14.) Aside from the "significant expense" that this litigation would cause them, the Electors also posit that there is a risk that such litigation would extend past the statutory safe harbor deadline, which would, according to the Electors' argument, permit Congress to disregard Minnesota's electoral votes. (*Id.*) Although the articulated injury under the safe harbor theory is sufficiently particular to the Electors, it ultimately fails to confer standing because this injury relies on a "highly attenuated chain of possibilities" that is not certainly impending, and thus, cannot support standing. *Clapper*, 568 U.S. at 410.

There are two ways that the State of Minnesota could fail to obtain safe harbor. First, Minnesota could change the procedures it uses to appoint electors after Election Day. 3 U.S.C. § 5; *Bush v. Palm Beach Cnty. Canvassing Bd.*, 531 U.S. 70, 77-78 (2000). Second, Minnesota could fail to determine which set of electors represent the State at the national meeting of presidential electors by the safe harbor deadline. 3 U.S.C. § 5.

The Electors appear to rely primarily on the second situation to support this standing theory.[15] (Reply at 13–15.) They claim that the "well-known realities of drawn-out post-election litigation" pose a risk that the State's election results will not be certified in time to satisfy the safe harbor provision. (*Id*. at 16.) The prospect of post-election litigation that would prevent Minnesota from meeting the safe harbor deadline is unsupported by any factual allegations. And the record again supports the opposite conclusion—Secretary Simon's actions under the Consent Decree are designed to ensure that the necessary deadlines are met. And as noted by the Intervenors, other states' statutorily-enacted ballot-receipt deadlines match or exceed the provisions of the Consent Decree, and nothing before the Court indicates those states have had difficulty meeting the safe harbor deadline in past elections. (ECF No. 38 ("Intervenors' Br.") at 26 n.3 (citing statutes of Illinois, Alaska, and Ohio)).

Moreover, in the implausible event that Minnesota fails to meet the safe harbor deadline, there are no allegations supporting the notion that it would lose its representation in the Electoral College. The Electors allege that the Consent Decree poses "a clear and present danger that Minnesota's election results will not be accepted under

---

[15] To the extent the Electors rely on the first situation, their claimed injury is too speculative to confer standing. The safe harbor provision would be violated in this manner, if at all, only after Election Day and only if Minnesota changed the way it chooses electors. 3 U.S.C. § 5. Multiple entities could cause such a violation: a court, the legislature, or the secretary of state, among others. Speculation that one of these entities will change Minnesota election law after Election Day and cause Minnesota to violate the safe harbor provision is not a sufficient injury to confer standing.

the safe harbor law and therefore will not be accepted by the United States Congress in determining the winner of the presidential election." (Pl. Br. at 16.) But even if a state fails to meet the safe harbor deadline, Congress is not simply free to disregard the state's election results at will.[16] The safe harbor provision imposes no requirements on the states; rather, it offers their election results protection. Although meeting the safe harbor deadline effectively ensures that Congress will count a state's electoral votes, the inverse is not necessarily true. Under Title 3, United States Code, Section 15, when Congress receives only one set of electoral votes from a state, Congress may not reject those votes except in narrow circumstances.[17] To suppose that Congress would make such findings requires a good deal of speculation; to further suppose that Congress would make these findings because of Secretary Simon's actions here requires even more.

---

[16] "If any State neglects to appoint electors under the safe harbor provision, the two Houses of Congress . . . are to resort to other provisions of the Electoral Count Act of 1887 to determine who are the legally appointed electors of the State. The Act contemplates no exclusion of electoral votes from the count because of the failure of a State to settle disputes as to the lawful vote of the State." Stephen A. Siegel, *The Conscientious Congressman's Guide to the Electoral Count Act of 1887*, 56 Fla. L. Rev. 541, 593 (2004) (quoting 18 Cong. Rec. 50 (1886)) (cleaned up).

[17] Congress may reject a state's electoral votes if they have not been "regularly given by electors" or made by electors who had not been "lawfully certified" pursuant to Title 3, United States Code, Section 6. 3 U.S.C. § 15. The Electors do not mention the possibility that Congress may receive more than one set of electoral votes from Minnesota. The prospect of Minnesota losing its representation under such a scenario is highly conjectural. 3 U.S.C. § 15. *See generally* Siegel, *The Conscientious Congressman's Guide*, 56 Fla. L. Rev. at 625–34 (discussing the process Congress uses when it receives more than one set of electoral votes from a state).

