**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

| | |
|---|---|
| JAMES CARSON and ERIC LUCERO, | Case No. 20-CV-2030 (NEB/TNL) |
| Plaintiffs, | |
| v. | ORDER ON EMERGENCY MOTION FOR INJUNCTION PENDING APPEAL |
| STEVE SIMON in his official capacity as Secretary of State of the State of Minnesota, | |
| Defendant, | |
| and | |
| ROBERT LAROSE, TERESA MAPLES, MARY SANSOM, GARY SEVERSON, and MINNESOTA ALLIANCE FOR RETIRED AMERICANS EDUCATION FUND, | |
| Intervenor Defendants. | |

On August 3, 2020, the state court entered an order and partial consent decree suspending Minnesota's absentee ballot receipt deadline for the upcoming presidential election. (ECF No. 36-1, Ex. C.) In late September, Plaintiffs ("the Electors") filed this action seeking to enjoin the state court's order and the consent decree. The Court denied the Electors' motion for a preliminary injunction. (ECF No. 59 ("Preliminary Injunction

Order").) The Electors have appealed, and they now seek an injunction pending that appeal. (ECF No. 61.) For the reasons that follow, the Court denies the motion.

## BACKGROUND

The Court has previously laid out the facts in this case in detail. (Preliminary Injunction Order at 2–18.) Thus, the Court recounts only the facts necessary to contextualize this motion. Intervenor Defendants in this suit ("the Alliance") sued Defendant Minnesota Secretary of State Steve Simon ("Secretary Simon") in state court seeking to enjoin, among other things, enforcement of the Minnesota statute requiring that election officials receive absentee ballots by 8:00 p.m. on Election Day. (Preliminary Injunction Order at 9–10.) Secretary Simon and the Alliance reached an agreement embodied in a consent decree (the "Consent Decree"), in which Secretary Simon agreed not to enforce the receipt deadline; the state court confirmed and entered the Consent Decree. (*Id.* at 12.) Later, the Electors brought this suit seeking to enjoin enforcement of the Consent Decree. (ECF No. 1 ("Compl.").) The Electors claim that the entry of the Consent Decree violated the Constitution and federal statutes. (*Id*. ¶¶ 2–3, 53–65, 75–90.)

After an expedited briefing schedule and a hearing, the Court found that the Electors lacked standing to bring their claims, declined to address the merits of their claims, and denied the preliminary injunction. (Preliminary Injunction Order.) The Electors filed a notice of appeal and this emergency motion for injunction pending appeal (ECF Nos. 60, 61).

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 62(d), a court may "suspend, modify, restore, or grant an injunction" while there is a pending appeal from an interlocutory order that grants, denies, or modifies an injunction. Fed. R. Civ. P. 62(d). When considering whether to issue an injunction pending appeal, a court must "engage in the same inquiry as when it reviews the grant or denial of a preliminary injunction." *Walker v. Lockhart*, 678 F.2d 68, 70 (8th Cir. 1982) (citations omitted). Thus, the Court must consider (1) the likelihood of success on the merits; (2) the likelihood of irreparable harm to the movant if the injunction is not granted; (3) the absence of any substantial harm to other interested parties if an injunction is granted; and (4) the public interest. *Shrink Mo. Gov't PAC v. Adams*, 151 F.3d 763, 764 (8th Cir. 1998) (citing *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 114 (8th Cir. 1981)). The moving party has the heavy burden to establish that the injunction should be granted. *Nken v. Holder*, 556 U.S. 418, 439 (2009) (Kennedy, J., concurring).

## ANALYSIS

In the Preliminary Injunction Order, the Court found that the Electors lacked standing and denied the Electors' motion for a preliminary injunction. (Preliminary Injunction Order at 38.) In doing so, the Court rejected the Electors' various theories of injury—vote dilution (*Id.* at 20–24), uncertainty (*Id.* at 24–27), risk of a safe harbor violation (*Id.* at 27–30), and injury as candidates for election (*Id.* at 30–34). The Court also

concluded that the Electors lack prudential standing because the injuries belong, if to anyone, to the Minnesota Legislature and Congress. (*Id.* at 34–37.) Since the Electors lacked standing to bring their claims, the Court did not reach, among other issues, the merits of their claims. (*Id.* at 37–38.)

