# United States Court of Appeals
## For the Eighth Circuit

_____

No. 20-3139

_____

James Carson; Eric Lucero

*Plaintiffs - Appellants*

v.

Steve Simon, Secretary of State of the State of Minnesota, in his official capacity

*Defendant - Appellee*

Robert LaRose; Teresa Maples; Mary Sansom; Gary Severson; Minnesota Alliance for Retired Americans Education Fund

*Intervenor Defendants - Appellees*

_____

Appeal from United States District Court
for the District of Minnesota

_____

Submitted: October 27, 2020
Filed: October 29, 2020
[Published]

_____

Before SHEPHERD, KELLY, and GRASZ, Circuit Judges.

_____

PER CURIAM.

This appeal involves the rules governing the counting of absentee ballots cast in Minnesota for the upcoming general election for President of the United States. Minnesota law dictates that election officials only count ballots received by election day. The Minnesota Alliance for Retired Americans Education Fund and some of its members (the "Alliance") sued Minnesota Secretary of State Steve Simon in Minnesota state court, alleging the statutory deadline was unconstitutional. The Secretary and the Alliance entered into a consent decree purporting to change these rules, by essentially making the statutorily-mandated absentee ballot receipt deadline inoperative. A Minnesota state court confirmed that decree. As a result of this agreement, the Secretary has directed election officials to count absentee ballots received up to a week after election day, notwithstanding Minnesota law.

James Carson and Eric Lucero, both Minnesota registered voters and also certified nominees of the Republican Party to be presidential electors, sued the Secretary, alleging that the consent decree and the state court's order confirming it violate the United States Constitution. Carson and Lucero sought an injunction, which the district court denied after concluding they lacked standing to bring the claims. On appeal, we conclude that Carson and Lucero have standing and that the extension of the deadline likely violates Article II, Section 1 of the Constitution because the Secretary extended the deadline for receipt of ballots without legislative authorization. We therefore reverse the district court's denial of a preliminary injunction, and remand to the district court to enter an injunction requiring the Secretary and those under his direction to identify, segregate, and otherwise maintain and preserve all absentee ballots received after the deadlines set forth in Minn. Stat. § 203B.08, subd. 3.

I.

Article II of the United States Constitution grants state legislatures the authority to select presidential electors and Congress the authority to select the date

of the election.  The so-called "Electors Clause" states that "[e]ach State shall appoint, in such Manner as the Legislature thereof may direct, a Number of Electors[.]"  U.S. Const. art. II. § 1.  The Constitution gives the United States Congress the power to set the date on which the presidential election occurs, but it requires the "day shall be the same throughout the United States."  *Id.*

Congress has set "the Tuesday next after the first Monday in November" as the date for selecting presidential electors.  3 U.S.C. § 1.  This year, that day falls on November 3, 2020 ("Election Day").  Once selected, the presidential electors meet "on the first Monday after the second Wednesday in December," 3 U.S.C. § 7, which this year falls on December 14.  Congress has also provided that it must generally accept the votes of electors selected and certified by the state at least six days before the meeting of the Electoral College, which this year is December 8.  *Id.* § 5.  This date is often referred to as the "safe harbor" for states to certify their election results for presidential electors.

Under Minnesota Election Law, "[a]ny eligible voter may vote by absentee ballot."  Minn. Stat. § 203B.02, subd. 1.  For the 2020 general election, voters have been able to cast absentee ballots since September 18.  *Id.* § 203B.081, subd. 1 ("An eligible voter may vote by absentee ballot . . . during the 46 days before the election[.]").  A voter may request an absentee ballot any time up until the day before Election Day.  *Id.*

Minnesota law provides receipt deadlines for absentee ballots depending on the delivery method.  *Id.* § 203B.08, subd. 3.  For a vote to count, election officials must receive absentee ballots delivered by hand by 3:00 p.m., and those delivered by mail by 8:00 p.m.  *Id.*  Ballots received after those times "shall be marked as received late by the county auditor or municipal clerk, and must not be delivered to the ballot board."  *Id.*  To facilitate compliance with this legislative mandate, Minnesota Rule

-3-

8210.2500 directs that absentee ballots arriving after the deadline "shall be marked as received late by the county auditor or municipal court[.]"

In May 2020, the Alliance sued the Secretary to enjoin enforcement of the receipt deadline. *LaRose v. Simon*, No. 62-CV-20-3149 (Minn. Dist. Ct. 2020). The Alliance alleged the receipt deadline was unconstitutional under the First and Fourteenth Amendments because it purportedly disenfranchised thousands of voters who would timely mail their ballots but not have them count because they were not received by the receipt deadline. The Alliance alleged this was particularly true in 2020 because of the COVID-19 pandemic and an anticipated increase in absentee ballots overwhelming the United States Postal Service. The Alliance sought an injunction directing the Secretary to accept timely postmarked absentee ballots received within a "reasonable" time after Election Day. The Alliance sought this relief for both the August 11, 2020, primary election and the November 3, 2020, general election.

The Secretary and the Alliance then filed a partial consent decree for the primary election and asked the state court to approve it. In mid-June, the Minnesota state court entered the partial consent decree order. Under the primary election consent decree, the Secretary agreed to not enforce the receipt deadline. Instead, election officials would accept all absentee ballots received up to two days after the primary so long as they were postmarked on or before the date of the primary. The Secretary also agreed to issue instructions to election officials about the change. These included enclosing information with each absentee ballot telling voters that their ballots could arrive up to two days after the date of the primary, as well as taking additional steps to inform the public.