Furthermore, the attenuated line of causation on which this theory relies makes it an inappropriate basis for standing. The links in a chain between Secretary Simon entering into the Consent Decree and the prospect of Minnesota running afoul of the safe harbor provision are myriad. First, someone with standing would have to file a lawsuit challenging the election results. Next, the litigation would have to extend past the safe harbor deadline of December 8. It is sheer conjecture that such a circumstance would occur. Then, as mentioned above, even if Minnesota's election results were not certified by the safe harbor deadline, both Houses of Congress would have to affirmatively decide to disregard Minnesota's electoral votes on one of two narrow bases, something which has—as best the Court can tell—happened in only one election since the United States' first presidential election approximately 230 years ago.[18] The Electors have not plausibly alleged that any of these events will come to pass. In sum, this claimed injury relies on an attenuated and speculative chain of causation, and cannot be the basis for standing.

### 4. Candidacy Supporting Injury

The Electors' final argument is that they have standing by virtue of being candidates for the position of presidential elector. (Reply at 13.) This theory is distinct

---

[18]In 1873, Congress rejected the electoral votes of Georgia, Louisiana, and Arkansas. Siegel, *The Conscientious Congressman's Guide*, 56 Fla. L. Rev. at 553–54. Georgia's electors had voted for a candidate who could not be president, Louisiana's electors lacked proper credentials, and Arkansas had not held a lawful election. *Id*. at 554. Here, the Electors provide no evidence suggesting that any similar circumstances will occur this year. Further, Congress's rejections occurred prior to the enactment of the Electoral Count Act of 1887, which still governs electoral voting today. 3 U.S.C. § 1, *et seq.*

from the safe harbor and vote dilution theories in that the Electors claim that their candidacy gives them a "direct and personal stake in the conduct of their election consistent with governing federal law and . . . Article II's Presidential Electors Clause." (*Id.*) The Electors claim that they will be "injured by the tallying of votes for their opponents in violation of federal law." (*Id*. at 15.)

The Electors cite three cases in support of the idea that candidates for office have standing in these circumstances: *McPherson*; *Bush v. Palm Beach County*; and *Bush v. Gore*, 531 U.S. 98 (2000). None of these three cases supports the Electors' argument. In *McPherson*, the plaintiffs were candidates to serve as presidential electors. 146 U.S. 1. Although the Supreme Court permitted the plaintiffs to bring the lawsuit, it did not address the issue of standing. The Court considered the issue of justiciability, but only as to whether the issue was a political question, not whether the plaintiffs had standing. *Id.* at 24 ("The question of the validity of this act . . . is a judicial question, and we cannot decline the exercise of our jurisdiction upon the inadmissible suggestion that action might be taken by political agencies in disregard of the judgment of [the Court]."). Further, *McPherson* preceded the development of the standing doctrine by approximately 30 years, and therefore cannot be relied upon to establish standing today. *See Fairchild*, 258 U.S. at 129–30 (holding that a plaintiff could not challenge the enactment of the Nineteenth Amendment because the challenge was "not a case, within the meaning of section 2 of article 3 of the Constitution, which confers judicial power on the federal

courts"); *Mellon*, 262 U.S. at 480–89 (dismissing a challenge to a law providing funding for maternity and child care "for want of jurisdiction" because a taxpayer lacked a sufficient interest in the use of federal funds to support a lawsuit); 13A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 3531.1 (3d ed. 2020) (discussing the historical evolution of the modern standing doctrine as beginning with *Mellon*).