## I.    **The Electors Still Lack Standing**

The Electors now primarily argue that the Court erred in determining that they lack standing for a preliminary injunction. The Electors' brief does not change the Court's analysis or their standing shortfalls. While many of the Electors' arguments under Rule 62(d) are the same as those contained in their original briefing, the Court will address a few points below.

### A.  *Article III Standing*

#### 1.  *Candidate Standing*

The Electors again argue that they have standing based on their status as candidates to serve as presidential electors. They rely on the same three cases to support this theory—*Bush v. Palm Beach County Canvassing Board*, 531 U.S. 70 (2000); *Bush v. Gore*, 531 U.S. 98 (2000); and *McPherson v. Blacker*, 146 U.S. 1 (1892)—but argue that the Court misapplied them.

The Electors first assert that the Court ruled that *McPherson* was "wrongly decided or upended by subsequent doctrinal developments." (ECF No. 62 ("Pl. Br.") at 5.) In their

view, the Court's conclusion "calls into question virtually all election-related challenged by candidates." (*Id.*)

The Electors mischaracterize the Preliminary Injunction Order's analysis of *McPherson*. The Preliminary Injunction Order did not conclude that *McPherson* was wrongly decided or that its holding was disturbed by later doctrine. The narrow point the Court made was that, contrary to the Electors' assertions, *McPherson* does not stand for the proposition that candidates to serve as presidential electors have standing to challenge these election procedures. (Preliminary Injunction Order at 31–32); *cf. Comm. for Monetary Reform v. Bd. of Governors*, 766 F.2d 538, 544 n.37 (D.C. Cir. 1985) (refusing to accord precedential value to a court's standing analysis when that case preceded an intervening change in the constitutional standards for standing). *McPherson* is still good law, but it does not support the proposition the Electors claim it does—that candidates to serve as presidential electors automatically have standing to challenge election procedures. The *McPherson* Court simply never considered the issue of standing.

Next, the Electors contest the Preliminary Injunction Order's distinction between the present case and *Bush v. Gore* and *Palm Beach County*. (Pl. Br. at 5–6.) In the Preliminary Injunction Order, the Court noted that both cases "involved post-election litigation with tangible, concrete harms, not vague, pre-election concerns over the possibility of post-election litigation asserted here." (Preliminary Injunction Order at 32.) The Electors claim that this analysis goes to ripeness, not standing. (Pl. Br. at 5.) The Electors are wrong on

this point; the Court was addressing exactly what it said it was addressing—standing. (Preliminary Injunction Order at 32). To establish standing, injuries must be concrete, actual, imminent, and more than merely speculative.[1] *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). The Electors' claim that the entry of the Consent Decree would harm their ability to serve as presidential electors is, as of now, a speculative injury.

The Electors also try to minimize the distinction between the present case and *Bush v. Gore* and *Palm Beach County*. (Pl. Br. at 5–6.) In their view, they have suffered a substantially similar injury to the plaintiffs in those two cases. (*Id.*) Specifically, the Electors claim that in those cases, like here, Vice President Gore had no reason to believe that the challenged ballots would favor one candidate over the other. (*Id.* at 5.) This contention misses the mark. In *Bush v. Gore* and *Palm Beach County*, Florida election officials had certified Bush the winner of the state's popular vote, and there was evidence of inconsistent vote-counting practices. *Gore v. Harris*, 772 So. 2d 1243, 1248 (Fla. 2000). The harm to Gore was clear and not merely hypothetical—if the vote-counting practices were not rectified, Gore would lose. This distinction is critical. As of now, all the Electors can do is speculate that ballots postmarked by November 3 and received afterward might affect the election, and that those votes would cost them the election.

---

[1] Ripeness, on the other hand, "turns on 'the fitness of the issues for judicial decision' and 'the hardship to the parties of withholding court consideration.'" *Pac. Gas & Elec. Co. v. State Energy Res. Conserv. & Dev. Comm'n*, 461 U.S. 190, 201 (1983) (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 149 (1967)). The Court discussed neither of these in the Preliminary Injunction Order.

2. *Uncertainty and Confusion*

The Electors assert that the Court, in concluding that their uncertainty and chaos theory did not confer standing, "improperly ma[de] assumptions about the merits during the standing inquiry." (Pl. Br. at 6 (emphasis omitted).) The Electors' argument here is that because they pled it, the Court must assume that the Consent Decree is unlawful and that it will cause confusion. The Electors cite no case for the proposition that taking allegations as true for standing purposes reaches this far. Taken to its logical end, the Electors' argument would mean that any citizen could challenge any law on the grounds that the unlawfulness would lead to confusion. (ECF No. 69 at 12.) More importantly, the Electors have not made any factual assertions to back up their conclusory allegations. The claims are too speculative to support standing.