After the state court entered of the primary consent decree, the Republican Party of Minnesota, the Republican National Committee, the National Republican Congressional Committee, and Donald J. Trump for President, Inc., intervened. The

-4-

Alliance soon asked the state court to enter an injunction for the general election containing essentially the same relief afforded by the primary consent decree order. In mid-July, the Secretary and the Alliance filed a consent decree for the general election and asked the state court to approve it. The state court intervenors opposed its entry. The state court entered the consent decree order on August 3, 2020.

Under the general election consent decree, the Secretary agreed to *not* enforce the ballot receipt deadline in Minn. Stat. § 203B.08, subd. 3. Instead, the Secretary agreed he would issue guidance to local election officials to count all mail-in ballots with a postmark of Election Day or before, if those election officials received the ballots within five business days (seven calendar days) of Election Day (the "postmark deadline"). The consent decree also provided that if a mail ballot did *not* have a postmark, the election official "should presume that it was mailed on or before Election Day unless the preponderance of the evidence demonstrates it was mailed after the Election Day."

The state court intervenors appealed the general election consent decree order to the Minnesota Supreme Court, but quickly abandoned the appeal. The Minnesota Supreme Court dismissed the appeals the same day upon motion of the parties.

In late August, the Secretary issued guidance to state election officials as agreed in the consent decree. The Secretary provided state election officials with documents to use as instructions for absentee ballot return envelopes. The absentee ballot guidance directed election officials to include the language with each ballot instructing voters that the ballot must be postmarked by November 3 but would be counted if received up to one week after Election Day.

Minnesota voters who requested absentee ballots for the general election began receiving their ballots on September 18, 2020, when early voting began. As of September 29, over 1 million Minnesota voters had requested absentee ballots.

-5-

In August 2020, Carson and Lucero were both certified pursuant to Minn. Stat. § 208.03 as nominees of the Republican Party to be electors for the State of Minnesota in the 2020 presidential election. Carson and Lucero (the "Electors") filed a lawsuit in federal district court against the Secretary. They alleged the Secretary exceeded his authority by entering into the consent decree and agreeing to accept absentee ballots after the Receipt Deadline, thereby violating the Electors Clause's exclusive delegation of this authority to the Minnesota Legislature. They also alleged that by agreeing to accept absentee ballots after the receipt deadline, the Secretary violated the congressional mandate that Election Day be held on November 3. The Electors moved for a preliminary injunction, essentially asking the district court to enjoin the Secretary and related election officials from implementing, enforcing, or giving effect to the portion of the general election consent decree that altered the receipt deadline for absentee ballots set by Minnesota law. The Alliance intervened in the action with both parties' consent.

On October 12, after briefing and a hearing, the district court denied the preliminary injunction. The district court based its denial solely on its conclusion that it lacked subject-matter jurisdiction because the Electors lacked both constitutional and prudential standing.

The Electors appealed and moved for a stay pending appeal as well as expedited resolution of the case. We ordered expedited briefing and set oral argument for October 27, 2020.

## II.

### A. Standing

Standing is a separation-of-powers doctrine that "ensure[s] that federal courts do not exceed their authority as it has been traditionally understood" under the United States Constitution. *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016). We review

the question of Article III standing de novo.  *Wallace v. ConAgra Foods, Inc.*, 747 F.3d 1025, 1029 (8th Cir. 2014).  "[T]he irreducible constitutional minimum of standing" requires: (1) an injury in fact; (2) a causal connection between the injury and the challenged conduct; and (3) a likelihood that a favorable decision will redress the injury.  *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992).

In this case, the Electors have standing as candidates.  While the Secretary and Alliance contend that the Electors are not candidates, we disagree because the plain text of Minnesota law treats prospective presidential electors as candidates.  *See* Minn. Stat. § 200.01; *see also id*. § 208.04, subd. 1.  The provisions that govern elections in that state expressly include Chapter 208—the chapter for "Presidential Electors"—as one of the chapters that "shall be known as the Minnesota Election Law."  *See id.* § 200.01.  And, "Minnesota Election Law applies to all elections held in this state unless otherwise specifically provided by law."  *Id*. § 200.015.

Chapter 208 references Chapter 200 for its definitions.  *Compare id*. § 208.01 ("The words used in this chapter have the meanings prescribed to them in chapter 200."), *with id*. § 200.02, subd. 2 ("[g]eneral election" means "an election held at regular intervals on a day determined by law . . . at which the voters of the state . . . choose by ballot public officials or presidential electors"), *id.* subd. 6 ("[p]olitical party" means "an association of individuals under whose name a candidate files for partisan office"), *id.* subd. 7 (defining "[m]ajor political party" as a "political party that maintains a party organization in the state . . . that has presented at least one candidate for election to the office of: . . . presidential elector . . . ; and whose candidate received votes in each county in that election and received votes from not less than five percent of the total . . . in that election."), *and id.* subd. 27 ("[p]artisan offices" includes "presidential electors").

In detailing how most offices appear on a ballot, Section 204B.03 expressly excepts "presidential electors" but refers to them in the same section as "[c]andidates

-7-

of a major political party for any partisan office[.]" *Id.* § 204B.03. And, it expressly references "presidential elector *candidates*" when describing how non-major political party candidates seek a nomination for other non-presidential-elector offices. *Id.* (emphasis added).