*Palm Beach County* and *Bush v. Gore* also fail to support the Electors' argument. Both cases involved post-election litigation with tangible, concrete harms, not vague, pre-election concerns over the possibility of post-election litigation asserted here. A county canvassing board, the Democratic Party of Florida, and presidential candidate Al Gore initially brought the lawsuit that became *Palm Beach County*. *See McDermott v. Harris*, No. 00-2700, 2000 WL 1693713 (Fla. Cir. Ct. Nov. 14, 2000). Gore was also the plaintiff in *Bush v. Gore*. *See Gore v. Harris*, No. 00-2808, 2000 WL 1770257 (Fla. Cir. Ct. Dec. 4, 2000). For purposes of standing, the critical distinction between this case and *Palm Beach County/Bush v. Gore* is that, in those two cases, Gore sued after the election, where he was initially declared the loser, and could point to a tangible injury: bad ballot-counting practices allegedly cost him the election. There, Florida canvassing boards had certified the election results and declared George W. Bush the winner of Florida's electoral votes. *See Gore v. Harris*, 772 So. 2d 1243, 1247 (Fla. 2000). Gore contended that those results

included illegal votes and omitted legal votes, and that the number of votes in question could change the outcome of the election. *Id.*

In contrast, any injury the Electors have alleged they may suffer is, at this point, conjectural and hypothetical—it is not specific to them, and is not actual, imminent, or concrete. *Lujan*, 504 U.S. at 560. The Court cannot reasonably infer any nexus between the entry of the Consent Decree and a diminished likelihood of their service as presidential electors.

On the other hand, multiple scenarios demonstrate that counting ballots postmarked on or before Election Day but received afterwards will not inflict such harm. For instance, if the Minnesota popular vote ends in a landslide in favor of either party, where the number of absentee ballots received after Election Day is less than the difference between the winning and second-place candidates, the challenged ballots likely would not impact which set of electors would represent Minnesota, and the Electors would suffer no injury.[19] Additionally, it is equally possible that more of the challenged ballots will be cast in *favor* of the Electors' candidate;[20] in that case, the Electors

---

[19] For example: Minnesota election officials receive 50,000 timely postmarked ballots after Election Day. Candidate A wins Minnesota's popular vote by 100,000 votes over Candidate B. Regardless of the contents of the late absentee ballots, Candidate A wins. In either circumstance, the Electors are not harmed because the outstanding absentee ballots cannot change the results of the election.

[20] The Electors have given the Court no reason to infer, much less conclude, that the challenged absentee ballots would tend to favor one candidate or the other. To the extent that such evidence could be produced, it is likely to be based on empirical evidence from

would benefit from ballots received after Election Day. The Electors' claim rests upon the implied assumption that counting absentee ballots received after Election Day will decide the election against their candidate. The Court cannot find standing in an implied and theoretical assumption.

### B.      The Electors Also Lack Prudential Standing

Even if the Electors had established Article III standing, they also lack prudential standing because they are asserting the rights of third parties—not their own. Apart from Article III standing, courts also decline to reach the merits of a case when the plaintiff lacks prudential standing.

As a general rule, a litigant may only assert his or her own rights, not the rights of others. *Craig v. Boren*, 429 U.S. 190, 193–94 (1976). The rule is not absolute, however, as there are circumstances in which a litigant has standing to assert the rights of another. *Kowalski*, 543 U.S. at 129–30. To satisfy this exception, a plaintiff first must have a "close relationship" with the party whose rights he or she seeks to assert. *Id.* at 130. The third party also must be hindered in some way that limits his or her own ability to assert those rights. *Id.*

Secretary Simon and the Alliance argue that the Electors assert claims of injury that the Minnesota Legislature and Congress suffered, not themselves. (ECF No. 35

---

previous elections, none of which are necessarily generalizable to the current election, which is expected to see record participation in absentee voting due to the pandemic. (Mayer Decl. at 3; ECF No. 39-1, Ex. 26.)

("Secretary's Br.") at 13–16; Intervenors' Br. at 26–29.) The Court agrees. Regarding Count I, the Electors maintain that the Electors Clause delegates the power to select presidential electors to the state legislature only—a power it cannot delegate—and Secretary Simon usurped that power by entering into the Consent Decree. U.S. Const. art. II, § 1, cl. 2. But even if the Secretary's actions were a usurpation of power and violated the Electors Clause, the Minnesota Legislature and Congress suffered the injury, not the Electors. Only a state legislature may bring a claim for a violation of the Elections Clause. *Corman*, 287 F. Supp. 3d at 573 (addressing U.S. Const. art. I, § 4, cl. 1). Because Elections Clause and the Electors Clause have "considerable similarity," this same logic applies to the Electors Clause. *Ariz. State Leg.*, 576 U.S. at 839 (Roberts, C.J., dissenting).