3. *Voter Standing*

Next, the Electors again claim that their votes will be diluted if the Consent Decree is not enjoined. Even assuming that the Electors' votes would be diluted, this harm would be felt in precisely the same way by every Minnesota voter,[2] which is necessarily true for

---

[2] To illustrate this point, suppose that 3,000,000 Minnesota voters cast a "non-challenged" ballot (that is to say, an absentee ballot received on or before Election Day, a vote cast in person during early voting, or a ballot cast in person on Election Day). Each voter's vote counts for 1/3,000,000 of the total. If election officials receive 10,000 "challenged ballots"—those postmarked by Election Day but received up to a week after Election Day. Each voter's vote is now worth 1/3,010,000 of the whole. Each of the initial 3,000,000 voter's votes is now worth marginally less of the whole, but the marginal dilution is spread exactly evenly, including to the Electors' votes.

a state-wide election. In such an election, there is nothing that distinguishes any single Minnesota vote from any other Minnesota vote. Even those ballots received after the Receipt Deadline will be diluted to the same extent as if they had been timely cast. This is in direct contrast to *Baker*, *Gill*, and numerous "one-person, one-vote" Equal Protection cases. In *Baker*, the plaintiffs lived in overpopulated districts where the ratio of citizens to elected official was higher than in other districts in the state. 369 U.S. at 192–93. This "plac[ed] them in a position of constitutionally unjustifiable inequality vis-a-vis voters in irrationally favored counties," providing the requisite individual and personal injury: the vote of a voter in one district was worth more than that of a voter in another. *Id.* at 207–08. *Gill* made clear that the claimed injury from vote dilution must be "district specific." 138 S. Ct. at 1930. Indeed, plaintiffs in *Gill* asserted a state-wide injury, but the Supreme Court rejected this theory as too generalized to confer standing—the voters who could have had standing under this theory were those from individual districts who had been personally injured. *Id.* at 1931. Finally, in *Reynolds*, the Supreme Court held that "an individual's right to vote for state legislators is unconstitutionally impaired when its weight is in a substantial fashion diluted *when compared with votes of citizens living on other parts of the State.*" 377 U.S. at 568 (emphasis added). In sum, these three cases illustrate the principle that when vote dilution is claimed as an injury, the dilution must be specific and personal to the plaintiff or to a specific group whose vote power was diluted vis-à-

vis another person or group. In the present case, the harm, if it exists, is felt equally by every Minnesota voter.[3]

The Electors also seek to distinguish their case from other recent cases that found that plaintiffs did not have standing as voters. (Pl. Br. at 9–10.) The chief distinction, in the Electors' view, is that fraud was not certain to occur in those cases, where here it is a certainty that "many late votes will be counted." (*Id.*) This contention ignores the fact that the Court found that the Electors lacked standing on their vote dilution theory because it is too generalized to confer standing. (Preliminary Injunction Order at 20–24.) Even if the Court accepted as true that the challenged ballots are invalid, the claim that those votes will dilute the Electors' votes is still too generalized. (*Id.*)

The Electors argue against this conclusion by claiming that the injury is specific to them, since only votes cast on or before Election Day will be diluted. (Pl. Br. at 10.) But votes received after Election Day will similarly be worth a smaller percentage of the total amount of votes cast. Even if the Electors were correct that only votes received on or before Election Day would be diluted, their vote dilution injury is still shared equally by

---

[3] The Electors contend that the Preliminary Injunction Order "cast[s] a shadow on voting rights in the United States by calling into question even individual voters' right to challenge vote dilution." (Pl. Br. at 9.) The Electors have again misinterpreted the Preliminary Injunction Order by reading its conclusions much more broadly than is justified. The Court did not call into question an individual voter's ability to challenge vote dilution. At most, the Court found that, based on the evidence in this case, the Electors' vote dilution theory was too generalized to confer standing. The Court's ruling was no broader than that and does not foreclose other justiciable challenges to alleged vote dilution.

millions of Minnesota voters—every voter who cast their ballot early in person, in person on Election Day, and had their absentee ballot received prior to Election Day. This injury would still be "shared in substantially equal measure" by a "large class of citizens" and would still constitute a generalized grievance. *Warth, v. Seldin*, 422 U.S. 490, 499 (1975). The fact remains that even if the Electors' votes are diluted, this harm is neither personal nor individual to them. *Gill*, 138 S. Ct. at 1929.