Meanwhile, Chapter 208 describes how major political parties nominate presidential electors. *See id.* § 208.03. And, it provides that "[w]hen presidential electors . . . are to be voted for, a vote cast for the party candidates for president and vice president shall be deemed a vote for that party's electors . . . as filed with the secretary of state." *Id.* § 208.04, subd. 1. Because Minnesota law plainly treats presidential electors as candidates, we do, too.

"To establish injury in fact, a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Spokeo*, 136 S. Ct. at 1548 (quoting *Lujan*, 504 U.S. at 560). A "particularized" injury "affect[s] the plaintiff in a personal and individual way." *Id.* A "concrete injury . . . must actually exist." *Id.* (cleaned up). "An allegation of future injury may suffice if the threatened injury is 'certainly impending,' or there is a 'substantial risk' that the harm will occur." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 n.5 (2013)).

-8-

As candidates, the Electors argue that they have a cognizable interest[1] in ensuring that the final vote tally accurately reflects the legally valid votes cast. An inaccurate vote tally is a concrete and particularized injury to candidates such as the Electors. The Secretary's use of the consent decree makes the Electors' injury certainly-impending, because the former necessarily departs from the Legislature's mandates. Thus, the Electors meet the injury-in-fact requirement.

Next, the Electors meet the causal-connection requirement because the injury flows from the challenged conduct (the Secretary's policy). And, even though the Secretary and the Alliance do not appear to challenge the redressability requirement, it is likely that the requested relief (an injunction) will redress the injury (an inaccurate vote tally) because the former will mitigate the latter.

For these reasons, we conclude the Electors have Article III standing as candidates.[2] Having so concluded, we must decide whether the district court was correct in concluding the Electors lacked prudential standing because they are asserting the rights of third parties — namely the Minnesota Legislature. We disagree with the district court's assessment.

---

[1]The Supreme Court recently declined to stay a consent decree entered into by the Rhode Island Secretary of State, which agreed not to enforce that state's witness and attestation requirements for mail-in voting. In its stay denial order, the Court noted that "the applicants lack a cognizable interest in the State's ability to 'enforce its duly enacted' laws." *Republican Nat'l Comm. v. Common Cause R.I.*, No. 20A28, 2020 WL 4680151, at *1 (U.S. Aug. 13, 2020) (quoting *Abbott v. Perez*, 138 S. Ct. 2305, 2324 n.17 (2018)). We do not take this statement to stand for the general proposition that violations of the Election and Electors Clauses cannot be challenged if a state does not oppose those violations. The Electors here have standing independently as elector candidates. Their standing is not based on Minnesota's ability, or lack of ability, to "enforce its duly enacted laws." *Id.* (cleaned up).

[2]Having concluded the Electors have standing as candidates, we need not decide whether they also have standing under their other theories.

-9-

First, we note the Supreme Court has greatly narrowed the doctrine of prudential standing. *See Lexmark, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 126 (2014). Where constitutional standing is present, refusing to hear a case based on prudential standing "is in some tension with . . . the principle that a federal court's obligation to hear and decide cases within its jurisdiction is virtually unflagging." *Id.* at 126 (cleaned up). While the Supreme Court recognized the concept of third-party standing may still fit within the prudential standing analysis, *id.* at 127 n.3, we do not find it applicable here because the Electors are raising their own rights as candidates in the Minnesota general election. Although the Minnesota Legislature may have been harmed by the Secretary's usurpation of its constitutional right under the Elector Clause, the Electors have been as well. Thus, we conclude they have prudential standing to vindicate their rights under federal law. *See generally Bond v. United States*, 564 U.S. 211, 214 (2011) (holding an individual charged for violation of a federal statute had prudential standing to claim the statute was invalid "on grounds that, by enacting it, Congress exceeded its power under the Constitution, thus intruding upon the sovereignty and authority of the States"); *Bush v. Gore*, 531 U.S. 103 (2000) (permitting a candidate for president to seek to vindicate his rights and stating the issues on appeal were "whether the Florida Supreme Court established new standards for resolving Presidential election contests, thereby violating Art. II, § 1, cl. 2, of the United States Constitution and failing to comply with 3 U.S.C. § 5, and whether the use of standardless manual recounts violates the Equal Protection and Due Process Clauses").

Having concluded the Electors have Article III and prudential standing to bring their claims, we must reverse the district court's decision to the contrary.

## B. Preliminary Injunction

Because the district court did not decide any issue other than standing, we would normally remand to the district court. *See MPAY Inc. v. Erie Custom Comput.*

-10-

*Applications, Inc.*, 970 F.3d 1010, 1021 (8th Cir. 2020) (explaining that remanding to the district court "is *ordinarily* the appropriate course of action") (emphasis added). "However 'where the merits comprise a purely legal issue, reviewable de novo on appeal and susceptible of determination without additional factfinding, a remand ordinarily will serve no useful purpose.'" *Mangual v. Rotger-Sabat*, 317 F.3d 45, 64 (1st Cir. 2003) (quoting *N.H. Right to Life v. Gardner*, 99 F.3d 8, 18 (1st Cir. 1996)). Here, resolution on the merits depends primarily on the purely legal issue of whether the Secretary's extension of the ballot deadline violates the Electors Clause. Further, the timing of this appeal makes it impractical to remand to the district court to decide the merits in the first instance. We therefore consider the Electors' constitutional challenge to evaluate the propriety of preliminary injunctive relief.