As for Count II, the Electors claim that Secretary Simon, by entering into the Consent Decree, contravened an act of Congress setting Election Day. (Pl. Br. at 12–14.) Similar to Count I, if anyone was injured by Secretary Simon entering into the Consent Decree, it was Congress, not the Electors.

Finally, the exception to the rule against raising the rights of third parties does not apply here. First, no close relationship exists between the Electors and the Minnesota Legislature. Although Lucero is a member of the Minnesota House of Representatives, the Electors do not argue, nor could the Court find, that this establishes a close relationship. *See Va. House of Delegates v. Bethune-Hill*, 139 S. Ct. 1945, 1953 (2019) (noting that individual legislators lack standing to assert the "institutional interests of a

legislature."); *cf. Raines v. Byrd*, 521 U.S. 811, 829 (1997) (holding that individual Senators lacked standing to challenge an institutional injury to the Senate). Second, the Electors have not alleged that the Minnesota Legislature is in any way hindered in, or prevented from, protecting its own interests. Thus, the Electors have not established prudential standing.

In an attempt to avoid this conclusion, the Electors argue that their claims involve "the Constitution's federalism provisions," (Reply at 17), and therefore they have prudential standing under *Bond v. United States*, 564 U.S. 211 (2011). In *Bond*, the Supreme Court held that a litigant has prudential standing where she "challenge[s] a law enacted in contravention of constitutional principles of federalism." *Id.* at 223–24. There, the criminal defendant had prudential standing because she was challenging a federal statute that infringed on the state's police powers in contravention of the Tenth Amendment. *Id.* at 225.

The Electors' reliance on *Bond* falls short because they do not allege a violation of the principles of federalism. The Constitution delegates certain authority to regulate presidential elections to the states. U.S. Const. art. II, § 1, cl. 2. The Electors allege violations of that authority, rather than powers reserved to the states under the Tenth Amendment. Indeed, as the Electors note, states have no inherent power regarding federal elections. *See Gonzalez v. Arizona*, 677 F.3d 383, 392 (9th Cir. 2012) ("In contrast to the Supremacy Clause, which addresses preemption in areas within the states' historic

police powers, the Elections Clause affects only an area in which the states have no inherent or reserved power.");[21] (Pl. Br. at 11 ("This power [to regulate presidential elections] is neither inherent no[r] preserved under the Tenth Amendment.").) The Consent Decree did not invade any Minnesota interest that the Tenth Amendment protects and thus no federalism concerns are at play here that would make *Bond* relevant. Accordingly, *Bond* does not support a finding that the Electors have prudential standing.

For these reasons, the Court concludes that the Electors lack prudential standing to bring either of their claims.

## II.   Other Issues

Standing is "a jurisdictional prerequisite that must be resolved before reaching the merits of a suit." *City of Clarkson Valley v. Mineta*, 495 F.3d 567, 569 (8th Cir. 2007). Because the Court finds that the Electors do not have standing, the Court lacks jurisdiction and does not make any findings on the multitude of additional issues this case presents, such as: whether the Court should abstain under *Pennzoil Co. v. Texaco, Inc.*, 481 U.S. 1 (1987); whether the *Purcell* principle counsels against the Court issuing an injunction so close to the election, *Purcell v. Gonzalez*, 549 U.S. 1 (2006); whether this suit is an improper collateral attack on the State Court Order; and whether the Electors satisfy the factors a

---

[21] Although *Gonzalez* addressed the Article I Elections Clause, the same logic applies to the Article II Electors Clause. *Ariz. State Leg.*, 576 U.S. at 839 (Roberts, C.J., dissenting).

court considers in connection with a motion for injunctive relief, *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 114 (8th Cir. 1981).

## CONCLUSION

Because the plaintiffs lack standing, the Court has no subject-matter jurisdiction and the motion for preliminary injunction is DENIED.

Dated: October 11, 2020                         BY THE COURT:

                                                s/Nancy E. Brasel
                                                Nancy E. Brasel
                                                United States District Judge