### 4. *Safe Harbor*

The Electors assert that the Court misconstrued their theory that failure to meet the safe harbor deadline constitutes a cognizable injury that confers standing. (Pl. Br. at 10–11.) The Court found that this theory did not confer standing because: (1) the prospect of Minnesota changing the rules by which it appoints electors after the election was too speculative; and (2) the state failing to certify a set of electors by the safe harbor deadline was similarly speculative. (Preliminary Injunction Order at 28–30.) The Electors now clarify that this theory of injury relies on the supposition that Secretary Simon's Consent Decree is not a "law[] enacted" within the meaning of the safe harbor provision. (Pl. Br. at 10–11); 3 U.S.C. § 5.

The best support that the Electors are able to marshal for this conclusion is pointing to the Complaint, which states that "[t]he consent decree is not an enacted law but an executive policy in flat contradiction to State law." (Pl. Br. at 11.) According to the Electors' theory, Minnesota, by applying the Consent Decree rather than its enacted

10

statutes, will be deemed to have changed the procedures it uses to appoint electors after Election Day. (*Id.*) This alternative theory fails for the same reason as the Electors' other safe harbor-related theories failed—it is too speculative. The Electors provide no support for their assertion that Minnesota will be deemed to have changed its procedures after Election Day. The procedures outlined in the Consent Decree will have been in place well before Election Day. (*See* ECF No. 36-1, Ex. C (entering the Consent Decree on August 3, 2020).) The circumstance the Electors raise is not a case where the popular vote comes in, Minnesota election officials certify it, and then the legislature changes the rules of picking electors. Further, Secretary Simon had the authority to adopt alternative election procedures when Minnesota's election laws could not be implemented due to a court order—authority that came from a law already on the books in Minnesota well before Election Day. Minn. Stat. § 204B.47.

Presumably Congress would be the one to make the determination that Minnesota has changed its procedures in violation of the safe harbor, but the Court has no reason to believe that such a result is "certainly impending" or that there is a "substantial risk that the harm will occur." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (quotation marks and citation omitted). The Electors have not cited any instances of Congress making a similar determination in the past, any electoral votes being rejected for this reason, or any reason to suppose that Congress will do so in the future. At this stage, the claimed injury is merely hypothetical, and does not confer standing.

Compounding this revised theory's problems is the fact that the Electors have mostly ignored the effect of Minnesota Statutes Section 204B.47. Section 204B.47 allows Secretary Simon to "adopt alternative election procedures" when a provision of the Minnesota election laws "cannot be implemented" due to a court order. Minn. Stat. § 204B.47. That this provision empowers Secretary Simon to adopt alternate procedures makes the Electors' theory even more speculative. Not only would Congress have to find that the Consent Decree is not a "law[] enacted" by Minnesota for purposes of the safe harbor provision, they would have to ignore section 204B.47 in doing so.

Finally, even assuming that the Electors are correct that the Consent Decree would cause Congress to find that Minnesota failed to satisfy the safe harbor provision, the Electors still have not addressed the speculative nature of the steps that would follow. In the Preliminary Injunction Order, the Court noted that the chain of events between Minnesota failing to obtain safe harbor and it losing its electoral votes is tenuous. (Preliminary Injunction Order at 28–30.) The Electors claim that loss of safe harbor is a cognizable injury since an increased risk of harm is sufficient to confer standing, and failing to obtain safe harbor increases the risk that Minnesota will lose its electoral votes.[4]

---

[4] In so arguing, the Electors again misread *Bush v. Gore*. They claim that "the loss of safe-harbor status" was a "sufficiently great injury to require terminating a recount." (Pl. Br. at 12.) As a threshold matter, the discussion of safe harbor in *Bush v. Gore* did not involve standing. In addition, the Supreme Court was concerned about failing to heed the Florida Legislature's desire to obtain safe harbor certification (as expressed through the Florida Supreme Court and Florida Legislature), not about the failure to obtain safe harbor in and of itself. In other words, the Supreme Court terminated the recount because not doing so

12

(Pl. Br. at 11–12.) Although it is true that increased risk of harm may establish the requisite injury for standing, this observation does not obviate the requirement that claimed injuries not be too speculative. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013). Despite the increased risk, as explained in the Preliminary Injunction Order, the prospect of Minnesota losing its electoral votes remains hypothetical at best.