We generally review a denial of a motion for a preliminary injunction for abuse of discretion, but here, because the district court never considered the merits, we are left with a purely legal question to consider de novo. *See Llapa-Mukasey*, 520 F.3d 897, 899 (8th Cir. 2008). The factors for evaluating whether a preliminary injunction should be issued are: "(1) the threat of irreparable harm to the movant; (2) the state of the balance between this harm and the injury that granting the injunction will inflict on other parties litigant; (3) the probability that movant will succeed on the merits; and (4) the public interest." *Dataphase Sys., Inc. v. C L Sys. Inc.*, 640 F.2d 109, 113 (8th Cir. 1981) (en banc). "While 'no single factor is determinative,' the probability of success factor is the most significant." *Home Instead, Inc. v. Florance*, 721 F.3d 494, 497 (8th Cir. 2013) (citations omitted) (quoting *Dataphase*, 640 F.2d at 113).

## 1. Success on the Merits

We conclude the Electors are likely to succeed on the merits. This follows from our determination that the Secretary's actions in altering the deadline for mail-in ballots likely violates the Electors Clause of Article II, Section 1 of the United States

-11-

Constitution.  The analysis is relatively straightforward.  By its plain terms, the Electors Clause vests the power to determine the manner of selecting electors exclusively in the "Legislature" of each state.  U.S. Const. art. II, § 1, cl. 2; *McPherson v. Blacker*, 146 U.S. 1, 27 (1892) ("The constitution . . . . leaves it to the legislature exclusively[.]").  And this vested authority is not just the typical legislative power exercised pursuant to a state constitution.  Rather, when a state legislature enacts statutes governing presidential elections, it operates "by virtue of a direct grant of authority" under the United States Constitution.  *Bush v. Palm Beach Cnty. Canvassing Bd.*, 531 U.S. 70, 76 (2000).  Consequently, only the Minnesota Legislature, and not the Secretary, has plenary authority to establish the manner of conducting the presidential election in Minnesota.

Simply put, the Secretary has no power to override the Minnesota Legislature. In fact, a legislature's power in this area is such that it "cannot be taken from them or modified" even through "their state constitutions." *McPherson*, 146 U.S. at 35; *see also Palm Beach*, 531 U.S at 76–77.  Thus, the Secretary's attempt to re-write the laws governing the deadlines for mail-in ballots in the 2020 Minnesota presidential election is invalid.  However well-intentioned and appropriate from a policy perspective in the context of a pandemic during a presidential election, it is not the province of a state executive official to re-write the state's election code, at least as it pertains to selection of presidential electors.  The democratically-enacted election rules in Minnesota provide that mail-in votes must be received by 8:00 p.m. on Election Day in order to be counted (or 3:00 p.m. if delivered in person).  Minn. Stat. § 203B.08.  The rule of law, as established by the United States Constitution and the Minnesota Legislature, dictates these rules must be followed notwithstanding the Secretary's instructions to the contrary. There is no pandemic exception to the Constitution.  *See Democratic Nat'l Comm. v. Wis. State Legislature*, No. 20A66, 2020 WL 6275871, at *4 (Oct. 26, 2020) (*DNC*) (Kavanaugh, J., concurring in denial of application for stay) ("'[T]he design of electoral procedures is a legislative task,' including during a pandemic.") (internal citation omitted).

-12-

The Secretary and the Alliance argue the Minnesota Legislature has delegated its authority to the Secretary by means of a general statute in the election code. Minn. Stat. § 204B.47. This statute allows the Secretary to "adopt alternative election procedures[,]" but only "[w]hen a provision of the Minnesota Election Law cannot be implemented as a result of an order of a state or federal court[.]" *Id.* Even if the Legislature's Article II powers concerning presidential elections can be delegated in this manner (an issue we do not reach), nothing in this statute authorizes the Secretary to override the Legislature's ballot deadlines due to public health concerns. By its terms, Section 204B.47 only authorizes alternate rules where an election statue "cannot be implemented as a *result*" of a court order. *Id.* (emphasis added). Here, the Secretary initiated the court order in cooperation with litigants. And even then, the order does not declare the statute invalid.

The Secretary's instructions to count mail-in ballots received up to seven days after Election Day stand in direct contradiction to Minnesota election law governing presidential elections, and the Electors have strongly shown likely success on the merits since the Secretary's actions are likely to be declared invalid under the Electors Clause of Article II of the United States Constitution.

## 2. Irreparable Harm

The Secretary's plan to count mail-in ballots received after the deadline established by the Minnesota Legislature will inflict irreparable harm on the Electors. The Secretary's directions to local election officials to count ballots received up to a week after the statutory deadline necessarily means that otherwise invalid ballots will be entered in the vote totals that determine whether the Electors will be elected or not. "The counting of votes that are of questionable legality . . . threaten[s] irreparable harm." *Bush v. Gore*, 531 U.S. 1046, 1047 (2000) (granting stay) (Scalia, J., concurring). Further, as discussed above, the Secretary's direction to local election officials to disregard Section 203B.08 violates the United States Constitution and

-13-

undermines the manner of selecting electors determined by the Minnesota Legislature.  This directly and irreparably harms the Electors as candidates.