In sum, as the Court concluded in its previous order, none of the Electors' theories confers Article III standing.

### B. *Prudential Standing*

The Electors criticize the Court's conclusion that they lack prudential standing to bring their claims. (Pl. Br. at 12–14.) In so doing, the Electors again miss the Preliminary Injunction Order's conclusions. The Electors advance new arguments to support their motion, but the Court's conclusion is the same—the Electors lack prudential standing.

Under the Electors reading of the Preliminary Injunction Order, the upshot of the Court's conclusions is that "no preemption claim can be brought in federal court." (Pl. Br. at 12.) This is clearly not the case. To the contrary, the Preliminary Injunction Order's conclusion is much narrower—the Electors are not asserting their own rights when they claim that the Consent Decree is preempted by federal statutes setting the election date.

---

would violate Florida's election laws, not because failing to obtain safe harbor is a "great injury." The only thing that *Bush v. Gore* says about the safe harbor provision is that when a state legislature expresses a desire to obtain safe harbor, a recount cannot be continued if doing so would violate the legislature's wish. As such, the Electors' citation to *Bush v. Gore* for this point is inapposite.

13

(Preliminary Injunction Order at 34–35.) This conclusion does not foreclose all preemption claims. Certain preemption claims may involve real, tangible injuries to an individual's rights, but this is not such a case. The Electors provide some helpful examples of cases where individual plaintiffs may bring preemption claims. (Pl. Br. at 12.) For example, in *Springfield Television, Inc. v. City of Springfield*, 462 F.2d 21 (8th Cir. 1972), the Court held that plaintiffs had standing to assert preemption when they suffered a "direct economic injury" and were within the zone of interests that the regulations sought to protect. *Id.* at 23. In *Viceroy Gold Corp. v. Aubry*, 75 F.3d 482 (9th Cir. 1996), the plaintiff had standing to assert that the National Labor Relations Act preempted state law when the plaintiff was within the zone of interests of the statute and suffered an injury— that due to state law it was not allowed to structure its employees' schedules as it wished. *Id.* at 488. The reasoning of the Preliminary Injunction Order is not in tension with either of these outcomes since, unlike those cases, the Electors here have not established a cognizable injury nor demonstrated that they are within the zone of interests that Congress intended to protect when it established a uniform election day.

The Electors also claim that they have prudential standing to bring Count I, challenging Secretary Simon's ability to enter into the Consent Decree. The Electors rightfully note that "private parties can litigate the constitutionality or validity of state statutes, . . . *so long as each party has a sufficient personal stake in the outcome of the controversy.*" (Pl. Br. at 13 (emphasis added) (quoting *Cherry Hill Vineyards, LLC v. Lilly*,

553 F.3d 423, 430 (6th Cir. 2008)).) The problem here is that the Court has already determined that the Electors do not have a personal stake in the outcome. (Order at 18–34); *supra* Analysis I.A.1–4; *Warth*, 422 U.S. at 498 (noting that the standing inquiry assesses whether the plaintiff has a personal stake in the outcome of the litigation).

Finally, the Electors claim that the Court misapplied *Bond v. United States*, 564 U.S. 211 (2011), by taking an overly narrow view of its holding. The fact remains, however, that the Electors are not making a Tenth Amendment claim, they are making a claim under Article II of the Constitution. *Bond* was based on a federal invasion of a state's police powers, and the litigant had standing to challenge the statute for that reason. *Bond*, 564 U.S. at 223–24. The Electors discuss the "balance of powers" that Article II provides, (Pl. Br. at 14), but they fail to identify a violation of the principles of federalism. Indeed, the Electors' claims involve violations of the power the Constitution delegated to the states, not on powers reserved to the states. In short, there is no federalism issue here, and thus *Bond* does not apply.

## CONCLUSION

Based on the foregoing and on all the files, records, and proceedings herein, the Plaintiffs' emergency motion for injunction pending appeal (ECF No. 61) is DENIED.

Dated: October 16, 2020							BY THE COURT:

							s/Nancy E. Brasel
							Nancy E. Brasel
							United States District Judge