### 3. Balance of Equities and the Public Interest

The balancing of equities in this instance is not a perfunctory exercise.  It is beyond question that an injunction may create harm in terms of voter confusion so close to the election.  However, the inevitable post-election challenges to the counting of invalid ballots if no injunction is granted is even more problematic since it would give voters no opportunity to adjust their mailing time or to deliver their mail-in ballots on Election Day to obviate their risk.  As discussed further below, the *Purcell* principle does not preclude an injunction under the present facts, especially if the injunctive relief is limited in scope.  And other considerations tip the balance in favor of the Electors.  These considerations are closely intertwined with the public interest, which also weighs in favor of injunctive relief.  The precedent it would set to allow an executive branch official to negate the duly-enacted election laws of a state as they pertain to a presidential election is toxic to the concepts of the rule of law and fair elections.  So we conclude the balance of harms weighs in favor of preserving the ability to uphold the duly enacted election law of Minnesota and the rule of law.

The public interest is likewise served by maintaining the ability to enforce the law adopted by the Minnesota Legislature and in upholding the exclusive authority vested in the Minnesota Legislature under the Electors Clause of the United States Constitution.

While injunctive relief preserving the ability to effectuate Minnesota election law, as written by the Legislature, has some potential for administrative disruption and voter confusion, this die was cast long ago.  Voter confusion was inevitable once the Secretary issued guidance to voters that was directly in contradiction to Minnesota election law.  An orderly process was hopelessly compromised when he

-14-

usurped the authority of the Legislature under the Electors Clause of the Constitution. During the entire pendency of this litigation, Minnesota voters have been left with two sets of contradicting instructions: one from the Secretary and another that has long been, and remains, codified in the election laws of Minnesota.  In the end, "it is always in the public interest to protect constitutional rights." *Phelps-Roper v. Nixon*, 545 F.3d 685, 690 (8th Cir. 2008), overruled on other grounds by *Phelps-Roper v. City of Manchester*, 697 F.3d 678, 692 (8th Cir. 2012) (en banc).  Likewise, it is in the public interest to maintain the integrity of elections by ensuring the ability to separate and count only those ballots cast according to law.

## C.  *Purcell* principle

The *Purcell* principle — that federal courts should usually refrain from interfering with state election laws in the lead up to an election — is well established. *See Purcell v. Gonzalez*, 549 U.S. 1 (2006) (per curiam).  The Supreme Court has recently and repeatedly reaffirmed it.  *See, e.g.*, *DNC*, 2020 WL 6275871; *Andino v. Middleton*, No. 20A55, 2020 WL 5887393 (U.S. Oct. 5, 2020); *Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 140 S. Ct. 1205, 1207 (2020) (per curiam). Election rules must be clear and judges should normally refrain from altering them close to an election.  *Purcell* protects the status quo.

But the Constitution recognizes something else.  Namely that the design of electoral procedures is, at bottom, a job for "the Legislature."  U.S. Const. art. I, § 4, cl. 1; art. II, § 1, cl. 2; *see also Rucho v. Common Cause*, 139 S. Ct. 2484, 2495 (2019); *cf. DNC*, 2020 WL 6275871, at *2 (Gorsuch, J., concurring in denial of application for stay) ("The Constitution provides that state legislatures — not federal judges, not state judges, not state governors, not other state officials — bear primary responsibility for setting election [and elector] rules.").  Here, the status quo (Minnesota's duly-enacted election law) was disrupted by the Minnesota Secretary of State.  When the constitutionally mandated locus for election decisions is

-15-

disregarded, whether by a federal court, a state court, a state agency, or a state official, the same rationale that works to prevent election interference by federal courts also works to prevent interference by other entities as well. *See DNC*, 2020 WL 6275871, at *4 (Kavanaugh, J., concurring in denial of application for stay) (defending appellate courts stepping in close to an election to remedy violations of *Purcell*).

The *Purcell* principle is a presumption against disturbing the status quo. The question here is who sets the status quo? The Constitution's answer is generally the state legislature. And in the case of presidential elections, the Electors Clause vests power exclusively in the legislature. In our case, the Minnesota Legislature set the status quo, the Secretary upset it, and it is our duty, consistent with *Purcell*, to at least preserve the possibility of restoring it.

The consequences of this order are not lost on us. We acknowledge and understand the concerns over voter confusion, election administration issues, and public confidence in the election that animate the *Purcell* principle. With that said, we conclude the challenges that will stem from this ruling are preferable to a post-election scenario where mail-in votes, received after the statutory deadline, are either intermingled with ballots received on time or invalidated without prior warning. Better to put those voters on notice now while they still have at least some time to adjust their plans and cast their votes in an unquestionably lawful way.

## III.  CONCLUSION

We therefore reverse the district court's denial of the Electors' motion for a preliminary injunction and remand to the district court with instructions to immediately enter the following order granting a preliminary injunction:

-16-

The Secretary and his respective agents and all persons acting in concert with each or any of them are ordered to identify, segregate, and otherwise maintain and preserve all absentee ballots received after the deadlines set forth in Minn. Stat. § 203B.08, subd. 3, in a manner that would allow for their respective votes for presidential electors pursuant to Minn. Stat. § 208.04, subd. 1 (in effect for the President and Vice President of the United States) to be removed from vote totals in the event a final order is entered by a court of competent jurisdiction determining such votes to be invalid or unlawfully counted.  The Secretary shall issue guidance to relevant local election officials to comply with the above instruction.

Finally, matters remain before the district court including the Electors' prayer for a permanent injunction, and the district court shall conduct further proceedings not inconsistent with this opinion.

KELLY, Circuit Judge, dissenting.

The Electors,[3] six days before the presidential election, seek to enjoin enforcement of a state court order governing Minnesota's deadline for absentee ballots.  Because I believe they have failed to show they are entitled to preliminary injunctive relief, I dissent.

As a threshold matter, I am not convinced the Electors have Article III standing to assert claims under the Electors Clause.  Although Minnesota law at times refers to them as "candidates," see, e.g., Minn. Stat. § 204B.03 (2020), the Electors are not candidates for public office as that term is commonly understood.  Whether they ultimately assume the office of elector depends entirely on the outcome of the state popular vote for president.  Id. § 208.04 subdiv. 1 ("[A] vote cast for the party

---

[3] Although I refer to plaintiff-appellants James Carson and Eric Lucero as "the Electors" to be consistent with the court's opinion, they are more accurately described as "certified nominees of the Republican Party to be presidential electors."  Ante at 2.

candidates for president and vice president shall be deemed a vote for that party's electors."). They are not presented to and chosen by the voting public for their office, but instead automatically assume that office based on the public's selection of entirely different individuals. But even if we nonetheless assume the Electors should be treated like traditional political candidates for standing purposes, I question whether these particular candidates have demonstrated the "concrete and particularized" injury necessary for Article III standing. Lujan v. Defs. of Wildlife, 504 U.S. 555, 560 (1992). To the contrary, their claimed injury—a potentially "inaccurate vote tally," ante at 9—appears to be "precisely the kind of undifferentiated, generalized grievance about the conduct of government" that the Supreme Court has long considered inadequate for standing. Lance v. Coffman, 549 U.S. 437, 442 (2007) (examining standing in the context of a claim under the Elections Clause). Because the Electors, should they in fact assume that office, must swear an oath to mark their Electoral College ballots for the presidential candidate who won the state popular vote, Minn. Stat. § 208.43 (2015), it is difficult to discern how they have more of a "particularized stake," Lance, 549 U.S. at 442, in Minnesota conducting fair and transparent elections than do the rest of the state's voters.

But even assuming the court is right that the Electors have standing, the merits of this case implicate both "the authority of state courts to apply their own constitutions to election regulations," Democratic Nat'l Comm. v. Wis. State Legislature, No. 20A66, 2020 WL 6275871, at *1 (Oct. 26, 2020) (Roberts, C.J., concurring in denial of application to vacate stay), and Minnesota's efforts to preserve its "democratically enacted state election rules," id. at *3 (Kavanaugh, J., concurring in denial of application to vacate stay). Under the Electors Clause, "[e]ach State shall appoint, in such Manner as the Legislature thereof may direct, a Number of Electors, equal to the whole Number of Senators and Representatives to which the State may be entitled in the Congress." U.S. Const. art. II, § 1, cl. 2. According to the court, the import of this clause is that "only the Minnesota Legislature . . . has

-18-

plenary authority to establish the manner of conducting the presidential election in Minnesota." Ante at 12.  Even if we operate under this narrow interpretation of the term "the Legislature,"[4] however, Minnesota's legislature has expressly delegated some of its lawmaking authority to the Minnesota Secretary of State where elections are concerned.

One of the statutes that delegates lawmaking authority to the Secretary of State provides that "[w]hen a provision of the Minnesota Election Law cannot be implemented as a result of an order of a state or federal court, the secretary of state shall adopt alternative election procedures to permit the administration of any election

---

[4] Contra Davis v. Hildebrandt, 241 U.S. 565, 566–70 (1916) (interpreting "the Legislature," as used in the Elections Clause, U.S. Const., art. I, § 4, cl.  1, to encompass the veto power of Ohio citizens exercised via the state constitution's referendum process); Smiley v. Holm, 285 U.S. 355, 368 (1932) (concluding that the Minnesota Governor's exercise of veto power was part of the state's process of enacting laws and explaining that nothing in the Constitution requires legislatures "to enact laws in any manner other than that in which the Constitution of the state has provided that laws shall be enacted"); Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n, 576 U.S. 787, 804–09 (2015) (interpreting "the Legislature," as used in the Elections Clause, to include an independent redistricting commission Arizona used to redraw its congressional districts); see also Moore v. Circosta, Nos. 1:20CV911, 1:20CV912, 2020 WL 6063332, at *23 (M.D.N.C. Oct. 14, 2020) ("The meaning of 'Legislature' within the Electors Clause can be analyzed in the same way as 'Legislature' within the Elections Clause."), request for injunctive relief pending appeal denied sub nom. Wise v. Circosta, No. 20-2104, 2020 WL 6156302 (4th Cir. Oct. 20, 2020) (en banc), application for injunctive relief denied sub nom. Moore v. Circosta, No. 20A72, 2020 WL 6305036 (Oct. 28, 2020); see Donald J. Trump for President, Inc. v. Bullock, No. CV 20-66-H-DLC, 2020 WL 5810556, at *11 (D. Mont. Sept. 30, 2020) ("As an initial matter, the Court finds no need to distinguish between the term 'Legislature' as it is used in the Elections Clause as opposed to the Electors Clause.").

-19-

affected by the order." Minn. Stat. § 204B.47.  The statute goes on to explain that the Secretary may adopt alternative election procedures encompassing "the voting and handling of ballots cast after 8:00 p.m. as a result of a state or federal court order or any other order extending the time established by law for closing the polls."  Id.  This delegation of the legislature's lawmaking authority is both specific and limited.  See id. (explaining that such alternative election procedures will remain in place only until "the first day of July following the next succeeding final adjournment of the legislature, unless otherwise provided by law or court order").

The underlying state court litigation began when the Alliance sued the Secretary concerning the constitutionality of a Minnesota statute, as applied in the context of a pandemic, requiring that absentee ballots be received by Election Day to be counted.  Minn. Stat. § 203B.08 subdiv. 3; Minn. R. Code § 8210.2200 (2020). The state court parties eventually agreed to a Partial Consent Decree, which the state court entered on August 3, 2020, deeming its contents consistent with both Minnesota and federal law.  That consent decree halted enforcement of Minnesota's Election Day receipt deadline for absentee ballots during the 2020 general election only. Pursuant to the consent decree, the Secretary agreed to "issue guidance to local election officials instructing" that all otherwise valid absentee ballots that are postmarked by Election Day and received by election authorities no later than seven days after the election must be counted.  As a result, the Secretary "adopt[ed] alternative election procedures to permit the administration" of the current election.

The court concludes that this change to the deadline for receipt of absentee ballots violates the Electors Clause because only "the Legislature" can designate the "Manner" of appointing electors under the Electors Clause.  U.S. Const. art. II, § 1, cl. 2.  But here the Minnesota legislature has "direct[ed]" the Secretary to adopt alternative procedures because a state court order prevents him from implementing

-20-

a provision of the Minnesota election law.[5]   Far from "overriding" the state legislature, the Secretary followed a duly enacted provision of Minnesota state law when implementing alternative procedures for receiving ballots after Election Day. I see no grounds to conclude that the Secretary's exercise of limited lawmaking authority pursuant to an express legislative delegation necessarily violates Article II. See e.g., Merril v. People First of Ala., No. 20A67, 2020 WL 6156545 (Oct. 21, 2020) (granting an application to stay district court's permanent injunction enjoining enforcement of the Alabama Secretary of State's ban—not the Alabama legislature's

---

[5]State legislatures regularly delegate to their secretaries of state such powers and duties as are necessary to regulate the "manner" of federal elections, including the selection of electors.  See, e.g., Minn. Stat. § 208.45(a)–(b) (giving the Secretary express statutory authority to "preside at the meeting of electors" and to appoint alternate electors should the anticipated elector fail to show up); Ohio Rev. Code Ann. § 3501.04 (2020) ("The secretary of state is the chief election officer of the state, with such powers and duties relating to the registration of voters and the conduct of elections as are prescribed in Title XXXV of the Revised Code," which includes laws governing selection of presidential electors.); Nev. Rev. Stat. § 298.065.1–.3 (2020) (giving the Secretary of State authority to "appoint to the position of presidential elector" an alternate elector, within certain statutory parameters, in the case a nominee for presidential elector is absent from the meeting of electors); W. Va. Code § 3-1A-6(a) (2020) ("The Secretary of State shall be the chief election official of the state. . . . [T]he Secretary of State shall have the authority . . . to make, amend and rescind such orders and to promulgate legislative rules . . . as may be necessary to standardize and make effective the provisions of this chapter," among which is a statute governing selection of presidential electors.); Ala. Code § 17-11-3(e) (2020) ("If the occurrence of a state of emergency . . . renders substantial compliance with this article impossible or unreasonable . . . the Secretary of State . . .  may adopt an emergency rule to allow those qualified voters to vote by absentee ballot.").  To insist that "the Legislature" in the context of the Electors Clause refers only to a state's traditional legislative organs, and cannot also encompass secretaries of state or other government entities to whom legislative duties have been delegated, is at odds with the reality of how states go about fulfilling the deeply important duty of holding presidential elections.

-21-

ban—on curbside voting in this election);[6] see also Bush v. Gore, 531 U.S. 98, 116 (2000) (per curiam) (Rehnquist, C.J., concurring) (noting that the Florida legislature, "[a]cting pursuant to its constitutional grant of authority," had "created a detailed, if not perfectly crafted, statutory scheme that provides for appointment of Presidential electors by direct election," including delegating "the duties of administering elections" to county canvassing boards).

The court relies on the idea that the Secretary "initiated" the state court order to conclude that § 204B.47 provides no statutory support for the Secretary's instructions to the voters. Yet it was the Alliance that sued the Secretary in state court for relief, after which the parties entered into a consent decree. There is no allegation of collusion between the state court parties to manufacture a dispute, nor is there any allegation of fraud on the state court. If there were such evidence, perhaps the "manner" for appointing electors would not have in fact been "directed" by Minnesota's legislature. A party's fraudulent efforts to obtain "an order of a state or federal court" in order to make sure "a provision of the Minnesota Election Law cannot be implemented" would be just that—fraud—and thus not within the authority the legislature delegated to the Secretary in § 204B.47. Minn. Stat. § 204B.47. But that is not this case. To the contrary, the record contains no indication that the Partial Consent Decree was the result of anything other than an arms-length negotiation.[7]

Notably, the Minnesota legislature has expressed no opposition to the decree, or to its extension of the deadline for absentee voters to submit their ballots. See

─────────────

[6]In that case, no provision of Alabama law expressly prohibited curbside voting, nor did any provision of Alabama law expressly provide for the practice. People First of Ala. v. Merrill, No. 2:20-cv-00619-AKK, 2020 WL 5814455, at *33 (N.D. Ala. Sept. 30, 2020).

[7]Indeed, the state court expressly found that the parties "have engaged in arms' length negotiations."

-22-

Republican Nat'l Comm. v. Common Cause R.I., No. 20A28, 2020 WL 4680151 (Aug. 13, 2020) (denying an application to stay a consent decree because, unlike other cases where the state "defends its own law," "the state election officials support[ed] the challenged decree, and no state official ha[d] expressed opposition"). In short, the fact that the Secretary, a defendant in a civil suit, settled a case pursuant to stipulated terms rather than going to trial does not render the resulting court-ordered Partial Consent Decree any less of a "state or federal court order" preventing a provision of the Minnesota election law from being implemented. See Minn Stat. § 204B.47. Under these circumstances, the Secretary is authorized to create alternative election procedures.

I am thus not persuaded the Electors have established a likelihood of success on the merits, the "most significant," ante at 11, factor in evaluating the propriety of preliminary injunctive relief. The other factors set out in Dataphase Sys., Inc. v. C L Sys., Inc., 640 F.2d 109, 113 (8th Cir. 1981) (en banc)—the potential harm injunctive relief will cause to other parties, the threat of irreparable injury to the Electors, and the public interest—also weigh in favor of denying the injunction. Further, the Supreme Court has cautioned that courts considering injunctive relief on the eve of an election must "weigh, in addition to the harms attendant upon issuance or nonissuance of an injunction, considerations specific to election cases and [the court's] own institutional procedures." Purcell v. Gonzalez, 549 U.S. 1, 4–5 (2006) (per curiam). When courts alter election procedures close to an election, they can themselves cause "voter confusion and consequent incentive to remain away from the polls." Id. at 5; see Common Cause R.I., 2020 WL 4680151, at *1 (declining to grant injunctive relief altering state election procedures months before the general election in part because doing so might confuse Rhode Island's voters); Andino v. Middleton, No. 20A55, 2020 WL 5887393, at *1 (Oct. 5, 2020) (Kavanaugh, J., concurring in grant of application for stay) ("[T]his Court has repeatedly emphasized

-23-

that federal courts ordinarily should not alter state election rules in the period close to an election.") (cleaned up).

The court's injunctive relief will cause voter confusion and undermine Minnesotans' confidence in the election process, implicating both Purcell concerns and the public interest inherent in having eligible citizens participate in state elections, as well as causing potential harm for voters. League of Women Voters of N.C. v. North Carolina, 769 F.3d 224, 247 (4th Cir. 2014) ("By definition, the public interest favors permitting as many qualified voters to vote as possible." (quoting Obama for Am. v. Husted, 697 F.3d 423, 436 (6th Cir. 2012) (cleaned up)). Voters have received but one set of instructions for returning their absentee ballots this election. Those instructions, which are printed on each of the more than 1.7 million absentee ballots the Secretary has already mailed out to voters this election cycle, direct voters as follows: your mail-in ballot will be counted so long as (1) it is postmarked by November 3; and (2) election officials receive it within seven calendar days of November 3. Under Minnesota law, these are the only ballot-return procedures in place. As of October 23, almost 580,000 Minnesota voters had requested—but not yet returned—their absentee ballots. In accordance with Minnesota's current election procedure, these voters would have until November 3 to mail or otherwise submit their ballots. The court's action today, however, *moves up* that absentee ballot receipt deadline, which has been in place since August 3, by one whole week. Any absentee voter who has not yet returned their ballot, and who is anxious about doing so in person because of COVID-19, especially given Minnesota's rising case numbers, runs the substantial risk of being disenfranchised.

The court's novel injunctive relief also harms Minnesota and the Secretary. Four days before Election Day, they are now required to figure out new procedures for sorting ballots that will comply with the court's order "to identify, segregate, and otherwise maintain and preserve all absentee ballots received after" election day. Ante at 17.

-24-

Finally, I'm not convinced the Electors have shown they would suffer any irreparable harm should this court deny injunctive relief. It cannot be ascertained at this point how many absentee voters will in fact mail their ballots on, or shortly before, Election Day, causing them to be received by local election authorities within the seven days following November 3. Nor can we know whether those votes, if counted, would make any difference to the Electors' position. Any claimed harm is thus insufficient to constitute irreparable injury to the Electors.

The Supreme Court has "repeatedly emphasized that lower federal courts should ordinarily not alter the election rules on the eve of an election." Republican Nat'l Comm. v. Democratic Nat'l Comm., 140 S. Ct. 1205, 1207 (2020) (per curiam). Nonetheless, this court has issued an order directing the Minnesota Secretary of State to take specific action with respect to its election process for an election that is already under way. I see nothing in the order that puts voters "on notice [of the change in the deadline for receiving ballots] while they still have at least some time to adjust their plans and cast their votes in an unquestionably lawful way."[8] Ante at 16. At this point, it is simply too late for any absentee voter who has not yet mailed their ballot to do so with confidence that it will arrive by Election Day. The court's injunctive relief has the effect of telling voters—who, until now, had been under the impression that they had until November 3 to mail their ballots—that they should have mailed their ballots yesterday (or, more accurately, several days ago). With the

---

[8]This court's specific injunctive relief, which was not requested by the Electors, also raises several questions. Is it possible for Minnesota election officials to separate out presidential votes from all other votes on the ballot? What will that undertaking entail? Should election officials tally votes for the presidential candidates on ballots received within seven days of Election Day, or await further instructions to do so? If all the votes will not be tallied, and this case has not reached final resolution, how can we determine which party's elector-nominees will participate in the Electoral College? Minnesota won't know, at least not until a court enters yet another order on the validity of Minnesota's election procedures.

court's injunction in place, fewer eligible Minnesotans will be able to exercise their fundamental right to vote.  That, in and of itself, should give us significant pause before granting injunctive relief.

I respectfully dissent.

_____

-26-